1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARNIE O'BRIEN, | . | Case No. 2:19-cv-06078-JMG |
| | . | |
| Plaintiff, | . | |
| | . | U.S. Courthouse |
| v. | . | 601 Market Street |
| | . | Philadelphia, PA 19106 |
| THE MIDDLE EAST FORUM | . | |
| et al., | . | |
| | . | |
| Defendants. | . | |
| | . | July 29, 2021 |
| . . . . . . . . . . . . . | . | 11:38 a.m. |

TRANSCRIPT OF INDIVIDUAL VOIR DIRE
BEFORE HONORABLE JOHN M. GALLAGHER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          ERICA A. SHIKUNOV, ESQ.
                            POND LEHOCKY STERN GIORDANO
                            2005 Market Street, 18th Floor
                            Philadelphia, PA 19103

For the Defendants:         MARGARET M. DIBIANCO
                            CLARK HILL PLC
                            Two Commerce Square
                            2001 Market Street, Suite 2620
                            Philadelphia, PA 19103

                            JONATHAN R. CAVALIER, ESQ.
                            COZEN O'CONNOR
                            1900 Market Street
                            Philadelphia, PA 19103

Audio Operator:             KENNY DUVAK

TRANSCRIBED BY:             NEAL R. GROSS

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

# **I N D E X**

**PAGE**

**VOIR DIRE**

JUROR 1 page 4
JUROR 2 page 11
JUROR 3 page 15
JUROR 4 page 20
JUROR 5 page 29
JUROR 6 page 43
JUROR 7 page 50
JUROR 8 page 58
JUROR 9 page 67
JUROR 10 page 73
JUROR 11 page 87
JUROR 12 page 92
JUROR 13 page 96
JUROR 14 page 105
JUROR 15 page 117
JUROR 16 page 128
JUROR 17 page 133
JUROR 18 page 149
JUROR 19 page 167
JUROR 20 page 173
JUROR 21 page 180
JUROR 22 page 196
JUROR 23 page 209
JUROR 24 page 217
JUROR 25 page 222
JUROR 26 page 228
JUROR 27 page 234
JUROR 28 page 246
JUROR 29 page 255
JUROR 30 PAGE 262

1          THE COURT:  All right, folks, we're all gathered

2    together now here in the jury room outside the ceremonial court

3    room and the intention is to bring in each of the jurors in

4    their order, starting with number one.  I have a handful of

5    follow-up questions that may be more narrative than the yes or

6    no fashion that we proceeded with in stage one.

7          I will -- I think I will ask each of them when they

8    come in, are they more comfortable if we have masks on or off

9    in here?  And whatever they say is -- no hard feelings.  Okay?

10    I just know it's trickier for all of us to operate with these

11   on, so yes.

12          (Simultaneous speaking.)

13          MS. SHIKUNOV:  That's a good way to put it, yes.

14          THE COURT:  Okay?  So -- also of course when I -- I

15   go through a -- and again, it's just three or four questions I

16   have.  I am going to allow you to ask the questions you want to

17   ask and maybe perhaps dig down into some of the answers.  And

18   some of them -- some of them have natural followers built in.

19   I can see that myself, okay?  All right, I -- I'll probably

20   emphasize to the jurors that -- you know, just as I did out

21   there -- that this is a very important service and when we're

22   talking about hardships -- you know, hardships aren't

23   inconveniences.  Hardships are, you're going to lose an

24   opportunity at something else very important to you that you

25   can't do.  All right?  All right, Ms. Stein.

1                    THE CLERK:  Number one?

2                    THE COURT:  Number one.

3                    THE CLERK:  All right.

4                    THE COURT:  I'm going to have a tough time

5    pronouncing the last name.

6                    PARTICIPANT:  (Unintelligible.)

7                    THE COURT:  That's right.  You should know.

8                    (Pause.)

9                    THE COURT:  After we release them one by one, shall

10   we be heard on cause challenges?

11                   PARTICIPANT:  That seems like it might be the most

12   efficient way to do it.

13                   THE COURT:  Since we're all here?  Hello, please come

14   in.  Please sit down.  No, come closer, come closer.

15                   (Laughter.)

16                   THE COURT:  Thank you very much.  School teacher?

17                   JUROR 1:  Former.

18                   THE COURT:  Former -- retired?

19                   JUROR 1:  Former -- just (unintelligible).

20                   THE COURT:  And -- okay.  And you're from Bucks

21   County?

22                   JUROR 1:  Yes.

23                   THE COURT:  Well welcome.  We're glad to have you

24   here.  Can I ask you a question -- and every -- every one's

25   position is personal and I'm fine with it.  Are you more or

1    less comfortable with people wearing masks in a situation like

2    this?  Would you prefer us to have them on or off?  The masks?

3              JUROR 1:  It's up to you, but I like

4    (unintelligible).

5              THE COURT:  Okay, and you're okay if we take it off?

6              JUROR 1:  Yes.

7              THE COURT:  Okay, thank you.  And -- we're okay

8    either way, okay?  So if you -- if you change your mind, please

9    tell us.  Okay.  Thank you.  Okay, so we're going to ask each

10   juror one by one certain questions.  It won't take very long,

11   okay?  Were you able to understand me when we were speaking in

12   the court room?

13             JUROR 1:  Yes.

14             THE COURT:  Okay, very good.  So I notice you're from

15   Bucks County.  This trial, starting tomorrow -- which will go

16   about five days, including today, will be in Allentown.  In the

17   Allentown Courthouse.  Okay?  Do you know where Allentown is?

18             (No audible response.)

19             THE COURT:  Is that -- the fact that it's in

20   Allentown, does that create a --

21             JUROR 1:  Is it far away from --

22             THE COURT:  From Bucks County?  Bucks County borders

23   Lehigh County where Allentown is.  But some of it is closer,

24   and some of it is farther away.  May I ask, do you drive?

25             JUROR 1:  I drive, but --

1          THE COURT:  Did you drive to Philadelphia today?

2          JUROR 1:  My husband drove me.

3          THE COURT:  Your husband drove, okay.  It is --

4    there's no train service to Allentown.  It is -- I would just

5    say, from personal experience, it is easier to drive in

6    Allentown than it is in Philadelphia.  I don't know if that's

7    any big deal because it's not easy to drive in Philadelphia, so

8    --

9          JUROR 1:  It's not a problem.

10         THE COURT:  Okay, so that's not a problem.  Okay, I

11   just wanted to make sure.  Okay.  And I -- I know you

12   appreciate, as I mentioned out there -- it is an inconvenience

13   to serve on a jury, but it's such an important duty and -- and

14   the parties in this case -- you know, we -- and myself, we

15   really need dedicated people who can put up with some

16   inconvenience and serve and do so fairly in the case.  Okay?

17         JUROR 1:  I understand.

18         THE COURT:  That's what matters here.  I mentioned

19   this trial will go five days.  That's our estimate.  It may be

20   a little shorter, it may be a little longer.  But that --

21   that's the best we can estimate.  Is there any disability that

22   you have that -- that you want to share with us that would make

23   it difficult for you to sit down and listen to testimony for a

24   number of hours each day?

25         JUROR 1:  I have migraines, but I can handle it.

```
 1            THE COURT:  You're comfortable?  You can handle it.
 2   I will tell you, while these are excellent lawyers and it will
 3   be busy trial days, we will also have breaks.  There will be
 4   morning break, there will be an afternoon break, there will be
 5   a lunch break.  So it will -- it will be broken up.  But there
 6   -- but there's going to be -- you know, there -- we're going to
 7   be working -- other than the breaks, we're going to be working
 8   straight through.  Okay?  I don't know -- I didn't take the
 9   list.  Did Juror Number One answer any of our earlier
10   questions?
11            PARTICIPANT:  Number 16.
12            THE COURT:  Number 16 -- so let me just take a look.
13   I don't remember what they were.  I had asked whether you, your
14   friends, or any members of your immediate family ever worked in
15   human resources or personnel administration?
16            JUROR 1:  There are two related, like, subjects
17   (phonetic).  When I lived in Russia, I worked in a psychology
18   (phonetic) lab and we help to select employees for leadership
19   positions, administered personnel assessments.
20            THE COURT:  So you had some personnel-type duties?
21            JUROR 1:  We gave advice -- we gave advice to -- for
22   the selection process.
23            THE COURT:  You heard very generally what this case
24   was about.  Would your experience in advising human resources
25   decisions at that old job -- is there anything about that that
```

1    would cause you to be unfair to either side in this case?

2              JUROR 1:  I don't think so.

3              THE COURT:  Okay.  All right.  And that -- and that -

4    - that's really what we're going to be asking when everyone

5    comes in here.  Is we -- it's very important factor we're

6    trying to determine here.  All right?  These -- these people to

7    your left and right, not only are they excellent lawyers, but

8    they're very nice people and they're going to have some

9    questions for you.  Okay, are you comfortable?

10             JUROR 1:  Yes, and I didn't respond to the second

11   question -- the second part of the issue.

12             THE COURT:  Forgive me -- please.

13             JUROR 1:  It's not an issue.  It's my Ph.D. in

14   industrial organizational psychology.

15             THE COURT:  Okay.

16             JUROR 1:  And again, it relates to personal

17   assessment, and (unintelligible) selection.  But I have no

18   experience in corporate America work (unintelligible).

19             THE COURT:  Understood.  Well that's very --

20             JUROR 1:  Only -- only education.

21             THE COURT:  -- that's very interesting and unique

22   experience, especially for Juror Number One in our case.

23             JUROR 1:  Yes.

24             THE COURT:  Okay.  I am certain that Counsel will

25   want to ask a couple of follow-up questions.  Okay?  Thank you

1  so much so far.

2            JUROR 1:  Thank you.

3            MS. SHIKUNOV:  I don't think we have any further

4  questions, Your Honor.

5            THE COURT:  I guessed wrong.

6            MR. CAVALIER:  Just briefly -- hello, my name is John

7  Cavalier.  When you were working in Russia and you had some

8  dealings in HR, as I think you said -- you had some HR

9  experience at -- were you ever involved in decisions about

10 hiring and firing people?

11           JUROR 1:  No, we just recommended -- just maybe -- we

12 just recommended the better candidate from our point of view.

13 But the employer did everything --

14           MR. CAVALIER:  Right, okay.

15           JUROR 1:  It's something like counsel (phonetic).

16           MR. CAVALIER:  Okay, and so you -- you weren't

17 directly responsible for the -- the decision to hire or fire?

18           JUROR 1:  No, no.

19           MR. CAVALIER:  How long were you in that role?

20           JUROR 1:  It's -- it's over.  I used to be.

21           MR. CAVALIER:  Right, but do you know -- do you

22 remember how long you spend doing that particular job?

23           JUROR 1:  Four years.

24           MR. CAVALIER:  Four years?  Okay.  Asking largely

25 because I'm curious, but your -- you said your Ph.D. is in

1   industrial psychology?

2              JUROR 1:   Industrial organizational psychology.

3              MR. CAVALIER:   Can you tell me what that is?

4              JUROR 1:   It's a discipline involved human behavior

5   in organizations.

6              MR. CAVALIER:   Okay.  And where did your Ph.D.?

7              JUROR 1:   Phoenix (phonetic) University.

8              MR. CAVALIER:   Okay.

9              JUROR 1:   Six years ago.

10             MS. SHIKUNOV:   Can I actually ask one follow-up on

11   that?

12             THE COURT:   You sure may.

13             MS. SHIKUNOV: You did your Ph.D. from Phoenix

14   University while you were in the States?

15             JUROR 1:   Yes.

16             THE COURT:   Okay.  Well thank you very much.  Ms.

17   Stein will bring you back out to the main courtroom and then

18   we'll -- going to move on to number -- juror number two.  Okay?

19             JUROR 1:   Okay, thank you.

20             THE COURT:   Thank you.  It's a pleasure to speak with

21   you.  Christine -- you can get Juror Number Two read, but just

22   poke your head in before you bring him in, okay?

23             THE CLERK:   Sure.

24             (Pause.)

25             THE COURT:   Counsel, do we expect a cause challenge

 1  on this?

 2          PARTICIPANT:  I can't imagine (unintelligible).

 3          THE COURT:  And you -- you're going to do your pre-

 4  emps, you know, when you have all your information.

 5          PARTICIPANT:  Yes.

 6          THE COURT:  Okay, all right -- all right, great.

 7  Interesting background, huh?

 8          PARTICIPANT:  That's what I would love to study if I

 9  was to (unintelligible) --

10          THE COURT:  All good, thank you.  Hello, how are you?

11          JUROR 2:  Good, how are you.

12          THE COURT:  Please, come in -- make yourself

13  comfortable.

14          PARTICIPANT:  Hello.

15          JUROR 2:  Hello.

16          THE COURT:  Thank you for being here today.  I want

17  to ask up front -- whatever your answer is, it's fine by us.

18  Are you -- would you -- are you uncomfortable if any of us have

19  our masks off in this -- you don't mind?

20          JUROR 2:  No.

21          THE COURT:  And I don't mind if you do.  It's up to

22  you, okay.  Thank you.  It's kind of a delicate question, you

23  know?  It's hard to know how to ask that best.

24          Because you might say, leave it on or I'm out of

25  here.  You know, so -- no, thank you very much.  I appreciate

```
 1    that courtesy.  So as you heard outside, we have a couple
 2    questions that I have that don't really lend themselves to yes
 3    or no.  So I wanted to have the opportunity to discuss in a
 4    more narrative fashion some of these questions.  Plus if you
 5    have any concerns you can -- you can share them with us and --
 6    I know we're all strangers to you, but it's a smaller group of
 7    strangers that you'd have to share any information with here.
 8    So -- sound fair?
 9               JUROR 2:  Yes.
10               THE COURT:  I want to start with -- I see you're --
11    you're from Lancaster?
12               JUROR 2:  Yes.
13               THE COURT: Okay.  Well we are doing this trial in
14    Allentown, Pennsylvania.
15               JUROR 2:  Okay.
16               THE COURT:  And not in Philadelphia.  Do you --
17    you're familiar with where Allentown is?
18               JUROR 2:  I haven't been there for a while.  I went
19    to Knoebels there.  Other than that --
20               THE COURT:  Knoebels -- well, Knoebels is actually
21    further away than Allentown.  That --
22               JUROR 2:  Dorney Park.
23               THE COURT:  Dorney Park -- you went to Dorney Park.
24               JUROR 2:  Dorney Park, yes.
25               THE COURT:  Yes, well we're right down the street.
```

1   So you can kill two birds with one stone if you're picked for

2   this panel.

3            Although it's very crowded these days, I'll tell you

4   that.  You came from Lancaster -- did you take mass transit or

5   drive here today?

6            JUROR 2:  I took the train myself.

7            THE COURT:  You took the train.  There's no train to

8   Allentown.  I don't mean to be personal.  Do you drive?

9            JUROR 2:  Yes.

10           THE COURT:  Okay.  Would it be a particular hardship

11  to have to go to Allentown for four days after today?  We

12  expect the trial is going to be five days including today.

13           JUROR 2:  Other than my nerves and stuff from driving

14  and stuff -- I have social anxiety.

15           THE COURT:  You do?  Okay.

16           JUROR 2:  Yes.

17           THE COURT:  Well, I wouldn't know.

18           JUROR 2:  And I do have plans to go away this coming

19  weekend -- Thursday and Friday.

20           THE COURT:  So a week from today and the following

21  Friday.  And that -- is that a family vacation?

22           JUROR 2:  Yes, we're taking my parents up to our

23  cabin.

24           THE COURT:  Okay, all right.  And if this case went

25  over to Thursday, that would be a problem?

```
 1              JUROR 2:  Yes.

 2              THE COURT:  Okay.  Any thoughts, Counsel?

 3              Okay.  All right, where -- we're not going to --

 4    we're not going to select you to sit on this panel because we

 5    wouldn't want to do anything to interfere with your family

 6    plans.  Okay?  Otherwise, you know, I've enjoyed meeting you

 7    and -- unfortunately, we're going to have to hold you as a

 8    prisoner with the rest of the jurors out there, but --

 9              JUROR 2:  Yes, (unintelligible) the beginning --

10              THE COURT:  Yes, right at the beginning, right.  But

11    really, that's -- that's the reason.  We really try to -- we

12    know that there's inconveniences that every juror has put up

13    with -- even coming here today.  But when you have something

14    important with your family and your -- and your folks, none of

15    us want to interfere with that.  We can't promise you that it

16    wouldn't go into Thursday.  Okay?  So thank you for your

17    willingness to serve, okay?

18              JUROR 2:  Thank you.

19              THE COURT:  And thank you for letting me get a break

20    from the mask for a moment.

21              JUROR 2:  Yes, it's no problem.

22              THE COURT:  Okay, whenever -- and whenever you're

23    ready on number three, Christine -- thank you.

24              (Pause.)

25              THE COURT:  See the job on this next one?
```

 1              PARTICIPANT:  Yes.

 2              THE COURT:  Hello.  Please come in.  Have a seat.  We

 3    saved the best seat in the house.

 4              JUROR 3:  Thank you.  No pressure, right?

 5              THE COURT:  No pressure.  I -- if I can ask at the

 6    outset, and it -- I'll be honest with you, it's an awkward

 7    question to ask, would you be uncomfortable if any of us took

 8    our masks off?

 9              JUROR 3:  Absolutely not.

10              THE COURT:  All right, and we wouldn't be if you --

11    however you're most comfortable.

12              JUROR 3:  Okay.  Thank you -- no, not at all.

13              THE COURT:  And there's no wrong answer to that.

14              JUROR 3:  Okay.

15              THE COURT:  Yes, so as I mentioned outside just very

16    briefly, we -- you know, we -- you heard what the case is about

17    very, very generally.  And -- and both sides want and deserve

18    and are entitled to a fair jury.  And that -- and that's --

19    that's all we're trying to pick here is somebody here who, you

20    know, is not putting the thumb on the scale for either side.

21    Who is going to hear the evidence -- not decide the case on

22    anything other than what comes into evidence and the law as I

23    explain it.  So the types of questions we ask, we -- we don't

24    mean to pry or anything like that.  But it's -- it's important

25    for Counsel to get a good idea for who exactly is sitting on

1    the panel.  And we're just very fortunate in this case.  We

2    have very experienced and talented lawyers.  But they're also

3    really nice people too.  So you know, we're -- we're in a good

4    place.

5               I can't -- I couldn't say that in every case.

6               JUROR 3:  Okay.

7               THE COURT:  They're saying -- you know what they're

8    thinking?  They're saying, I bet you say that to all the

9    lawyers.  But -- but I mean it this time, so -- so I have just

10   a couple follow-up questions and then I -- I'll open it up to

11   Counsel, and then also if you had anything you wanted to share

12   with us.

13              JUROR 3:  Okay.

14              THE COURT:  This is a little more private.  We're all

15   strangers in here, but there's more strangers out there, so if

16   you needed to share something that was, you know, sensitive,

17   this is the place.  Okay?

18              JUROR 3:  Okay.

19              THE COURT:  So this trial -- and I snuck a peak.

20   You're in Berks County?

21              JUROR 3:  I'm in Berks County, yes.

22              THE COURT:  This trial will be in Allentown.

23              JUROR 3:  That's actually better for me, so --

24              THE COURT:  That -- and that's -- that's what I was

25   hoping to hear.  That's -- what I -- I saw when you were from

1    Berks, you're sort of in the neighborhood.  So the -- the --
2    the plan is we -- we think this trial will be a total of five
3    days including today.  We can't swear to that.  It could be a
4    little shorter, it could be a little longer.  All of us -- all
5    of us have -- you know, we've all been involved as -- as -- as
6    lawyers in trials.  And I think what we've learned about
7    predicting is don't predict.  But I think we -- we're pretty
8    solid on about that range.  So four days after today, in
9    Allentown, in downtown Allentown.
10            JUROR 3:  My only concern is I am supposed to go on
11   vacation next Thursday.
12            THE COURT:  Next Thursday, okay, okay.  That's two in
13   a row.  You're not going -- you're not going with Juror Number
14   Two on Thursday, right?
15            JUROR 3:  No, no -- sorry.
16            THE COURT:  No, no.  I'm sorry too.  But we don't
17   want to -- Counsel, I suggest we don't want to risk it.
18            MS. SHIKUNOV:  I agree, I agree.
19            THE COURT:  Yes.  Just because we -- are you going
20   anywhere good?
21            JUROR 3:  Rhode Island to visit my son.
22            THE COURT:  Okay.  No, that -- well that's important.
23    That's important.  Is he in school?
24            JUROR 3:  No, no.  He just -- he moved up -- well, he
25   did the school, moved, and left.

 1              THE COURT:  And settled there.

 2              JUROR 3:  Yes.

 3              THE COURT:  Yes, all right -- well, look.  It's -- if

 4     nothing else, it's a pleasure to meet you.

 5              JUROR 3:  Same here.  And I'm sorry because I -- I

 6     would have liked to do this.  I do work in HR, so this is

 7     interesting to me and I've seen -- I -- both sides, you know.

 8     I hear both sides.

 9              THE COURT:  I think you would have been a real good

10     prospect, but -- Rhode Island, so --

11              JUROR 3:  Rhode Island.

12              THE COURT:  I hear you.  Unfortunately, you'll have

13     to remain outside in the courtroom until we finish, and that

14     might be a little while.

15              JUROR 3:  Okay.

16              THE COURT:  But -- none of us want to take the chance

17     of interfering with the vacation.

18              JUROR 3:  Well, thank you.  I appreciate that.

19              THE COURT:  And thank you so much.

20              JUROR 3:  All right.

21              THE COURT:  I'm glad we got to meet.

22              JUROR 3:  Same here.  And everybody have a good day.

23              (Simultaneous speaking.)

24              PARTICIPANT:  Have a good trip.

25              THE COURT:  Safe travels back to Berks.

```
 1                JUROR 3:  Thank you.

 2                (Pause.)

 3                THE COURT:  Yes, this is vacation season.  It really

 4     is.  Last month and this month.

 5                (Pause.)

 6                THE COURT:  Lancaster -- no, no.  Hello, please come

 7     in.  Come here, we saved a chair for you.

 8                Thank you so much for being here today.  I want to

 9     ask you a question.  There's no wrong answer to it.  Are you --

10     would you be uncomfortable if anyone in here removed their

11     mask?

12                JUROR 4:  No.

13                THE COURT:  Okay.  Besides -- it just makes it easier

14     to speak.  And you're welcome to as well.  But again, there

15     would be no wrong answer.  But we are grateful for that answer.

16                There's no wrong answer, but one is a little righter

17     than the other.

18                No, seriously, I -- we're grateful for you being here

19     and -- and we're going to follow-up on some of the yes-no

20     questions we had in there.  And then if you had any concerns

21     you wanted to share with us.  It's a little -- a little more

22     private in here than speaking out in --

23                JUROR 4:

24                THE COURT:  -- and sometimes people want to be able

25     to share things without being in the even bigger group.  So --
```

1    I did -- I did note that you're from Lancaster.

2              JUROR 4:  Yes.

3              THE COURT:  Did you take the train down?

4              JUROR 4:  Yes.

5              THE COURT:  You did, okay.  This trial will -- we're

6    -- our estimate is that it would be five days, including today.

7     The trial will be held in Allentown, at the Federal

8    Courthouse.  Not in Philadelphia.  I don't know if you drive.

9    There's not a train.

10             JUROR 4:  No, no -- there's not a train.

11             THE COURT:  Yes.  Are you familiar with Allentown?

12             JUROR 4:  No, not at all.

13             THE COURT:  It's -- it's -- look, I'll be candid.

14   It's a little bit of a drive.

15             JUROR 4:  Yes.

16             THE COURT:  It's doable.  I -- you know, that's where

17   I went and got my vaccines.

18             JUROR 4:  Yes, yes.

19             THE COURT:  You know, I drove up there a couple

20   times.  That mall -- that old Bonton (phonetic) I think it was.

21    That's where they were giving out the vaccines.  So, as I

22   mentioned in there, we asked people if they have a hardship.

23   But I do -- I ask them to consider a hardship as -- as a higher

24   level than an inconvenience.  It -- it -- there's no doubt all

25   jury service is an inconvenience, but it's -- I just urge

```
 1   everybody that this is just so important.  It's so important --
 2   to me, to the court system, to the counsel, to the parties
 3   here.  And so is there anything about four days after today in
 4   Allentown that's a hardship?
 5           JUROR 4:  I mean, driving there.  I'm a little
 6   apprehensive about driving alone there.
 7           THE COURT:  Okay.
 8           JUROR 4:  And other than that -- I mean, no.  My
 9   husband is a park superintendent and he's nonprofit.  And they
10   are down in employees, so I have been volunteering there.  And
11   there's only he and another employee and myself.  So it
12   wouldn't be a hardship, it would just be -- probably more of an
13   inconvenience.
14           THE COURT:  A high-level inconvenience.
15           JUROR 4:  Yes.
16           THE COURT:  I understand.  How -- how many miles did
17   you -- you're in Lancaster -- can I ask what township?  I'm
18   trying to gauge --
19           JUROR 4:  Mannheim Township.  It was like 70 -- I --
20   I googled it from the train station.  It was like 78 miles from
21   there.
22           THE COURT:  To Philadelphia?
23           JUROR 4:  To Philadelphia.
24           THE COURT:  How much do you think to Allentown?
25           PARTICIPANT:  Fifty-six.
```

 1              THE COURT:  (Unintelligible.)

 2              PARTICIPANT:  I was going to say, I used to live out

 3  there and --

 4              (Simultaneous speaking.)

 5              THE COURT:  And you -- and yes --

 6              PARTICIPANT:  -- and I have (unintelligible) out in

 7  Allentown -- right outside Allentown, it's about an hour --

 8  hour and a half drive.

 9              THE COURT:  So it's -- it's about an hour, hour and a

10  half --

11              JUROR 4:  Even in -- even in, like, morning traffic?

12              PARTICIPANT:  Morning traffic, it might be a little

13  bit worse.  But you don't usually get as much of it when you're

14  that far out.  It's (unintelligible) as bad.

15              THE COURT:  The -- one thing I'll mention -- and

16  again, I -- I -- we haven't said this yet, but you know to the

17  extent that you're able to overcome inconveniences like this, I

18  think it's so important.  The -- if you are 50 miles or further

19  from your home to Allentown -- is that right, Christine?

20              It's an option -- the -- the clerk of court will

21  provide a hotel room for you.  And downtown Allentown has seen

22  a Renaissance lately.  There's -- you know, it's actually quite

23  nice.  We're very proud of it.  I married into the area, but

24  I'm -- I'm super proud of Allentown and the Lehigh Valley.  So

25  -- I'm sure Counsel will follow up on that, but I just -- you

1   know, I just wanted us to have a chance to talk with that --

2   about that.  Are there any special disabilities or anything

3   that -- you know, if you're on jury duty you have to sit for

4   hours each day.  We'll take a break in the morning.  We'll take

5   a break in the afternoon.  There will be a lunch.  But you

6   know, it's also work.  You have to pay attention and -- and --

7   and -- you know, and hear both sides completely and fairly.  Is

8   there -- is there anything -- do you have any disability or any

9   concern that you wouldn't be able to do that?

10          JUROR 4:  No -- I mean, other than having a tough

11   time sitting still.

12          THE COURT:  Yes, you and me both.

13          PARTICIPANT:  You and everybody -- everyone in this

14   room.

15          JUROR 4:  Everybody.

16          PARTICIPANT:  You said that and I was shaking my leg

17   under the table.

18          THE COURT:  Well we will -- we will have breaks.

19          JUROR 4:  Yes.

20          THE COURT:  And -- okay, all right.  Well I'm going -

21   - I'm going to turn it over to Counsel to ask you some

22   questions.  Again, I'm grateful for your willingness.  I'm

23   grateful that you're here today.  I mean, I know you're -- even

24   by train, this is a long way to go.  You heard me mention we --

25   we covered the Federal District in nine counties.  So I think

1   probably one end from Lancaster to the other end of -- out by

2   Easton is -- you know that's a long ways to go.  You know,

3   there -- it's a big county, so -- all right?

4            MS. SHIKUNOV:  I just have a brief follow-up on the

5   information that we were provided.  They don't have an

6   occupation or employer listed for you.  Are you employed?

7            JUROR 4:  No.  I was a -- I'm a retired teacher.

8            MS. SHIKUNOV:  A retired teacher.  And which school

9   district did you teach in?

10           JUROR 4:  Warwick School District in Lititz,

11  Pennsylvania.

12           MS. SHIKUNOV:  (Unintelligible).

13           JUROR 4:  I taught there for 34 years.

14           PARTICIPANT:  What subject?

15           JUROR 4:  First grade.

16           (Pause.)

17           THE COURT:  That sounds like it could be hard work,

18  but also very rewarding at that age.

19           MS. SHIKUNOV:  I don't think I have any follow-up

20  questions for you.

21           THE COURT:  Okay, thank you.

22           MR. CAVALIER:  What subject?

23           JUROR 4:  Everything.  First grade.  First grade.

24  Everything.

25           THE COURT:  So, everything from recess --

1            JUROR 4:  Including, half the time, cheese.  Yes.

2            MR. CAVALIER:  I got you.  That's all I had.  Yeah.

3            THE COURT:  Okay.  All right, well -- yeah, please.

4            JUROR 4:  There's something that you asked if I'd

5     ever been a witness.

6            THE COURT:  Okay.

7            JUROR 4:  Well, I was a victim of a crime and I

8     didn't have to be a witness.

9            THE COURT:  It didn't go to court.

10           JUROR 4:  It didn't go to court.

11           THE COURT:  But someone was charged and it was

12    resolved without you going to court.

13           JUROR 4:  Yes.  Yes.  Yes.  But I didn't know if that

14    was important.  Because I was summoned.

15           THE COURT:  It's better that we know than we don't

16    know.  And if I may ask, is there anything about that that

17    would cause you to be unfair to either party?

18           JUROR 4:  I don't think so.

19           THE COURT:  Okay.  Okay.

20           JUROR 4:  I mean, somebody stole my purse and they

21    ended up trapping me in the car and I drove on the side of the

22    car and fell out (unintelligible).

23           THE COURT:  Oh, my.  That's tough.  When was that?

24    That's awful.

25           JUROR 4:  Ten years ago.

```
 1                THE COURT:  Oh, my Lord.  Were you hurt?

 2                JUROR 4:  Mm-hmm.  Yeah.

 3                THE COURT:  I'm sorry to hear that.

 4                JUROR 4:  Concussion.  I still have days when it

 5     hurts.

 6                THE COURT:  Oh.

 7                JUROR 4:  So, yeah.

 8                THE COURT:  That's awful.  That's awful.  Well, I'm

 9     glad you did share that with us.  But I'm terribly sorry you

10     had to go through it.

11                JUROR 4:  Yeah.  So, this brings up a little anxiety

12     when I start thinking about --

13                THE COURT:  Courtrooms and --

14                JUROR 4:  Courtrooms and such.  So, yeah.  But it's

15     okay.

16                THE COURT:  Okay.  Well, thank you.

17                JUROR 4:  Thank you.

18                THE COURT:  I am very grateful you shared that with

19     us.

20                JUROR 4:  Yeah.

21                THE COURT:  Okay?

22                JUROR 4:  Thank you.

23                THE COURT:  Ms. Stein, unfortunately we have to keep

24     you out here for a little while --

25                JUROR 4:  Yes.  Yes, yes.  Oh, sure.
```

  1            THE COURT:  -- and thank you for the reprieve from

  2     the mask.

  3            JUROR 4:  Yes.

  4            THE COURT:  Anything?

  5            MR. CAVALIER:  We're going to challenge for cause.

  6            THE COURT:  For cause?

  7            MR. CAVALIER:  Yes.

  8            THE COURT:  They're challenging for cause.

  9            PARTICIPANT:  Ready?

 10            THE COURT:  Just one moment, please.  Just one

 11     moment.

 12            MS. SHIKUNOV:  We don't have a cause strike, but we

 13     don't -- if they feel strongly about it, we're not going to

 14     oppose it.

 15            THE COURT:  Okay, I'll hear you if you want, but I'm

 16     not going to strike her for cause.

 17            MS. SHIKUNOV:  Okay.

 18            THE COURT:  She said she could be fair.  I do agree,

 19     I suspect you're concerned about the level of inconvenience of

 20     her having to get --

 21            MR. CAVALIER:  Actually, no, Your Honor.

 22            THE COURT:  No?

 23            MR. CAVALIER:  I'm concerned about the fact that

 24     there are sexual assault allegations I this case and she's a

 25     crime victim.  It clearly weighs on her.  She brought it up

  1   voluntarily.  We didn't even ask her.  She said it still hurts

  2   today.

  3         And when she hears some testimony from Plaintiff and

  4   from some of the other witnesses who allege criminal activity,

  5   I think it's going to be very difficult for her to remain

  6   impartial.

  7         THE COURT:  Okay, I understand that.  She also -- she

  8   said it was ten years ago today, and I think she brought it up

  9   as a matter of candor.  And it just brought to mind being in a

 10   court system.  But I think she answered the important question,

 11   that she believes she can be fair in this case.  So, I'm not

 12   going to strike her for cause.

 13         MR. CAVALIER:  Understood.

 14         MS. SHIKUNOV:  Okay.

 15         THE COURT:  Okay?

 16         MR. CAVALIER:  And I also understand we're dealing

 17   very limited calendars.

 18         THE COURT:  Ms. Stein?  We're up to number 5.  All

 19   right?  Will you be able to hear all this, Kenny?

 20         PARTICIPANT:  Yes, sir.  (Unintelligible.)

 21         THE COURT:  All right.

 22         JUROR 5:  Good afternoon.

 23         THE COURT:  We saved you a seat.

 24         JUROR 5:  Thank you.  I appreciate it.  It's not

 25   warm, is it?

```
 1              THE COURT:  Probably.  It's the hot seat.  It's the
 2    hot seat.  Turn on the bright lights, Christine.
 3              (Unintelligible) if I can ask you -- there's no wrong
 4    answer to this --
 5              JUROR 5:  Sure.
 6              THE COURT:  Would you be uncomfortable if any of us
 7    took our masks off in here?
 8              (Simultaneous speaking.)
 9              JUROR 5:  Can I take mine off?
10              THE COURT:  Absolutely.  We said no.
11              (Laughter.)
12              THE COURT:  Hey, thanks for being here.  You're
13    coming in from Berks.
14              JUROR 5:  Mm-hmm.  Or Montgomery.  Northern
15    Montgomery.
16              THE COURT:  Like, what area?
17              JUROR 5:  Just south of Pottstown.
18              THE COURT:  Okay.
19              JUROR 5:  (Unintelligible).
20              THE COURT:  Sure.
21              JUROR 5:  I live beside the line.
22              THE COURT:  Okay, I know exactly where you are.
23              JUROR 5:  Yeah.
24              THE COURT:  This case, we expect it's going to be
25    five days, including today.  It's going to be in Allentown
```

1  after today.  Are you familiar at all with Allentown?

2            JUROR 5:  Yeah.  Been there a few times.  Not to the

3  courthouse.

4            THE COURT:  Not to the courthouse.  Actually, you

5  make a good point.  When we do have a jury, we'll have to

6  specify which courthouse they go to, because there are several

7  of them downtown together.

8            And oftentimes we have people, like where are these

9  parties?  How come they didn't show up?  And they're at the

10  state courthouse or the old courthouse.

11            JUROR 5:  I was surprised there was much different

12  locations (unintelligible).

13            THE COURT:  Well, as I mentioned, out there the

14  federal court - we're all probably more familiar with county

15  court.  Each county has their seat, right?

16            JUROR 5:  Yeah.  Mm-hmm.

17            THE COURT:  And here, Berks would be Reading,

18  obviously.  Or Allentown, where Lehigh.  But we have nine

19  counties that we cover.  And that's why I've been prefacing

20  what we say in here with, as I said outside, I know jury duty

21  is an inconvenience.  There's no doubt about it.

22            Because people have lives and families and work, and

23  all of that.  But we're really trying to find if the next four

24  days in Allentown are a hardship.  Like, really, the type that

25  would be distracting to you, where you couldn't be fair in the

1  case.  Along those lines.

2            So, I'm going to ask you just generally.  We'll start

3  with, would going to Allentown for the next four days be that

4  type of hardship?

5            JUROR 5:  There's only two concerns I have out of my

6  travel distance.

7            THE COURT:  Sure.

8            JUROR 5:  The first is just work, obviously.  I have

9  to take paid time off to be here.

10           THE COURT:  Right.

11           JUROR 5:  Once I run out of paid time off, I have to

12 do it unpaid.  And the second one is my wife is eight months

13 pregnant.  So, me being away and kind of -- I'm not real far.

14 Allentown over in here is probably an hour.  That isn't too

15 far.  That's my only two concerns.  She's due in September.

16 First week of September.

17           THE COURT:  First child?

18           JUROR 5:  Third.

19           THE COURT:  Third.  Well, congratulations.

20           MS. SHIKUNOV:  Congratulations.

21           JUROR 5:  Thanks.  This is --

22           (Simultaneous speaking.)

23           JUROR 5:  The house is full, the cars are full.

24 Can't fit any more.

25           THE COURT:  After two you were still going to do

1   more, huh?

2           JUROR 5:  Yeah.  I had one extra bedroom, so I had to

3   fill it.

4           THE COURT:  Got to fill it.  Got to fill it.

5           JUROR 5:  Those are my only two concerns.  They're

6   minor.  My wife, she's always gone late.  Usually goes after

7   nine months, but just being a little bit more disconnected,

8   that's the only major one.  The work one I'll handle.

9           THE COURT:  Well, if you were on the panel, we could

10  make arrangements that if she needed to contact you, that she

11  could call our deputies, Christine or Brian, who would

12  immediately get our attention.

13          JUROR 5:  Okay.

14          THE COURT:  But I think it's important to share with

15  us.  I think it's important to share with us.  So, your work

16  doesn't pay you after a certain amount of time?

17          JUROR 5:  I have to use my paid time off and I didn't

18  really check that before I left here how much I have left.  I

19  was saving it for when the baby was born.

20          THE COURT:  Yeah.

21          JUROR 5:  And I was just going to burn it all.

22          THE COURT:  And did you ask your job about whether

23  they would pay for your jury duty?  I know a lot of companies -

24  -

25          JUROR 5:  I did not.  I checked the employee

1   handbook, like actually this morning.  And I just saw my

2   message.  My boss said, I didn't take the day off.  I said,

3   hey, I was supposed to take today off.

4           So, I apologized I (unintelligible).  I told him I

5   had jury duty.  So, he knew it but he didn't advise me I needed

6   to take the time off.  So, that was my only concern.  If it's a

7   problem, I'll take FMLA when the baby's born.  That's fine.

8           THE COURT:  Okay.

9           JUROR 5:  Those are just the two concerns that I

10  have.

11          THE COURT:  Well, look.  We ask a lot of our jurors.

12   That's asking a lot.  And you'd be willing to do that?

13          JUROR 5:  Yeah.

14          THE COURT:  All right.

15          JUROR 5:  I think this is interesting.  Thankfully,

16  I've never been in the court system.  But I think it's

17  interesting to partake in it.  It's a bit of a hassle, but, I

18  mean, interesting.  I could do it once, and then if you could

19  take me off the list.

20          THE COURT:  No problem.  No, look, it is super-

21  interesting.  And it's super-important.  I mean, each side and

22  their lawyers deserve a fair jury who's only going to decide

23  that case, who is going to be interested in their case and hear

24  both sides, and not decide it based on anything but what they

25  hear in that courtroom, or the law as I explain it.  And that's

1   it.

2            I mean, that's paramount.  In fact, that's non-

3   negotiable.  We don't just ask -- we ask, but we really demand

4   that from our jurors.  You good with that?

5            JUROR 5:  Yeah.

6            THE COURT:  Okay.

7            JUROR 5:  Yeah, I'm good.

8            THE COURT:  All right.  I ask all the jurors this

9   question.  The answer seems obvious from us just conversing

10  like this, but do you have any disabilities that would make it

11  difficult for you to hear, to comprehend?  We're in the

12  courtroom for a good number of hours a day.  There's a break in

13  the morning, a break in the afternoon, and a lunch.  Jurors

14  need a bathroom break.

15           JUROR 5:  (Unintelligible) lunch today.

16           THE COURT:  Are we past lunch already?

17           JUROR 5:  The only disability I would bring up is I

18  was in the Army for two years.  My hearing is not the greatest.

19   I can understand everybody.  I do better when I can see your

20  lips.

21           THE COURT:  Right.

22           JUROR 5:  I'm not disabled in any -- the VA looked in

23  my ears and said they were fine.  But it helps me better when I

24  can see people's lips.  I know you have these.  I saw these.

25           THE COURT:  Yeah, yeah.

```
 1              MS. DIBIANCA:  In the Allentown courthouse, no masks.
 2              THE COURT:  It's not required.  We'll hear how the
 3     jury feels about it.  Actually, I thought Philadelphia didn't
 4     require this.  I was surprised when we got here today.  But I
 5     had one in my car.
 6              JUROR 5:  Same.
 7              (Simultaneous speaking.)
 8              THE COURT:  All right, well, counsel on this case are
 9     all not just excellent and experienced lawyers, they're also
10     good people.
11              They'll have some follow-up questions now.
12              JUROR 5:  Okay.
13              THE COURT:  And then, we'll take it from there.
14              MS. SHIKUNOV:  The engineering position that you have
15     right now, is that a Union position?
16              JUROR 5:  No.
17              MS. SHIKUNOV:  Okay.  That was the only follow-up
18     question I had for this witness.
19              MR. CAVALIER:  I have no follow-up.
20              THE COURT:  All right.  Well, the good news is,
21     you're done with us in here.  The bad news is, you're not done
22     with us out there yet.
23              JUROR 5: (Unintelligible).
24              THE COURT:  All right?  But hey, either way it's been
25     good to meet you.  And I am very grateful for your willingness
```

1    to serve.  Again, I know I speak for counsel.  It is the most

2    important of what we do, is pick good jurors.

3              JUROR 5:  Okay.

4              THE COURT:  So, thank you.

5              JUROR 5:  Appreciate it.

6              THE COURT:  Good?  No cause?

7              MS. SHIKUNOV:  No.

8              MR. CAVALIER:  No.

9              THE COURT:  No cause.  Okay.

10             MS. SHIKUNOV:  I feel bad for him.

11             MS. DIBIANCA:  I know.  I can sympathize with him,

12    but I don't think that it's great.

13             THE COURT:  Yeah, I was going to -- it's cry me a

14    river.  She's seven months pregnant.

15             MS. DIBIANCA:  She's (unintelligible) she's a pro.

16             MS. SHIKUNOV:  Yeah.

17             THE COURT:  Welcome.  Please come in.  We saved you

18    the best seat in the house.  I hope you feel that way.  I'm

19    sure the better seat is at your house, but in this house,

20    that's the best seat.  No wrong answer to this question.

21             JUROR 5:  Okay.

22             THE COURT:  Would you be less comfortable if any of

23    us took our masks off?

24             JUROR 5:  I'm good with that.

25             THE COURT:  You don't mind if I do.

1          JUROR 5:  I don't mind.

2          THE COURT:  And I don't mind if you do.  It's your

3     call.  It's an awkward question to ask people.

4          JUROR 5:  Thank you.

5          THE COURT:  It's like, we might get more jurors if we

6     let them take their masks off so they can breathe.  No, we're

7     very grateful for you being here.  And we just want to just --

8     there were some questions that we want to ask that are more

9     narrative, don't lend themselves to yes or no.

10          So, we like to do them in a little more private

11     surrounding, so if people to have things that they want to

12     share that they were uncomfortable sharing --

13          JUROR 5:  I understand.

14          THE COURT:  And I know we're still strangers in here.

15      I know there's strangers out there, but there's less strangers

16     in here.  Your county is Lancaster.

17          JUROR 5:  Correct.

18          THE COURT:  Okay.  The first thing I want to talk

19     about is, you heard me mention -- I try to make the point that

20     there's a difference between true hardships and inconvenience.

21      We have 30 jurors here.  There's no doubt there's 30

22     inconvenienced people here.

23          JUROR 5:  Mm-hmm.

24          THE COURT:  But because of how important it is, in

25     this case but in general, but we get good jurors, we have to

1   inconvenience people.

2          Now, sometimes, because of things people have going

3   on in life, it is that next level.  It is a true hardship.

4          We want you to share that with us, and you'll have an

5   opportunity to speak about that generally or specifically.  But

6   the first thing that I want to tell you is, you're in

7   Lancaster?

8          JUROR 5:  Yep.

9          THE COURT:  Today we're in Philadelphia.  This trial

10  will go five days after today, so the next four days, and

11  that's our estimate, will be in Allentown courthouse.  It's in

12  downtown Allentown on Hamilton Street.  Do you ever get to

13  Allentown?

14         JUROR 5:  It's about the same distance to here.

15         THE COURT:  Well, you probably say that about

16  Allentown, but I always say about Lancaster, you can't get

17  there from here.  Well, you probably say the same about us.

18  So, I don't know if you drove or took the train here.

19         JUROR 5:  I drove.

20         THE COURT:  You drove.

21         JUROR 5:  I spent the night last night.

22         THE COURT:  And I'll just put out there, and I don't

23  even know if it'll matter, but the court system will pay for a

24  hotel if you live more than 50 miles away from the courthouse.

25         So, that applies up in Allentown.  By the way, if you

1   haven't been there for a while, Allentown is going through a

2   renaissance the last five years.  The downtown area --

3              JUROR 5:  You're selling Allentown.

4              THE COURT:  I am.  All the time.  Special bumper

5   sticker, man.  I married into the place, but I've been there

6   20 years.  And I really am a cheerleader.  There's no doubt

7   about it.

8              But my law clerk, Mike, he's a cheerleader for

9   Lancaster.  So, we've got them both covered.

10             So, anyway, just from that limited information, and

11  it's really just limited to when and where.  Would that be a

12  hardship?

13             JUROR 5:  Well, like I said, it's about the same

14  distance to here.

15             THE COURT:  Right.

16             JUROR 5:  Allentown's a tough slog from a road

17  standpoint.

18             THE COURT:  It is.

19             JUROR 5:  Like, what time do those trials start?

20  That kind of thing.

21             THE COURT:  Our plan would be a 9:00 to 5:00.  We

22  would do a break in the morning, lunch, and then a break.  But

23  it's going to be a busy day, with very good lawyers putting on

24  a good amount of evidence.

25             JUROR 5:  Okay.  I'm a vice president of sales for my

1    company.  I travel nationally, sometimes international.  That's

2    two business trips for me as well.

3               THE COURT:  Oh, you have two planned.

4               JUROR 5:  Yes.  Florida Sunday night to Tuesday, and

5    California Thursday to Thursday.

6               THE COURT:  Well, look, you tell me.  I know it's a

7    big ask, but we'll be guided to a significant extent by what

8    you tell us.  Is that like a super-duper inconvenience or a

9    hardship?

10              JUROR 5:  It's probably in between, if I'm being

11   honest.

12              THE COURT:  Mm-hmm.

13              JUROR 5:  Just coming out of COVID, we've been locked

14   down forever.  I've been on the west coast basically every week

15   for the last two months just trying to see customers that we

16   haven't been able to see.

17              THE COURT:  Understood.

18              JUROR 5:  And that's primarily why I'm going there.

19   I have been called twice in the past four years as well.  I

20   deferred one time due to a family vacation.

21              THE COURT:  Right.  And by the way --

22              JUROR 5:  And as an honest answer.

23              THE COURT:  And that's a hardship.  We all agree with

24   that.

25              JUROR 5:  And the second time, I was not paid.  Just

1   told me I didn't have to show up.

2             THE COURT:  Was that local in the county?

3             JUROR 5:  No, it was this again.

4             THE COURT:  It's down here.

5             JUROR 5:  Yes.

6             THE COURT:  Okay.

7             JUROR 5:  Yes.

8             THE COURT:  All right.

9             JUROR 5:  So, I figured this time I might as well get

10  it over with and do my duty.

11            THE COURT:  What do you think, folks?  Do you have

12  questions?  Or what's the thought?

13            MS. SHIKUNOV:  Like, just regular questions?  Or are

14  you saying what's the thought with regard to the business

15  trips?

16            THE COURT:  I'll ask this way.

17            MS. SHIKUNOV:  Okay.

18            THE COURT:  Would you have a need for follow-up

19  questions?

20            MS. SHIKUNOV:  Just based on his answers to where he

21  raised his hands, I think probably both sides would have some

22  follow-up questions, unless --

23            THE COURT:  Should we proceed?  I'll put it that way.

24   Should we proceed with questioning of this gentleman?  Okay,

25  then we will.

1          MS. SHIKUNOV:  So, my first question for you,

2   Mr. Coisack, you mentioned that you participated in a lawsuit

3   previously.  Could you give us a little bit more information

4   about that?

5          JUROR 6:  Our company gets sued every day.  And in my

6   position, I'm involved in some of those.

7          MS. SHIKUNOV:  What types of lawsuits?

8          JUROR 6:  Usually product liability.  Could be

9   business-oriented things, where accusing us of wrongdoing in a

10  business relationship.  Those types of things.  And I'm drawn

11  into those from time to time.  But nothing personal.  All

12  business-related.

13         MS. SHIKUNOV:  Okay.  With regard to the business-

14  related lawsuits, have any of them been employment-related

15  lawsuits?

16         JUROR 6:  No, not yet.  No.

17         MS. SHIKUNOV:  Okay.  Not yet is a little cryptic.

18  Are you expecting one?  Or are you just --

19         JUROR 6:  Not imminently.  But there's a lot of

20  people that work for me.  So, I would imagine that at some

21  point that will happen.  I guess I shouldn't have said that.

22         MS. SHIKUNOV:  Okay.

23         JUROR 6:  I'm trying to do everything right, so that

24  never happened.

25         MS. SHIKUNOV:  Right.  Right.  And I guess that half

1    answers my follow-up question that I asked, that you also

2    raised your hand with having terminated an employee.  Was there

3    any litigation, or anything that followed that?

4            JUROR 6:  No.  No.

5            MS. SHIKUNOV:  Okay.

6            JUROR 6:  I've terminated numerous people and there

7    hasn't been anything.

8            MS. SHIKUNOV:  You also raised your hand indicating

9    that you or somebody that you know has been a victim of sexual

10   harassment.  And I'm not going to ask you to get into the

11   sordid details of that, but can you clarify if that was

12   yourself or somebody else?

13           JUROR 6:  It's not myself.  My wife left a job

14   because she was started to get uncomfortable with some things

15   prior to us meeting.  So, I have knowledge of that, and I do

16   know other women in my life who have been through things as

17   well.  Friends, mostly.  And acquaintances.

18           MS. SHIKUNOV:  Those were my questions.

19           MS. KEESLER:  I just had a follow-up on those.  Good

20   morning and nice meeting you.  Those that you know who

21   indicated that they had been sexually harassed, did any of them

22   file suits?

23           JUROR 6:  No, they did not.

24           MS. KESSLER:  Okay.  Do you know why they did not?

25           JUROR 6:  I think they just decided to move on from

1  the situation, instead of going through that.

2          MS. KESSLER:  Okay.

3          THE COURT:  Okay, let me ask this.  And don't read

4  anything into this.  If you were selected for this jury, are

5  these business trips things that you'd be able to reschedule?

6          JUROR 6:  Yeah, I obviously would have to cancel

7  them.

8          THE COURT:  Right.  Right.  Right.  Counsel,

9  anything?

10         MR. CAVALIER:  No questions.

11         THE COURT:  Okay.  All right, the good news is,

12 you're free to leave this room.  But the bad news is, we're

13 going to keep you next door for a little bit.

14         JUROR 6:  Right.

15         THE COURT:  All right?

16         JUROR 6:  Twenty-four more to go.

17         MS. SHIKUNOV:  Thank you.

18         MS. SHIKUNOV:  I apologize.  I asked for cause.  What

19 I meant to ask was, were the business trips the same thing as

20 the vacation, is what I was trying to (unintelligible).

21         THE COURT:  No, it's all good.  Is there a motion on

22 this guy?

23         MS. DIBIANCA:  No.

24         THE COURT:  No?

25         MS. DIBIANCA:  Sorry, I have one.

```
 1              THE COURT:  Yeah, absolutely.  Absolutely.  Give us
 2   just a minute.  Okay, Christine?
 3              Any motions?
 4              PARTICIPANT:  None from us, Your Honor.
 5              THE COURT:  Okay, no motions?  Counsel, before we
 6   bring in the next prospective juror, I'm looking at the clock.
 7    I think it's about 12:30ish.
 8              MS. SHIKUNOV:  Yes.
 9              MR. CAVALIER:  My stomach tells me that.  Yes.
10              THE COURT:  Really, I'm looking for our input.  I
11   want to be respectful and I'd like them to be able to eat.  But
12   at the same time, they're talking about late afternoon storms.
13              DEPUTY:  Do they get their own lunch?  Is that how it
14   works?
15              THE COURT:  Today they'd be on their own for lunch.
16   Right, Christine?
17              THE CLERK:  Yeah.  The remaining jurors that are
18   still upstairs, Paul did release them for one hour of lunch, to
19   return (unintelligible).
20              THE COURT:  We've been through six names.  Look, it's
21   going to take a little while.  And I think that's unavoidable.
22              PARTICIPANT:  The hungrier they get, the more ornery
23   they're going to get.
24              MS. SHIKUNOV:  I know, I know.
25              THE COURT:  It's just like Mike.
```

1          MS. DIBIANCA:  I know.  That's who I was talking

2    about.

3          MR. CAVALIER:  You're not lying.

4          THE COURT:  So, Erica, what do you think?

5          MS. SHIKUNOV:  I am okay right now, but I do think

6    we've got to give them a time.  Because we did get a late start

7    because we were trying to sort things.  So, I don't mind if

8    maybe if we got through like ten, and then taking a break.

9    Because at least then we've made some --

10         MS. DIBIANCA:  That's fine.

11         MS. SHIKUNOV:  I would like the opportunity to

12   procure my water bottle, or have somebody bring it to me.  I

13   don't mind going out to get it, or if we need to have Patricia

14   bring it back.  I just didn't know if you wanted us to walk

15   back out into the courtroom right now.  I'd rather just keep it

16   and move it along.  So, I would say have Patricia

17   (unintelligible) and bring it in --

18         (Simultaneous speaking.)

19         THE COURT:  Why don't we go to ten --

20         MS. SHIKUNOV:  I agree.

21         THE COURT:  -- and then regroup and see where we are.

22         MS. DIBIANCA:  Okay.

23         THE COURT:  Okay?

24         MS. DIBIANCA:  Because, I mean, generally, if people

25   are hungry, I don't want to make a juror -- I can sit all day,

1   but I don't a juror to have to --

2            (Simultaneous speaking.)

3            MS. DIBIANCA:  To go past 1 o'clock is too much to

4   ask of the jurors.

5            LAW CLERK:  Can I make a suggestion?

6            THE COURT:  Yeah.

7            LAW CLERK:  Can we release them as we question them,

8   so once their out, give them an hour to come back from lunch?

9            MS. DIBIANCA:  Oh, for lunch you mean.  I thought you

10  meant all together.  I was like --

11           THE COURT:  You know, Jakob, that went through my

12  mind too.  But then, I was wondering, are we going to create

13  like an anger between the low numbered --

14           LAW CLERK:  We definitely don't want to do that.

15           (Simultaneous speaking.)

16           THE COURT:  They're like, how come they got to go?

17           MR. CAVALIER:  Well, that why, I mean, even though

18  you know people were ticking off, they're still sitting there,

19  because you don't want to tick them.

20           THE COURT:  Right.  Right.  All right, let's get to

21  ten and, Pete, if you have the chance, if you think of a great

22  idea of how to handle this, let me know.

23           MS. SHIKUNOV:  I was just thinking if there is like

24  roughly 30 of them, we're a third of the way through the folks

25  that are in there when we take a break.

```
 1                THE COURT:  Okay.
 2                MS. SHIKUNOV:  That was my thought process.
 3                THE COURT:  Okay.
 4                MS. KESSLER:  So, Emily, are you going to -- you want
 5      your water after we're done with number ten, or as I take this
 6      one back out, I'll just (unintelligible).
 7                MS. SHIKUNOV:  That would be -- thank you so much.
 8      Mine is the giant silver one that --
 9                (Simultaneous speaking.)
10                THE COURT:  And yours is out there.
11                (Simultaneous speaking.)
12                THE COURT:  Are you sure.
13                (Simultaneous speaking.)
14                MR. CAVALIER:  That's filtered.
15                THE COURT:  That's filtered water.  Yeah.  By the
16      way, there are cups up there.  Use the styrofoam ones, even
17      though I'm not in love with them.
18                (Pause.)
19                MS. SHIKUNOV:  Hi.  How are you?
20                JUROR 7:  Hi.
21                MR. CAVALIER:  Hi there.
22                THE COURT:  Hi, sir.  How are you?
23                JUROR 7:  Good.  How are you doing?
24                THE COURT:  We're doing good.  And thank you for your
25      service and your willingness to be here today.  I know it's an
```

1   inconvenience.  There's no doubt about it.

2           As you heard, we're trying to pick a civil jury.  As

3   opposed to a criminal case, a civil case.  And my first

4   question is, if I might ask, and there's no wrong answer.

5   Everybody has their own preferences.  Do you prefer everyone

6   keep their masks on in here?  Or do you not have a preference?

7           JUROR 7:  I don't care.

8           THE COURT:  If I took it off, you wouldn't mind it?

9           JUROR 7:  No.

10          THE COURT:  I feel the same way.  However you're most

11  comfortable.  Okay?  But thank you for that.

12          JUROR 7:  You're welcome.

13          THE COURT:  As you know, it's difficult to talk

14  through these things.

15          JUROR 7:  Yeah.

16          THE COURT:  It's in my mouth half the time.  So,

17  thank you for that courtesy.  I really appreciate it.

18          So, you're in Berks County.

19          JUROR 7:  Yes.

20          THE COURT:  One of the things I mentioned outside

21  that we're trying to do here, is through yes/no questions, as

22  well as more interactive, narrative questions in here, find out

23  a bit more about the prospective jurors, but also to determine

24  if they have a legitimate hardship that would prevent them from

25  being a juror in this case, among other things.

1          Most importantly, we need to find people who could be
2     fair.  But we want to know that -- we know it's an
3     inconvenience for everybody.  Even today is an inconvenience.
4     This wasn't your plan to be here today --
5          JUROR 7:  No.
6          THE COURT:  -- when you said, what will I do in July.
7     So, I'll share a little bit about where the case is and how
8     long we expect it to be.  But we're also going to follow up if
9     you answered any of the other questions, as well as invite you
10    to share anything you want with us.  Okay?
11         JUROR 7:  Okay.
12         THE COURT:  Sounds fair, right?
13         JUROR 7:  Yes.
14         THE COURT:  So, we're in Philadelphia today.  You're
15    in Berks County.
16         JUROR 7:  Mm-hmm.
17         THE COURT:  This trial will be give days, including
18    today, so four more days -- that's our estimate -- in
19    Allentown.  And it's downtown at the federal courthouse in
20    Allentown.
21         We pick all juries in the nine-county district in
22    Philadelphia.  But the courtroom that I'm attached to is in
23    Allentown.  So, that's where this trial will be.  If you're
24    from Berks, you might be at least a little familiar with
25    Allentown.

1          JUROR 7:  Yeah, 40 minutes away.

2          THE COURT:  Okay.  Okay.  Did you drive here today?

3          JUROR 7:  Yeah.

4          THE COURT:  Yeah, because there's no train from

5     Allentown to Philadelphia, or from Redding.  There was back in

6     the day.

7          JUROR 7:  Yeah, used to be.

8          THE COURT:  It's a shame, because it would be a great

9     convenience.  And so, is there anything about that particular

10    fact and circumstance, that we would be four days after today

11    in Allentown, rather than Philadelphia, that's a hardship for

12    you?

13         JUROR 7:  No.

14         THE COURT:  Okay.  And we'll ask about some more

15    circumstances and welcome anything else you want to say.  But I

16    want to ask these particular questions.  Sir, do you have any

17    disability that would make it -- again, a hardship is something

18    we should really know and the lawyers should really know --

19    about sitting in a courtroom and listening to testimony, again,

20    for a good four days?

21         And there's going to be a fair amount of evidence

22    here.  We have very experienced and talented lawyers in this

23    case and they're each going to put on their case and we're

24    going to receive a lot of evidence.

25         We will take a break in the morning, we'll have a

1   lunch, and we'll take a break in the afternoon.  Is there

2   anything, knowing that this is a somewhat vigorous request that

3   we're making, is there any handicap that you have that would

4   make this just too hard?

5          JUROR 7:  No.

6          THE COURT:  Okay.  All right.  Did I say that

7   question right?  Seemed like a lot of words.

8          JUROR 7:  There was a lot of words.  I guess I got to

9   get used to that, huh?

10          THE COURT:  You know, I think they say lawyers are

11   paid by the word, right?  Or at least judges are.

12          Okay, those are just the general questions I have.

13   I'm going to open up to counsel and they'll ask you questions.

14    And again, you're welcome to also share anything you would

15   like with us.

16          JUROR 7:  Good.

17          MS. SHIKUNOV:  Hi, how are you?

18          JUROR 7:  Hi.

19          MS. SHIKUNOV:  Our sheet here for all the jurors

20   identifies your job as being a GBH Helper.  What is that?

21          JUROR 7:  GBH Helper, I help doing various jobs doing

22   the plant.  Well, in the department.  I can help out on the

23   floor, production, mixing.

24          MS. SHIKUNOV:  Okay.

25          JUROR 7:  GBH Helper.

```
 1                MS. SHIKUNOV:  Okay.

 2                THE COURT:  And is this a factory?

 3                MS. SHIKUNOV:  Yeah, Pepper Farm.

 4                THE COURT:  Oh, Pepperidge Farm.  Okay, sure.

 5                MS. SHIKUNOV:  And is that a new position with

 6   Pepperidge Farms?

 7                JUROR 7:  No.

 8                MS. SHIKUNOV:  Okay.  That's the only questions I

 9   have.  Just one.

10                THE COURT:  I am a big fan of Pepperidge Farm.

11                JUROR 7:  Yeah.

12                THE COURT:  Who isn't?

13                MS. KESSLER:  Sir, how long have you been in that

14   position for?

15                JUROR 7:  Well, I just switched back to shipping, so

16   I've been in GBH position for eight months and seven days, I

17   think.

18                MS. KESSLER:  Eight months and seven days?

19                JUROR 7:  Mm-hmm.

20                MS. KESSLER:  What was your employment prior to that?

21                JUROR 7:  I was in Shipping Department.

22                MS. KESSLER:  Shipping.

23                MS. SHIKUNOV:  Oh, so within the same company.

24                JUROR 7:  Yes.

25                MS. SHIKUNOV:  Okay, how long have you been with the
```

 1  company in general?

 2          JUROR 7:  Seven years.

 3          MS. SHIKUNOV:  Seven years.  Okay.

 4          THE COURT:  Any questions.

 5          MR. CAVALIER:  No.  We have absolutely no questions.

 6          THE COURT:  Okay.

 7          MS. KESSLER:  Thank you.

 8          THE COURT:  Is there anything you need to share with

 9  us?

10          JUROR 7:  No.  I'm just hungry, that's all.

11          THE COURT:  Just before you came in here, we were

12  talking about it.  We're going to try to get you guys out to

13  eat soon.

14          JUROR 7:  Okay.

15          THE COURT:  All right?

16          JUROR 7:  Yep.

17          THE COURT:  Hey look, thank you for your service so

18  far and your willingness to serve going forward.  The justice

19  system can't work without good jurors.  So, we're very

20  grateful.

21          JUROR 7:  You're welcome.

22          THE COURT:  Thank you.

23          MR. CAVALIER:  Thank you.

24          MS. SHIKUNOV:  Thank you.  We appreciate it.

25          JUROR 7:  Mm-hmm.

```
 1              THE COURT:  Any motions?

 2              MR. CAVALIER:  No motions.

 3              MS. SHIKUNOV:  Your Honor, I do want to disclose

 4   though, I once upon a time -- and this was when I was doing

 5   Worker's Compensation law, so several years ago -- I did

 6   represent Pepperidge Farm through an insurance company on

 7   Worker's Comp cases.  So, when he said that, I just wanted to

 8   bring that up.

 9              THE COURT:  Okay, thank you.

10              MS. SHIKUNOV:  Yep.

11              THE COURT:  Did they pay you in cookies?

12              MS. SHIKUNOV:  Actually, they used to bring like the

13   damaged product in giant garbage bags, so it looked very

14   unappetizing.  So, it'd be a giant garbage bag.  It felt like

15   literally a higher full-sized garbage bag --

16              THE COURT:  I could eat it right out of the garbage

17   bag.

18              MS. SHIKUNOV:  (Unintelligible) yeah.

19              (Simultaneous speaking.)

20              (Pause.)

21              MS. SHIKUNOV:  That was just Juror 8, correct?

22              MS. DIBIANCA:  Seven.

23              MS. SHIKUNOV:  Seven.

24              MR. CAVALIER:  Seven.

25              THE COURT:  Number 8, please, Christine.  Brooks
```

1   County again?

2           MR. CAVALIER:  Mm-hmm.

3           THE COURT:  Any questions on this one?  Answer any?

4           Hello.  Please come up.  How are you?

5           JUROR 8:  Okay.

6           THE COURT:  Thank you.  We saved you this seat right

7   in the front.

8           JUROR 8:  Okay.

9           THE COURT:  So, my first question to everybody who's

10  been coming in here is, do they want everyone to keep their

11  masks on while we're in this room?

12          JUROR 8:  No.

13          THE COURT:  Would you prefer that?

14          JUROR 8:  No.

15          THE COURT:  Okay.  So, if you can't understand me,

16  let me know and I'll try to articulate better.  Okay?

17          JUROR 8:  Okay.

18          THE COURT:  Thank you very much.  And thank you for

19  being here today.  We know it's always an inconvenience to be

20  called for jury duty, but I think we also all know just how

21  important it is.  And it's important, obviously, to the lawyers

22  and their clients in this case, but it's more than that.

23          And it's important to me and the court system, but

24  it's really important to us all, as I mentioned, in the bigger

25  courtroom today, because if we ever need a jury for something

1    in our life or someone important to us, we want dedicated,

2    fair, impartial people.  So, that's our aim.  That's what we

3    aim to do today.  Okay?  Sir, I note that you live in Berks

4    County.

5              JUROR 8:  Yes, sir.

6              THE COURT:  The first thing I want to share with you

7    as we sort of explore whether there's hardships versus

8    inconveniences, and they're not exactly the same.  But we're in

9    Philadelphia today, obviously.

10             JUROR 8:  Yes.

11             THE COURT:  This trial is going to last five days, so

12   it's four after today.  That's our estimate.  That's all of our

13   estimate.

14             It will not be in Philadelphia.  It will be in

15   Allentown.  I don't know if that's better or worse.  If you're

16   from Berks, you probably know there's no train to Allentown.

17             JUROR 8:  Yeah.

18             THE COURT:  And so, is there anything about four days

19   in Allentown that would be a particular hardship to you?

20             JUROR 8:  Not that I know of.

21             THE COURT:  Can't think of anything.  You could get

22   to Allentown?

23             JUROR 8:  I can get there.

24             THE COURT:  Have you been to Allentown?

25             JUROR 8:  Yeah.  The road to get there isn't very

```
 1  nice, but --
 2            THE COURT:  222?
 3            JUROR 8:  Yeah.
 4            THE COURT:  Yeah.
 5            JUROR 8:  It's not the best.
 6            THE COURT:  And you're always stuck behind a school
 7  bus or a truck.  Always.  I don't know how they do that, but
 8  that's what happens.  Yeah, so look, that's where we'll be.
 9            And so, what we're going to want to ask you in the
10  next couple of minutes, whether that or anything else would be
11  a significant hardship to you that would or should prevent you
12  from sitting on this particular jury.
13            There may be things that we don't know about.  We'd
14  ask you to let us know about them while you're in here.  But
15  counsel have other questions.  If we're sitting for four days
16  in this case, as we expect, there will be a good amount of
17  evidence that the jury will be hearing.
18            We have very good lawyers on this case and they're
19  going to put their case before the jury.  And so, for four days
20  we'll all be receiving information.
21            There'll be a break in the morning, there'll be a
22  lunch, and there'll be a break in the afternoon.  But is there
23  anything about knowing that -- this is an important duty, but
24  there's also work involved.  Do you have any health concerns,
25  or any concerns about sitting through a trial as I've just
```

1   described?

2              JUROR 8:  No.  Not with that.

3              THE COURT:  Okay.  Is there anything else that you

4   want to share with us?

5              JUROR 8:  When would this start?

6              THE COURT:  We would go tomorrow, Monday, Tuesday,

7   Wednesday, and then, fingers crossed, bid everyone farewell.

8   You have something on your mind.  You can share with us.

9              JUROR 8:  No, because I have a hotel room for these

10  couple of days.  So, if it would start tomorrow, I'd have to

11  leave tonight to get there.

12             THE COURT:  Yeah, you probably would.  We'd be doing

13  9:00 to 5:00.  And I don't think you'd live far away from

14  Allentown to get a hotel room in Allentown.  You know, the

15  government pays for one if you're more than 50 miles.

16             I don't know that where you live is more than

17  50 miles from Allentown.  Probably not, right?

18             JUROR 8:  No, I would have to drive in every day.

19             THE COURT:  Right.  Right.  And do you drive every

20  day?  Are you a driver?

21             JUROR 8:  Yeah, I can.

22             THE COURT:  Okay.  Okay.  The lawyers you see here,

23  they're going to ask you some more questions.  And then, again,

24  you're free to share anything you want with us as well.  Okay?

25             JUROR 8:  Okay.

```
 1                THE COURT:  All right, please.

 2                MS. SHIKUNOV:  Okay.  How are you?  I noted that you

 3     answered yes to being a prior juror when you were asked some

 4     questions out there.  What type of case were you a juror in?

 5                JUROR 8:  I was on two cases, one criminal, one

 6     civil.

 7                MS. SHIKUNOV:  Okay.

 8                JUROR 8:  They were both county cases.

 9                MS. SHIKUNOV:  And what county?

10                JUROR 8:  Pardon?

11                MS. SHIKUNOV:  Out in Berks County?

12                JUROR 8:  Yes.

13                MS. SHIKUNOV:  Okay.  And did both of those cases go

14     to verdict?

15                JUROR 8:  The criminal case was a guilty, and the

16     civil case was not-guilty.

17                MS. SHIKUNOV:  Okay.  What kind of case was the civil

18     case?

19                JUROR 8:  Pardon?

20                MS. SHIKUNOV:  What kind of case was the civil case?

21                JUROR 8:  Basically, it was two people assaulted each

22     other, and one was claiming something about, you know.  I don't

23     remember everything about it.

24                MS. SHIKUNOV:  That's okay.  That's --

25                JUROR 8:  That's basically what it was.
```

1            MS. SHIKUNOV:  -- exactly what I was asking.  Yep.
2    And on the sheet that we're provided with some basic
3    information, we don't have filled out for what you're
4    occupation is.  Are you retired, sir?
5            JUROR 8:  Yes.
6            MS. SHIKUNOV:  Okay.  And what was your job before
7    you retired?
8            JUROR 8:  The what?
9            MS. SHIKUNOV:  What did you do before you were
10   retired?
11           JUROR 8:  I worked at a foundry.
12           MS. SHIKUNOV:  I'm sorry, at a what?
13           JUROR 8:  A foundry.
14           MS. SHIKUNOV:  A foundry?  What did you do for them?
15           JUROR 8:  I did all their jobs, from (unintelligible)
16   the material, nutting, sizing, everything.  And in my later
17   years there I was a crew leader, until they took it away from
18   me.  And then I retired.
19           MS. SHIKUNOV:  Okay.  I think that pretty much
20   answered --
21           (Simultaneous speaking.)
22           MS. SHIKUNOV:  Oh.  And then, sir, I'm sorry.  You
23   had answered yes to number four, which was asking whether you
24   had any friends or family members in the legal profession.
25           JUROR 8:  The what?

1          MS. SHIKUNOV:  The legal profession.  If you knew
2     anybody that was a lawyer, a law clerk, or --
3          JUROR 8:  I didn't answer it though.
4          MS. SHIKUNOV:  You didn't answer that?  Okay.
5          JUROR 8:  No.  I don't remember that.
6          MS. SHIKUNOV:  Oh, you don't remember that?  All
7     right, well then I can't read my own handwriting and those are
8     all my questions.
9          MS. KEESLER:  Sorry, we got the numbers off.  That
10    was our problem.
11         THE COURT:  No, that's okay.  That's okay.
12         MS. KEESLER:  That's my bad.
13         MR. CAVALIER:  We have no questions for Mr. Rogala.
14         THE COURT:  All right, you have anything else for us,
15    sir?
16         JUROR 8:  No, not that I can think of.
17         THE COURT:  Okay.  All right.  Well, are you able to
18    hear me okay?
19         JUROR 8:  Yes.
20         THE COURT:  Okay.  I'll let you know that also in the
21    courtrooms, if people need them, we often make available
22    headphones so they can hear more clearly as well.  But it's
23    just something that I note.
24         Sometimes with these, it's just more difficult to
25    hear people.  Well, thank you very much.  The good news is, you

1   don't have to sit in here anymore with us, but the bad news is,
2   we have to hold you for a little while longer out there.  Okay?
3            JUROR 8:  Yeah.
4            THE COURT:  Thank you.  Thank you so much.
5            JUROR 8:  Okay.  Thank you.
6            THE COURT:  Any motions on this juror from either
7   side?
8            MR. CAVALIER:  We're concerned about his hearing.
9   But we don't --
10           MS. SHIKUNOV:  I don't disagree with that.  But I had
11  the mask on but, I mean, I felt like I was really yelling.
12           MS. DIBIANCA:  Well, the concern for me, of course,
13  is that he does want us to wear masks, right?  So, if we get
14  him in the pool, in the box, then we're all going to have to
15  wear masks, because he definitely is not going to hear us.
16           THE COURT:  Molly, that crossed my mind.
17           MS. DIBIANCA:  Yeah.
18           THE COURT:  But I don't think that's a cause.
19           MS. DIBIANCA:  Oh, no.  I'm just talking out loud.
20  I'm not saying this for cause.
21           THE COURT:  And I think both of you make a good point
22  on his hearing.  You know, when he did ask for clarification
23  more than once, but that's what I checked with Ms. Stein.  And
24  there are headphones available.
25           MS. DIBIANCA:  Yeah.

```
 1          MR. CAVALIER:  If I could make a suggestion.  Maybe
 2   we see how many we have when we get to the end, and then maybe
 3   we can all just talk it out.  I don't want to -- I just have --
 4          THE COURT:  John, I'm not inclined --
 5          MS. SHIKUNOV:  We're not either.  We're just saying.
 6    We're inclined to keep him.
 7          THE COURT:  He's within driving distance.  Berks
 8   County --
 9          MR. CAVALIER:  I'm not saying I'm --
10          (Simultaneous speaking.)
11          MS. DIBIANCA:  Totally agree.
12          THE COURT:  Okay.  No, I know you're not.
13          MR. CAVALIER:  I'm just trying to be sympathetic to
14   the guy.
15          THE COURT:  Yeah, I agree.  I agree.  So, he stays
16   for now.
17          MS. SHIKUNOV:  Yeah, I think that I actually don't
18   mind John's suggest.  Like, let's see how many we get that can
19   make the drive.  And then, maybe we just mark him with a
20   question mark.
21          THE COURT:  And John brought it up out of concern for
22   whether it would be difficult on him and I appreciate that.
23   And so, we'll do that.  We'll talk about it.  But his
24   willingness is appreciated.
25          MS. SHIKUNOV:  We just have to use our stage voices.
```

```
1               THE COURT:  All right.  What number?

2               MR. CAVALIER:  Nine.

3               MS. SHIKUNOV:  Hi.  How are you?

4               JUROR 9:  Good afternoon.

5               THE COURT:  Hi.  How are you?

6               JUROR 9:  I'm doing fine, thank you.

7               THE COURT:  Juror number 9, right?

8               JUROR 9:  Number 9.

9               THE COURT:  Philadelphia.

10              JUROR 9:  Yes.

11              THE COURT:  There you go.  So, you came probably the

12     shortest distance to be here today.

13              JUROR 9:  Yeah, got dropped off.

14              THE COURT:  That brings me to the very first thing I

15     want to raise with you.  We're in Philadelphia today,

16     obviously.  This case is going to go for four days -- that's

17     our estimate -- after today, all of which will be in Allentown,

18     Pennsylvania, in the federal courthouse.

19              You heard me mention outside -- can I ask you

20     something?  There's no wrong answer here.  Do you have a

21     preference if we keep these masks on or off?

22              JUROR 9:  Oh, I'm vaccinated.

23              THE COURT:  So, you don't mind if we --

24              JUROR 9:  No.

25              THE COURT:  All right.  And we don't mind if you do
```

1  either.

2              JUROR 9:  Thanks.

3              THE COURT:  There's no wrong answer.  It's just it's

4  so hard to talk.  It's so hard.

5              JUROR 9:  You're right.

6              THE COURT:  So, one of the things, obviously, we're

7  going to ask, as we've been asking everybody to come in here,

8  is whether there's a particular hardship or hardships that

9  would make this the wrong case for them to sit on.

10             And the attorneys will ask questions along those

11  lines, and obviously, I mean, our biggest need is to find fair

12  and impartial jurors, but also ones that don't have significant

13  hardships.

14             The fact that I've told you that we expect it will be

15  four more days -- so it'll be Friday, Monday, Tuesday,

16  Wednesday -- is our estimate.  And it's in Allentown.  Does

17  that create a hardship?

18             JUROR 9:  Yes.  Your Honor, first of all, I'm leaving

19  on vacation tomorrow.

20             THE COURT:  That's it.  Say no more.

21             MS. SHIKUNOV:  See you later.

22             THE COURT:  Where are you going?

23             JUROR 9:  The Jersey Shore.

24             THE COURT:  Oh, good.  Which town?

25             JUROR 9:  Wildwood.

```
 1                    THE COURT:  Wildwood.  Okay.
 2                    JUROR 9:  North Catholic Reunion Weekend.
 3                    THE COURT:  Oh, fabulous.
 4                    (Simultaneous speaking.)
 5                    THE COURT:  Do you know there's unfortunate hardships
 6      and there's happy hardships.  They don't all have to be
 7      unfortunate.  Yours is not.  All right, we appreciate that.
 8                    MS. SHIKUNOV:  Thank you.
 9                    THE COURT:  Okay?  We will have to hold you prisoner
10      next door here for a little while longer while we get through
11      the panel.
12                    JUROR 9:  I've still some packing to do, Your Honor.
13                    THE COURT:  Well, you'll be there for the week?
14                    JUROR 9:  At least Monday.  Hopefully longer.
15                    THE COURT:  Yeah.  Well --
16                    JUROR 9:  And I'm retired now.  So, I got a little
17      extra leeway.
18                    THE COURT:  Enjoy it.  Enjoy it.
19                    JUROR 9:  I'm trying.
20                    THE COURT:  And I hope the traffic's good to you.  I
21      was in Sea Island in the beginning of the month, so have a
22      great time.
23                    JUROR 9:  I'm going to try my best.
24                    THE COURT:  I think you'll figure out a way with all
25      your old buddies.
```

```
 1              JUROR 9:  Yes.

 2              THE COURT:  Thank you so much.

 3              JUROR 9:  Thank you, Your Honor.

 4              THE COURT:  Take care.

 5              MS. SHIKUNOV:  Thank you.

 6              JUROR 9:  Thank you everybody.

 7              MS. DIBIANCA:  Thank you.

 8              MS. SHIKUNOV:  Thank you.

 9              MS. DIBIANCA:  Your Honor, we do have a concern to

10   raise.

11              THE COURT:  Yeah, sure.

12              MS. DIBIANCA:  Apparently, the Plaintiff's paralegal

13   is making small talk with some of the jurors, which is a

14   problem.

15              MS. KEESLER:  Okay.  I will go tell (unintelligible).

16              THE COURT:  Please.

17              MS. KEESLER:  Yeah.

18              MS. DIBIANCA:  Or maybe -- I don't know what you want

19   to do.  Or maybe Christine should.  I'm not sure if it's

20   appropriate for counsel to go in at that point.

21              MS. SHIKUNOV:  Oh, okay.

22              MS. DIBIANCA:  I don't know.  I ask the Judge.

23              THE COURT:  I'm fine either way.  But we can ask

24   Christine.

25              MS. DIBIANCA:  Okay.
```

 1                THE COURT:  Christine, can you please come in a
 2    moment?  We want to make sure that no one from the legal teams
 3    are talking to prospective jurors.  Even innocent, unrelated --
 4                THE CLERK:  Okay.
 5                THE COURT:  -- small talk, or anything like that.
 6    Would you please speak to each side and let them know that
 7    that's a must.
 8                THE CLERK:  And that should be private.  Should I
 9    call them to the side?
10                THE COURT:  Yeah.  I think so.  I think so, yeah.
11                MS. DIBIANCA:  Instead of doing that, do you want to
12    just go out, Erica?  I'm okay with it if you just want to go
13    out.
14                MS. SHIKUNOV:  I'm happy to address it myself.  I
15    don't care.  What Your Honor thinks is appropriate.
16                THE COURT:  Do you have people out there too, Molly?
17                MS. DIBIANCA:  Yeah.  But they're the one telling me
18    that they're worried because that's happening.
19                THE COURT:  Whatever we want to do, we want to do in
20    a way that doesn't make an issue out of --
21                MS. DIBIANCA:  Yep.  Fair enough.
22                THE COURT:  That there isn't one there.
23                MS. DIBIANCA:  Okay.
24                THE COURT:  Okay?
25                MS. DIBIANCA:  So just so I'm clear since I missed

1    the conversation, who am I addressing?

2              THE COURT:  Who's out there?

3              MS. DIBIANCA:  Her paralegal.

4              MS. SHIKUNOV:  Okay.  Okay.

5              THE COURT:  And I would just move them to the side

6    and ask them.  Okay?

7              MS. DIBIANCA:  Okay.

8              THE COURT:  All right.

9              MS. DIBIANCA:  And do you want me to bring this juror

10   in first?

11             THE COURT:  That's a good idea, right?

12             MS. SHIKUNOV:  Yes.

13             MR. CAVALIER:  Yes.  This is number 10.

14             THE COURT:  Chester County?

15             MS. SHIKUNOV:  Molly, so that I know for later, what

16   (unintelligible)?

17             MS. DIBIANCA:  I don't know.  He just said paralegal.

18             THE COURT:  Hi.  Please come on in.  We saved you a

19   seat.

20             JUROR 10:  Ah, how lovely.

21             THE COURT:  We've been waiting for you.

22             JUROR 10:  This is much more comfortable.  The

23   benches are like, uh.

24             THE COURT:  I know.  We're asking so much of our

25   jurors, can't we give them like a comfy chair to sit in?

1           JUROR 10:  Yeah, this is wonderful.

2           THE COURT:  So, what I've been asking first, and

3    there's no wrong answer, are you any less comfortable if the

4    people in here have their masks off?

5           JUROR 10:  No, it doesn't matter.

6           THE COURT:  All right.

7           JUROR 10:  I'm fully vaccinated.

8           THE COURT:  And so are we.  So, however you're most

9    comfortable.  And again, there's no wrong answer.  But this is

10   the answer we love.

11          JUROR 10:  Good.  You can breathe again.

12          THE COURT:  Finally.  All right, well thank you.  I

13   know this has already been a long morning.  And we still have

14   some work to do.

15          And this is a significant inconvenience.  It always

16   is.  There's no two ways about it.  When I get called for jury

17   duty, it's the same thing.

18          But as I mentioned very briefly out there, we're

19   trying to -- obviously, job one is we need a fair jury who's

20   going to listen carefully to the evidence and not bring

21   anything extraneous into the decision-making, and follow the

22   law as I tell them.

23          That's critical.  But also, we have to consider the

24   jurors.  And there may be inconveniences, but are there things

25   that rise to a true hardship?  And at that point, it's not fair

1   to ask the juror, and also we don't want anyone who's

2   distracted and not listening to the case.  The lawyers and

3   their clients, nor I, we can't have that either.

4            So, that's sort of why we sort of differentiate.

5   Like I said out there, you didn't plan this out as part of your

6   vacation to be here.  But again, so a lot of times hardships

7   are also based on timing.

8            But those are the types of questions we'll be asking.

9    And we'll get to do it in a little bit more back-and-forth

10  than in there, where it's numbers.

11           JUROR 10:  Yeah.

12           THE COURT:  But I do note that you're from Chester

13  County.

14           JUROR 10:  Correct.

15           THE COURT:  So, this is the first thing I want to

16  tell you, and ask you if this poses a hardship.  There's

17  actually two pieces to it.

18           We expect -- this is our estimate -- that the case

19  would be a total of five days -- today and four more.  That's

20  the how-long we estimate.  The where-it's-going-to-be is

21  Allentown, Pennsylvania.  Yeah, that's up 476.

22           JUROR 10:  Yeah, yeah.  Oh, dear.  Yeah, I know where

23  that is.

24           THE COURT:  Yeah.  So, sometimes folks don't drive,

25  or something like that.  There's no train to --

1          JUROR 10:  No.  I took the train to get in here
2    because I don't like driving into Philly.  But --
3          THE COURT:  No.  Neither do I.
4          JUROR 10:  But I was going to say, I was quick doing
5    a calculation.  No, I don't think there's a train that goes up
6    that way.
7          THE COURT:  There is not.  There is not.  And one
8    thing to consider.  I'm not 100 percent sure, but I'm thinking
9    Chester is more than 50 miles from Allentown.  If that means
10   anything, if you're over --
11         JUROR 10:  If it's over 50, then you can stay in a
12   hotel.
13         THE COURT:  -- 50 from your home, you can get a
14   hotel.
15         JUROR 10:  I know.  Depending on which way you come
16   into Philly, it's 44 miles one way, or 51 or 52 miles the other
17   way.  And it's like, oh great, it's 50 to Allentown.
18         THE COURT:  Yes.  This would be --
19         JUROR 10:  But it would be 50 to Allentown, then that
20   I don't know.
21         THE COURT:  Yeah, I'm not certain either.  But you're
22   familiar with the rule that they would provide a hotel --
23         JUROR 10:  Yes.
24         THE COURT:  -- and I don't know is meaningful in
25   your --

1          MS. DIBIANCA:  What part of Chester County are you
2     in?
3          JUROR 10:  I'm near Cotesville.  So, it's sort of
4     Western, north of --
5          MS. DIBIANCA:  I don't know if it's 50 miles
6     (unintelligible).
7          THE COURT:  You don't?
8          MS. DIBIANCA:  I don't.  I don't think Cotesville is
9     not -- if it's closer.  I used to live out in Westchester, and
10    so I used to have to drive out that way quite a bit.  And yeah,
11    I don't know if that --
12         JUROR 10:  It may not be, I don't know.
13         THE COURT:  Okay.  And so, I don't know the answer.
14    So, I'm not sure if that provides an option.  But starting from
15    that point does that become a hardship?
16         JUROR 10:  It's not my preferred way.  This is
17    spending my morning in rush hour traffic.  But, I mean, I am
18    retired and I technically, I have some things to do, but it's
19    not like having a job I'm missing.
20         THE COURT:  And I appreciate that.  And that candor
21    is very important to us.  You can disagree.  I'd put this is in
22    the super-duper inconvenient category, but shy of the hardship.
23         JUROR 10:  Yes, sort of.  I mean, I used to live in
24    the Havertown area and drive up to Ithaca, New York where my
25    mother was.  So, I'm very familiar with going by --

```
 1              THE COURT:  Well, you passed it.  Well, that was --
 2              JUROR 10:  -- Allentown.
 3              THE COURT:  And you had a long drive after Allentown
 4   from there.
 5              JUROR 10:  Oh, yeah.  Mm-hmm.
 6              THE COURT:  Past Binghamton and all of that.  Like
 7   Scranton, Binghamton.  Well, that was one of the things that --
 8   I ask just a couple of questions.  That's one of them.  Another
 9   one I ask is, we would be sitting for four days with very
10   experienced and talented lawyers giving us a lot of information
11   to consider.
12              And so, I ask is there any medical or other type of
13   disability that would make it difficult for the juror to truly
14   be able to fully take in the case and provide the attention
15   that both parties really need and deserve?
16              And just like we would deserve it if we wanted a jury
17   as well.  Is there any concerns in that regard?
18              JUROR 10:  Well, you know it's interesting that since
19   I've been retired, I haven't had to sit and focus on anything
20   all that time.
21              So, as you get older, your memory kind of goes and
22   you wonder whether you'll remember things said once you get
23   back into the jury mode.  But, I mean, I don't have any medical
24   issues.
25              THE COURT:  And again, it's an important duty, but
```

1    it's also hard work.  And so, the folks that are on the panel,

2    they will have a break in the morning, they will have a lunch

3    break, they will have a break in the afternoon.  And if they

4    needed other, of course we're going to accommodate it.  But

5    again, we're not watching a TV show.  We all have to be

6    focused --

7                 JUROR 10:  Attention.

8                 THE COURT:  Yeah.  So, those were my questions.  And

9    counsel may have some others.  Okay.  Either side?

10                MS. SHIKUNOV:  Hi.  I do have a few brief follow-ups,

11   just based on some of the questions that you raised your hand

12   for.

13                So, my first question for you is, you mentioned you

14   knew somebody that was employed in the legal profession.

15                JUROR 10:  My sister is a lawyer.  She isn't

16   currently practicing.   She did practice in the Washington, DC

17   area and she's up in Boston now.

18                MS. SHIKUNOV:  What kind of lawyer was she?

19                JUROR 10:  I think she was defense, probably.  But I

20   know she kind of helps out friends every now and then when they

21   have legal issues.  So, she's not completely divorced from it.

22    But she's not --

23                THE COURT:  Active.

24                JUROR 10:  She's not active.

25                MS. SHIKUNOV:  When you say defense, you mean like

1   criminal defense?  Or insurance defense?

2            JUROR 10:  I think it was more criminal.  I mean, it

3   was a while ago.  That's my kind of remembrance, which, as you

4   get older, your brain goes.

5            MS. SHIKUNOV:  I'm going to ask you the same

6   question, but with regard to the HR question.  You raised your

7   hand about that.

8            JUROR 10:  Yep.  I worked at the University of

9   Pennsylvania in undergraduate admissions, and I sort of did

10  everything that wasn't the admission stuff.  So, I was the

11  person in charge of budget and finance and HR and building-

12  related issues.

13           MS. SHIKUNOV:  And in that position, did you ever

14  have to terminate anybody?

15           JUROR 10:  We did have to terminate somebody.  Yes.

16           MS. SHIKUNOV:  And did that result in litigation?

17           JUROR 10:  No.  As far as I know, it didn't.

18           MS. SHIKUNOV:  Okay.  I mean, were you the sole

19  decision-maker for that, or was there anybody else in who

20  (unintelligible)?

21           JUROR 10:  No, it was a joint decision.  It was one

22  of those inevitable things, unfortunately.

23           THE COURT:  Unfortunately.

24           MS. SHIKUNOV:  Just have a few more questions.

25           JUROR 10:  Mm-hmm.

1                 MS. SHIKUNOV:  In your HR capacity, did you ever take

2    any discrimination complaints or sexual harassment complaints?

3                 JUROR 10:  I don't believe so.

4                 MS. SHIKUNOV:  Was that handled by a separate

5    department, or just none came your way?

6                 JUROR 10:  I don't think -- and there were some

7    underlying things that people thought there might be some stuff

8    going on, but nothing kind of came of it.

9                 MS. SHIKUNOV:  Okay.  How long were you in that

10   position for?

11                JUROR 10:  Fifteen, sixteen, seventeen years.

12                MS. SHIKUNOV:  Was there a sexual harassment

13   (unintelligible) policy in place at the time that you were

14   employed by HR?

15                JUROR 10:  I think so.  I try not to think about

16   those days.  You're retired and my life changed.

17                THE COURT:  That's right.  That's right.  They're not

18   paying you to think about that anymore.

19                JUROR 10:  That's right.  Well, I moved from Haverton

20   out to Chester County three weeks after I retired.  So, live

21   was kind of busy.

22                MS. SHIKUNOV:  Just another follow-up question.

23                JUROR 10:  Sure.

24                MS. SHIKUNOV:  Did you ever handle any employee

25   complaints in general?

1          JUROR 10:  Yeah, I had people who would come into my

2    office and complain about this, that and the next thing.  Yes.

3          MS. SHIKUNOV:  And in your position as interim, did

4    you ever conduct an investigation into those complaints?

5          JUROR 10:  Well, I did talk to several people, to try

6    to find out more information.

7          MS. SHIKUNOV:  What were the natures in the

8    complaints you handled?

9          JUROR 10:  People didn't get on with their

10   supervisor.  That kind of thing.

11         MS. SHIKUNOV:  Were you ever tasked with disciplining

12   the supervisor if there was an employee complaint?

13         JUROR 10:  I had to have several conversations with a

14   woman who worked for me, because she was very rude to the dean.

15    So, this (unintelligible) not a dumb thing.

16         THE COURT:  Doesn't seem like a good idea.

17         JUROR 10:  No.  But she -- yeah, she had her own mind

18   about things.

19         MS. SHIKUNOV:  Were you tasked with disciplining that

20   employee?

21         JUROR 10:  Well yeah, that was my responsibility.

22   Yeah.

23         MS. SHIKUNOV:  I don't think I have any further

24   questions.

25         MR. CAVALIER:  No, we have nothing for Ms. Hughes.

```
 1                  MS. DIBIANCA:  We don't have any questions.
 2                  THE COURT:  Do you have anything for us?
 3                  JUROR 10:  You need me to tap dance on the table?
 4                  THE COURT:  I'd be super impressed.
 5                  JUROR 10:  I would be too.
 6                  THE COURT:  And it would make the day go faster.  And
 7    we'd all have a story to tell.
 8                  JUROR 10:  Right.  That's right.
 9                  THE COURT:  Thank you so much.
10                  JUROR 10:  Thank you so much.
11                  THE COURT:  I'm afraid we're going to have to hold
12    you next door with the rest of the --
13                  JUROR 10:  With the herd?
14                  THE COURT:  With the herd, who have all been so good
15    and so dedicated in showing up here.  And the reward is, go
16    find the hardest bench next door and sit on it for another
17    couple of hours.  Thank you so much.
18                  JUROR 10:  All right, thank you so much.
19                  (Pause.)
20                  THE COURT:  Any motions on --
21                  MS. DIBIANCA:  I'm sorry, I was just getting him to
22    do it.
23                  THE COURT:  No?  Okay.  No motions, counsel?
24                  MS. SHIKUNOV:  No motions.
25                  THE COURT:  Okay.  So, we're thinking about breaking
```

1  now.  And do you think I could get away with telling them,

2  probably not a half-hour, right?  Yeah, you get away with

3  telling them 45 minutes.

4          MS. SHIKUNOV:  I'm trying to think about what's close

5  to here.  Because that's the problem is, it's a little bit of a

6  hike.

7          THE COURT:  Pagano's is probably the closest,

8  downstairs.

9          MS. SHIKUNOV:  Yeah.

10          THE COURT:  And there's pizza there and there's a

11  deli there, and there's --

12          MR. CAVALIER:  Is there a (unintelligible) back up

13  in --

14          THE COURT:  I think I've read it was open, but I

15  haven't been there.

16          PARTICIPANT:  Excuse me, Judge.  Pagano's closed

17  during the pandemic.

18          THE COURT:  Oh, they need to be open.

19          PARTICIPANT:  No, sir.  Closed down.  Yeah.

20          THE COURT:  Oh, my goodness.  Well, there's the other

21  Pagano's, but it's about 20 blocks from here.

22          MS. SHIKUNOV:  Oh, I know that Pagano's very well,

23  because that was the building I worked in when I started this

24  case.

25          PARTICIPANT:  They're still open.  That's down on the

1   corner of 7th.  How about the (unintelligible).

2            PARTICIPANT:  Oh, that's right.

3            (Simultaneous speaking.)

4            THE COURT:  Christine, if you're asked, maybe DeBois

5   is the place they go.  How short of a time do you think I can

6   get away with telling them?

7            PARTICIPANT:  I think a half-hour is good.

8            MS. SHIKUNOV:  I think 30 minutes is tight.

9            PARTICIPANT:  I would actually vote for a half-hour,

10  but I think it's tight.

11           MS. KEESLER:  But I think it's tight.

12           THE COURT:  Or should we just bite it and --

13           MS. KEESLER:  Just give them an hour.

14           THE COURT:  -- do the hour.

15           MS. KEESLER:  I know jurors always come back late, or

16  they're (unintelligible).

17           THE COURT:  Yeah.

18           MS. KEESLER:  So if the goal is to actually have them

19  back by an hour, then I might say 45 minutes.

20           THE COURT:  Well, and you're right, Susan.  But I

21  think that if one doesn't come --

22           PARTICIPANT:  We could just roll with it.

23           (Simultaneous speaking.)

24           PARTICIPANT:  I was just going to say that as long as

25  we get like 11 and 12 back on time, we're probably --

```
 1              THE COURT:  Right.  Right, that'll buy enough space
 2  for the rest.
 3              COUNCIL:  And 13 wants absolutely no part of this.
 4              PARTICIPANT:  I'm so curious to talk to 13.
 5              (Simultaneous speaking.)
 6              (Whereupon, the above-entitled matter went off the
 7  record at 1:11 p.m. and resumed at 2:20 p.m.)
 8              THE COURT:  So, anyway, counsel, I appreciate your
 9  patience.  I had to fall on the sword there because I did not
10  give that --
11              PARTICIPANT:  It worked out just fine.
12              THE COURT:  -- a standard instruction, but it seems
13  like no harm, no foul.
14              PARTICIPANT:  Exactly.
15              (Simultaneous speaking.)
16              THE COURT:  You can strike the judge for cause
17  though.
18              (Laughter.)
19              PARTICIPANT:  Don't kid.  I've seen crazy things
20  happen.
21              THE COURT:  Well, I'll take that under advisement and
22  hope one side briefs on my behalf.  All right, we're good for
23  the next one?  What number, 11, Christine?
24              PARTICIPANT:  Eleven.
25              THE COURT:  Thank you.  We good now?
```

```
 1              MR. CAVALIER:  Yeah.

 2              PARTICIPANT:  Hi, welcome.

 3              MR. CAVALIER:  How are you doing?

 4              PARTICIPANT:  Good, how are you doing?

 5              MR. CAVALIER:  Have you met Colin?

 6              THE COURT:  Colin is an intern with us this summer.

 7              MR. CAVALIER:  Oh, nice.

 8              PARTICIPANT:  Awesome, congratulations.

 9              PARTICIPANT:  I thought all right, I did the program

10    at Temple.

11              THE COURT:  He's doing great work for us.

12              PARTICIPANT:  That's great, an awesome experience.

13              THE COURT:  Sir, come on in.  We saved a seat for

14    you.

15              JUROR 11:  Oh, thank you.

16              THE COURT:  What do you think of that?  Thank you

17    very much.  You know, I said it to the group.  I said I want to

18    say it individually too, but thank you for your patience today.

19              I know this is a lot to ask, but as I also mentioned

20    outside, it's that important, and, you know, everybody that you

21    see in this room, myself included, but particularly the lawyers

22    and their clients, you know, we need to find a fair jury that's

23    going to be able to, you know, fully participate in the

24    evaluation of the evidence and, you know, so it takes some

25    time, so thank you.
```

```
 1                 JUROR 11:  I understand.

 2                 THE COURT:  That's my long way of saying thank you.

 3                 JUROR 11:  From New York?

 4                 THE COURT:  Queens.

 5                 JUROR 11:  My parents are from Brooklyn.

 6                 THE COURT:  Oh, from Brooklyn.

 7                 JUROR 11:  I've been there a million times.  I know

 8    the accent.

 9                 THE COURT:  First generation Pennsylvanian?

10                 JUROR 11:  Yeah, from New Jersey, yeah.

11                 THE COURT:  Yeah, and the first question I've been

12    asking, and there's no wrong answer, do you mind -- are you

13    made less comfortable if we have our masks off?

14                 JUROR 11:  Oh, I don't care.  It doesn't matter.

15                 THE COURT:  All right, music to my ears.  Thank you.

16     I appreciate it, but I'm more uncomfortable if you take yours

17    off.

18                 (Laughter.)

19                 THE COURT:  No, I'm teasing.  I'm teasing.  Now,

20    would that be fair?  Fair is the word here.

21                 PARTICIPANT:  Exactly.

22                 THE COURT:  So, a couple of things and, you know, I

23    mentioned the errand briefly here.  There's a lot of

24    inconvenience involved to picking a jury and for the jurors.

25    Sometimes it's even more than that.
```

1          It creates a hardship that is really just too much to
2    ask or results in a situation where a juror can't focus
3    properly the way we need them to focus, but I do try to
4    distinguish between something that may be an inconvenience,
5    even a real big pain in the inconvenience, and then the next
6    level is hardship.
7          Sometimes timing just makes it that way, you know, or
8    people's circumstances.  There's no right or wrong, but that's
9    one of the factors we're considering here, so I always start
10   out with mentioning how long and where.  We're in -- what
11   county are you in?
12         JUROR 11:  (inaudible)
13         THE COURT:  Well, have I got some news for you. The
14   length of the trial we expect is going to be five days
15   including today, so four days, but here's the good news.  It
16   won't be in Philadelphia.  It's going to be in Allentown or
17   Hamilton and 6th, Hamilton and 5th.  Talk to me.  Are you
18   pained?
19         PARTICIPANT:  It looks that way.
20         JUROR 11:  I mean, no.  I mean, the location is great
21   for me, but I'm a small business owner.  I'm a one-person shop.
22   I'm a financial advisor and my only secretary, she's battling
23   cancer right now, and she's having a mastectomy and she hasn't
24   been there for a couple of months.  I'm doing everything on my
25   own.  I'm running the whole business myself.

 1                THE COURT:  Okay.

 2                JUROR 11:  And it's, I mean, everything is on me, and

 3     being out of the office is, I mean, it's hard, and that's the

 4     only reason.  If I didn't have that, I'd have -- I'd be fine.

 5     That's my only thing that I can tell you as to why I couldn't

 6     serve.

 7                THE COURT:  And you'd have to close the door for

 8     those four days?

 9                JUROR 11:  Yes, and I go from Allentown to King of

10     Prussia every day, so I do drive a bit, but again, I'm on my

11     own.  If I'm out of the office all next practically, that would

12     be really, really difficult.

13                THE COURT:  And that's your primary source of income?

14                JUROR 11:  My only source.

15                THE COURT:  Okay, all right, okay, any objection to

16     releasing?  Okay, all right, we appreciate it.  I think what

17     you have described is sort of a word picture of what a hardship

18     is, and I appreciate that, your willingness to serve, but I

19     also respect the circumstances.

20                JUROR 11:  Thank you, Your Honor.  I appreciate that.

21                THE COURT:  No, no, of course.  You know, we're going

22     to have to keep you next door until we release them, but then,

23     you know, maybe we'll get you on another panel --

24                JUROR 11:  That's fine.

25                THE COURT:  -- down the road, all right?

```
 1              JUROR 11:  As long as she's back to help me, that's

 2   fine.

 3              THE COURT:  Well, you know, I'm obviously hoping the

 4   best for her, you know, I mean, not just, you know, for your

 5   business, but also for her --

 6              JUROR 11:  Yes.

 7              THE COURT:  -- of course.

 8              JUROR 11:  Yes, absolutely.

 9              THE COURT:  All right, good man.

10              JUROR 11:  Thank you, sir.

11              THE COURT:  Thank you so much.

12              MS. SHIKUNOV:  Thank you.

13              JUROR 11:  Thank you, everybody.

14              MS. SHIKUNOV:  Thank you.

15              THE COURT:  I don't need a motion for that.  I'm just

16   going to strike his cause, okay?

17              MR. CAVALIER:  (inaudible) extra pre-emptor

18   (inaudible).

19              (Laughter.)

20              MS. SHIKUNOV:  I was not following you there for a

21   minute.

22              THE COURT:  All right, number 12, what do we got?  We

23   need to get a streak going here.  We're ready.  Thank you.

24   Welcome, and please come on in.  You didn't get drenched at

25   lunch time, did you?
```

```
 1                    JUROR 12:  No, no, I stayed dry.

 2                    THE COURT:  Good man.

 3                    JUROR 12:  It's all good.

 4                    THE COURT:  Good man.  The first thing I've been

 5      asking everybody, and there's no wrong answer, are you made

 6      less comfortable if we had our masks off?

 7                    JUROR 12:  No.

 8                    THE COURT:  Do you mind?

 9                    JUROR 12:  No.

10                    THE COURT:  Okay, great, and I hope -- feel free.

11                    JUROR 12:  Yeah.

12                    THE COURT:  How nice is that?

13                    JUROR 12:  That feels better, yeah.

14                    THE COURT:  Thank you.  Again, there's no wrong

15      answer.  It's everyone's personal preference, but, you know,

16      since we're going to be talking unlike yes and no and holding

17      up the numbers --

18                    JUROR 12:  Yeah.

19                    THE COURT:  -- it just makes it so much easier.  So,

20      you're from Philly?

21                    JUROR 12:  Mm-hmm.

22                    THE COURT:  Okay, so you had one of the shorter trips

23      today.

24                    JUROR 12:  Yeah.

25                    THE COURT:  One of the things that is important for
```

1   us to talk about in the next few minutes is whether there is

2   hardships that would make, you know, make it extremely

3   difficult for you or other jurors to serve on this case.  You

4   know, again, we all know jury duty can be inconvenient, but we

5   mean like hardships.

6               JUROR 12:  Mm-hmm.

7               THE COURT:  One of the first things I tell people is

8   the when and the where because sometimes that factors in.  This

9   case, we anticipate, we expect will be five days, including

10  today.  This case will not be in Philadelphia.  The trial would

11  be in Allentown.

12              JUROR 12:  Oh.

13              THE COURT:  Starting -- there's no mass transit to

14  Allentown if --

15              JUROR 12:  Right.

16              THE COURT:  -- you were wondering.

17              JUROR 12:  Yeah.

18              THE COURT:  So, starting with that, does that fall

19  into either of those categories, inconvenience or hardship?

20              JUROR 12:  That is a hardship, yes.

21              THE COURT:  Talk to me.

22              JUROR 12:  Well, transportation is not a problem.

23  I'm taking care of my mother.  She had a stroke about eight

24  months ago.

25              THE COURT:  Oh, I'm sorry to hear that.

1            JUROR 12:  Yeah, so my neighbor is watching her now,

2    but, you know, to be away for four days or even five --

3            THE COURT:  Okay, it's the length of time?

4            JUROR 12:  Yeah.

5            THE COURT:  And I'm sure you would tell us if there

6    was any alternate means, if you had a sibling or someone who

7    was able to watch her, but that's not the case?

8            JUROR 12:  Not right now, no.

9            THE COURT:  Okay, okay, well, then this might not be

10   the case for you and, you know, it's through no fault of your

11   own.

12           JUROR 12:  Okay.

13           THE COURT:  But I'm not going to put you in the pool

14   of jurors from whom we're going to select for this case.

15           JUROR 12:  Thank you.

16           THE COURT:  Okay?

17           JUROR 12:  Yes.

18           THE COURT:  That's good news, and, you know, I wish

19   you the best of luck with your mom, but we do have to keep you

20   next door for a little while longer --

21           JUROR 12:  Okay.

22           THE COURT:  -- while we continue to process.

23           JUROR 12:  All right.

24           THE COURT:  Okay?

25           JUROR 12:  Thank you.

1                    THE COURT:  It was good to meet you.

2                    JUROR 12:  Thank you.

3                    THE COURT:  And thank you for being here today.

4                    JUROR 12:  All right.

5                    MR. CAVALIER:  That's going to be three in a row.

6                    PARTICIPANT:  They always say like bad things come in

7        threes, so we'll get the three out of the way and then

8        everybody else will be available.

9                    MR. CAVALIER:  This next guy has got to be on the

10       jury.

11                   PARTICIPANT:  Yeah, I'm kind of excited.  I'm not

12       going to lie.

13                   PARTICIPANT:  I know.

14                   THE COURT:  Want to wager whether it's okay to take

15       this off?

16                   PARTICIPANT:  Yeah, $100.  Oh, I would say that it

17       is, don't you think?

18                   MR. CAVALIER:  No.

19                   PARTICIPANT:  Oh, no?

20                   MR. CAVALIER:  No way.

21                   THE COURT:  All right, come on in.  Good, we saved a

22       chair for you.

23                   JUROR 13:  Oh, my gosh.  Thank you so much.  I'm not

24       used to that.  I'm usually the oddball out.

25                   THE COURT:  Christine, turn on the bright lights in

1    here, all right?  You know, it's time for the third degree.

2              (Laughter.)

3              THE COURT:  Thanks for being here today.  You know,

4    as I mentioned outside -- oh, sorry, bad habits.  Well, let me

5    ask you, are you made less comfortable if I'm unmasked?

6              JUROR 13:  No, I'm vaccinated.

7              THE COURT:  We all are too.  You don't mind?

8              JUROR 13:  Yeah, I work in the service industry, so

9    feel free.

10             THE COURT:  All right, and you can feel free too.

11             JUROR 13:  Yeah.

12             THE COURT:  But, well, look, I appreciate your

13   occupation because you're, you know, you're exposed more than

14   any of us, so I hope you -- you know, I wish you good health,

15   continued good health.

16             So, there are a number of things we'll talk about in

17   the next few minutes, but this is our chance to speak more

18   narratively rather than, you know, and I think I saw your

19   number quite a few times.

20             JUROR 13:  Yeah (inaudible).

21             THE COURT:  Was your upside-down, your number?  That

22   wasn't yours?

23             JUROR 13:  No, no.

24             THE COURT:  That was one of your neighbors?

25             JUROR 13:  That was somebody else, yeah, yeah.

1              THE COURT:  So, we talk very briefly about, you know,

2    this sort of notion of hardship versus inconvenience, and it's

3    different for every potential juror, and sometimes it's more

4    about timing of things going on in people's lives or there

5    could be other factors.

6              So, you know, we try to separate out, you know, if

7    something's an inconvenience, even like, you know, a big

8    inconvenience, if I'm comfortable that it's not going to be a

9    distraction where a juror is still going to be able to carry

10   out their duties and do it fairly, you know, that to me is, you

11   know, a different bar, a lower bar than a true hardship, and a

12   hardship could come in many different forms.

13             And so that's sort of one of the things that I'm

14   trying to find out here today, so I'll ask a couple of

15   questions, but I want you to feel free to share anything you

16   think, you know, well, maybe that's not a hardship, but this is

17   what I'm dealing with.

18             JUROR 13:  Right.

19             THE COURT:  And we're open to hear anything that

20   anyone has to say.  So, the first thing that I've been telling

21   folks is that this case would be five days, including today.

22   That's our estimate.  And what county do you live in?

23             JUROR 13:  I'm in Philadelphia.

24             THE COURT:  Philly.

25             JUROR 13:  Yeah.

```
 1              THE COURT:  The trial would be in Allentown,
 2   Pennsylvania.
 3              JUROR 13:  That's my hometown.
 4              THE COURT:  Oh, is it?
 5              PARTICIPANT:  Oh.
 6              THE COURT:  Are you an Allen graduate?
 7              JUROR 13:  No, I went to Central Catholic.
 8              THE COURT:  Oh, Central Catholic.  Well, you know
 9   where we are then.
10              JUROR 13:  Yeah.
11              THE COURT:  Do you still have family there?
12              JUROR 13:  Just a couple of blocks away.
13              THE COURT:  A couple of blocks away?
14              JUROR 13:  Yeah.
15              THE COURT:  Yeah, yeah, you were over at 4$^{th}$ and
16   Chew, right?
17              JUROR 13:  Yeah.
18              THE COURT:  Yeah, right by the hospital.
19              JUROR 13:  Right.
20              THE COURT:  Yeah, when did you graduate?
21              JUROR 13:  '13.
22              THE COURT:  Small world, small world.  Well, anyway,
23   then I don't if that time and place creates an inconvenience or
24   a hardship, or if there's anything else that might.  We need
25   you to tell us.
```

1                    JUROR 13:  Yeah.

2                    THE COURT:  And just be straight with us.

3                    JUROR 13:  So, I will -- so I production manage

4     concerts for a living.  I'm an independent contractor, excuse

5     me, and the only thing is that on Tuesday, I have a 300-person

6     concert at Bach and I production manage it.  So, it would be

7     like you having to run a trial without you there that you've

8     spent --

9                    PARTICIPANT:  Impossible.

10                   JUROR 13:  -- three months preparing for.

11                   PARTICIPANT:  Can't be done.

12                   JUROR 13:  So, that's the only thing.  That would be

13    on Tuesday.

14                   THE COURT:  Yeah.

15                   JUROR 13:  And then I have like a big prep on Monday,

16    and I can show you my schedule and all the things that I have

17    to prove that.

18                   THE COURT:  No.

19                   PARTICIPANT:  No, no, no.

20                   THE COURT:  If we asked you to do that, you'd be the

21    first one we're asking to do that.

22                   PARTICIPANT:  Right.

23                   THE COURT:  We're not going to ask that.

24                   JUROR 13:  Right, yeah.

25                   THE COURT:  We're comfortable you're telling us the

 1   truth.  And by the way, you know, I talked about inconveniences

 2   and hardships.  Your livelihood without having someone to back

 3   you up falls in that category.

 4            JUROR 13:  Yeah, I mean, it would be literally

 5   impossible for me, like I'm, like, working.  I mean, I'm on my

 6   phone, like I'm, like -- I had to, like -- I was supposed to go

 7   in yesterday, so I had to like -- because I have concerts all

 8   this week and then all next week.

 9            THE COURT:  Well, it's the summer.

10            JUROR 13:  So, I had to, like, reschedule.  I'm,

11   like, texting people and my manager called out, so, like, it

12   was a lot of stuff.

13            THE COURT:  I didn't know why, but I was -- I went

14   out on a limb when we finished questioning out in the courtroom

15   and I said I don't think number 13 wants to be with us next

16   week.

17            JUROR 13:  No, I really, I really can't.

18            THE COURT:  See, I was right.

19            JUROR 13:  Yes, yes.

20            THE COURT:  These guys didn't believe me.  Well,

21   look, we think that it's good cause and we appreciate you being

22   here today, and, you know, maybe, you know, down the road,

23   another panel will be the right panel for you, the right timing

24   because, look, it is super important, you know what I mean.

25            JUROR 13:  No, I was super -- I love jury duty.

1                    THE COURT:  Oh, you do?

2                    JUROR 13:  I live for this shit, like --

3                    THE COURT:  Oh, well, I wouldn't have guessed that --

4                    JUROR 13:  I'm the type of person --

5                    THE COURT:  -- from your answers.

6                    JUROR 13:  Well, I like sitting in on the drama and

7        it's very entertaining.

8                    THE COURT:  Well --

9                    JUROR 13:  I'm in the entertainment industry, so I

10       like that stuff.

11                   THE COURT:  Don't share this with anybody, but you're

12       missing out on the drama in this case, my friend.

13                   JUROR 13:  I know, I bet.  Also, to be quite, like,

14       open and honest, like there's no way.  Like as soon as I walked

15       in, you're like this is like a sexual assault case, and then I

16       saw her, and then I saw him, and I'm sorry.  There's no way --

17                   THE COURT:  Well, and --

18                   JUROR 13:  -- that I could ever, like -- just, like,

19       seeing him skulk around, like just, I was like absolutely not,

20       so.

21                   THE COURT:  You know you can't talk to anybody out

22       there, right?

23                   JUROR 13:  Absolutely not.  Well, I haven't talked.

24       You know, I keep (inaudible) but you said be honest.

25                   MS. SHIKUNOV:  Are you sure you can't sit on this

1   jury?

2           (Laughter.)

3           (Simultaneous speaking.)

4           JUROR 13:  I was like if you want, like if you want

5   me to, and I was like just being honest, like if you wanted me

6   to vote a certain way, absolutely, but there's no way that I

7   could be impartial.

8           THE COURT:  Look, I appreciate your honesty, but can

9   you be fair?

10          (Laughter.)

11          JUROR 13:  I could be fair, but like, I'm like, you

12  know.

13          THE COURT:  Well, do you know what?  We could just

14  give him the verdict form now --

15          PARTICIPANT:  Yeah.

16          THE COURT:  -- and he can go to work because I think

17  he already knows, so.

18          (Laughter.)

19          THE COURT:  Anyway, look, we do appreciate it.

20          JUROR 13:  Yes, thank you.

21          THE COURT:  And I hate to tell you, you got to stick

22  around a while longer.

23          JUROR 13:  I know.

24          THE COURT:  I know this takes a while, but there will

25  be another case.

1              JUROR 13:  I know.  It's like Catholic school all
2       over again in the pews.
3              THE COURT:  Yeah.
4              PARTICIPANT:  It is so painful.
5              THE COURT:  Yeah, but you're also missing out on --
6       you know, you could have had mom's cooking or something while
7       you were back there, right?
8              JUROR 13:  No, no, no, no, no.
9              (Laughter.)
10             THE COURT:  Well, we appreciate it.
11             JUROR 13:  Thank you.
12             THE COURT:  All right, stay safe now.
13             MS. SHIKUNOV:  Thank you.
14             THE COURT:  And have a great show next week.
15             JUROR 13:  Thanks.
16             THE COURT:  Did we --
17             (Simultaneous speaking.)
18             MR. CAVALIER:  He was 13.
19             THE COURT:  So, did we have five in a row?
20             MR. CAVALIER:  No, three.
21             PARTICIPANT:  No, 10 was not a strike.
22             THE COURT:  Oh, okay.
23             MR. CAVALIER:  Nine, 11, 12, and 13.
24             PARTICIPANT:  Yeah.
25             THE COURT:  Nine, 11 --

1          PARTICIPANT:  Hey, I was the only one who thought he
2   wouldn't want a mask on and I have to say I was right on that.
3          PARTICIPANT:  You were right on that.
4          PARTICIPANT:  Everybody else was like all mask.
5          PARTICIPANT:  That was not what I expected, but just
6   as entertaining.
7          THE COURT:  That would have been malpractice for all
8   of us.
9          PARTICIPANT:  He actually said I live for this shit.
10          MR. CAVALIER:  I love this shit.
11          PARTICIPANT:  He said I live for this shit.
12          PARTICIPANT:  Wait, so he graduated high school in
13   2013, so he's 26?
14          MR. CAVALIER:  Twenty-six.
15          THE COURT:  All right.
16          MR. CAVALIER:  He is 26.
17          THE COURT:  Next up?
18          (Simultaneous speaking.)
19          PARTICIPANT:  Yeah, that's absolutely right.
20          MR. CAVALIER:  Credit to him.
21          PARTICIPANT:  Give him credit for that.
22          THE COURT:  More pleasant than I would have expected.
23          PARTICIPANT:  Yeah, absolutely.
24          THE COURT:  Sir, come on in.  Thank you.
25          JUROR 14:  Thank you.

1             THE COURT:  It's nice to see you.

2             JUROR 14:  Nice to see you.

3             MS. SHIKUNOV:  Hi.

4             JUROR 14:  Hi.

5             THE COURT:  The first question I've been asking, and

6     there's no wrong answer, would you feel less comfortable or

7     less safe if we were not wearing these?

8             JUROR 14:  I'm vaccinated, so it's fine with me.

9             THE COURT:  You don't mind if we take them off?

10            JUROR 14:  Not at all.

11            THE COURT:  Because we're also vaccinated.

12            JUROR 14:  Great.

13            THE COURT:  Good.

14            JUROR 14:  I've been wearing a mask this long, since

15    --

16            THE COURT:  Hey, you know, I always say with that

17    question, there's no wrong answer, but there is an answer

18    that's more right.

19            (Laughter.)

20            THE COURT:  And you got it, so thank you.  We

21    appreciate it.  I see you're in Delaware County.  One of the

22    things we need to talk about -- now we get the chance to speak

23    actually more narratively than yes and noes and holding up

24    numbers, but we need to make sure that jurors --

25            Obviously, we have to have a fair jury, a jury that's

1   going to be able to, you know, hear all of the evidence and do

2   the hard work that goes into being a juror, and follow the law,

3   but we also appreciate that sometimes people have hardships and

4   it might not be the right time to be on jury duty.  That, as I

5   mentioned outside, is different than an inconvenience.

6          You already have been inconvenienced sitting here

7   today, but again, I tell you and I think you appreciate it,

8   despite the inconvenience, it's just such an important and

9   necessary duty, and so we're very grateful for it, but we kind

10  of do want to talk about if there's anything that is like truly

11  a hardship for sitting on a jury in this particular case, and

12  the first thing I like to bring up is the when and the where.

13         So, you're here today.  We can't give that back to

14  you.  This trial would be five days.  That's our estimate,

15  including today.  This trial, that's the when.  The where is

16  not here.  It's in Allentown in the federal courthouse.  So, I

17  know it would be up 476.  I don't know if you took the train in

18  today, but there is no mass transit to Allentown.

19         So, I share that and I also ask like just at the

20  outset here if there's any physical, or medical, or any type of

21  disability that would also be a problem for sitting on a jury,

22  and again, receiving in a serious fashion a significant amount

23  of information over a period of probably four days.

24         We get a break in the afternoon, a break in the

25  afternoon and a lunch, but, you know, it's a critically

1    important duty, but it's also, it's work, it's work.

2            So, my questions are a hardship based on the when,

3    the where, whether there's any disabilities, and then counsel

4    can also ask anything that they want and you can offer anything

5    in terms of whether, you know, fairness, or hardship, or

6    anything like that, okay?

7            JUROR 14:  It depends on what you mean by hardship.

8    I mean --

9            THE COURT:  Well, I --

10           JUROR 14:  -- there's hardship and then there's

11   hardship.

12           THE COURT:  And I have a very high bar, but it's easy

13   for me to have a high bar, right, because I have to be there.

14   Look, again, I think it's subjective.  It's going to depend on

15   each individual juror.  If there's things that, you know -- you

16   know, I'll tell you what's an easy hardship and a positive

17   hardship.

18           My family and I have a prepaid vacation.  Go have

19   fun.  There will be other cases, okay, or, you know, there's a

20   family medical situation where I have to care for somebody and

21   no one else is available that I trust.  Those are pretty easy

22   ones, you know.

23           Lesser, and please don't think I'm cavalier about it,

24   but, you know, missing work is a big deal, but it's a big deal

25   for everybody, and, you know, we also want jurors that are a

1   mix, not just people who are not working.  You know, ideally

2   you get a nice cross-section, a nice representation of the

3   community.

4           So, I know that's not like a very good -- you know,

5   there's no bright line rule there for you, but, like generally

6   speaking, you know, there's things that are inconveniences and

7   maybe even super inconvenient that don't rise to that level,

8   and I urge and ask the jurors to look at it that way.

9           Like I said out there, like if we ever, you or I,

10  ever needed a jury and our rights and responsibilities were at

11  stake, or someone we care about, our family or something, you

12  know, we want jurors who realize and appreciate that

13  significant responsibility and bear with the inconvenience.

14          That's my pitch.  My second pitch is, even though I'm

15  a transplant, Allentown is beautiful this time of year.  You

16  know, there's been a renaissance going on.  There's restaurants

17  there.  I don't know if you ever get up there, but sincerely,

18  it is on the upswing, but that's a lesser factor, so, but, you

19  know, we'll hear whatever you want to say on it.

20          JUROR 14:  It will be difficult.  I have an eight-

21  year-old and my wife works.

22          THE COURT:  She works?

23          JUROR 14:  Yeah, and like you guys' work is right

24  now, where I work, we close Friday and we're closed for a

25  month, and there's an audit coming up and there's no one really

1  else to prepare for the audit other than me.

2           THE COURT:  So, when you say the shop is closed --

3           JUROR 14:  I work for a private club in the city.  I

4  work six blocks from here, seven blocks from here, so it wasn't

5  an inconvenience for me to come down here at all --

6           THE COURT:  Right, right, right.

7           JUROR 14:  -- because I went to work before I came

8  here and worked and then walked down, but it's, yeah, it's

9  going to be a challenge.  It would be a real challenge.

10          THE COURT:  Who, if anyone, would be able to watch

11 your child if it wasn't you?

12          JUROR 14:  My mother-in-law is in Puerto Rico, so I

13 really don't know at this point.

14          THE COURT:  Right, okay.

15          JUROR 14:  I'd have to talk to my wife about that.

16 My sister is away in Maine, so it's --

17          THE COURT:  It's a travel month.

18          JUROR 14:  Yeah, it's a travel month.  I have an 18-

19 year-old son, but he's got work.  He works full time before

20 he's going into college as a freshman in September, so he's

21 trying to make some money.  So, that would be something that

22 I'd have to spend some time working on.

23          THE COURT:  Yeah, and obviously you have to have

24 someone you trust.

25          JUROR 14:  Yeah.

1          THE COURT:  That's most important.

2          JUROR 14:  Yeah.

3          THE COURT:  Counsel, do you want to ask any

4     questions?

5          MS. SHIKUNOV:  I feel like I was hogging going first,

6     so I was just like -- I just have some follow-up questions on

7     some answers that you held your number up for.

8          JUROR 14:  Sure.

9          MS. SHIKUNOV:  So, you had indicated that yourself or

10    a family member had participated in a lawsuit previously?

11         JUROR 14:  Yes.

12         MS. SHIKUNOV:  Can you tell me about that lawsuit?

13         JUROR 14:  Well, there's one ongoing.  It was an

14    automobile accident --

15         MS. SHIKUNOV:  Okay.

16         JUROR 14:  -- and personal injury.  It was a

17    collision and there's a lawsuit.

18         MS. SHIKUNOV:  And are you personally involved in

19    that or is that somebody in your family?

20         JUROR 14:  Me.

21         MS. SHIKUNOV:  Okay, and are you the plaintiff or the

22    defendant?

23         JUROR 14:  I'm the defendant.

24         MS. SHIKUNOV:  Okay, and what firm is representing

25    you or representing your insurance company?

1          JUROR 14:  I'm being -- my insurance company is the
2     one that's taking care of the case, although I've retained
3     somebody, but I haven't had to use him yet.
4          MS. SHIKUNOV:  Can you give me the names of the two
5     law firms that are involved?
6          JUROR 14:  I think -- it's changed a couple of times,
7     the plaintiff, so I don't really know.
8          MS. SHIKUNOV:  I'm asking your lawyer, sir, the law
9     firms that you're involved in and --
10         JUROR 14:  Travelers is the one that's representing
11    me right now.
12         MS. SHIKUNOV:  Okay, okay, and --
13         JUROR 14:  I'm the insured and they're the insurance
14    company.
15         MS. SHIKUNOV:  Sure, sure, I'm just -- I'm asking,
16    Your Honor, because my husband is a personal injury defense
17    attorney --
18         THE COURT:  I recall.
19         MS. SHIKUNOV:  -- and so that's why I'm asking what
20    law firm it is because there may be a conflict.
21         JUROR 14:  Yeah, he's bounced around from one to the
22    other and to another, and I don't know who that is.
23         MS. SHIKUNOV:  Okay, you don't know who your attorney
24    is?
25         JUROR 14:  I'd rather not say at this point.  I've

1   just retained somebody that I know, but I haven't had to use

2   him yet.

3          MS. SHIKUNOV:  Is the law firm McCormick and Priore?

4          JUROR 14:  No.

5          MS. SHIKUNOV:  Okay, that was probably the easier way

6   to do it.  I was not trying to force that issue, but -- and you

7   also answered that you are in human resources or somebody that

8   you know?

9          JUROR 14:  I work for a private club, and so we're

10  really small, so we do a lot of different things and that's one

11  of the things that we do.

12         MS. SHIKUNOV:  And you mentioned that you've had to

13  terminate somebody?

14         JUROR 14:  Yes.

15         MS. SHIKUNOV:  Was there a lawsuit that arose out of

16  that termination?

17         JUROR 14:  No.

18         MS. SHIKUNOV:  Okay, those are all of the questions

19  that I have.

20         THE COURT:  Thank you, Counsel?

21         MS. DIBIANCA:  I don't have any questions, no.

22         THE COURT:  Okay, all right, we're going to talk

23  about your behind your back if that's okay.

24         JUROR 14:  Okay, so you're finished with me?

25         MS. SHIKUNOV:  Yes.

1          THE COURT:  Yeah, but we have to keep you next door

2    for now.

3          JUROR 14:  Yeah, understood.

4          THE COURT:  And I apologize for that, but we are

5    grateful.

6          JUROR 14:  Okay, thank you all.

7          MS. SHIKUNOV:  Thank you.

8          THE COURT:  Whether we see you or not, thank you so

9    much.  The work doesn't bother me, but the childcare.

10          MR. CAVALIER:  But if he's working, who's taking care

11    of the kid?

12          MS. SHIKUNOV:  That was really unclear to me, I mean,

13    because he said like they close on Friday?

14          MR. CAVALIER:  Yeah, it was odd.

15          THE COURT:  I think he meant --

16          MS. SHIKUNOV:  Yeah.

17          THE COURT:  -- they close on Friday to the membership

18    and the public, and he's working there while that's going on

19    preparing for an audit was the way I took that.

20          MR. CAVALIER:  Right.

21          PARTICIPANT:  But then why does he have to watch the

22    daughter?

23          MR. CAVALIER:  If he's working?  That's what I didn't

24    get.  How is a day of jury duty different than a day of work in

25    terms of childcare?

```
1                THE COURT:  Just a minute.

2                MS. SHIKUNOV:  I mean, it is far insofar and he's got

3   to get to Allentown --

4                THE COURT:  Sure.

5                MS. SHIKUNOV:  -- from Philly.  I was just like can

6   you just like tell me the name of your lawyer?  I was trying to

7   make sure there's not a conflict.

8                MS. DIBIANCA:  Yeah.

9                (Simultaneous speaking.)

10               MS. SHIKUNOV:  And also caring for the child, which

11  is what many parents are doing right now.

12               MS. DIBIANCA:  I just think we have a lot of strikes,

13  but we got to keep him on the list until we get to the end.

14               MS. SHIKUNOV:  Do you want to give him a question

15  mark like we did with the other juror?

16               THE COURT:  And we'll keep him for now like the other

17  man.

18               MR. CAVALIER:  Yes.

19               THE COURT:  Okay, we'll do that then and then let's

20  see where these numbers bring us.

21               MS. DIBIANCA:  Because it's only 3:00.  Oh, there's a

22  tornado watch.  There you go.  That works right into our theme

23  of this case.

24               THE COURT:  All right, so 15 then?

25               MS. SHIKUNOV:  Yeah, Judge, I just got a text from
```

1  Paul Lombardy (phonetic).  There are some remaining jurors
2  upstairs and they need to release them by 3:20, so that's a
3  half hour.  So, he wants me to text him back by 3:20.
4          THE COURT:  I don't think we're going to need to add
5  to the 30 we have, do you?
6          PARTICIPANT:  I think it's unlikely.
7          PARTICIPANT:  Right now, we've got one, two, three,
8  four, five, six, seven.
9          MR. CAVALIER:  We have seven.
10          PARTICIPANT:  We have seven right now.
11          THE COURT:  I thought we had --
12          (Simultaneous speaking.)
13          PARTICIPANT:  No, we have eight.
14          PARTICIPANT:  Eight.
15          MR. CAVALIER:  Eight right now.
16          MS. DIBIANCA:  Yeah, we have eight.
17          PARTICIPANT:  Eight with two question marks.
18          MS. DIBIANCA:  Eight with two question marks.
19          MS. SHIKUNOV:  So, we don't have to answer him now.
20  I just meant, you know, when we're at a position where
21  (inaudible).
22          THE COURT:  No, I mean, we might have to hold onto
23  them.
24          MS. SHIKUNOV:  Okay.
25          THE COURT:  I mean, we got to get through this today,

1  and if it's late, it's late.

2          MS. SHIKUNOV:  Okay.

3          THE COURT:  All right, 15?

4          PARTICIPANT:  Yeah.

5          THE COURT:  Hi.

6          JUROR 15:  Hi.

7          THE COURT:  Welcome, thanks for your patience.

8          JUROR 15:  Yeah.

9          THE COURT:  Oh, forgive me, I have to ask first.

10          JUROR 15:  Am I supposed to put this one on?

11          THE COURT:  Let me ask you first.

12          JUROR 15:  Okay.

13          THE COURT:  Will you feel less safe or comfortable if

14  we don't wear this?

15          JUROR 15:  No, I don't care.

16          THE COURT:  Okay.

17          JUROR 15:  I've been vaccinated.

18          THE COURT:  We're the same thing, so.

19          JUROR 15:  Yeah.

20          THE COURT:  And you can make yourself comfortable --

21          JUROR 15:  Okay.

22          THE COURT:  -- please.  Thank you.

23          JUROR 15:  Okay.

24          THE COURT:  But we do want you to wear the clear

25  mask.

1               JUROR 15:  Got you.

2               (Laughter.)

3               JUROR 15:  Oh, okay.  I was like what?

4               THE COURT:  That doesn't make much sense.

5               JUROR 15:  That's not fair.

6               (Laughter.)

7               THE COURT:  And we're about fair here.

8               JUROR 15:  Yeah.

9               THE COURT:  Lancaster?

10              JUROR 15:  Yes.

11              THE COURT:  Okay, just this will give us an

12   opportunity to talk that we didn't have out there, and we're

13   trying to, you know, obviously, you know, we're trying to pick

14   a jury that's going to be fair and open to hearing all of the

15   evidence on both sides, but we also need to ask of the jurors

16   if there's any particular hardships that are close to

17   insurmountable preventing their service.

18              With that little background, this is the first thing

19   that I bring up.  This case will take about, we estimate, five

20   days, and that includes today, so four after today.  Those four

21   days will be in Allentown, not Philadelphia.

22              JUROR 15:  Mm-hmm.

23              THE COURT:  So, I don't know -- you're Lancaster.  I

24   don't know if you took a train here today.

25              JUROR 15:  I did.

 1            THE COURT:  There's not a train to Allentown.  I

 2    don't know if, you know, if you drive or if there's any issue

 3    with that, but the first, you know, that's the first thing that

 4    I put out there.

 5            We also welcome any discussion, you and the lawyers

 6    can ask, about anything else that might be a concern and we

 7    just talk it out, and that's what we're going to do and that's

 8    why we're here.

 9            JUROR 15:  Okay.

10            THE COURT:  All right, sound fair?

11            JUROR 15:  Sounds good.

12            THE COURT:  So, what do you think of the time and the

13    place?

14            JUROR 15:  I'm not -- I don't love that because of my

15    job.  I'm a dental hygienist and today they had to cancel all

16    of my patients, and I have nobody to work for me, so there will

17    be -- if I have to be here next week for four days, that's

18    also, you know -- I'm working, of course.

19            I normally work two days a week, but next week, I'm

20    working four days because somebody is on vacation and I'm

21    covering Monday and Tuesday, and I don't get paid at all, so

22    I'm going to be out quite a lot of money financially which is

23    also quite a concern for me, which, you know, I want to do my

24    duty, but that's a lot of -- you know, we're talking a couple

25    thousand dollars probably that --

1          THE COURT:  Four days' work?

2          JUROR 15:  Yeah, so, I mean, I make a pretty good

3   wage that would be hard to -- I don't have savings to back it

4   up, put it that way.

5          THE COURT:  And you don't -- there is no -- the

6   dentist's office doesn't pay if you're not there?

7          JUROR 15:  She won't, no, because I'm not even full

8   time.  I don't even know if she would for full time, because I

9   know the front desk girl had to go to jury duty and she didn't

10  get paid, so, or had to go like I did today, so she didn't get

11  picked, but --

12         THE COURT:  Okay, all right, I'm going to open it up

13  to counsel here, okay?

14         MS. SHIKUNOV:  All right, I'm going to go really fast

15  and I'm just going to follow up on some answers that you gave

16  to questions.  So, my first question for you is that you had

17  indicated yes when you were asked if you felt that your

18  personal or political beliefs would influence your ability to

19  be fair and impartial in this case.  Could you explain that to

20  us a little bit more?

21         JUROR 15:  I guess for a couple of reasons, not

22  necessarily particularly the case, but my niece was sexually

23  molested by my brother-in-law, and we have been waiting for her

24  trial, like for that to hit.  It's been like a year.  It

25  happened right when COVID happened, so we have not -- I don't

1  know.

2        I guess I'm just a little negative about the court

3  system and how this all plays out in general because we've been

4  waiting so long and it's been a huge stress for my sister, and

5  my parents, and my family, and my niece is undergoing a lot of

6  stress.

7        And also, my husband is a police officer and I

8  definitely have probably some opinions that aren't always -- I

9  don't know.  They're opinionated, I guess, is the word.  I

10  don't know if I can be as partial in some situations as I would

11  want to be, but I don't know, without knowing more about the

12  case, how I would view things.

13        MS. SHIKUNOV:  And you also indicated when the judge

14  asked if there was a reason that you couldn't serve.  Is that

15  what you were talking about just now with your work situation?

16        JUROR 15:  It was mostly the work situation --

17        MS. SHIKUNOV:  Okay.

18        JUROR 15:  -- and the concern for how we're going to

19  deal with getting, with COVID and everything, how we would get

20  the patients back in because we already have nowhere to put

21  people, and then we're talking four days' worth of patients to

22  move and not give care, but.

23        MS. KEESLER:  Sorry, can I ask a follow-up to that?

24        JUROR 15:  Sure.

25        MS. KEESLER:  First of all, I'm sorry to hear about

1   your niece.

2              JUROR 15:  Thank you.

3              MS. KEESLER:  Do your opinions regarding what's going

4   on with your niece, would that impact your ability to be able

5   to hear this case?  It's not a sexual assault case, but it's a

6   sexual harassment case.

7              JUROR 15:  I don't know that it would necessarily

8   impact because it's a different age group we're talking about.

9              MS. KEESLER:  Okay.

10             JUROR 15:  If it was a younger person, then, yes,

11  probably, but --

12             MS. KEESLER:  There are also no police officers in

13  this case, nothing criminal involved.  So, knowing that,

14  despite what you said you had opinions about because, I guess,

15  your husband is a police officer, would that impact your

16  ability to be fair in this case?

17             JUROR 15:  I don't know.  No, I don't think so.

18             THE COURT:  And if I could follow-up on that too --

19  and I must say I'm very grateful for how candid you're being

20  with us.  That's what we need, you know, so we can make the

21  right decisions.  I forget if you've been on jury duty before.

22             JUROR 15:  No.

23             THE COURT:  No, so, you know, what the number one

24  rule is, is that, you know, we need jurors who are going to

25  base their decisions just on what happens in the courtroom,

1    just on the evidence that's presented by each side and the law

2    that I share with the jury, and you would hear that as a juror

3    over and over again, not just in this courtroom, and that's,

4    you know, because say you or I needed to have a jury adjudicate

5    our rights or someone we care about.

6                JUROR 15:  Mm-hmm.

7                THE COURT:  We'd want that.

8                JUROR 15:  Mm-hmm.

9                THE COURT:  You know, and nothing less, right?

10                JUROR 15:  Right.

11                THE COURT:  So, you know, we need to find a jury that

12    can uphold that ideal, and it's lofty, you know, but that's why

13    it's such a critical part of our civic duty.  You noted

14    correctly that this is sexual harassment allegations.  I know

15    you've already been asked this and counsel asked you.  I'm

16    going to ask you again.

17                With everything that I'm saying, do you think you'd

18    be able to just, again, evaluate the evidence as it comes into

19    the courtroom in the case, and apply the law as I explain it,

20    and render a verdict without bias or being unfair to either

21    side?

22                JUROR 15:  I probably can't answer that I'm sure that

23    I could not be biased toward either side without doubt, but I

24    would do my best to, you know what I mean, not make any --

25    there's probably a part of me that would probably be leaning

1   one way, but I wouldn't --

2              THE COURT:  Okay.

3              JUROR 15:  But I would listen, and I understand the

4   rules and --

5              THE COURT:  And you would follow them?

6              JUROR 15:  I would try to do -- yeah, I know that's

7   what you're supposed to do, so, but that would be probably a

8   head game, you know, trying to fight against what your bias

9   might be versus the actual knowing what you need to go by, the

10  evidence --

11             THE COURT:  Okay.

12             JUROR 15:  -- I should say.

13             THE COURT:  Well, again, I appreciate the candor.

14             JUROR 15:  If that makes sense.

15             THE COURT:  No, it does.  Counsel, any questions?

16             MR. CAVALIER:  Ma'am?

17             JUROR 15:  Yes?

18             MR. CAVALIER:  Would it affect your ability to be

19  fair if you heard testimony from witnesses in this case that

20  did, in fact, allege sexual assault?

21             JUROR 15:  Explain what you mean by that.

22             MR. CAVALIER:  If one of the witnesses took the stand

23  and testified that the defendant sexually assaulted her, would

24  that make it difficult for you to be fair and impartial?

25             JUROR 15:  Possibly.

1          MR. CAVALIER:  If one of the witnesses in this case

2     was a former policeman, do you think that you would give his

3     testimony different weight than you would give other witnesses

4     because of the fact that he was a former policeman?

5          JUROR 15:  No, not necessarily.

6          MR. CAVALIER:  That's all I have.

7          THE COURT:  Okay, any follow-up?

8          MS. KEESLER:  No, Your Honor.

9          THE COURT:  All right, well, thank you so much.  I

10    wish I could tell you that you're free to leave, but that would

11    be premature.

12         JUROR 15:  Okay.

13         THE COURT:  But again, thank you for --

14         JUROR 15:  Thank you.

15         THE COURT:  -- your candor.

16         JUROR 15:  Yeah.

17         MR. CAVALIER:  Thank you, ma'am.

18         PARTICIPANT:  So, not to be the worrier in the group,

19    but we've taken three hours for page one and it's 3:00, so

20    we've got to pick it up or we'll never get them out.  We'll

21    never be done by 5:00 like we have to be.

22         MR. CAVALIER:  We're going to challenge her for

23    cause.

24         THE COURT:  Thoughts?

25         MR. CAVALIER:  She admitted that she didn't know if

 1  she could be impartial.

 2          PARTICIPANT:  I mean, she said she would hear the

 3  evidence first and evaluate it.

 4          MR. CAVALIER:  And she specifically said she would --

 5          PARTICIPANT:  Biased, right.

 6          MR. CAVALIER:  -- be leaning one way.

 7          PARTICIPANT:  Right.

 8          THE COURT:  She said she -- I think she was saying

 9  she couldn't tell us in advance --

10          PARTICIPANT:  Right.

11          THE COURT:  -- that she would consciously be aware

12  that if she had some bias, that she needed to follow the rules,

13  but she did not yet affirmatively say that she would succeed at

14  doing that, and I think we probably, you know -- I think that's

15  -- I know we need bodies, but I think we need to strike her.

16          MR. CAVALIER:  I'm trying to be judicious of --

17          THE COURT:  No, I appreciate it.  I appreciate it.

18  It was a close, but it was a no cigar.

19          MR. CAVALIER:  Plus, she had the thing where she was

20  going to miss work with the money and all of that, so --

21          THE COURT:  Yeah, and I got the sense though she

22  could have rescheduled those patients --

23          MR. CAVALIER:  Probably.

24          THE COURT:  -- and it would have been like a grind

25  for her.

```
 1              MR. CAVALIER:  And if it was only that, I wouldn't
 2  have said anything --
 3              THE COURT:  Yeah.
 4              MR. CAVALIER:  -- but --
 5              THE COURT:  Yeah, no, I hear you.  I hear you.  All
 6  right, let's do another one.  Christine, now let's talk about
 7  Paul Lombardo and the other jurors.
 8              DEPUTY:  Okay.
 9              THE COURT:  Hi, come on in and have a seat.  Oh, hang
10  on.
11              PARTICIPANT:  Hi, how are you?
12              MR. CAVALIER:  How are you?
13              PARTICIPANT:  Oh, so sorry.
14              THE COURT:  All right, the first thing I'm asking
15  people, would you be any less comfortable if we took these off?
16   No wrong answer.
17              JUROR 16:  No, I wouldn't be less comfortable.
18              THE COURT:  Okay.
19              JUROR 16:  That's fine.
20              THE COURT:  And I wouldn't be less comfortable if you
21  did it either.
22              JUROR 16:  Thank you.
23              THE COURT:  You have the hot seat, so you get to
24  decide for all of us.
25              JUROR 16:  Thanks.
```

```
 1              THE COURT:  I say there's no wrong answers, but there
 2    is a righter answer, so.  Thank you very much.  I know this has
 3    already been a long day.  I note that you're in Bucks County.
 4    And if I'm going too fast, tell me.  We're here so we can be
 5    able to speak to one another.
 6              I mentioned before, earlier this morning, that, you
 7    know, we're trying to separate.  One of the things we're trying
 8    to separate is where there's inconvenience versus a true
 9    hardship, and, you know, that really is something we can only
10    learn when we speak to the prospective jurors.
11              And in that vein, I usually share right at this point
12    a couple of quick facts.  This trial, we expect, we estimate,
13    will be five days, and that includes today, okay?  That's the
14    when.  The where is this trial would be in Allentown in the
15    federal courthouse.  I see you're in Bucks County.
16              JUROR 16:  Mm-hmm.
17              THE COURT:  So, I suspect you're probably at least
18    familiar with Allentown, is that fair?
19              JUROR 16:  Yeah, it's not too far.
20              THE COURT:  It's not terrible far, but also there's
21    no mass transit there.  Do you drive?
22              JUROR 16:  Yeah, yeah.
23              THE COURT:  Okay, so I'm not saying that would be the
24    only issue we need to discuss here, but it's not one that I
25    shared out front, so I put that out.  For either those days
```

1  that I mentioned or the location, does that reach the level of

2  a hardship?

3          JUROR 16:  It does not.

4          THE COURT:  Okay, all right, now counsel are going to

5  ask you other questions and we also welcome you to share

6  anything else that you think we should need to know.

7          JUROR 16:  Okay.

8          THE COURT:  Okay, fair enough?

9          JUROR 16:  Sure.

10          THE COURT:  All right, good man, thank you.  Either

11  side?

12          MS. DIBIANCA:  Plaintiff can start.

13          MS. SHIKUNOV:  Oh, yeah, you had raised your number

14  for the question about sexual harassment, that you or somebody

15  that you knew had been sexually harassed.  Can you give us a

16  little bit more information about that situation, mostly who

17  was involved?  We're not asking you to delve into personal

18  details you're uncomfortable sharing.

19          JUROR 16:  So, it was a colleague and close friend of

20  mine, a female.  At the time, I was, actually I was working in

21  security for my company at the time, so I was going to college

22  at night.

23          And what had happened was her direct manager was

24  sharing unsolicited and inappropriate text messages directly

25  with her.  She confided in me and shared with me those text

1   messages basically asking my opinion on what she should do,

2   what her approach should be.

3           Once I gave her the guidance, and I told her just to

4   go directly to ethics, at that point, it was you can't talk

5   about it anymore.  And beyond that point, I didn't get called

6   to ethics or anything like that, but that's about the extent of

7   it.

8           MS. SHIKUNOV:  Do you think that that experience

9   would impact your ability to be fair or impartial in a sexual

10  harassment case?

11          JUROR 16:  No.

12          MS. SHIKUNOV:  Okay, I have nothing further.

13          MR. CAVALIER:  How long ago was that?

14          JUROR 16:  This would have been 2005.

15          THE COURT:  Mr. McHugh, is there anything else you

16  think we should take into consideration?

17          JUROR 16:  There's nothing else that I can think of.

18          THE COURT:  Okay, all right, and look, you've been

19  very patient.  I'm going to ask you to be patient a little

20  while longer at least, okay?

21          JUROR 16:  Sure.

22          THE COURT:  I know it is a big inconvenience and we

23  also have a storm outside, and so we're asking a lot of you,

24  but we're grateful for it, okay?  Thank you for --

25          PARTICIPANT:  We appreciate it.  Thank you.

1          JUROR 16:  No problem.  It's been like 12 years since

2     I had to do this.

3          PARTICIPANT:  Oh, congratulations.

4          JUROR 16:  And the last time was in Camden, so I'm

5     happy to be in Philly.

6          (Laughter.)

7          JUROR 16:  Take care.

8          PARTICIPANT:  Thank you.

9          THE COURT:  And I don't want to brag, but Allentown

10    is beautiful this time of year.

11         JUROR 16:  So is Bucks County.

12         (Laughter.)

13         THE COURT:  Thank you.

14         JUROR 16:  Thank you.

15         PARTICIPANT:  Okay.

16         THE COURT:  We need to have more of those.

17         MR. CAVALIER:  Yeah, right.

18         PARTICIPANT:  Yeah.

19         THE COURT:  All right, no motions, right?

20         PARTICIPANT:  No.

21         MR. CAVALIER:  No.

22         THE COURT:  Do I ask the coordinator to save those

23    extra bodies for us?

24         PARTICIPANT:  I think so, yeah.

25         PARTICIPANT:  I'm a little nervous because we had so

1   many in a row.

2           THE COURT:  I know.

3           PARTICIPANT:  If there's another streak like that --

4           THE COURT:  I know.

5           PARTICIPANT:  -- then we could be up the creek.

6           PARTICIPANT:  Right.

7           THE COURT:  And we were on a good streak before that

8   the other way.

9           PARTICIPANT:  Yeah, because we still have those two

10  questions marks too.

11          THE COURT:  Yes, please.  Hi.

12          JUROR 17:  Hello.

13          THE COURT:  Welcome, sorry to keep you waiting.

14          JUROR 17:  Sure.

15          THE COURT:  I appreciate your patience.

16          JUROR 17:  No problem.

17          THE COURT:  Hey, my first question I've been asking

18  everybody, and there's no wrong answer, if we were not wearing

19  this, if I took this off, would that make you uncomfortable?

20          JUROR 17:  No, because I'm keeping mine on.

21          PARTICIPANT:  Oh, good for you.

22          THE COURT:  You can keep yours on, but if you're more

23  comfortable with mine on, I'm fine with that.

24          JUROR 17:  If you're comfortable, whatever, it's

25  cool.

1          THE COURT:  Oh, yeah, good man, I appreciate that.

2     Thank you.  A couple of things, in picking this jury, we're

3     trying to figure out, you know, a number of things, who could

4     be fair, of course, but also if people have particular

5     hardships that are of such a level that this might not be the

6     right case for them.

7          I always start out this conversation we have, and

8     it's a conversation, you're welcome to discuss anything you

9     want, but I always start it out by talking about how long it's

10    going to be and where we're going to be.

11         So, we estimate that this case would be five days,

12    and we're including today in that five days, so it would be

13    four days of trial.  That's the when.  The where is in

14    Allentown, Pennsylvania at the federal courthouse.  I note

15    you're a Philadelphia resident, so it was probably not a big

16    challenge to get here today, is that fair to say?

17         JUROR 17:  That's fair to say.

18         THE COURT:  There's no -- I don't know if you drive,

19    but there's no mass transit to Allentown.

20         JUROR 17:  True.

21         THE COURT:  So, that's the first thing.  We'll talk

22    about anything you want to talk about.  The counsel will all

23    have questions, but is there anything about these first factors

24    that I've mentioned, a five-day trial including today and you'd

25    have to be in Allentown from 9:00 to 5:00 every day, that is

1   what we call a hardship?

2            I do want to throw in one qualification.  I don't

3   know if it applies here.  If jurors live 50 miles, just over 50

4   miles, I think 50 miles is the cutoff from the courthouse -- so

5   I don't know if where you live in Philly is 50 miles -- they

6   will provide a hotel in the town where the courthouse is in

7   Allentown.

8            So, with that sort of basket of factors, what do you

9   think?

10           JUROR 17:  How far is Allentown from Philly?

11           THE COURT:  If you're driving and you're not in a

12  time of traffic --

13           JUROR 17:  Because I know you get on the Jersey

14  Turnpike or something?

15           THE COURT:  You would take the Schuylkill to 476.  Do

16  you drive?

17           JUROR 17:  I do.

18           THE COURT:  Yeah.

19           JUROR 17:  I was going to try to do the math because

20  I feel like -- so if I get called, if I do it now, then I won't

21  have to do it for two years, correct?

22           THE COURT:  That's what I'm told.

23           (Laughter.)

24           THE COURT:  But that's a good calculation though.

25           JUROR 17:  Do you mind if I do a travel --

1                PARTICIPANT:  Google Maps?

2                JUROR 17:  Yeah.

3                THE COURT:  Yeah, in terms of mileage, I don't think

4      there's any of Philadelphia that's less than 50 miles from

5      Allentown.

6                PARTICIPANT:  I don't think so.  It's an hour and a

7      half away.

8                THE COURT:  Yeah, but --

9                JUROR 17:  Oh, yeah?

10               THE COURT:  The drive is about that.

11               JUROR 17:  That's a lot.

12               PARTICIPANT:  That's a lot.  It is a lot.

13               JUROR 17:  Why you couldn't find anybody from

14     Allentown?

15               (Laughter.)

16               PARTICIPANT:  We'd like to.  We'd like to.

17               THE COURT:  You know anybody?  Give us some names.

18               PARTICIPANT:  Yeah, right, exactly.

19               JUROR 17:  Didn't you say that everything happens in

20     Jersey, so it's like if everything is happening in Jersey, then

21     nobody's in Allentown.

22               THE COURT:  But you know what happens is --

23               (Laughter.)

24               THE COURT:  I agree with you, but because we're in

25     federal court, there's nine counties.

1          JUROR 17:  Yeah.

2          THE COURT:  So, they give us names from Philly, from

3    Bucks, from Lancaster, from Burks, you know, so from Easton

4    down to Philly and back up to Reading, so we get folks from all

5    over.

6          JUROR 17:  And you got it on the head.  It's 60.  I

7    even put my exact address in, but just from Philly, it starts

8    off to say 63 miles, so an hour and a half.  So, yeah, no one's

9    trying to drive that there and to.  I mean, some people do it

10   for a commute if they're making a good amount of money.

11         THE COURT:  Sure, they do, and, you know, I believe

12   the courts give you a little change.

13         JUROR 17:  They said something about $212 a night or

14   something.

15         THE COURT:  Is that for housing?

16         JUROR 17:  For if like today you had to come in for a

17   hotel because it was too far --

18         THE COURT:  Oh, for the hotel.

19         JUROR 17:  That's what they said for today.  I'm not

20   sure as far as like the proceeding and things like that.

21         THE COURT:  Well, is there -- do you have your own

22   vehicle?

23         JUROR 17:  Yeah, so you're saying starting from

24   today, it would be five days?

25         THE COURT:  Yeah, so --

1          JUROR 17:  So, today and tomorrow would be two, and

2   then --

3          THE COURT:  Off for the weekend.

4          JUROR 17:  -- Monday and then Wednesday would be the

5   next three.

6          THE COURT:  Monday, Tuesday, Wednesday, and that's

7   what we expect it will be over by then.

8          JUROR 17:  So, if it's not?

9          THE COURT:  Then Thursday.

10          JUROR 17:  Oh, see, then I wouldn't be able to do it

11   because I have a conference that's on Friday and I have to

12   leave Thursday.

13          THE COURT:  You have a flight?

14          JUROR 17:  I was actually going to drive.  I was

15   going to leave Wednesday, and then kind of like cruise it and

16   then get there Thursday because it starts Friday, but I was

17   thinking if this ran over until Wednesday, then I would just

18   have to take a flight down on Thursday and then just rent a

19   car.

20          THE COURT:  Where is the conference?

21          JUROR 17:  It's in Florida.

22          THE COURT:  Okay, yeah, that's a hike.

23          JUROR 17:  So, if we're not done on Thursday, I would

24   have to stay and then I'd just have to figure out a way to get

25   a flight because I feel like you all are going to call me

1   because you guys always call me.  Usually it's the other

2   district, I mean, not district, the other courthouse.  I'm like

3   oh, they got me this time.

4           (Laughter.)

5           JUROR 17:  I'm serious because my --

6           PARTICIPANT:  You're popular.

7           JUROR 17:  My grandfather has the same name and he

8   passed away six months before I was born --

9           PARTICIPANT:  Oh.

10          JUROR 17:  -- so in the system, it still says both of

11  our names, so if it was for him, I was going to get hit.

12          THE COURT:  You were still getting called it.

13          JUROR 17:  So, I would sometimes be able to get away

14  with it over the phone and let them know, because they usually

15  would be calling for him.

16          THE COURT:  But if we went into Thursday and you were

17  on the jury, what would happen?

18          JUROR 17:  It would have to -- would it be over by

19  5:00?

20          THE COURT:  Well, every day we'll be done by 5:00.

21          JUROR 17:  I don't think that would work if I'm

22  honest with myself just because I know between flights, trying

23  to get out here to go back home, then you were talking about it

24  would be, what, 5:00, so that would be 7:30, and then I got to

25  get on the first flight smoothly and then get a rental car.  I

1  mean, that's a push.

2           MS. DIBIANCA:  You're a champ.

3           JUROR 17:  I know, right?

4           (Laughter.)

5           JUROR 17:  I'm listening to it and then I was looking

6  at the courtroom.  I know there's got to be a quota or

7  something because I'm like one out of two black people in the

8  room, so they may need me.

9           (Laughter.)

10          JUROR 17:  I'm just saying.  Everybody is thinking

11  it.  So, it's like maybe you might be able to work this out.

12          MS. DIBIANCA:  No one in this room was thinking it.

13  I can tell you that.  It's totally random --

14          THE COURT:  Look --

15          MS. DIBIANCA:  -- but you're a champ for saying it.

16          (Laughter.)

17          THE COURT:  Counsel may have some follow-up questions

18  for you, but I think it is -- it would be -- it's tough to say.

19   It's definitely a super inconvenience, but it may be one that

20  we might be asking you to make, so.

21          JUROR 17:  What, are you all rolling dice?  How do

22  you all decide?

23          THE COURT:  Well, you've been through it before,

24  right?

25          JUROR 17:  Well, I never got picked.  I was lucky.

```
1              THE COURT:  We're getting to a point where there's a
2    list of the people who we're not knocking off as some sort of
3    hardship, and then the lawyers go back and forth and pick the
4    jurors.  Sometimes it's just how far you were in the list
5    determines whether or not you get picked or not.
6              JUROR 17:  Okay.
7              THE COURT:  So --
8              JUROR 17:  Do you know the rate for a hotel if I'm
9    out there because I know I'm not going to want to drive?
10             THE COURT:  Well, there are a couple of nice hotels
11   in downtown Allentown.  I mean, there's some, like there's up
12   by the airport there are some.  There's over by Dorney Park
13   there's others, but downtown, there's actually two now, two
14   hotels.
15             JUROR 17:  So, would we go to Allentown tomorrow?
16             THE COURT:  Yeah, in the morning.
17             JUROR 17:  And the traffic, 8:30?
18             THE COURT:  Yeah, we're trying to get folks there by
19   9:00.
20             JUROR 17:  Okay, so that's at least by 7:00.  We'll
21   see what we can do.
22             THE COURT:  You have a very good attitude --
23             PARTICIPANT:  You sure do.
24             THE COURT:  -- about your duty.
25             PARTICIPANT:  Thank you so much.
```

```
 1                    THE COURT:  You really do.

 2                    PARTICIPANT:  You really do.

 3                    THE COURT:  You really do.  I wish it was contagious.

 4                    PARTICIPANT:  Yeah.

 5                    JUROR 17:  I don't know.

 6                    (Laughter.)

 7                    JUROR 17:  Then there might be a lot more hardships.

 8                    THE COURT:  Yeah.

 9                    PARTICIPANT:  Well, that's awfully nice of you.

10                    MS. SHIKUNOV:  I only have one question.

11                    THE COURT:  Please.

12                    MS. SHIKUNOV:  It's just following up on a question

13     you raised your number for.  You said you had folks either in

14     your family or friends that are in the legal profession.  Can

15     you just give us a little bit more info about that?

16                    JUROR 17:  One of my cousins, she's like an

17     entertainment lawyer.

18                    MS. SHIKUNOV:  Oh, okay, that's cool.

19                    JUROR 17:  So, I think that's about it.

20                    THE COURT:  West coast?

21                    JUROR 17:  No, she's in Philly.

22                    THE COURT:  In Philly.

23                    JUROR 17:  I think she's in D.C.  She's on the east

24     coast.  We'll just stick to that.

25                    THE COURT:  Yeah.
```

1          (Laughter.)

2          JUROR 17:  She moved.  I don't really know.

3          MS. SHIKUNOV:  That's the only question that I have,

4    Your Honor.

5          JUROR 17:  Because you all did ask about, you know,

6    if someone has ever been like a witness or something.

7          MS. SHIKUNOV:  Yes.

8          JUROR 17:  That was, like I think my sister was like

9    years ago, like over a decade, but that was like a family

10   thing, so it wasn't criminal or --

11         THE COURT:  And it wouldn't affect you --

12         JUROR 17:  No.

13         THE COURT:  -- and you'd able to be fair --

14         JUROR 17:  Yes.

15         THE COURT:  -- if you were a juror in this case?

16         JUROR 17:  I go where it makes sense.  I don't really

17   go through, you know, everything else.

18         MR. CAVALIER:  Just one.

19         THE COURT:  Yes, sir.

20         MR. CAVALIER:  You also raised your card for, I think

21   the question was whether you knew someone or were associated

22   with someone who had experience with sexual harassment?

23         JUROR 17:  Yeah, I think, honestly, I think everybody

24   has dealt with it.  You know, someone might have made a pass at

25   them at their job and it's kind of like you can't say much.

1

2              You know, just for full transparency, being black,

3   you kind of deal with a lot more on both sides, so it's very

4   common in our demographic.  So, I can't really -- I had to be

5   honest though on that one --

6              MR. CAVALIER:  Sure.

7              JUROR 17:  -- because everybody experiences some

8   things.

9              PARTICIPANT:  Yeah, tell me about it.

10             JUROR 17:  But it wouldn't (inaudible) but I would be

11  able to recognize.  I guess it would make me a little

12  expertise.

13             THE COURT:  But --

14             (Simultaneous speaking.)

15             THE COURT:  Again, I have to follow up and repeat the

16  same question just with this new information you gave us.

17  Could you assure me, could you assure these lawyers that if you

18  were on the jury, you would make your determinations based only

19  on the evidence that comes in that case?

20             JUROR 17:  Right.

21             THE COURT:  Nothing from outside, and the law as I

22  would explain it to you?

23             JUROR 17:  Yes.

24             THE COURT:  All right.

25             JUROR 17:  Like I said, as long as it makes sense,

1   here we go, but if it don't make sense either way, I don't

2   really have, you know, what do they say, a horse in the race,

3   however that, a shoe in the race?

4                (Laughter.)

5                THE COURT:  A horse in the race.

6                PARTICIPANT:  There you go, a horse.

7                (Simultaneous speaking.)

8                MS. DIBIANCA:  A horseshoe.  That works too.

9                THE COURT:  There is horseshoes in those races.

10               JUROR 17:  I've worked next to the track, but I've

11   never been to the track, so I don't know.

12               THE COURT:  All right, well, look, thank you.  I'm

13   not sure what exactly will happen from here.  I know we have to

14   keep you a little longer next door, but --

15               JUROR 17:  I'm real close to a nap.

16               (Laughter.)

17               PARTICIPANT:  No one's going to be watching.

18               THE COURT:  No, no one will know.

19               PARTICIPANT:  You can totally take a nap.

20               THE COURT:  All right, well, thank you.  Thank you

21   again, and your candor is refreshing.  We appreciate it.

22               JUROR 17:  Yeah, it's a little dry in here.

23               THE COURT:  Yeah.

24               PARTICIPANT:  No kidding.

25               (Laughter.)

```
 1                MR. CAVALIER:  Thank you so much.

 2                PARTICIPANT:  Thank you.

 3                JUROR 17:  Will they let me know like --

 4                PARTICIPANT:  Oh, yeah.

 5                JUROR 17:  -- say if I do get picked, they'll let me

 6   know like the details?

 7                MR. CAVALIER:  Yes.

 8                PARTICIPANT:  Oh, yeah.

 9                THE COURT:  Absolutely.

10                PARTICIPANT:  Yeah, yeah, for sure.

11                THE COURT:  Thanks a million.

12                JUROR 17:  Have a good one.

13                THE COURT:  No motions?

14                MR. CAVALIER:  Not from us.  I do have a housekeeping

15   request though.

16                THE COURT:  Yeah.  Go ahead.

17                MR. CAVALIER:  My client, when he came in this

18   morning, there was no issue bringing in him electronic.  Which

19   is one of the reasons why we were able to get close to

20   settlement.

21                Coming back in after lunch, the Marshals at the other

22   entrance basically told us no.  No computer, no phone.  A

23   Marshal also came in and -- my point is, they need your

24   permission so that he can have a computer so that he can

25   continue to work this settlement.
```

1          THE COURT:  I don't object to that.  Does that bother
2  you guys at all?
3          MS. SHIKUNOV:  Well, I know our client's phone was
4  taken away at security.  So, I guess it's just an equity thing.
5   Anyway.
6          MR. CAVALIER:  I mean, I don't care if they have a
7  phone either.  I just --
8          THE COURT:  Yeah.
9          MR. CAVALIER:  I was just trying to push this thing
10 along.  I mean, --
11          THE COURT:  Look, I -- if he -- if someone's asking
12 me, I don't mind that either of them have their phones in here.
13          MS. SHIKUNOV:  They're parties.  So, I think that as
14 long as it's a --
15          THE COURT:  That's what I say.
16          MS. SHIKUNOV:  The situation, then I don't -- I don't
17 have a problem with that.
18          THE COURT:  And I don't mind that.
19          (Simultaneous speaking.)
20          MS. SHIKUNOV:   But for trial --
21          MR. CAVALIER:  No, not for trial.
22          MS. SHIKUNOV:  Yeah, but for trial they should not.
23          THE COURT:  No.  Absolutely not.
24          MR. CAVALIER:  And there's so much down time.
25          THE COURT:  Yeah.  Right.  Well, that's the thing.

1          MS. SHIKUNOV:  Well, and that's -- I --

2          THE COURT:  And some jurors have phones out there,

3  some don't.  Some have both and, kind of a --

4          MR. CAVALIER:  Yeah.  I think they're not supposed to

5  use them, but I mean, --

6          THE COURT:  They're not.

7          MR. CAVALIER:  They're going to sit there.

8          MS. SHIKUNOV:  Right.

9          MR. CAVALIER:  I agree with you, Your Honor.  I

10  wouldn't take them until trial.

11          THE COURT:  Yeah.  Yeah.  I'm fine with it.

12          MR. CAVALIER:  Fair enough.

13          THE COURT:  I don't know how you share that message.

14   But, I don't have a problem.

15          MR. CAVALIER:  I'll take care of it once we -- once

16  we get the next person up.  I might leave for two minutes once

17  we get the juror in.

18          THE COURT:  How's it going from your perspective?

19          MR. CAVALIER:  Well, pretty marvelous, so --

20          MS. SHIKUNOV:  Marvelous, I like that.

21          THE COURT:  All right.

22          MS. SHIKUNOV:  Here's to hoping.

23          THE COURT:  All right.  Music to my ears.  Yes,

24  please.

25          THE CLERK:  You can come on in.

1          THE COURT:  Please come on in.  How are you?

2          JUROR 18:  Just ducky.

3          THE COURT:  Just ducky.  It's a good -- that's a good

4   way to describe it today.  That's for sure.

5          JUROR 18:  I have a non sequitur question.  Why is

6   Harvey Bartel's picture so much bigger than everybody else's?

7          THE COURT:  Well, it's because he's still here.

8          JUROR 18:  Oh.

9          THE COURT:  Because he's still with us.  He's

10  upstairs.

11         JUROR 18:  Oh.  I figured if you're on the wall

12  you're retired or died.

13         THE COURT:  No.  He's -- but he's -- that's the wall

14  of former Chief Judges for the -- and so yep, he's still, he's

15  still working away.

16         JUROR 18:  Sorry to take up your time.

17         THE COURT:  No.  No, no.  My first question I always

18  have, and there's no wrong answer.  If I was not wearing this

19  mask, would you be more -- would that make you uncomfortable?

20         JUROR 18:  No.

21         THE COURT:  Do you mind if I --

22         JUROR 18:  I'm fully inoculated.

23         THE COURT:   And I am as well.  And however you're

24  most comfortable, please.

25         JUROR 18:  I'm fine.

1              THE COURT:  Okay.

2              JUROR 18:  Yeah.  I'd like to say first of all, I did

3    not answer one of your questions.

4              THE COURT:  All right.  Well, we're going to have to

5    start over from the beginning then, so.  No, go ahead right

6    now.

7              JUROR 18:  You asked a question about Israel.

8              THE COURT:  Yes.

9              JUROR 18:  I am increasingly resentful of Israel as a

10   country, about what they're doing in the Mid-East.  I should

11   have raised my hand.  So, I --

12             THE COURT:  Well, I appreciate your candor.  And I

13   assure you, this case would not be a debate about Israel.

14             JUROR 18:  Okay.

15             THE COURT:  However, it's -- and we'll have some

16   follow up questions on it.  It is something that we'll need to

17   explore.

18             JUROR 18:  Okay.

19             THE COURT:  And it is important that you did what you

20   just did, and you let us know about this, so the parties can

21   ask.

22             We have to make sure that we pick a jury amongst

23   things that at the top of the list, that can be fair.  And not

24   make any determination based on, you know, anything outside of

25   what happens in the courtroom.

1          But, I thank and applaud you for letting us know
2     that.  We'll talk about it in a minute.  Okay?
3          JUROR 18:  The other thing I need to let you know is,
4     I have a fairly serious hearing impairment.
5          THE COURT:  Okay.
6          JUROR 18:  I mean, I can hear you clearly.  I can
7     hear most people.  It's a sensory neural issue.  So, it's not
8     volume, it's I don't understand words.  They don't get into my
9     head.
10         So, if everybody speaks clearly and loudly, I'm fine.
11     But plexiglass and masks and mumbling and accents, I lose
12    stuff.
13         THE COURT:  Gotcha.  Gotcha.  Now, there -- I don't
14    know if this helps with the condition that you have, we do have
15    headphones available that -- but that sounds like it would be
16    for amplification of volume.
17         JUROR 18:  Right.  That's probably not going to help.
18         THE COURT:  That's not going to help?
19         JUROR 18:  Again, I don't think it's an
20    insurmountable issue.  But, I just want everybody to
21    understand, there may be times when I don't understand what's
22    being said.
23         THE COURT:  Well, it's -- well, it's important that
24    we have jurors that do understand.  And we don't want them
25    missing --

1           JUROR 18:  What?

2           THE COURT:  See what you did?  Now, I'm not so ducky

3    anymore.

4           THE COURT:  No, the -- how will -- I mean, this is

5    something I think we really need to talk seriously about.

6    Because if we -- we can't have you miss any of it.

7           JUROR 18:  Well, I can't guarantee that.  That's the

8    problem.  Because I have been in situations where people don't

9    speak clearly with a mask.  And the words get garbled somewhat.

10           You know, my left ear is serious enough that I don't

11    even bother wearing a hearing aid, because they say it's not

12    going to help.

13           THE COURT:  Okay.

14           JUROR 18:  So, I'm not trying to get out of anything.

15           THE COURT:  No, I didn't --

16           JUROR 18:  I'm just clarifying that.

17           THE COURT:  I don't think you are.  Let me ask this,

18    if you were on a panel, and there came a point that you were

19    have difficult -- you were having difficulty hearing a

20    particular speaker or something that was going on, would you --

21    are you comfortable that you would let us know?

22           JUROR 18:  I'm not a -- I'm not a shrinking violet.

23           THE COURT:  You would know, or a shrinking ducky.

24           So, I mean, that might -- I mean, that might be the,

25    you know, that might be the way we can address this.  Is if you

1   can assure me that you would say, I need that repeated.

2          How frequently does this happen?

3          JUROR 18:  It's -- there's no given.  I can

4   understand you perfectly well.  You're, you know, you're

5   speaking clearly.  You're speaking loudly.

6          If I watch an English comedy where they're going

7   (unintelligible), I might as well go to bed.

8          THE COURT:  Right.

9          JUROR 18:  I went to a zoning hearing one time where

10  there was an older lawyer who spoke mostly to his shoes.  And I

11  finally, even though I was very interested in the situation, I

12  finally said, I might as well go home, because I'm missing 75

13  or 80.

14         I'll give you an example.  When I take a hearing

15  test, I'm sorry to bore everybody with this --

16         THE COURT:  No, this isn't boring.

17         JUROR 18:  With these details.

18         MS. SHIKUNOV:  No, it isn't boring.

19         JUROR 18:  When I take a hearing test, part of it is

20  they give a list of 100 words.  I get 40 percent of the words

21  in one ear.

22         THE COURT:  And that's the good ear?

23         JUROR 18:  Well, I have a hearing aid in my good ear.

24         THE COURT:  But that's the --

25         JUROR 18:  That would be with no hearing aid.

1               THE COURT:  Okay.

2               JUROR 18:  But they do -- they do both ears.  I can't

3     -- I can't answer that exactly.

4               MS. SHIKUNOV:  Can I ask a question on this, Your

5     Honor?

6               THE COURT:  Yeah.  Please go ahead.

7               MS. SHIKUNOV:  If there were no masks being worn in

8     the courtroom, and you were able to look at the person that was

9     speaking, either from the witness box, or at the attorney that

10    was speaking, would that aid with your situation?

11              JUROR 18:  Probably not.  I'm not -- I'm not training

12    in lip reading.  And I --

13              SHIKUNOV:  Okay.  But, if the -- the absence of

14    masks, would that help?

15              JUROR 18:  Certainly, that would help.  Because it

16    doesn't mute, you know, the mask mutes and distorts the sound.

17              THE COURT:  Okay.

18              MS. SHIKUNOV:  And the same question for the

19    plexiglass?  If there's no plexiglass and no masks?

20              JUROR 18:  It would -- I would stand a better chance

21    obviously.  But, it also is a function of how the person

22    speaks.

23              Some people speak very distinctly and clearly.  Other

24    people sort of mumble along.  I -- I'm sorry to make a big

25    issue out of this.  But, I wanted you to know.

1          MS. DIBIANCA:  No.  That's really important.  It's
2  important.
3          THE COURT:  But, it also seems that you had no
4  difficulty following the track of the conversation we've had
5  for about five or ten minutes now.
6          JUROR 18:  Yeah.  I'm sitting right here.
7          MS. SHIKUNOV:  Right.
8          THE COURT:  Right.
9          JUROR 18:  If I'm sitting way in the back and
10  somebody's over there talking, --
11          THE COURT:  How about when we were sitting in there?
12   Were you able to hear me?
13          JUROR 18:  Yes.  I can hear you.
14          THE COURT:  And I had a --
15          JUROR 18:  Did I understand a 100 percent of the
16  words that you said?  Probably not.  But you take things in
17  context, and you know.
18          THE COURT:  Compute it.
19          MS. SHIKUNOV:  Fill in the blanks.
20          THE COURT:  And you had -- you had, yeah.  All right.
21   Just real quick.  This trial would last five days, we
22  estimate, including today.  And it would be in Allentown,
23  Pennsylvania.
24          Do those, either of those cause you a hardship?
25          JUROR 18:  Well, I wouldn't be happy about it.  But,

 1   a hardship, no.

 2            THE COURT:  Okay.  All right.  I'm going to turn it

 3   over to counsel.

 4            MS. DIBIANCA:  You had an EOC complaint?

 5            JUROR 18:  It was 30 years ago.

 6            MS. DIBIANCA:  Okay.

 7            JUROR 18:  And it was so long ago that I don't

 8   remember a lot of the details.  But, I was terminated from a

 9   position.  And I had fairly good reason to believe it was -- it

10   was a political situation.

11            MS. DIBIANCA:  Okay.

12            JUROR 18:  And I didn't think it was fair.  There's a

13   background story, which really is not important --

14            MS. DIBIANCA:  Yeah.

15            JUROR 18:  Given the amount of time that's gone by.

16   What I didn't like, is that I filed a complaint with EEOC.

17   They thought the complaint was valid enough to follow up on it.

18            In a court of law everybody gets to participate.  The

19   EEOC met with my former employer.  I was not allowed to attend

20   it.

21            So, I just, I was very bitter about the whole

22   situation.  The fact that I couldn't present any kind of a

23   defense.

24            But again, it was 30 years ago.  I'm retired now. So,

25   it's just -- I was answering a question that I had --

1          MS. DIBIANCA:  Yep.  Absolutely.  Yep, definitely.  I

2    thought there was another -- is that the same, you had

3    mentioned about, I think you had said something about being the

4    subject of a discrimination complaint.

5          Was that you who raised your hand?

6          JUROR 18:  No.  There -- I think you asked --

7          MS. DIBIANCA:  You were the one to complaint --

8          JUROR 18:  Had I ever recommended that an employee be

9    terminated.

10          MS. DIBIANCA:  Um-hum.

11          JUROR 18:  And the answer is yes.

12          MS. DIBIANCA:  Okay.

13          JUROR 18:  On several occasions.

14          MS. DIBIANCA:  Okay.  And is that because you're --

15    in the course of your job, you had management authority?

16          JUROR 18:  Yeah.  Just interaction with other

17    employees.  When you see somebody who clearly isn't carrying

18    their own weight, and as a result, you have to do half of their

19    job, you know, and it really is behooven to complain about it.

20          MS. DIBIANCA:  Yep.  Okay.  I don't have any other

21    questions.

22          MS. SHIKUNOV:  I just want to follow up, sir.  Nice

23    to meet you.  I think you had answered yes to if you or someone

24    you know has been accused of discrimination.

25          JUROR 18:  No, I didn't.

```
 1              MS. SHIKUNOV:  You didn't?  Okay.

 2              JUROR 18:  I don't -- I don't believe I did.

 3              MS. SHIKUNOV:  That might be my mistake.

 4              JUROR 18:  Okay.

 5              MS. SHIKUNOV:  Well, thank you.

 6              THE CORUT:  And just as a follow up, given these

 7   experiences, we all take our experiences to the table.  Again,

 8   could you -- could you assure the parties here that if you were

 9   a juror, you would consider this case only on the evidence that

10   came in in this case, and the law as I explained it to you?

11              JUROR 18:  I would certainly try my best.

12              THE COURT:  And you have no reason to think you

13   couldn't?

14              JUROR 18:  No, I do not.

15              THE COURT:  And sir, again, I just want to clarify

16   one thing.  You would have no hesitancy to let us know, if you

17   were selected for this jury, if you were having difficulty

18   hearing something?

19              JUROR 18:  Yes, I would.

20              THE COURT:  You would let us know?

21              JUROR 18:  Yes.

22              THE COURT:  Okay.  All right.  Well, thank you.  I

23   greatly appreciate it.  It's been a pleasure talking to you.

24   And we're going to unfortunately keep you next door for a --

25   you'll be stuck for a little while longer.
```

```
 1              JUROR 18:  Okay.
 2              THE COURT:  Okay?  But, --
 3              JUROR 18:  Justice moves in slowness.
 4              THE COURT:  I'm glad we got to meet though.
 5              JUROR 18:  Thank you.
 6              THE COURT:  Thank you, sir.
 7              MS. SHIKUNOV:  Thank you.  So, I think both of us
 8    agree it's that he did raise his hand for accused of
 9    discrimination.  I heard him say that too.  That's on my list
10    to ask.
11              MS. DIBIANCA:  I have it written down.  I don't know
12    if he was confusing the EEO?
13              MS. SHIKUNOV:  Or he didn't hear.
14              MS. DIBIANCA:  Or he didn't hear it, or maybe he
15    didn't hear it properly.
16              MS. SHIKUNOV:  Yeah.
17              MS. DIBIANCA:  I think that might be that he didn't'
18    hear it.
19              THE COURT:  Which question?
20              MS. SHIKUNOV:  The accused of discrimination.
21              MS. DIBIANCA:  If you or someone you know has been
22    accused.  And that was number 23. I had 18, jurors 18 and 23
23    raise their hands.  And we had that -- I had that as --
24              MR. CAVALIER:  I don't have anyone responding to
25    question 23.
```

1          MS. SHIKUNOV:  I don't know what question it was.
2     Sorry, I wasn't tracking it that way.
3          MS. DIBIANCA:  The accused one.  Whatever number one
4     that is.
5          MR. CAVALIER:  Have you ever filed an EEO --
6          (Simultaneous speaking.)
7          MS. SHIKUNOV:  No.  I have him -- 23 and 18 is what I
8     have.
9          MS. DIBIANCA:   That's what I have.  Twenty-three
10    yeah, have you or someone you know been accused of
11    discrimination based on gender, race, religion, national
12    origin, or age?
13         Number 23 and number 18 raised their hands.  That's
14    what I have.
15         MR. CAVALIER:  Yeah.  I have number 24 as well.
16         MS. SHIKUNOV:  I have that as well.
17         THE COURT:  You have for 4?
18         MR. CAVALIER:  I have it for 24.
19         THE COURT:  That -- that juror?
20         MR. CAVALIER:  Yes.
21         MS. DIBIANCA:  Maybe their numbers are different from
22    our numbers.  This is our --
23         MS. SHIKUNOV:  Oh right, yeah.
24         MS. DIBIANCA:  We are -- whatever nine on the drafts
25    that you gave us --

1             (Simultaneous speaking.)

2             MS. SHIKUNOV:  What number is the accused section?

3             MS. DIBIANCA:  Is what I have.

4             MS. SHIKUNOV:  That's why I didn't write -- didn't

5    use question numbers, because I was like, I don't know which

6    draft we're using.

7             MS. DIABIANCA:  Yeah.

8             MS. SHIKUNOV:  So, I just wrote down the description

9    of it.  Accused of discrimination, 23 and 18.

10            MR. CAVALIER:  Yeah.  He answered yes to the Israel

11   question that was in here.  And then he also said he terminated

12   an employee, and that he knows or has himself been accused of

13   discrimination on --

14            MS. SHIKUNOV:  Yep.

15            MR. CAVALIER:  More than one occasion.

16            MS. SHIKUNOV:  That's exactly.  Which gives me, or

17   worries me that he didn't hear the question.  Because -- and I

18   will also say that, because I wrote down 23 on this, the

19   accused of discrimination one, I wrote down 23 first and 18

20   second, which tells me he raised his hand after everybody

21   raised their hand.

22            So, that makes me think he was hesitating about what

23   the question was.  He didn't understand or hear it properly.  I

24   mean, he's got a lot of issues, so.

25            THE COURT:  Yeah.  But, we had like a 15-minute

1    conversation with him in here.  And he did not miss a beat.
2    And he did tell us if -- and I, just from the brief encounter
3    with him, believe it's true, that he would not hesitate to let
4    us know if he could not hear us.
5                You know, --
6                MR. CAVALIER:  Israel.
7                MS. DIBIANCA:  Yeah, the Israel issues is --
8                MR. CAVALIER:  And he came in strong with that one.
9                MS. DIBIANCA:  Yeah.
10               THE COURT:  I know he did.  But Johnny, what's the --
11               MS. SHIKUNOV:  But, he also said that he's terminated
12   somebody.  So, I think that he probably cuts both ways on that.
13               MR. CAVALIER:  You also asked him several times about
14   his impartiality.
15               THE COURT:  And he repeatedly said that he had no --
16               MS. SHIKUNOV:  Yeah.  I think --
17               THE COURT:  Reason to believe that he couldn't be
18   fair.
19               MS. DIBIANCA:  I think we leave him on the list.
20   Pickings are slim, so.
21               THE COURT:  I think -- and I think -- was it -- I
22   don't know if it was you, Molly, or it was Erica.  But one of
23   you made some good points about there wouldn't be masks.
24   Right?
25               MS. SHIKUNOV:  No, we won't -- and that was why I was

1  asking.  I have a cousin who is hearing impaired.  I don't

2  think the same condition.

3          But, that's why I was asking, like if we're not

4  wearing masks, can you lip read?  And he said no.  But also,

5  that courthouse doesn't have the plexiglass and masks.

6          THE COURT:  Right.

7          MS. SHIKUNOV:  I mean, I can't hear through the

8  plexiglass and the masks.  So --

9          THE COURT:  And he indicated that he didn't believe

10  he lost anything from my speaking to the group.

11          MS. DIBIANCA:  Except that he seemed to because he

12  answered the question, accused of discrimination affirmatively,

13  and then came in here and didn't know what we were talking

14  about.

15          But, I think we leave him on the list.  And we see

16  what we've got.

17          THE COURT:  Yeah.  Look, if he -- if he winds up, you

18  know, we'll again ask him.  I don't want to insult him.  But, -

19  -

20          MS. DIBIANCA:  Right.

21          THE COURT:  We'll again ask him, you know, you

22  promised us you would tell us if you were having any trouble

23  hearing.  Because he has to be able to hear.

24          But, I fall on the side that I think he will.

25          MS. DIBIANCA:  Yep.

```
1              THE COURT:  He's given us a heads up.  I'm not -- I
2    don't think that he's missed anything yet.  I know both counsel
3    think he missed that question.
4              I don't think we had it on our list as him answering
5    the affirmative on that one.
6              MS. DIBIANCA:  Oh, I thought Mike did.
7              (Simultaneous speaking.)
8              MS. SHIKUNOV:  He did.  He just had it numbered
9    differently --
10             THE COURT:  Oh, you did?  Oh, okay.
11             MS. SHIKUNOV:  Because Susan and I were going off of
12   the draft you circulated.  We printed it and were keeping track
13   on the draft, so.
14             THE COURT:  All right.
15             MS. DIBIANCA:  Plus, I got two Israeli Citizens of
16   Defendant.  So, that's something we'll have to consider.  But,
17   I -- the pickings are slim.
18             THE COURT:  Are they -- are they both citizens?
19             MS. DIBIANCA: They're dual citizens, yeah.
20             THE COURT:  Yeah.  All right, well, I'm going to --
21   we're going to keep him.
22             MS. DIBIANCA:  Yep.  Agreed.
23             PARTICIPANT:  Judge, can we use the restroom?
24             THE COURT:  Absolutely.  Absolutely.
25             MS. SHIKUNOV:  Thank you.
```

1            THE COURT:  Christine, what about telling Paul?

2            MS. DIBIANCA:  Yeah.  We're on that point right now.

3            THE COURT:  We should -- I think we should keep him

4    until, you know, regrettably, but.

5            MS. DIBIANCA:  Yep.

6            THE COURT:  We need another good run here.

7            MS. DIBIANCA:  Yes.  Yes, exactly.

8            PARTICIPANT:  Well, 19 I don't have ready to stand

9    for anything.

10           MS. DIBIANCA:  That's the same thing I have, so.

11   Unless he says something really wild when he comes in, I think.

12           THE COURT:  Anything could happen.

13           MS. SHIKUNOV:  He listed his shell.  I'm going to

14   frame that one.  That was the one that I'm like wow.  All

15   right, we went there.  Yes, that's real.

16           MS. DIBIANCA:  I had a juror like when he was a

17   prosecutor, this woman came in and she was just like, I mean,

18   I'm not biased.  But, I don't want to be here.  And I'm not

19   going to pay attention to anything you say.

20           And if you give me a pen and paper, I'm probably

21   going to draw the whole time.  And if you don't, I'm just going

22   to look at my nails.

23           And like she just was just like, I don't want to be

24   here.  And they were both like, God.

25           MR. CAVALIER:  When the Judges let me do my own my

1  own voir dire, my last question is always, do you want to be on

2  this jury?

3          MS. SHIKUNOV:  Yeah.

4          MR. CAVALIER:  Every time.  And you always get some

5  of those people who are like, absolutely not.  Always.

6          MS. DIBIANCA:  Now he had some good stories from, you

7  know, from doing that.  Because they out in Lancaster get like

8  $20 a day or something.

9          MS. SHIKUNOV:  Oh.

10          MS. DIBIANCA:  And some woman that came in and was

11  like, I really need this job.  And he was like, oh.

12          THE COURT:  Okay, all good?  And you'll let Paul

13  know?

14          MS. DIBIANCA:  Yeah.  I did, sir.

15          THE COURT:  Sorry.

16          MS. DIBIANCA: No, I'm fine.

17          THE COURT:  So that was number what?

18          MS. DIBIANCA:  That was 18.

19          THE CLERK:  Next is Juror 19, Joseph Siwinski.

20          THE COURT:  All right.  Come on in.  Thanks for your

21  patience.  Make yourself comfortable.  Hey, let me ask you.

22  Sorry, I should do this first.

23          If I took this off, would it make you less

24  comfortable?  Be honest.

25          JUROR 19:  No.  I'm all right, thanks.  Can I take?

```
 1              MS. SHIKUNOV:  Yes.  Yes, you can take it off.
 2              THE COURT:  It makes me uncomfortable.  No, go ahead.
 3              JUROR 19:  Thank you.
 4              THE COURT:  And thank you.  I appreciate it.  You
 5    know, and there's no wrong answer to that.  It's sort of
 6    however people are comfortable, they're comfortable.  And I'm
 7    fine with that.
 8              I noticed you're from Montgomery County.
 9              JUROR 19:  I am.
10              THE COURT:  And one of the things we try to talk
11    about right now, is you know, obviously you know we want a jury
12    that -- a jury that can be fair to both sides.
13              JUROR 19:  Yes.
14              THE COURT:  But we also have to be mindful for
15    potential hardships, true hardships of jury service.  And
16    that's really the hardship to the juror.
17              And it could be individual, it could be timing.
18    There's all those sorts of things.
19              JUROR 19:  Yeah.
20              THE COURT:  So, one of -- we'll talk about that in
21    any way you want.  And counsel will ask.  The first thing that
22    I sort of do in that vein to start it off, is I try to share
23    how long it will be, and where it will be.
24              JUROR 19:  Okay.
25              THE COURT:  So, the how long we have predicted
```

1   amongst us all, that it will be five days, including today.

2                JUROR 19:  Um-hum.

3                THE COURT:  The where, is not Philadelphia, it's in

4   Allentown.

5                JUROR 19:  Okay.

6                THE COURT:  And I know you're Montgomery County.

7                JUROR 19:  Yeah.  Ambler.

8                THE COURT:  So -- say again?

9                JUROR 19:  Ambler.

10               THE COURT:  Oh, Ambler.

11               JUROR 19:  Yeah.

12               THE COURT:  Okay.  Okay.  So, you're at least

13  familiar with Allentown, is that fair?

14               JUROR 19:  I don't think I've ever been.

15               THE COURT:  Really?

16               JUROR 19:  But, I've heard of it, yeah.

17               THE COURT:  You're missing out.  Don't get me

18  started.

19               MS. SHIKUNOV:  He's going to start printing bumper,

20  printing bumper stickers.  This is I love Allentown.

21               (Simultaneous speaking.)

22               MS. DIBIANCA:  I'm surprised you're even doing this -

23  -

24               THE COURT:  Don't get me started.

25               MS. DIBIANCA:  I know.

1          THE COURT:  So, we'll be in Allentown, Pennsylvania.

2    There's no mass transit there.  Do you drive?

3          JUROR 19:  I do, yeah.

4          THE COURT:  Okay.  So, we'll talk about anything that

5    you want to talk about.  But, specific to the when and the

6    where, does that cause a hardship?

7          JUROR 19:  Yeah.  Yeah.

8          THE COURT:  Talk to me.

9          JUROR 19:  I work for the USGA.

10         THE COURT:  Um-hum.

11         JUROR 19:  The golf -- the golf association.

12         THE COURT:  Yeah.  Sure.

13         JUROR 19:  And I'm on a contract.  So, it's kind of

14   like hourly.  And we're going to a few country clubs next week

15   that I would have to cancel should this go.

16         THE COURT:  Would that -- would the work have to be

17   cancelled if you weren't there?

18         JUROR 19:  Yes.  Because I'm the lead on that.  I'm

19   basically going there and recording data of player's shots and

20   stuff like that.  Their distances and their metrics.

21         And if I'm not there, I can't do that for the

22   project.

23         THE COURT:  Is that during a tournament?

24         JUROR 19:  It's recreational golfers.  So, it's not

25   during a tournament.  It's just with the players that are

1   there.

2          THE COURT:  And what days is it in the field would

3   those be?

4          JUROR 19:  I think it's Wednesday and Thursday.

5          THE COURT:  Um-hum.  All right, counsel do you have

6   questions?

7          MS. SHIKUNOV:  No.

8          MS. DIBIANCA:  No, Your Honor.

9          THE COURT:  No?  Okay.  Anything else you want to

10  share with us?

11         JUROR 19:  That's it.

12         THE COURT:  All right. That's all we can ask.

13         JUROR 19:  Thank you.

14         THE COURT:  All right.  Yeah, we're going to have to

15  keep you next door until we're finished.

16         JUROR 19:  Okay.

17         THE COURT:  But we again, appreciate your patience.

18         JUROR 19:  No problem.

19         THE COURT:  All right.  Thank you.

20         JUROR 19:  Thank you guys.

21         MS. DIBIANCA:  Thank you.  Appreciate it.

22         JUROR 19:  It's been enjoyable.

23         MS. SHIKUNOV:  You're the first ever to say that.

24  So, thanks.

25         JUROR 19:  It was my first one.  So, it's my debut.

```
1              MS. SHIKUNOV:  Oh, good.  Good.

2              MS. DIBIANCA:  Lovely combination.

3              MS. SHIKUNOV:  Welcome to the party.

4              THE COURT:  Hardship or inconvenience?

5              MS. DIBIANCA:  He's an independent contractor.  So,

6    it's more than an inconvenience, right?  At least that's how he

7    makes a living, so.

8              MS. SHIKUNOV:  But, he didn't say -- did he say he

9    was a contractor?  He said was on hourly.

10             MS. DIBIANCA:  Yeah.  He said he was hourly.  Not

11   that he was on a contract.  Because if he wants to be list --

12             THE COURT:  Let me tell you, as a golfer where do we

13   leave it?

14             MS. DIBIANCA:  I think we leave him on the list and

15   keep plowing ahead.

16             THE COURT:  So, no motion?

17             MS. DIBIANCA: No.

18             THE COURT:  For cause?

19             MS. DIBIANCA: No.

20             THE COURT:  Okay.  Anyway.

21             MS. DIBIANCA:  Well, he needs a life.  He said, it's

22   my debut.

23             MR. CAVALIER:  He's having such a good time.

24             MS. DIBIANCA:  Right.  I know.  I mean, anybody who

25   thinks this is a good time, come on over.  Okay.
```

1            THE COURT:  Yes, ma'am?

2            THE CLERK:  Ready?

3            MS. DIBIANCA:  Number 20, lucky 20.

4            THE CLERK:  Jesse R. Kober, Juror 20.

5            THE COURT:  Please, make yourself comfortable.  How

6  are you?

7            JUROR 20:  I'm good.  How are you doing?

8            THE COURT:  I'm doing great.  Thank you.  Thank you

9  for all the patience that you've had and the -- that we're

10 asking you to continue to have.

11           My first question to everybody is, and there's no

12 wrong answer, would you be less comfortable if I was not

13 wearing this mask?

14           JUROR 20:  Oh.  I don't have a preference.

15           THE COURT:  If I took it off you wouldn't be --

16           JUROR 20:  No.

17           THE COURT:  It wouldn't make you nervous?

18           JUROR 20:  No.  Not at all.

19           THE COURT:  Okay.  Thank you.  And you -- however you

20 --

21           JUROR 20:  Should I take this off?

22           THE COURT:  However you're comfortable.  Okay?

23           JUROR 20:  Thank you.

24           THE COURT:  Fair is fair, right?

25           JUROR 20:  Thank you.

1            THE COURT:  All right.  Well, thank you.  I -- as you

2      know, we're trying to pick a jury here.  And we need people who

3      are going to consider the evidence in this case fairly and

4      follow the instructions on the law that I give the jury.

5            And but we also need to consider the jurors.  And if

6      any have any hardships that make it, you know, close to

7      impossible for them to be on this jury.

8            But, maybe not quite that.  But, more than an

9      inconvenience.  And one of the first things that I've been

10     asking is, so you have a little bit more framework, is first I

11     share the length of the case and the location of the case.

12           And we expect that this trial will go five days.

13     That's today plus four.

14           JUROR 20:  Um-hum.

15           THE COURT:  The trial would be in Allentown, in the

16     federal courthouse.  I don't know if you're familiar with

17     Allentown at all.

18           JUROR 20:  Not very.

19           THE COURT:  Not very?  And I notice you live in

20     Philadelphia.

21           JUROR 20:  I live in West Chester.

22           THE COURT:  Oh, West Chester?  Maybe I got that

23     wrong.

24           JUROR 20:  Yeah.

25           THE COURT:  Okay.  Okay.  All right.  So, do you

1   drive?

2              JUROR 20:  Yes.

3              THE COURT:  Because there's no mass transit to

4   Allentown.

5              JUROR 20:  Okay.

6              THE COURT:  Okay?  That, focused on that, --

7              JUROR 20:  Um-hum.

8              THE COURT:  Is that a hardship?

9              JUROR 20:  I mean, I would need to look up where it

10  was.  Maybe it's, I think, like maybe like an hour?

11             THE COURT:  I'd say thereabout.  Thereabout.

12             MS. SHIKUNOV:  Downtown Allentown's not a bad trip

13  from West Chester.  It's just once you get to the 14, it's just

14  --

15             MS. DIBIANCA:  You're apparently a walking Google

16  map.

17             MS. SHIKUNOV:  I am.

18             MS. DIBIANCA:  You've been everywhere I go.

19             (Simultaneous speaking.)

20             MS. SHIKUNOV:  If it's in Pennsylvania, I've got you.

21             JUROR 20:  So is there parking I could do?

22             THE COURT:  It's very --

23             MS. SHIKUNOV:  Yeah.  The courthouse isn't far from

24  there.

25             JUROR 20:  Okay.

```
 1                THE COURT:  It's very close.  That's the landmark.
 2                JUROR 20:  Okay.
 3                THE COURT:  We have a lot more to offer than in
 4     Allentown then here.
 5                MS. DIBIANCA:  Good, bad, other.
 6                THE COURT:  I'm a cheerleader for Allentown.
 7                MR. CAVALIER:  I can see that.
 8                THE COURT:  Yeah.
 9                MS. DIBIANCA:  It's hard to believe.
10                THE COURT:  All right.  That was -- that was the
11     question that I have.  But then I open it up to counsel.  And
12     then we also welcome anything, unlike in there, we're happy to
13     talk freely.
14                JUROR 20:  Oh, okay.
15                THE COURT:  Okay?
16                JUROR 20:  Great.
17                THE COURT:  So, all right.  So, counsel?
18                MS. SHIKUNOV:  Sure.  Just a couple of questions that
19     are follow ups on -- when you raised your number in the other
20     room.
21                JUROR 20:  Um-hum.
22                MS. SHIKUNOV:  So, you had indicated that you or
23     somebody you know works in human resources.  Could you give us
24     just a little bit more information about that?
25                JUROR 20:  Sure.  So, not anymore.  My father was a
```

1   human resources manager at Dupont, the chemical company.

2           THE COURT:  Is he retired?

3           JUROR 20:  Yes.

4           MS. SHIKUNOV:  Did he ever discuss his work with you?

5           JUROR 20:  Not in much detail.

6           MS. SHIKUNOV:  Do you know if he handles employee

7   complaints?

8           JUROR 20:  No.  It was more like the hiring and staff

9   reorganization type.

10          MS. SHIKUNOV:  Okay.  Well, I think I -- give me one

11  moment.  That's all I have on that.  Did you answer yes to the

12  question of, if you or someone you know was a victim of

13  harassment?

14          JUROR 20:  Yeah.  I wasn't sure if I should have

15  raised my hand for that particular question.  So, it wasn't a

16  family member, like a close friend.

17          But, I did have like an acquaintance in college like

18  tell me that they were like uncomfortable with like how like a

19  staff member had treated them.

20          And so, I told them that they maybe should consider

21  like contacting like a professional advisor at the college.

22  And they did confirm to me that they did that.

23          But then we didn't discuss it again.

24          MS. SHIKUNOV:  Okay.  Do you think that that

25  experience would impede your ability to be fair and impartial

1  here?

2          JUROR 20:  No.

3          MS. SHIKUNOV:  Thank you.

4          THE COURT:  Thank you, counsel?

5          MS. DIBIANCA:  I don't have any questions.  Thank

6  you.

7          THE COURT:  All right.  Do you have any for us?

8          JUROR 20:  So, I guess I -- when you said the trial

9  is going to be five days?

10          THE COURT:  Yes.

11          JUROR 20:  So, would it be next week?

12          THE COURT:  It would go up through -- well, we expect

13  it to go up through Wednesday.  It's very difficult to predict

14  exactly.  It could be a little less.  It could be a little

15  more.

16          But, that's sort of the best guess of everyone in

17  this room, you know, with our years of experience.

18          JUROR 20:  Um-hum.

19          THE COURT:  Does that run up against anything for

20  you?

21          JUROR 20:  Not in particular.  I am starting like a

22  new job this last week.  So, it's just been like a little

23  tricky to navigate that.

24          But, I guess not an actual.

25          THE COURT:  So, it's a, you say hi to your new boss,

1   and then say I'll be at jury duty.  I'll see you in a week.

2              JUROR 20:  Yeah.  Right.  Yeah.

3              THE COURT:  Yeah, that's awkward.  But -- yeah.

4   Yeah.  All right, yeah.  And you know, ultimately we'll see

5   what panel gets selected.  But, we -- Christine, Ms. Stein,

6   whoever's on the panel, they're going to make whatever

7   information they need available for that.  But, it would be

8   starting tomorrow.

9              JUROR 20:  Okay.

10             THE COURT:  Okay?  Well, it's good to meet you.

11             JUROR 20:  Yep.  Good to meet you.

12             MS. SHIKUNOV:  Thank you.  Appreciate it.

13             THE COURT:  So, I have to ask you to have a little

14  more patience next door.  I know that's --

15             JUROR 20:  Okay.  Sure.

16             THE COURT:  I hope I haven't used up all your

17  patience.

18             JUROR 20:  Okay.  Thank you.

19             THE COURT:  Thank you very much.

20             MS. SHIKUNOV:  Thank you.

21             THE COURT:  No motions, right?

22             MS. SHIKUNOV:  Correct.

23             MS. DIBIANCA:  Would we say 19 is a question mark?

24  That's the USGA guy.

25             MR. CAVALIER:  I had put 18 as a question mark.

 1              MS. SHIKUNOV:  Yeah.  I had that too.

 2              MS. DIBIANCA:  Yeah.  18 definitely.  But, I wasn't

 3    sure about 19 since -- maybe a potential question mark, because

 4    we weren't sure about his USGA.

 5              THE COURT:  Yeah.  He's going to be a tough one to

 6    kick for cause.  And --

 7              MS. DIBIANCA:  Yeah, yeah.  But, I'm just trying to

 8    make sure I -- my notes are being accurate.

 9              THE COURT:  I mean, that -- that is super

10    inconvenient.

11              MS. DIBIANCA:  Right.

12              MR. CAVALIER:  But, it's your exact example.

13              THE COURT:  Yeah.  I gave us the example, right?

14              MS. DIBIANCA:  Right.

15              THE COURT:  All right Ms. Stein.

16              THE CLERK:  Ready?  Juror number -- Tyler Henry

17    Jorich, Number 21.

18              THE COURT:  Hey, how are you?

19              JUROR 21:  Fine.

20              THE COURT:  Please, have a seat.

21              JUROR 21:  Thanks.

22              THE COURT:  You didn't think we'd ever get to you,

23    did you?

24              JUROR 21:  This is a long day.

25              THE COURT:  I know.  And I'm -- and I'm very grateful

1  for your patience.

2          JUROR 21:  Okay.

3          THE COURT:  And we're asking you to have even more.

4  Yeah.  First question I have, whatever you say is fine by me.

5  If I was -- if we were not wearing these masks, would it make

6  you uncomfortable?

7          JUROR 21:  No.  Not at all.  I'd prefer it.

8          MS. DIBIANCA:  Good answer.

9          THE COURT:  All right.  Give this guy a star next to

10  his name.

11          MS. DIBIANCA:  Yeah.  Exactly.

12          THE COURT:  All Right.  Well, you know, as you know,

13  we're doing our level best in this case, as in all cases, to

14  pick a jury that can be fair.

15          A jury that, you know, put aside any experiences

16  outside of their own life.  And make a decision based on the

17  evidence that they hear only in this case, and the law as I

18  share it with the jury.

19          We also, and it's a big part of our conversation back

20  here, need to talk to you about, you know, if service would be

21  a hardship.  A hardship that it's just, you know, it would be

22  such a complication on your life because of whatever

23  circumstances or timing that's going on.

24          Or it would be such a hardship that it would -- you

25  would not be somebody that either side would want on the case

1   because you would be distracted or things along those lines.

2   Okay.

3          JUROR 21:  Okay.

4          THE COURT:  So, with that, and unlike in there where

5   your choices were yes, no, put the paper up, please feel free

6   to talk with us in here.

7          JUROR 21:  Um-hum.

8          THE COURT:  We're much less robotic in here then we

9   are out there.

10         JUROR 21:  Okay.

11         THE COURT:  The first thing that I share, and then I

12  ask a quick follow up.  The follow up will be, does that pose a

13  hardship, is the when and the where of the case.

14         We have estimated collectively, it's an estimate, but

15  we believe this case will be five days, including today.

16         JUROR 21:  Okay.

17         THE COURT:  That's the when.  The where is Allentown,

18  Pennsylvania in the federal courthouse.  We -- because we're in

19  federal court, you know, there's nine counties.  This is the

20  only place we pick.

21         But, our courthouse is up in Allentown.

22         JUROR 21:  Okay.

23         THE COURT:  So, your county is -- oh, you're in

24  Montgomery, right?

25         JUROR 21:   Yes.  I'm in Montgomery.

```
 1              THE COURT:  Okay.  We'll talk about anything you want
 2    and what counsel wants to raise.  But, the when and the where,
 3    does that create a hardship?
 4              JUROR 21:  I mean, Allentown is a bit of a hike
 5    obviously.  I've been -- I've been really busy with work
 6    lately.  I've been having to like be on my phone this whole
 7    time.
 8              So, it's really tough.  I mean, yeah, so it is pretty
 9    tough.  But, I mean, I know everyone works too.  So, I'm not
10    trying to act like my schedule is more important than others.
11              THE COURT:  No.  And look you need to share that.
12    And I invited you to speak candidly with us.
13              JUROR 21:  Um-hum.
14              THE COURT:  You -- do you drive?
15              JUROR 21:  Yes.
16              THE COURT:  Okay.  Because I only ask because there
17    is no mass transit.
18              JUROR 21:  Um-hum.
19              THE COURT:  Are you -- into Allentown.  Are you
20    familiar with Allentown at all?
21              JUROR 21:  Yeah, just from going to the amusement
22    park there.
23              THE COURT:  Dorney Park?  Yeah.
24              MS. SHIKUNOV:  I've heard that a lot today actually.
25              THE COURT:  So, that's two in a row, I think, yeah.
```

1   Yeah look, I do appreciate.  You know, we ask a lot of our

2   jurors.  A lot.

3          And I'm -- I am, you know, it's always incredible to

4   me, you know, just how accommodating everybody is.  And I know

5   today --

6          JUROR 21:  Um-hum.

7          THE COURT:  Just today is a big ask.  And we're

8   asking for a lot more.  But, in terms of work, and I know you

9   touched on this yourself, yeah we -- you know, there's -- if

10  you were going to lose your job because of this, which by the

11  way is illegal.

12         But, if you were, that would be something.  If you

13  were going to not be able to, you know, pay your mortgage.  And

14  believe me, sometimes that is the case for people.

15         That's the type of stuff that to me is like the true

16  hardship.  I'm -- we're asking a lot.  There's no two ways

17  about it.

18         You don't fall into those types of categories though,

19  fairly?

20         JUROR 21:  No.

21         THE COURT:  Okay.  Okay.  And I appreciate your

22  candor.

23         JUROR 21:  No problem.

24         THE COURT:  Because I know you probably want to say,

25  get me out of here.

```
1              JUROR 21:  Yeah.  I mean, they understand.  I work
2    for a public company.  So, they're not going to -- they can't
3    pull any of like you said.  Yeah, so.
4              THE COURT:  And they won't.  They wouldn't, and they
5    can't.  But, they're usually the best when it comes to that
6    anyway.
7              JUROR 21:  Um-hum.
8              THE COURT:  But, I also appreciate if you were
9    selected, no one's doing your work while you're out.  So --
10             JUROR 21:  That's my -- yeah.  And I was on vacation
11   all last week.  So, I'm trying to catch up this week.  And this
12   came up.
13             THE COURT:  There's no team of gremlins doing your
14   work while you're out.
15             JUROR 21:  Yeah.
16             THE COURT:  And then you start fresh.  I get that.  I
17   get that.  So, I'm going to turn it over to the lawyers here.
18   Okay?
19             JUROR 21:  Okay.
20             MS. SHIKUNOV:  So, you raised your number to the
21   question about whether or not you could be fair or impartial in
22   this case.
23             JUROR 21:  Um-hum.
24             MS. SHIKUNOV:  Could you give us a little bit of
25   information about that?  Because I think all of us in the room
```

1  would like to know that?

2          JUROR 21:  Yeah.  I know this is going to sound old

3  fashioned, rude, maybe whatever.

4          MS. SHIKUNOV:  That's okay.

5          JUROR 21:  I noticed as the Plaintiff was writing on

6  this hand, she had like this whole tattoo sleeve going up her

7  arm.  And then she's like covering it the whole time.

8          I don't know if that was instructed by her attorney

9  or what.  I don't know, I just -- I have trouble trusting

10  people with like, male, or female, with like tattoos on their

11  necks, their arms, things like that.

12          So, I might be a little biased.  I'm not going to

13  lie.

14          MS. SHIKUNOV:  That's an honest answer.  We want to

15  hear the honest truth.

16          JUROR 21:  And I'm still watching, she's like this

17  the whole time out there.  Because then it caught my eye.  So,

18  I've been like, she's right in front of me.

19          So, I've been -- so, I'm like, why are you covering

20  it?  Like it would be more -- I'd be more -- less -- I'd be

21  less biased if she would just let it roll, but.

22          And I know we're more in this environment with works

23  thinks like trust me, I work for a public company.  I know you

24  can't judge people based on that.

25          And I don't judge people based on race, religion,

1   anything.  But, I mean, I won't date a girl with tattoos.  I

2   won't -- I'd never get a tattoo anywhere like here, here, here.

3           So, I don't know.  I'm just like, I'm guess more of a

4   conservative person.  So, I'm just -- I guess I've been judging

5   her.

6           But, I've just been watching her.  I'm like I don't

7   trust this woman.  That sounds bad.  But, that's the truth.

8           MS. SHIKUNOV:  I don't have any further questions on

9   that.

10          MS. DIBIANCA:  Nor do we.

11          THE COURT:  And I know it's a tough question to ask.

12          MS. DIBIANCA: I'm sorry, I talked for John and I

13   shouldn't have done that.

14          THE COURT:  Yeah.

15          MR. CAVALIER:  Despite the fact, and listen, I know

16   it's a long day.  You've been sitting out there all day.  And I

17   don't know where you're sitting, but I suspect she's ten feet

18   in front of you.

19          JUROR 21:  Yeah.  She's right in front of me.

20          MR. CAVALIER:  Do you think you have it within you to

21   set that initial impression aside, hear the case on the facts,

22   and render your verdict in accordance with what the Judge

23   instructs you on the law?

24          JUROR 21:  Yeah.  I would definitely listen to the

25   case thoroughly, clearly.  I would -- I wouldn't -- I wouldn't

1   base my decision on that.

2             But, I just wanted to be honest that I was that

3   little, at first, taken back like --

4             MR. CAVALIER:  Sure.

5             JUROR 21:  One of these, like so.

6             MS. SHIKUNOV:  Yeah.  Yeah, yep.

7             MR. CAVALIER:  And --

8             JUROR 21:  I mean, like is she just trying to get a

9   payday?  I might be speaking bluntly.  But, I'm not trying to -

10  - maybe she is, maybe something bad did happen to her.

11            But, I don't know.  That's just -- that's my -- I'm

12  just being honest.  I mean, that's the initial --

13            MS. SHIKUNOV:  Yeah.  We appreciate that.

14            MS. DIBIANCA:  No, we appreciate it.

15            JUROR 21:  Honest thing that was going through my

16  head.

17            MS. SHIKUNOV:  Yeah.

18            JUROR 21:  Like, is this lady trying to get a payday

19  here?

20            MS. SHIKUNOV:  Yeah.

21            JUROR 21:  Because this is -- you know how much this

22  has been going on in the news and all that.  Is she just

23  following the popular thing people are doing these days?

24            MS. SHIKUNOV:  Yeah.

25            THE COURT:  But, wouldn't you have to listen to the

1   evidence too, to make that decision?

2          JUROR 21:  Oh, definitely.  That's why I said, she

3   could -- she could very well be correct.  And then I'd feel bad

4   for what I'm saying now.

5          But, like I said, I'm just being completely honest.

6   What crossed my mind.

7          THE COURT:  And what did I ask you?  To be honest.

8          JUROR 21:  Yeah.

9          THE COURT:  And to talk with us, right?  And so, you

10  know, I -- and then we have to make certain decisions.  And if

11  you don't share that with us, that's the problem.  Not that you

12  did share it with us.

13         And so again, but, I have to dig deeper.  You know,

14  because these are, you know, people on both sides, that this

15  case is very important to both sides.

16         And you know, I need to know, you shared, you know,

17  how you feel about people with tattoos.  And maybe it's a

18  combination of tattoos, but also you're trying to --

19         JUROR 21:  Yeah.  That was what more got me.

20         THE COURT:  Hide the tattoos.

21         JUROR 21:  And I don't have anything against tattoos.

22   I would actually get one.  But, I just -- some -- you know,

23  like I've just been taught, don't get them in places where you

24  can see.  And I don't know.  I know I sound old fashioned, I

25  guess, but.

1              THE COURT:  Yep.  I -- and it's --

2              JUROR 21:  And it's some -- you know, I know you're

3    judging people.  But, if you see someone with that, you're

4    automatic -- I'm automatically like, if you're not like an

5    athlete or a rock star, you know, peace and star like, and I

6    don't know.

7              But, it's -- I maybe going on a tangent.  But, that's

8    just how I think.

9              THE COURT:  And can -- but, this is the question.

10   Can you assure us, and I use that word deliberately, assure us

11   that you would decide this case based on the evidence?

12             Based on the law as I instruct you on it?  And not

13   based on whether either side has tattoos?

14             JUROR 21:  Definitely, yes.  I would be fair.  I

15   would listen to all the facts.

16             THE COURT:  All right.  And --

17             JUROR 21:  I would never put -- I would never base a

18   decision on that.  Like on any type of physical traits of a

19   person.

20             THE COURT:  All right.  Thank you again for being

21   candid with us.  It's information we all need to know.  But,

22   that was the question I needed to ask.  All right?

23             JUROR 21:  Um-hum.

24             THE COURT:  Do you have any questions for us?

25             JUROR 21:  No.

1          THE COURT:  All right.  Hate to tell you this, --

2          JUROR 21:  I wanted to say that I'm sorry.

3          MS. DIBIANCA:  No.  No, it's super important.  Thank

4   you.

5          MR. CAVALIER:  We need to know.

6          JUROR 21:  Just being honest.  I don't want to be

7   rude.  I knew I was probably going to sound rude.  But, I was

8   just being honest with everyone.

9          MS. DIBIANCA:  It sounds honest.  That's all it is.

10  Thank you.

11         THE COURT:  All right.  I'm going to have to keep you

12  next door for hopefully not too much longer.

13         JUROR 21:  Okay.

14         THE COURT:  All right.

15         JUROR 21:  No problem.  It takes a little while.  No

16  problem.

17         THE COURT:  Thanks so much.

18         JUROR 21:  Thank you.  Appreciate it.

19         MS. SHIKUNOV:  Your Honor, I'm moving for cause on

20  that one.

21         THE COURT:  Anything from your side?

22         MS. DIBIANCA:  Well, he said he was very clear,

23  unequivocally that he could absolutely and would absolutely be

24  -- that he was being candid with the Court like the Court

25  requested.

```
 1              And had no problem whatsoever with taking all the
 2    evidence and being -- making a fair decision not having
 3    anything to do with the tattoos.
 4              MS. SHIKUNOV:  But he also said he was judging her.
 5    He doesn't trust her.  She was just looking for a payday.
 6    She's following what's popular on the news.
 7              MS. DIBIANCA:  No.  He didn't -- he raised --
 8              MS. SHIKUNOV:  He went on with that.
 9              MS. DIBIANCA:  He raised --
10              MR. CAVALIER:  That's not what he said.
11              MS. DIBIANCA:  He raised his hand to questioning
12    whether he could be fair or not.
13              MS. SHIKUNOV:  I'd also like to add yeah, I think
14    with his complete --
15              (Simultaneous speaking.)
16              MS. DIBIANCA:  Actually, he was inconsistent.
17              MS. SHIKUNOV:  He was not consistent with the
18    statement he made.
19              THE COURT:  Wait a minute.
20              MS. SHIKUNOV:  That makes me really question how
21    forthcoming he was being.  Then -- and then he says, he would
22    get one.  But wouldn't date a girl with one.
23              That's exacting a lot of, you know, there's a little
24    sexist judgement there.
25              THE COURT:  Yeah.  But we're not asking him to date
```

 1  anybody.

 2          MS. DIBIANCA:  Right.

 3          THE COURT:  I think --

 4          MS. SHIKUNOV:  The fact that he was --

 5          THE COURT:  It was an unusual response.  I'll grant

 6  you that.  And not expected.  But, I think ultimately,

 7  ultimately what matters is, that he said that he would put it

 8  aside.

 9          I note, Susan, you suggested that he -- he was being

10  -- he might not have been candid with us.  That's the thing I

11  thought, the thing I think he was.

12          MS. DIBIANCA:  Yeah.  Exactly.

13          THE COURT:  Was candid with us.  And so, if I'm you

14  know, if I'm going to be troubled by the early things that he

15  said, because I'm not going to believe his ultimate assurance

16  to us, and I use that word very deliberately.

17          You know, because we all know from picking juries, I

18  will do my best.  We hear that.  You know, I can --

19          MS. DIBIANCA:  Right.

20          THE COURT:  I can imagine that won't bother me.  He

21  assures us.  But, he also let us know why perhaps he should be

22  a preemptory strike for one side or the other.

23          MS. DIBIANCA:  Right.

24          THE COURT:  But, I -- you know, I appreciate your

25  argument.  Believe me.  I'd be making the same ones if I was

 1  sitting there.

 2          But, I think the ultimate here is that he assured us

 3  that he would be fair.  And I think he -- I found -- I found it

 4  credible when he said, you know, he almost seemed embarrassed

 5  to --

 6          MS. DIBIANCA:  Yes.

 7          THE COURT:  Share it with us.

 8          MS. DIBIANCA:  Yes.

 9          THE COURT:  And he did.

10          MS. DIBIANCA:  Yes.

11          THE COURT:  So, I -- you know, there is some

12  credibility to that.  And I'm not approving in any way of what

13  he was suggesting.

14          MS. SHIKUNOV:  Oh, yeah.  And we're not going to go

15  with that.

16          MS. DIBIANCA:  If Mr. I don't like Israel isn't being

17  stricken for cause, he said that he would try to follow the

18  evidence.  I don't see how that guy gets struck for cause.

19          THE COURT:  Yeah.  It's an interesting day.  Yeah.

20  But, I'm going to -- I'm going to deny that motion.  I'll

21  overrule it.

22          MS. SHIKUNOV:  Okay.

23          THE COURT:  All right.  Thank you.  Christine needs a

24  minute.

25          MS. DIBIANCA:  When John said yesterday, he says,

1  this one here, he says am I the oldest person in the room?  And

2  then he tells me how old he is, and he's significantly younger

3  than me, I was like that was really not a smooth move.

4            MR. CAVALIER:  You should have taken it as a

5  compliment that I asked the question though.

6            MS. DIBIANCA:  I was like no, I'm actually.

7            MS. SHIKUNOV:  That's like walking in, and being like

8  are you pregnant?

9            MS. DIBIANCA:  Yeah, I'm the oldest one, thanks for

10  pointing it out.

11            MR. CAVALIER:  I knew you were from our previous

12  conversations, and I still didn't say it until you said it.

13            MS. DIBIANCA:  When I was pregnant, I wished more

14  people did say it.  I used to, I would always be like I'm

15  pregnant, it's a big belly right here, we can talk about it.

16            MS. SHIKUNOV:  I just don't like when people try to

17  touch me, that's my thing.  I don't know you man, like we're

18  not cool like that.  I was so happy that night.

19            MR. CAVALIER:  Yes, please.

20            MS. SHIKUNOV:  I had my license plate stolen when we

21  were in court the other day.

22            MS. DIBIANCA:  Not license plate, license plates,

23  both.

24            MS. SHIKUNOV:  The plates, the front, and back.

25            MS. DIBIANCA:  Both.

 1          MS. SHIKUNOV:  The parking garage attendant actually

 2   told us today, I drove here with them, and the parking garage

 3   attendant goes where's your license plate?  And I was like what

 4   do you mean?  Right here (unintelligible).

 5          THE COURT:  Hi, please sit down.  It's good to see

 6   you.  My first question, and there's no wrong answer to this,

 7   if I took this off, does it make you uncomfortable?

 8          JUROR 22:  No, not at all (unintelligible).

 9          THE COURT:  There's no wrong answer, but that's a

10   very right answer, I appreciate it.

11          JUROR 22:  Could I, I feel like I've been sitting out

12   here thinking about things all day today, I need to clarify a

13   couple of my answers.  I was asked, one of the questions was

14   whether -- was it anybody I knew that was on a jury, or was it

15   whether I was on a jury?

16          THE COURT:  We can go with you, your family, your

17   close friends, that sort of thing.

18          JUROR 22:  My wife served many years ago on a civil

19   case in this courthouse.

20          THE COURT:  In federal court?

21          JUROR 22:  In federal court many years ago.  I've

22   never, when I took your question as a witness, I've never been

23   in court as a witness, but I've been subpoenaed several times,

24   and provided testimony, I never actually went to court on any

25   of the things, but they were two civil cases, two partners

1  suing each other for a company I worked for.  And there was a

2  claim against, this happened in Florida, a builder, home owner

3  was suing a builder for something that I was a draftsman, and I

4  had drawn it up, and I provided expert witness on that in a

5  deposition.  So, I was subpoenaed for a deposition.

6            THE COURT:  Okay, so you --

7            JUROR 22:  I wanted to clarify, I took your question

8  as had I ever been in court as a witness, and no, I hadn't, but

9  I have done depositions.

10           THE COURT:  I'm glad that you, it's better to share

11 that, and answer more expansively, but that's very helpful.

12           JUROR 22:  I didn't raise my hand as a yes for that,

13 again, sitting out here today, it was many years ago.

14           THE COURT:  We had you sitting out there for --

15           JUROR 22:  Right, we started to reminisce, and think

16 about --

17           (Simultaneous speaking.)

18           MS. DIBIANCA:  You were having a good time out there?

19           THE COURT:  You started from childhood, right?

20           JUROR 22:  I know who's got the nice seats, I can

21 tell you that, you should approve of this on the church pews.

22           THE COURT:  You're only the second person who pointed

23 that out.  I thought there'd be more.

24           JUROR 22:  I tried to trade as I was waiting in the

25 hallway, but they didn't want to switch.

1          THE COURT:  Man, well look, we'll have a few
2    questions, one of the things that we need to do in the next few
3    minutes, and as you've seen already, it's much more narrative
4    in here than it is in there, by necessity.  So, we want you to
5    speak freely, and I'm comfortable, that you're comfortable
6    doing that.

7          JUROR 22:  Thank you.

8          THE COURT:  So, we need to obviously get a jury to be
9    fair to both sides, and who will make their decision based only
10   on what occurs in the courtroom during the trial that comes
11   into evidence, and the instructions as I provide them to the
12   jury.  We also, in this conversation, need to determine if
13   there would be such a hardship that a particular juror should
14   not sit on this particular case, and I alluded to outside,
15   there's certainly going to be inconvenience.

16         If I said to you, I can promise you there'll be
17   inconvenience to you, you'd say yeah, there has been already,
18   I've been here all day.  That's built into it.  We understand
19   that, but it's almost like this much higher level, but we also
20   want to hear from the jurors, the prospective jurors like
21   yourself, the things that might be to that level.  So, I always
22   start, before I turn it over to counsel, just to share a little
23   bit about where the case is going to be, and how long it's
24   going to last.

25         And we've estimated, it's our best estimate between

1   the group of us that it would be five days including today,

2   that's the when.  The where is the Allentown Courthouse in

3   Downtown Allentown, because we're federal court, and I don't

4   know if you remember this from when your wife served, all nine

5   counties pick juries here, even for the judges who sit in

6   Easton, Allentown, and Redding.

7           THE COURT:  And so from just that limited information

8   I gave you about the when, and the where, is there a hardship,

9   or a potential hardship you want to discuss with us?

10          JUROR 22:  Work related, that's going to be very,

11  very difficult.  I know that I had planned on three days, it

12  was great to be able to get to the office yesterday.  I manage

13  a number of individuals at my company, I run an inspection

14  department for a structural engineering company, and I've got

15  multiple guys that I need to coordinate, to get out in the

16  field, I coordinate with homeowners every day to make sure that

17  my guys are being where they are, as well as job sites, and

18  things.  One of my inspectors is on vacation tomorrow, so I'm

19  already shorthanded in the office, but that's, I'm dedicated

20  here obviously.

21          I have a company vehicle, so I took the train in

22  today, I don't have a personal vehicle.  I would have to check

23  with the company to see if they're okay with me getting to

24  Allentown.  I'm in Hatboro, so the train, it was no problem

25  taking the R2 down today, but I would have to find out from the

1   company whether they're okay with me for personal use, taking

2   it to get to Allentown.

3          THE COURT:  Do you think you -- do you know if they

4   would pay you for your days off?  I know your concern is the

5   actual work getting done, and the managing of personnel, and

6   projects, do you know if they would pay you?

7          JUROR 22:  I don't know how many days I get paid for,

8   I work for a very generous company, I can tell you that, we're

9   ranked very high in the nation, as one of the best companies to

10  work for.  I don't know anybody else who's been through this,

11  and I don't know what to base that on.  I know I'll be

12  reimbursed for today, because I showed down here today, and I'm

13  here back tomorrow, will probably get paid for that. I would

14  have to check, but.

15         THE COURT:  Okay, and I appreciate you sharing that

16  with us, and I don't want to sound, because my mind's not here,

17  but I don't want to sound, in any way disrespectful, but that

18  sounds like it would be high on the scale of inconvenience, and

19  I think largely, correct me if I'm wrong, because when you came

20  back, all the work that you didn't do for those three, four,

21  five days would be waiting for you as well as the work that was

22  due the day you come back?

23         JUROR 22:  Yeah, without a doubt.

24         THE COURT:  So, to me that's a heavy lift, and a big

25  ask, but it is an ask that we'll be making, it's an ask we'll

1   be making.  In terms of the travel, and counsel will have other

2   questions, there's a bus stop in Allentown, but taking the bus,

3   and I've done it before, anywhere between Philadelphia, and

4   Allentown it seems like they stop every block in that 70

5   something miles.

6           So, the best way is to drive, because there's not a

7   train there, and you're right, the train, we know everybody who

8   we're talking to today can get to Philadelphia, because they're

9   in Philadelphia, but we don't know that for Allentown.  So,

10  those are definitely, it's important you share it with us, and

11  there are considerations, I promise you we'll consider them

12  very seriously amongst the other factors, but I'm going to turn

13  it over to counsel to see, and if you want to share anything

14  with us, this is two way, feel free, and speak freely.

15          JUROR 22:  Sure.

16          MS. SHIKUNOV:  All right, I just have a few brief

17  follow up questions based on where you raised your number.

18          JUROR 22:  Yes.

19          MS. SHIKUNOV:  So, you mentioned that you, or

20  somebody that you knew had been sexually harassed, can you just

21  give us a little bit of information about that?  I don't need

22  details that are uncomfortable to discuss, but more just who

23  the person involved was, and their relation to you.

24          JUROR 22:  It was me, it happened at work, it was a

25  woman in an elevator, I was about 16 years old, and it was a

 1  coworker.

 2          MS. SHIKUNOV:  And I want to ask this delicately, and

 3  you can round --

 4          (Simultaneous speaking.)

 5          JUROR 22:  Sure, go right ahead.

 6          BY MS. SHIKUNOV:  But about how long ago was that

 7  that you were 16?

 8          JUROR 22:  Yeah, well I'm 58 now, so I don't know,

 9  quite a number of years ago.

10          MS. SHIKUNOV:  Do you think that experience would

11  impact your ability to be fair, or impartial in this case?

12          JUROR 22:  No, I don't think so.

13          MS. SHIKUNOV:  Was there any litigation, or anything

14  that happened at work as a result of that?

15          JUROR 22:  No, that was back decades ago, and none of

16  this stuff was ever talked about, or anything like that, the

17  boss thought it was funny, and wanted to know why I resisted if

18  you want to know the truth.  I laughed at, I think my comment

19  to her, and I said to him was I don't think my mother would be

20  real proud of me right now.  She was a married woman, so, and

21  my boss thought that was hysterical that I was going to go tell

22  my mommy on her.  Different times.

23          MS. SHIKUNOV:  So, were you the victim in that?

24          JUROR 22:  Yes.

25          MS. SHIKUNOV:  So, she made the inappropriate comment

1   to you?

2          JUROR 22:  Yes, in an elevator, it was more than a

3   comment.

4          MS. SHIKUNOV: And then you brought it to the boss?

5          JUROR 22:  It was more than a comment, it was up

6   against the wall, so yeah.

7          MS. SHIKUNOV: And you also indicated that you have

8   either recommended termination, or participated in the

9   termination of an employee, can you, again, I don't want you to

10  say anything you're not comfortable divulging, but can you just

11  give us a little bit of context for that?

12         JUROR 22:  Multiple times by, as part of my position,

13  not so much with this company, but a previous company that I

14  worked for, for about 14 and a half years, another engineering

15  company.  That was part of my role, was to let people go. A lot

16  of times, it was never anything from what this seems to be

17  about, it was more so somebody not doing their job, but I was

18  in the position where I had to let people go, if that helps.

19         MS. SHIKUNOV:  Did any of those terminations ever

20  result in any type of litigation?

21         JUROR 22:  Not that I'm aware of.

22         MS. SHIKUNOV:  I don't have any further questions.

23         THE COURT:  Thank you.

24         MS. DIBIANCA:  I don't have any questions.

25         MR. CAVALIER:  Do you have any questions for us?

1            JUROR 22:  One other experience that I, and again,

2    you guys can weigh this all out, but the last company that I

3    worked for, the boss was having inappropriate relationship with

4    an office manager, and that ended up in she left, and I know

5    there was a pay out, and arrangements, and things like that was

6    made.  That was something else I had thought about today, that

7    was 15, 16 years ago, probably 18 years ago now.

8            So, I was aware of a situation where something had

9    happened at an owner level with a subordinate level that ended

10   up with subordinate leaving, and getting some type of

11   arrangement, or whatever that was.  I don't know if that plays

12   anything.

13           MS. SHIKUNOV:  But does that have anything to do with

14   you, were you involved, or you were just an observer of that?

15           JUROR 22:  No, just a complete observer, just knew it

16   was happening.  Again, I've been in the construction industry

17   for all of these years, you can imagine what I've seen.

18           MS. SHIKUNOV:  And would that experience impact your

19   ability to be fair or impartial?

20           JUROR 22:  No, I don't think so.

21           MS. SHIKUNOV:  I don't have anything on that.

22           THE COURT:  Counsel?

23           MS. DIBIANCA:  I don't have anything either, thank

24   you.

25           THE COURT:  All right, thank you for your patience,

1  and your willingness to be here, and we're going to have to

2  hold you prisoner next door a little while longer while we're

3  getting through this, okay?  I know it's been a long day, so

4  thanks so much.

5          JUROR 22:  Understood, everybody's good with me.

6          THE COURT:  All good, thank you, it's a pleasure to

7  meet you.

8          JUROR 22:  Nice to meet everyone too, thank you.

9          MR. CAVALIER:  Thank you sir.

10          MS. SHIKUNOV:  Thank you.

11          THE COURT:  No motions?

12          MS. DIBIANCA:  No.

13          THE COURT:  Can we just, let's take just a one minute

14  breather.  Yeah, do you mind? You can stretch your legs.

15          MS. DIBIANCA:  I would love to stretch my legs

16  honestly, yes (unintelligible).

17          MR. CAVALIER:  There's a single one right through

18  those doors.  It's a pretty cozy jury room considering

19  (unintelligible).

20          MS. DIBIANCA:  I know, I know, I can't imagine how

21  you must feel, my legs are --

22          MS. SHIKUNOV:  Actually it's worse when I move

23  around.  See, I have a hard time getting up from that position,

24  that's the one, my husband (unintelligible).

25          (Simultaneous speaking.)

1      MS. DIBIANCA:  I always have a tough time, yeah,
2  you've got to roll, right?
3      MS. SHIKUNOV:  I have a hard time turning,
4  remembering to turn to the side, because it is easier that way,
5  but I feel like, what were those toys, the weebles wobble but
6  they don't fall down?
7      MS. DIBIANCA:  Yes, the weeble wobble
8  (unintelligible).
9      MS. SHIKUNOV:  That's how I feel.
10      MS. DIBIANCA:  I have a vivid recollection of them,
11  playing with them on my kitchen floor when I was a kid, it's
12  amazing how clear that memory is.
13      MS. SHIKUNOV:  That's what I feel like.  All right,
14  we'll just keep ploughing through.
15      MS. DIBIANCA:  I know we are.
16      THE COURT:  Let me just make this known to everybody,
17  this is our issue.  There's 3 more jurors that are waiting just
18  for us, and they would normally be gone by now.
19      MS. DIBIANCA:  I think you send them home, I don't
20  think we need them, we've got so many on the list already.
21      MR. CAVALIER:  One, two, three, four, five, six,
22  seven, eight, nine, ten, 11, 12, 13, 14, 15.  We have 15 minus
23  six is nine, we're going to get a panel out of what we've got,
24  I think you can send them home.
25      THE COURT:  Listen to that optimist over there.

```
1              MS. DIBIANCA:  I agree.

2              THE COURT:  Music to my ears.

3              MR. CAVALIER:  Let's do it.

4              THE COURT:  All right, I'm going to --

5              MR. CAVALIER:  Start with the question marks, you're

6    just going to have to do your civic duty.

7              THE COURT:  Yeah, all right.  Let me let Christine

8    know.

9              MS. SHIKUNOV:  Because we have one, two, three, four,

10   five, six, seven, eight more to talk to, or seven more to talk

11   to?

12             MS. DIBIANCA:  Eight.

13             MS. SHIKUNOV:  Eight more.

14             MR. CAVALIER:  We've got 15 (unintelligible)

15             (Simultaneous speaking.)

16             MS. DIBIANCA:  Yeah, even if we get half of those in,

17   I think that (unintelligible).  I don't like people that much.

18             (Simultaneous speaking.)

19             THE COURT:  All right, is everyone ready to keep

20   going?  I'm keeping you late.

21             (Simultaneous speaking.)

22             THE COURT:  You meant that?

23             MS. DIBIANCA:  It's crap, I just like to talk to

24   myself in the mirror (unintelligible).

25             THE COURT:  Yes, please, you did (unintelligible).
```

1    Good man, thank you.  What number are we on, Mike?  Hi, how are

2    you?  You've been waiting all day.

3              JUROR 23:  It's okay.

4              THE COURT:  Here's my first question I ask everybody,

5    and there's no wrong answer, if I took this off, would you feel

6    less safe?

7              JUROR:  No.

8              THE COURT:  I think you just answered it.

9              JUROR 23:  I'm vaccinated.

10             MS. SHIKUNOV:  You anticipated the question.

11             JUROR 23:  I'm vaccinated, so (unintelligible).

12             (Simultaneous speaking.)

13             THE COURT:  Thank you, this is our little secret.

14             MS. SHIKUNOV:  I'm sorry before we start, I just

15   wanted to -- are we on 23, or 24?  Because I thought I heard

16   you say 24.

17             MR. CAVALIER:  23.

18             MS. DIBIANCA:  23.

19             MS. SHIKUNOV:  23, okay, that's where my head is.

20             THE COURT:  All right, I know it's been a long day,

21   and we ask a lot in jury selection, and that kind of goes into

22   my first question, where I mentioned outside, obviously we have

23   to have a fair jury above all, but we also have to weigh are

24   there hardships?  More than inconveniences, it's definitely,

25   today has already been an inconvenience, but a hardship that

1  really makes it close to impossible that someone should be on a
2  jury.
3          And the first thing I do, and this is a narrative
4  back, and forth, feel free to speak freely, okay?
5          JUROR 23:  Okay.
6          THE COURT:  We have to be robots in there, here we
7  can actually speak.  And counsel will speak to you, but the
8  first thing I always mention, because I don't know if it's
9  going to be a problem, is I let folks know how long it's going
10  to take, and where we're going to be.
11          JUROR 23:  Okay.
12          THE COURT:  So it is our estimate, and we feel pretty
13  good about it, but it's our estimate that we have a five day
14  trial including today, so it would be four after today, that's
15  the when.  The where is the Allentown Federal Courthouse in
16  Allentown, Pennsylvania.
17          JUROR:  It's about an hour away from me.
18          THE COURT:  And you're Monco (phonetic)?
19          JUROR 23:  Yeah, North Wales, so it's about an hour.
20          THE COURT:  Okay, that's a nice area.
21          JUROR 23:  Yeah.
22          THE COURT:  I drove through there a couple weeks ago,
23  I was actually in an accident, I was trying to get to, what's
24  the seat of Bucks County?
25          JUROR 23:  Doylestown.

1          THE COURT:  Doylestown, yeah.

2          JUROR 23:  Yeah, it's right there.

3          THE COURT:  So then I wasn't lost, then I did go

4    there.

5          JUROR 23:  Yeah, sort of.

6          THE COURT:  So, if you're there did you drive here

7    today, or did you take a train?

8          JUROR 23:  I had someone drop me off.

9          THE COURT:  Okay, because Allentown doesn't have mass

10   transit, at least not a train system, so do you drive?

11         JUROR 23:  Yes.

12         THE COURT: Okay.  Have you been to Allentown?

13         JUROR 23:  About 25 years ago.

14         THE COURT:  It's much better now.

15         MS. SHIKUNOV:  He should have a brochure that he

16   publishes, because --

17         THE COURT:  Whether or not you're on this case, visit

18   Allentown, I'm a cheerleader.

19         JUROR 23:  Okay, great.  Yeah, it's been a very long,

20   long time.

21         THE COURT:  We're on the upswing.

22         JUROR 23:  Oh good.

23         THE COURT:  That is good.  So, I know there's no

24   doubt it would be an inconvenience to be there for those days

25   at that place, more than that?

1          JUROR 23:  I do have one pending problem, but I'm not
2     sure going forward, because my father just, he's Parkinson's,
3     and dementia, and he just took a very bad fall, and pulverized
4     his whole hip.
5          THE COURT: Oh my goodness, when was that?
6          JUROR 23:  This was, he did it on the 15th, and he's
7     been in the hospital for a month, but he's very combative, and
8     he just doesn't know where he is, and all that.  I'm waiting to
9     hear from the surgeon actually today if he has to go back in
10    for another surgery.  The only person is my sister, but I
11    didn't know if that was considered, you mentioned something,
12    that's the only thing I have on my plate.
13         THE COURT:  well that's significant.
14         JUROR 23:  Okay, I didn't know in the way the court
15    is, I wasn't sure, so I thought I'd just wait, and talk to
16    somebody about it if it's a problem.
17         THE COURT:  Hardship is in the eye of the beholder
18    typically, and that's significant.  So, I guess the question is
19    what's the likelihood, and you don't know what?
20         JUROR 23:  I would venture to say, and I mean I'm in
21    the medical field as well, so I kind of have a good idea.  I'm
22    not sure, but I would say there's probably a better chance,
23    than there is not a chance of him going back.  Either that, if
24    he's not going back into surgery, he'll be discharged, and sent
25    into an inpatient rehab, and I'm also currently trying to get

1   him into the VA State Vet's Home as well, so that's also

2   something that's kind of like.

3           THE COURT:  I get it, that's a lot.

4           JUROR 23:  Yeah, it just kind of all dropped on me

5   the day after my birthday, so I'm just like yay.

6           MS. SHIKUNOV:  Well happy birthday, sorry.

7           JUROR 23:  No, it's quite all right.  This was, like

8   I said, he's Parkinson's, so this has been a bit, he's military

9   disabled too, so it's all the VA stuff, but I didn't know if

10  that was considered something that was --

11          THE COURT:  No, it certainly is, and he's in the

12  hospital now?

13          JUROR 23:  Yes, in the inpatient rehab, yeah.

14          THE COURT:  And so you're waiting to hear whether

15  he's going into another, staying in inpatient rehab, or he

16  needs more surgery?

17          JUROR 23:  Or he needs more surgery.  We're kind of

18  on the cusp because he's 86, he's got a very high level of

19  combativeness.  Like when he came out of the first surgery,

20  they had to restrain him.  So, we had all that mess as well

21  with mental health, so it's been a real challenge.

22          THE COURT:  Let me ask you this.  Let's say you were

23  able, your sister was able to take care of him, that's just a

24  hypothetical.

25          JUROR 23:  Yeah, no, that's a good question.

1           THE COURT:  But here's the question, would you be
2  distracted worried about him, and not fully tuned into the
3  case?
4           JUROR 23:  I am now, yes sir.
5           THE COURT:  You see where I'm going?
6           JUROR 23:  Yes sir.
7           THE COURT:  Even, God willing, the best case for your
8  dad, you're still going to be distracted?
9           JUROR 23:  Yes sir, I've been distracted all day to
10  be very honest with you.
11          THE COURT:  I understand, that's why I asked.
12          JUROR 23:  Yeah, I have all the documentation, and
13  all that, but I just, like I said, all day long I've been back,
14  and forth with the rehab, with my mother who is also elderly,
15  and very, I mean it's just --
16          THE COURT:  I have nothing further to ask you.
17  Counsel, does anyone have any questions?
18          MS. DIBIANCA:  No, absolutely not.
19          JUROR 23:  Thank you, that was very kind.
20          THE COURT:  I'm sorry to ask you personal questions
21  like that, but --
22          JUROR 23:  No, quite all right, I came prepared, so -
23  -
24          THE COURT:  And we're, obviously we're all hoping the
25  best for your dad, and your family, so.

1          JUROR 23:  Yeah, I was kind of like this, I was
2    looking forward to this actually, it's very interesting, and I
3    wanted to do it, and.
4          THE COURT:  And there's great lawyers on this case.
5          MS. DIBIANCA:  I was just going to say, I mean you're
6    lucky that (unintelligible).
7          (Simultaneous speaking.)
8          JUROR 23:  But yes, I really would have enjoyed
9    something like this.
10         THE COURT:  I appreciate that, well perhaps down the
11   road, all right?  In the meantime, you take care of your dad.
12         JUROR 23:  Thank you so much.
13         MS. SHIKUNOV:  Best of luck.
14         THE COURT:  The only bit of bad news we have left, is
15   you still have to wait until we're done, but we're getting
16   close.
17         JUROR 23:  You know, I decided that that's a great
18   punishment for anybody.
19         MS. DIBIANCA:  We were talking about that earlier
20   today actually.  I think you should --
21         THE COURT:  That's four people who commented on the
22   comfort of the benches.
23         JUROR 23:  And not on a soft, nice chair like this
24   one.
25         THE COURT:  That's what the last person said.

1          MS. DIBIANCA:  I've got to put some orthopedic

2    padding down.

3          JUROR 23:  Very nice, I was able to get one of these

4    lovely chairs, so I was really happy, I was thankful, I was

5    like wow, I'm lucky.  One of the other guys was trying to

6    negotiate it in the hallway.

7          THE COURT:  Well we're lucky we got to meet you, so

8    thank you so much, okay?

9          JUROR 23:  Is that all?

10         THE COURT:  Yeah, that's it.  You have to wait next

11   door.

12         JUROR 23:  Yeah, that's fine, I'm used to that

13   already.

14         THE COURT:  Thanks so much.

15         MS. DIBIANCA:  All right, thank you so much, I

16   appreciate your time.  Thank you, and best of luck to you.

17         THE COURT:  Thank you for yours.

18         JUROR 23:  Thank you, thank you.

19         THE COURT:  All right, that's cause.  That was 22,

20   Mike?

21         MR. CAVALIER:  23.

22         MS. DIBIANCA:  That's 23, not that my name's Mike,

23   but.

24         MR. CAVALIER:  It can be if you want it to be.

25         THE COURT:  Need a bathroom break?

1          MS. SHIKUNOV:  I'm sorry, no, she's kicking me in the
2    ribs right now, and I'm like --
3          THE COURT:  You mean the baby, not Susan, right?
4          MS. SHIKUNOV:  She has a mean high kick, but no,
5    she's in her chair right now.
6          THE COURT:  You good to go?  All right, next.  Hi,
7    come on in, come over here, we saved this chair for you.  The
8    first question that I'm asking everybody is will you be any
9    less comfortable if I took this mask off?
10         JUROR 24:  No.
11         THE COURT:  You don't mind?
12         JUROR 24:  No.
13         THE COURT:  You're sure, okay?  Because I don't mind
14   if you mind.
15         JUROR 24:  Completely.
16         THE COURT:  All right, good, thank goodness.  All
17   right, thanks for waiting all day.  I know jury duty is a big
18   ask, and I note that you live in Philadelphia.  So, what we're
19   trying to do here is obviously we have a jury that tells us
20   they can be fair.  We also have to make sure that it's the
21   right fit from the jury's side too.  All jury service, like I
22   said outside, is inconvenient.  We're looking for, are there
23   reasons that are so inconvenient that they really become a
24   hardship.
25         And it could be in any number of different ways.

1              THE COURT:  But you understand there's sort of a

2    distinction between the two?

3              JUROR 24:  Correct.

4              THE COURT:  For everybody it's not fun, but it's so

5    important, you appreciate that.  My first question, and you're

6    going to be free to speak, unlike in there where all you can do

7    is raise, hey, you're going to get to say whatever you want in

8    here, okay?

9              JUROR 24:  Sure.

10             THE COURT:  It says you live in Philadelphia.  The

11   first two things I want to tell you is how long the case will

12   be, and where it will be.  It will be five days, that's our

13   estimate including today.  It will be in Allentown,

14   Pennsylvania.  I don't know if you drive, but there's no trains

15   to Allentown, have you ever been to Allentown?

16             JUROR 24:  Yeah.

17             THE COURT:  It's a wonderful town.

18             JUROR 24:  It is.

19             THE COURT:  I've been telling everyone that, at least

20   I've found someone who agrees with me.

21             JUROR 24:  Right.

22             THE COURT:  Is there anything about just those two

23   things, the five days including today, or having to go to

24   Allentown that would reach that level of hardship caused to

25   you?

1          JUROR 24:  There shouldn't be.

2          THE COURT:  You don't expect there would be?

3          JUROR 24:  No.

4          THE COURT:  All right, then counsel's going to ask

5   you some more questions, and it's about trying to find people

6   who could be fair, and who could tell us with an honest heart

7   that they will decide the case only on the evidence that's

8   presented in the case, and the laws I share with the jury.  All

9   right, is that fair?

10         JUROR 24:  Fair.

11         THE COURT:  Okay, counsel?

12         MS. SHIKUNOV:  I don't think we have any questions.

13         MR. CAVALIER:  Neither do we.

14         MS. DIBIANCA:  Well I do.

15         THE COURT:  That was so close.

16         MS. DIBIANCA:  I don't want to ruin it, I'm usually

17  the one who doesn't have questions all today.  But I thought

18  you raised your hand, and I could be wrong on this, but I

19  thought you may have raised your hand on dispute with your

20  employer, or somebody in your family had a dispute with your

21  employer, do you remember if you?

22         JUROR 24:  Yes.  I actually work across the street,

23  I'm a federal officer at the Bureau of Prisons, so a part of

24  being the union, and stuff, we file a lot of disclaimers, and

25  disputes, and all that stuff, so that's really all it is.

1          MS. DIBIANCA:  So, you have not had any personal?

2          JUROR 24:  No, not anything personally, no.

3          MS. DIBIANCA:  Just in your union?

4          JUROR 24:  Correct.

5          MS. DIBIANCA:  Are you a shop steward, or?

6          JUROR 24:  No.

7          MS. DIBIANCA:  Okay, that's all I had, that was all

8  my questions.

9          THE COURT:  How long have you been at FDC?

10         JUROR 24:  Two years.

11         THE COURT:  Two years, well regardless of whether or

12 not you're on this panel, we appreciate your service.

13         MS. DIBIANCA:  Definitely.

14         JUROR:  Thank you.  That's the only other thing I was

15 like, if it ever turns, I do work over there, so.

16         THE COURT:  Yeah, and that's a tough job when it

17 isn't coronavirus, so.

18         JUROR 24:  Yeah, it's horrible, it's something else I

19 tell you.

20         THE COURT:  Yes, well thank you very much, we're

21 going to ask you to just wait, I'm sorry.

22         MS. DIBIANCA:  Did you also answer yes to litigation?

23         JUROR 24: I don't think so.

24         MS. DIBIANCA:  Okay, I had you as, Mike am I wrong on

25 that?  Being in prior litigation, you, or someone your family

1    member you knew?

2              MR. CAVALIER:  Yes.

3              MS. DIBIANCA:  By accident maybe.

4              JUROR 24:  Yeah, probably.

5              MS. SHIKUNOV:  Sorry, we also had you down as, have

6    you ever filed a complaint, or a charge for discrimination?

7              JUROR 24: No, didn't raise my hand on that.

8              THE COURT:  All right, thanks for your patience,

9    we've got to ask you to sit outside a little while longer,

10   okay?

11             JUROR 24:  Okay, thank you.

12             THE COURT:  Thank you so much.

13             MS. DIBIANCA:  Thank you.

14             MR. CAVALIER:  Almost done.

15             THE COURT:  And no motions counsel?

16             MS. DIBIANCA:  No.

17             THE COURT:  Okay, and then whenever you're ready,

18   Christine.  Hi, we saved you a seat right up here in the front.

19             JUROR 25:  Hi.

20             THE COURT:  Thank you for your patience, I know it's

21   been a long day already.  And I know those seats aren't the

22   most comfortable seats out there, are they?

23             JUROR 25:  No.

24             THE COURT:  You'd think that we were punishing the

25   jury, like they did something wrong.  I'm very grateful for you

1  being here today, and being so patient with us, but the first

2  question I ask, and no matter how you answer, there's no bad

3  answer.  Would you be less comfortable if I wasn't wearing

4  this?

5        JUROR 25:  No, I don't care.

6        THE COURT:  Oh God, thank you.  There's no wrong

7  answer, but.

8        JUROR 25:  If you want you can take it off, I've had

9  my shots too.

10       THE COURT:  Yes, so however you're most comfortable

11 too, but we ask everybody because we want to be respectful.

12 So, a couple things.  I mentioned inside that we are picking a

13 jury, and we obviously need a jury that can be fair, you

14 understand that.  But we also need to know whether it's a jury

15 that each particular juror is available, that it's not a

16 hardship in their life to be able to attend it.  And so we'll

17 ask some question about that, but I'll start it out with the

18 two I've been using all day long.

19       THE COURT:  This case will last, we've estimated 5

20 days including today.  So that would be Friday, Monday,

21 Tuesday, Wednesday, that's what we expect, it could be a little

22 less, it could be a little more, that's the when.  The where,

23 this case would be in Allentown, Pennsylvania, yeah at the

24 federal courthouse.  You're in, are you in Delaware County?

25       JUROR 25:  Yes, I'm in Darby, Pennsylvania.

```
 1                THE COURT:  So you took the train down today?
 2                JUROR 25:  No, I drove down.
 3                THE COURT:  You could drive to Allentown, I don't
 4    know if you've done that before?
 5                JUROR 25:  Many times.
 6                THE COURT:  You have?
 7                JUROR 25:  Yeah, and it's a long ride.
 8                THE COURT:  It's a long ride, but it's a great town
 9    once you get there.  You didn't answer that.
10                MS. DIBIANCA:  No comment she says.
11                THE COURT:  Well, with those two factors in mind, and
12    many people we spoke to had taken the train today, well that's
13    just not an option to get to Allentown, you drive anyway, so
14    that isn't a consideration, other than it's not fun to take the
15    long drive.  Is there anything about the when, and the where
16    that creates a true hardship for you?
17                JUROR 25:  The only hardship right now for me is that
18    I work for Housing and Urban Development, and presently we are
19    kind of like in a very, very busy, and of course it would be me
20    that would have the State of Delaware, where the president is,
21    and Wilmington.  So, I oversee that, and they've gotten
22    millions, and millions of dollars of stimulus money, and it
23    would be somewhat of a hardship for me, because right now, with
24    us trying to give out all this money, and oversee it, I kind of
25    like have deadlines, and so does the state, and the city.  So,
```

1  five days would really kind of put me in a bad place.

2          THE COURT:  When are those soonest deadlines?  If I

3  can ask.

4          JUROR 25:  Well I have one that's August 31st, and I

5  have one that's September 30th.  So, of course our fiscal year

6  ends September 30th, and I have audits, and monitors that I'm

7  doing presently.  I'm also in an audit right now, this week.

8  So, I had to take away from the audit today in order to come

9  here, which is going to push me back.

10          THE COURT:  Because nobody's doing your work while

11  you're away?

12          JUROR 25:  Exactly.  So, that would be, that's why I

13  have been to Allentown many times, I've been at HUD for 30

14  years.

15          THE COURT:  For what?

16          JUROR 25:  I've been auditing for a long time, so

17  I've audited Allentown many times.  So, that's how come I know

18  how to get there, and how long it takes, and all of that.  But

19  that's the only hardship that would be on me presently.  And it

20  would be a real hardship, especially since I have the state of

21  Delaware.

22          THE COURT:  Understood, and I appreciate that, that

23  seems like a super inconvenient type of obstacle.

24          JUROR 25:  Yes.

25          THE COURT:  Let me ask counsel what questions they

1   have.

2               MS. SHIKUNOV:  We don't have any questions.

3               THE COURT:  You don't have any?

4               MS. DIBIANCA:  So, I'm from Delaware, I live in

5   Delaware, I'm just making a special guest appearance.  Do you

6   have any feelings one way, or the other about Delaware that

7   would interfere with your ability to hear the case in

8   (unintelligible)?

9               (Simultaneous speaking.)

10              JUROR 25: No.

11              MS. DIBIANCA: Other than it's a wonderful place

12  (unintelligible).

13              JUROR 25: Yes.

14              THE COURT:  It's the challenges of work?

15              JUROR 25: Yes, it's very hard right now.  I mean

16  super, super, super, I'm sometimes working until six, and seven

17  o'clock at night.

18              MS. DIBIANCA:  May I ask another?

19              THE COURT:  Of course.

20              MS. DIBIANCA:  Would you be distracted by that if you

21  were called to serve, would that be something that would

22  interfere with your ability to concentrate on the case do you

23  think?

24              JUROR 25: Most definitely.

25              MS. DIBIANCA:  Okay, I get it, okay.

```
1                JUROR 25:  Sorry to say --

2                MS. DIBIANCA:  No, we're asking because we want the

3    truth.

4                JUROR 25:  I mean I am overwhelmed right now.  I'm

5    really overwhelmed, especially with me just finishing up an

6    audit from Wilmington, which took weeks, and I just finished

7    that, and now I'm starting a new one.  I just started a new one

8    Monday.  So, I'm really --

9                MR. CAVALIER:  There's an audit in this case, are you

10   sure you don't want to (unintelligible).

11               (Simultaneous speaking.)

12               JUROR 25:  If you knew what this was like, you would

13   be really, you would know that I was really crazy right now.

14               THE COURT:  Any follow up plaintiff?

15               MS. SHIKUNOV:  I don't think there's any, no.

16               THE COURT:  All right, that's what we have.  We're

17   going to have to ask you to wait a little while longer, but

18   thank you so much for your patience.

19               JUROR 25:  No problem, no problem.

20               THE COURT:  All right, so motions?

21               MS. DIBIANCA:  Yeah, I think we actually agree, I

22   mean she very clearly just doesn't want to be here.

23               MR. CAVALIER:  The fact that she admitted she

24   wouldn't be able to pay attention (unintelligible).

25               THE COURT:  Yeah, leading question, but I agree.
```

```
1              MS. DIBIANCA:  You're the one who asked it earlier, I
2    was just following your lead.
3              MS. SHIKUNOV:  Can I just use the ladies' room
4    (unintelligible).
5              (Simultaneous speaking.)
6              THE COURT:  Yeah, absolutely, we just need one
7    minute.
8              MS. SHIKUNOV:  Thank you.
9              THE COURT:  I don't even know what time it is now, my
10   watch (unintelligible).
11             (Simultaneous speaking.)
12             MS. DIBIANCA:  4:43, I know, I know.
13             Jon's going to use the restroom, but we can just
14   carry on.
15             MR. CAVALIER:  Yeah, keep going.
16             MS. DIBIANCA:  I didn't really need any extra time.
17             THE COURT:  All right, Christine, we're good to go
18   again.
19             MS. DIBIANCA:  Right here.
20             THE COURT:  Hi, good afternoon, how are you?
21             JUROR 26:  Good, thank you, how are you?
22             THE COURT:  It's been a long day.
23             JUROR 26:  Yeah, too long.
24             THE COURT:  Yeah, I'm sorry.  And the chairs aren't
25   comfortable, I know.
```

 1          JUROR 26:  No, they're not.

 2          THE COURT:  The ones in here, I shouldn't say this,

 3  these are better, I have to apologize.

 4          MS. DIBIANCA:  You guys negotiate in the hallway.

 5          JUROR 26:  I'll survive.

 6          MS. DIBIANCA:  We're almost there.

 7          THE COURT:  We're getting right to, you were sitting

 8  further in the back, we're getting to the end of the list.

 9          THE COURT:  My first question I've been asking

10  everybody, and however you feel is how you feel, and we're fine

11  with it, would you be less comfortable if I took this off?

12          JUROR 26:  I'm fully vaccinated, so I'm fine.

13          THE COURT:  And however you're comfortable is fine by

14  me too, so.

15          JUROR 26:  Well, if nobody's vaccinated, I'm going to

16  keep it on.

17          MS. DIBIANCA:  I think we're all vaccinated.

18          THE COURT:  Yeah, but however you want.

19          MS. DIBIANCA:  You also can keep it on if you want,

20  yeah definitely.

21          THE COURT:  Yeah, so just we have a handful of

22  questions, but now we get a chance to speak, unlike in there

23  where it was just holding up the signs.  So, if there's

24  anything you want to discuss with us feel free, and speak

25  freely. There's a couple things I want to share with you early

1   on.  I mentioned inside, Jury duty, there's certainly an

2   inconvenience to it, but since it's so important, it's so

3   critical, we really look for reasons that people are offering

4   for not being on a jury that go beyond inconvenience, and

5   become true hardships.

6            And some people have them, they do.  So, there's not

7   a hard line where we can, it's more like I know it when I see

8   it type of thing. So, we want you to share any issues you have

9   with that, but I always start out at least letting you know how

10  long it's going to be, and where it's going to be.  So, how

11  long we've estimated, our best estimate is five days, and that

12  includes today.  So, four days after today, maybe a little

13  shorter, maybe a little longer, but we feel pretty good with

14  saying another four days.  The where is Allentown, at the

15  courthouse at Hamilton and Fifth.

16           THE COURT:  You're familiar with Lehigh County?

17           JUROR 26:  I'm from Allentown.

18           THE COURT:  You're from Allentown?

19           JUROR 26:  Yeah.

20           THE COURT:  So, at least in terms of getting to the

21  courthouse, that wouldn't be a hardship, right?

22           JUROR 26:  No sir.

23           THE COURT:  I've been doing this with everybody here,

24  tell them how awesome Allentown is.

25           JUROR 26:  It's pretty awesome.

1            MS. DIBIANCA:  That's so nice.

2            THE COURT:  It is pretty awesome, she's right.

3            JUROR 26:  And I'll plug this, and my son owns an ice

4    cream store in Allentown, right by the courthouse, so we can go

5    for ice cream.

6            MS. DIBIANCA:  No kidding, I love it.

7            THE COURT:  Sign her up.

8            (Simultaneous speaking.)

9            MS. DIBIANCA:  She's in.  Wait a minute, wait, no.

10           THE COURT:  She just said the ice cream's terrible,

11   don't go.

12           JUROR 26:  It's not terrible, I shouldn't have said

13   that, I'm sorry.  No, he's doing really great, but anyway.

14           THE COURT:  No, that's wonderful.  Then you're well

15   aware of all the great things that are going on downtown?

16           JUROR 26:  My goodness, he's right there.

17           THE COURT:  It's very exciting.  I've been there most

18   of 20 years, and to see what's been going on, but it's getting

19   late, I'm sorry.

20           JUROR 26:  That's okay, that's all right.  Everybody

21   out there is just waiting for the next person to come in, so I

22   don't want to be that person.

23           THE COURT:  Is there anything about the five days,

24   the four after today, that's a problem?

25           JUROR 26:  No.

1          THE COURT:  Okay, I'm going to just turn it over to

2     counsel, and they'll follow up.

3          MS. SHIKUNOV:  The only question that we had was just

4     a follow up for you raised your number about you, or somebody

5     you know having participated in a law suit?

6          JUROR 26:  Well, me personally, I had a workman's

7     comp lawsuit like 25 years ago, so I don't know if that counts.

8          MS. SHIKUNOV:  And work related, you're totally good,

9     I don't think it's germane to these proceedings, so if it's a

10    worker's comp case that was that long ago, I don't think I have

11    any follow up about that.

12         JUROR 26:  Well, the reason why I brought it up was

13    because the one gentleman raised his hand said work, or non-

14    work, and they said work, so that's why I brought it up.  So, I

15    wanted to be honest, I wanted to --

16         MS. DIBIANCA:  No, we appreciate it.

17         THE COURT:  No, we appreciate that.  More

18    information's better, so we get to know a little bit about you.

19         JUROR 26:  Okay, great then.

20         MR. CAVALIER:  No questions.

21         THE COURT:  No questions?

22         MS. DIBIANCA:  We don't have any questions.

23         JUROR 26:  Okay, thanks.

24         THE COURT:  Thank you.

25         JUROR:  You want that ice cream.

1          MS. DIBIANCA:  I do, I'm actually thinking that right
2     now.
3          THE COURT:  Let me ask you one question, what's the
4     best flavor?
5          JUROR 26:  Well he makes boozy shake, so --
6          (Simultaneous speaking.)
7          MS. SHIKUNOV:  You're talking about ice cream at the
8     end of the day to a pregnant lady, I'm like come on now.
9          MS. DIBIANCA:  Awesome.
10         THE COURT:  All right, we're going to have to ask you
11    to stay just a bit longer while we get through this, okay?  But
12    thank you, it's such a pleasure to meet you.
13         JUROR 26:  You're welcome, thank you so much.
14         MS. DIBIANCA:  Thank you.
15         JUROR:  And the name of it is called Batch
16    Microcreamery, B-A-T-C-H.
17         THE COURT:  Christine, you got that?
18         MS. SHIKUNOV:  I am writing that down actually.
19    Thinking about ice cream (unintelligible).
20         MS. DIBIANCA:  Is your son's last name the same,
21    Galvin?
22         JUROR 26:  It isn't, it's Hungrac.
23         MS. DIBIANCA:  Okay, just so he gets appropriate
24    credit.
25         JUROR 26:  H-U-N-G-R-A-C, yeah.  Thank you so much.

```
 1                 MS. DIBIANCA:  Okay.

 2                 MR. CAVALIER:  Thank you.

 3                 MS. DIBIANCA:  Okay, deal, thank you.

 4                 THE COURT:  Well, that was a late day pleasure,

 5     wasn't it?

 6                 MS. DIBIANCA:  I know, you finally got your ding,

 7     ding, ding Allentown, we have a winner.

 8                 THE COURT:  She said Allentown's wonderful.

 9                 MS. DIBIANCA:  She did so sincerely, it's actually

10     really cute.

11                 THE COURT:  So now there's two who have said that

12     today.

13                 MS. SHIKUNOV:  I got married in Orefield, that's like

14     right there.

15                 THE COURT:  That's very close.  Allentown is

16     wonderful.

17                 MS. SHIKUNOV:  You have to see it.

18                 THE COURT:  You already got the job, I'm telling you.

19                 (Simultaneous speaking.)

20                 MS. DIBIANCA:  No bias, I know exactly.

21                 THE COURT:  I owe Jerry some ice cream at least.  Hi,

22     how are you, please have a seat. Long day.

23                 JUROR 27:  Yeah.

24                 THE COURT:  Let me put this on, I know we're asking a

25     lot of you, and it's just so important, and my first question
```

1  has been to everybody, there's no wrong way to answer this.

2  Would you be less comfortable if I took this off?

3           JUROR 27:  You're fine.

4           THE COURT:  You don't mind?

5           JUROR 27:  No, I don't mind.

6           THE COURT:  Because if you are, just say so, I'm

7  fine.

8           JUROR 27:  No, I'm fine, I'm vaccinated.

9           THE COURT:  All right, good, me too, me too,

10  terrific.  All right, just a couple things real quick.  This is

11  the opportunity for you to speak to us, and us to speak to you,

12  unlike when we were sitting in there, and it was, here's my

13  number.  So, we do want to hear from you, and get to know you a

14  little bit, but one of the things we need to try to figure out

15  is if you serving on this jury would create a significant

16  hardship for you.

17           I know for everybody it's an inconvenience, and so we

18  want to talk a bit about that, and to start out I want to tell

19  you how long we expect the trial will last, and where it will

20  be, okay?  And I think, are you in Chester, is that right?

21           JUROR 27: Yeah.

22           THE COURT:  Okay, so our best estimate between all of

23  us is that this is a five day trial, including today.  So, our

24  best estimate would be Friday, Monday, Tuesday, Wednesday of

25  next week. The where is in Allentown, Pennsylvania, all right?

```
1              JUROR 27: Okay.

2              THE COURT:  It's right downtown, I don't know if

3    you've been to Allentown?

4              JUROR 27: I don't actually think so.

5              THE COURT:  Okay, it's a wonderful place, but it's

6    right downtown, how did you get here today if I may ask?

7              JUROR 27: I drove.

8              THE COURT:  Okay, so you drive.  The reason I ask is

9    you can get to Philadelphia by a dozen different train lines,

10   there's none in Allentown, but at least that sounds like that

11   wouldn't be an issue.

12             JUROR 27: Yeah, no, I can drive.

13             THE COURT:  How about, anything about the five days,

14   or the four days after today that would be a hardship?

15             JUROR 27: It might, I'm one of three employees at a

16   business, and we're down one employee next week, so that might

17   be.

18             THE COURT:  What type of work do you do?

19             JUROR 27: It's retail, so it's not like, I mean it

20   could be worked out, but.

21             THE COURT:  And I would ask that you try to work it

22   out.  It's a big ask, I'm not minimizing it at all, and these

23   are busy times, and you're in a retailer?

24             JUROR 27: Yeah.

25             THE COURT:  And after a year of them having no
```

1    customers, they need their work, they need their work.  So,

2    again, I would urge you to try to make that work, and I'm going

3    to turn it over to counsel to ask you some questions, okay?

4              MS. SHIKUNOV:  I just have a few brief questions for

5    you based on raising your, I was going to say raising your

6    flag, but I mean your raising your piece of paper -- it's the

7    end of the day, thank you --  with regard to some of the

8    questions that were asked of you.  You had indicated that

9    yourself, or somebody you knew had suffered from sexual

10   harassment.  I don't need you to get into nitty gritty details,

11   but can you just let us know if it was yourself, or somebody

12   else?

13             JUROR 27: Both.

14             MS. SHIKUNOV: And do you think that that would impact

15   your ability to be fair, or impartial with regard to this case?

16             JUROR 27: I honestly don't know.

17             THE COURT:  I'd like to follow up on that, and I

18   appreciate you sharing that with us, and one of the reasons we

19   ask people to come back here is so you can share things like

20   that, that are not comfortable to share without being in a

21   bigger room of people.  So, it's important that we know these

22   things, so thank you.  And I'm sorry for your experience.  I

23   would ask this question, okay?  This is the job that I ask of

24   jurors, and that the lawyers, and their clients ask.

25             THE COURT:  Though you went through this experience,

1    and your friend as well, would you be able to tell us that you

2    would make your decisions in this case, you don't know the

3    plaintiffs, you don't know the defendants, right?  You don't

4    know them at all, you've told us that.  Would you be able to

5    make decisions in this case based only on the evidence that

6    comes in, in this case?  and put aside any other feelings you

7    have, and decide the case on the evidence that comes in, and

8    the law as I would explain it to you in the full jury?  Can you

9    do that for us?

10           JUROR 27: I mean, I think so, I do it with other

11   things, but.

12           THE COURT:  It's a good point, we do that in life,

13   right?  Because we all do have certain experiences, and baggage

14   that we bring with us, but we, it is just of critical

15   importance that we're able to put it aside here in fairness to

16   both sides.

17           JUROR 27: Yeah, I totally understand.

18           THE COURT:  And I'm comfortable that you do, so thank

19   you.  Counsel?

20           MR. CAVALIER:  Just a few briefly, and I apologize in

21   advance if they're insensitive at all, or they make you feel

22   uncomfortable.  The first question I have to ask you is how

23   long ago was your own personal harassment?

24           JUROR 27: I don't know, within ten years, I don't

25   know, it was a while ago.

```
 1              MR. CAVALIER: Was it workplace related?
 2              JUROR 27: I mean there are minor incidences at work,
 3    but mostly mine was personal life.
 4              MR. CAVALIER:  Okay.  Having gone through that, do
 5    you think that you have a tendency when you hear of other women
 6    who claimed sexual harassment to believe them, and take them at
 7    their word?
 8              JUROR 27: I try to in my personal life, yeah, so.
 9              MR. CAVALIER: Do you think that in this case, there's
10    some serious allegations in this case, do you think that
11    hearing those allegations against the background of your own
12    personal experience, you would have a tendency to believe those
13    allegations, and take them at face value?
14              JUROR 27: That's where I would run into problems,
15    because in my personal life, I do try to believe people when
16    they say it, but I understand the importance of being more
17    detached in this case, so that's why I said I don't know
18    earlier.
19              MR. CAVALIER:  That's fair.
20              MS. DIBIANCA:  Yeah, for sure, we thank you for being
21    honest, we appreciate it.
22              THE COURT:  Plaintiffs have follow up?
23              MS. SHIKUNOV:  I guess the ultimate question is, even
24    with your personal experience, I'm sorry you went through that,
25    but for this case do you think you could be fair, and open
```

1  minded, just since the judge had stated, listen to all the

2  evidence, listen to both sides, be fair to both sides before

3  you actually come to a decision?

4          JUROR 27: Yeah.  I mean, I probably could if I tried,

5  which --

6          THE COURT:  And would you?

7          JUROR 27: Yeah, I guess I've been psyching myself up

8  for that.

9          THE COURT:  You made an interesting point before, and

10  you talked about how you would need to detach, I think that was

11  your word, your own experience from what you heard in this

12  case. I think that couldn't be said any better.  That's what,

13  I'll say that's what we're asking, that's what we need to

14  insist upon, and you understand that?

15          JUROR 27: I do.

16          THE COURT:  And you can do that, you can tell

17  everyone here you would do that?

18          JUROR 27: Yeah.  If I were, I would, if I walked out

19  of here, and never came back, I might think differently, but as

20  long as I'm here I would try.

21          THE COURT:  Okay.

22          MR. CAVALIER:  Now, and again, I apologize, and I

23  know this sounds very particular, but you said you would try,

24  and I understand it's difficult to be certain, but I've got to

25  be, I've got to ask the question, are you promising us that you

1   will try, or can you promise us that you are certain you can do

2   that?

3            JUROR 27: I get why you're asking, I'm trying to, you

4   know, because I knew this was going to come up, so I've been

5   trying to answer it all day actually.  I think I could, I think

6   it would be difficult, but I would, I guess.

7            THE COURT:  And you know how important it is to both

8   sides?

9            JUROR 27: Yeah, I do.

10            THE COURT: I mean of the utmost importance to both

11   sides.

12            JUROR 27: Yeah.

13            MS. SHIKUNOV:  And for us, we want to hear the honest

14   answer, not, there's not a right answer.

15            JUROR 27: Yeah, and I get that too, and I'm trying to

16   be honest, so.

17            THE COURT:  And I think you are, I think you're being

18   honest.

19            MS. DIBIANCA:  Yeah, definitely, we appreciate it.

20            THE COURT:  We appreciate all your candor, and we

21   appreciate all your patience, okay?  We have to ask you to be

22   patient for a little while longer, but we're --

23            MS. DIBIANCA:  Not much, almost there.

24            THE COURT:  You know from where you're sitting that

25   we're almost at the end of the list.

1          JUROR 27:  Yeah, they're all counting.

2          THE COURT:  But thank you.  Whether we see you

3    further on this case, or not, we're all super grateful to you,

4    okay?  And we'll be back out in a few.

5          MS. DIBIANCA:  Thank you, we really appreciate it,

6    thank you.

7          THE COURT:  That's tough.

8          MR. CAVALIER:  Challenge (unintelligible).

9          MS. SHIKUNOV:  I mean, I look at that as being the

10   same thing as, I'm going to sound slightly disrespectful, and

11   refer to him as the anti-tattoo guy, but I think that's the

12   same situation.  She said she would do her best to be

13   impartial, she thought that she could do it, asked her two, or

14   three times, she confirmed, and I think that.

15         THE COURT:  I think it's going to be very hard for

16   her, but I'm taking her at her word.

17         MR. CAVALIER:  The anti-tattoo guy was a tattoo

18   issue, she suffered sexual harassment, and she said that she

19   would try to be impartial. She used the word try half a dozen

20   times, and I give her all the credit in the world for believing

21   in her heart, I think if we see her on this jury, she will do

22   her absolute positive best to try.  But she can't tell us for

23   sure that she can be impartial, and I think that's a major

24   risk.

25         THE COURT:  I think she made some significant points

1   though John, about having to detach those experiences.

2          MS. DIBIANCA:  But she also said that she's been

3   sitting out there thinking about it all day, which tells me

4   that the fact that she has still been thinking it, and it's

5   five o'clock, she's still thinking about it, and has not gotten

6   past try, there's definitely.

7          MR. CAVALIER:  True, she also did say your honor, in

8   her personal life, she believes women, she takes women who

9   allege sexual harassment at their word.

10          MS. SHIKUNOV:  Right, but then when asked if she

11   could be fair to both sides, and listen to the evidence --

12          MS. DIBIANCA:  She said I'll try.

13          MS. SHIKUNOV:  She said she could, she didn't say

14   I'll try to that, she didn't say I'll try to everything.  And I

15   think it actually goes to the fact that she's putting gravity

16   behind this, that she's been sitting out there thinking about

17   how she's going to answer questions about that.

18          THE COURT:  I agree, and I was as emphatic as I could

19   be, that this is important that we feel she could be fair to

20   both sides here, despite her experience.  And I didn't want

21   her, I hope it didn't come across at all disrespectful to her,

22   because it was not my intention, but I was just trying to test

23   the best I could do in these limited forms we have here,

24   whether I was comfortable that she would be fair, and treat

25   your side, and your side fairly, and based on what happens in

1   that courtroom.  So, I'm going to overrule the objection the

2   plaintiff.

3           MR. CAVALIER:  The plaintiff should strike her

4   anyways.

5           THE COURT:  We might not get this deep in the list,

6   right?  So you don't know.

7           (Unintelligible.)

8           THE COURT:  The court officer?

9           MS. DIBIANCA:  Corrections officer, yeah.

10          THE COURT:  All right, send her in.

11          MS. DIBIANCA:  Bring her back.

12          MR. CAVALIER:  That's interesting, I've never had

13  that happen before.

14          MS. DIBIANCA:  That actually happened to me when I

15  got called for jury service, and it's a great excuse.

16          THE COURT:  I think she's disqualified.

17          MS. SHIKUNOV:  Yeah, she is.

18          MS. DIBIANCA:  She is disqualified, so off she goes.

19          THE COURT:  All right, you don't have to, you can

20  just tell her, thank you for sharing that.  Going the wrong

21  way.

22          MR. CAVALIER:  (Unintelligible.)

23          MS. DIBIANCA:  That's too bad, she had tattoos.

24          MR. CAVALIER:  I wanted her and tattoo guy to form a

25  romance.

1          MS. DIBIANCA:  Yeah, I was going to make a personal

2    request that they were both in panel.  I have so much to do

3    tonight.  That opening is going to be killer good, as soon as I

4    hear it.

5          MR. CAVALIER:  What I'm really enjoying is getting in

6    the car, and driving to Allentown, that's what I'm really

7    looking forward to.

8          MS. SHIKUNOV:  I just am really looking forward to

9    the other protein bar that I have in my bag that I should have

10   eaten at lunch.

11         MS. DIBIANCA:  I have a banana if you want it.

12         MS. SHIKUNOV:  I have it out there, it's just I

13   (unintelligible).

14         (Simultaneous speaking.)

15         THE COURT:  Come on in.  Thank you, please grab a

16   seat.  Thanks for your patience.

17         JUROR 28:  Yes sir.

18         THE COURT:  Really, I know it's a long day.  First

19   question I've been asking, and no wrong answer, would you be

20   less comfortable if I took this off, this mask?

21         JUROR 28:  Absolutely, I'm vaccinated, so --

22         THE COURT:  All right, good man, thank you.  It's

23   always our first question, and however people are comfortable,

24   that's what we're going to do. I don't have your county of

25   residence, but it looks like you're up in the Lehigh Valley

1    somewhere from your job?

2            JUROR 28:  North Hampton County.

3            THE COURT:  Okay, great.  Very quickly, I mentioned

4    outside, and this is our opportunity to speak, out there it's

5    pretty robotic, but here we actually, whatever you want to say,

6    we want to hear, and we want to ask you questions. We're trying

7    to find a panel, obviously the panel must be a fair panel, but

8    we also have an issue that we have to talk about with each

9    juror, and that's whether their service in this particular case

10   would be a hardship.

11           It's a given that it's going to be an inconvenience,

12   but some raise to the level of hardship, sometimes it's timing,

13   whatever it might be.  So, to start out with that, I've been

14   telling everybody who's come in, and you just happen to be one

15   of the last, because you have one of the highest numbers, where

16   the case is going to be, and how long it's going to last.  We

17   have estimated that the case will be five days, that's

18   including today.

19           So, it'll be four more days.  The case will be at the

20   Allentown Courthouse on Fifth and Hamilton.  We pick all the

21   juries for the whole nine counties of the district here, but I

22   sit up in Allentown, and that's where we go.  Do you know

23   downtown Allentown at all?

24           JUROR 28: Yeah.

25           THE COURT:  Yeah, so it's right across from the

1  county courthouse, yeah, caddy corner.

2            JUROR 28: I'm there, you know Olly Fullcheck

3  (phonetic)?

4            THE COURT:  Yeah, absolutely, all right, yeah.

5            All right, is there anything about the where and the

6  when that rises to the level of a hardship?

7            JUROR 28: I would say, to be quite honest, and fair

8  to both the plaintiff and defendant, I don't know if I could

9  provide my undivided attention for a jury trial, given my

10  responsibilities at work.  In addition, I have six performance

11  appraisals due by next Friday, and I'm taking on a whole new

12  team starting next week, from our position group at the

13  hospital, I literally sent an email up in the juror's room,

14  that they're transitioning coming next week.

15            So, that would be my focus, would be really my only

16  concern.  Location's not an issue there.  So, that's really my

17  only comment as far as the focus for the -- could I devote the

18  time, and focus that I should for the trial is my concern.

19            THE COURT:  All right, counsel, follow up?

20            MS. SHIKUNOV:  Yes.  Just following up on a few of

21  the questions where you raised your card, not flag like I said

22  last time, your card.

23            You raised your card saying that you or somebody that

24  you knew had been involved in a lawsuit, could you just, we

25  don't need to know the nitty gritty, but could you give us just

1   was it yourself, was it a family member?  And the nature of

2   this issue?

3             JUROR 28: No, the comment the gentleman asked, was it

4   work related as well?  And the owner said yes, so that's why I

5   raised, because we have been in several lawsuits involved at

6   Lehigh Valley Health Network, actually currently we have one.

7   A girl is suing for race discrimination that I'm involved in.

8   I did a deposition a couple weeks ago.

9             MS. SHIKUNOV:  And are you involved as a party, or as

10  a witness?

11            JUROR 28: Witness.

12            MS. SHIKUNOV:  And same question, but you raised your

13  hand about having terminated somebody?

14            JUROR 28: Yes.

15            MS. SHIKUNOV:  Do you, I don't want to say regularly,

16  but it is part of your job responsibilities to participate in

17  the termination, or separation process at your workplace?

18            JUROR 28: It is, yes.

19            MS. SHIKUNOV:  And have any of those terminations, or

20  separations resulted in litigation?

21            JUROR 28: I think I've been there for quite some

22  time.  Not that I personally got involved in, where I got

23  pulled in, there have been, but not necessarily where I got

24  pulled into a trial aside from the deposition would be the

25  extent of it.

1          MS. SHIKUNOV:  And when you're being called in as a

2     deposition, are you being called in just as somebody who

3     witnessed, or had information, or are you being called in as

4     somebody who is central to the case?

5          JUROR 28: Central to the case.

6          MS. SHIKUNOV:  And you also mentioned that you, or

7     somebody that you knew had been sexually harassed.  I don't

8     want you to get into anything that's uncomfortable to speak

9     about, but can you clarify if it was yourself, or somebody

10    else?

11         JUROR 28: I'm fine, it was my wife.

12         MS. SHIKUNOV:  Okay.  And was there litigation as a

13    result of that?

14         JUROR 28: No.

15         MS. SHIKUNOV:  Do you think any of the things that

16    you've just told me would impact your ability to be fair, or

17    impartial with regard to these proceedings?

18         JUROR 28: No.

19         MS. DIBIANCA:  Just a follow up question, I don't

20    want to get too deep into this, but was your wife sexually

21    harassed in the workplace, or elsewhere?

22         JUROR 28:  Workplace.

23         MS. DIBIANCA:  And do you know if she reported it?

24         JUROR 28:  It was many years ago, actually before we

25    even met.  I don't think she reported it, I think she left the

1   firm, so I don't think she reported it.

2           THE COURT:  Before I ask defense counsel, I just want

3   to talk about again, your availability with work, and I

4   appreciate what you said about you have a number of deadlines

5   that are coming up.  When we pick a jury, obviously we're

6   asking everybody to put aside things that they have going in

7   their lives, and from brain surgeons to truck drivers, and we

8   ask them.  So, if you were selected on this panel, is it your

9   contention that you're not going to be able to focus sitting in

10  a courtroom, listening to testimony that you're -- let me ask

11  this, your job, do you multi task in your job?

12          JUROR 28: Yeah.  So, I have over 350 employees in our

13  department, and I have responsibility for all the billing, and

14  collections for Lehigh Valley Health Network, both the

15  physician side, and the hospital side.  So, we just opened a

16  hospital, Eggtown Oaks (phonetic) on July 1st.  We're having

17  some payer issues there, so there's just a lot, as always.  And

18  I'm not making excuses, like I said, I'm just being candid with

19  you, that I'm constantly thinking about work.

20          And not that I wouldn't do my best if I was chosen to

21  give 100 percent focus, I'm just letting you know that after I

22  drive home tonight, I'll be on until midnight with emails,

23  easily.  And that's just the nature of my job, so with that

24  said, doing my civic duty as well function also.

25          THE COURT:  But my concern is, because you did

1    qualify it as you would be distracted, which almost seems like
2    throwing out there a known excuse, and I'm not, I'm just saying
3    excuse in the terms of being excused from the process, not that
4    you're not being candid.  So, I hear those words, and it's hard
5    now for me to be comfortable that you're going to give these
6    parties the full attention, and concentration that they're
7    entitled to.
8            And frankly that, if you, or I, or someone we cared
9    about was going to have a matter before a court, and before a
10   jury, we would want all of the juror's undivided attention no
11   matter what their job was.
12           JUROR 28: Understand.  I'm just being honest that,
13   it's driving me crazy out here.  I have so much going on, and I
14   am thinking about what I've got to do.  And like I said, I
15   guarantee, I can shoot you an email tonight at midnight, I'll
16   be on, because I just have a ton of stuff, and that's my only
17   concern. I would love to serve, I'm just saying that I'll be,
18   knowing that I'll be thinking of trying to focus, but I may not
19   be able to focus completely depending on what happens between
20   now, and during my trial.
21           If I could shut the emails down for five days, and do
22   that, I would easily focus, but I don't have that luxury.
23           THE COURT:  But we also, we have a need to take
24   representative panels, and that includes people who have jobs,
25   people who have important jobs, people who have no jobs, and

1  so, but again, I mean the verbiage you use, it just jumps out

2  at me.

3          JUROR 28: I'm a workaholic, I'm on weekends, nights,

4  vacations.

5          THE COURT:  Join the club, it's (unintelligible).

6          (Simultaneous speaking.)

7          JUROR 28: I know, I'm just throwing, so I'm just

8  being honest with you, that that's, I'm always focused on work,

9  and that's part of it goes with the territory, the position,

10  but I didn't want to not say anything about sitting there, and

11  I get notification the night before that, I don't know, our

12  phone system's down, or there's, we had two resignations in a

13  key area, that would play on my mind.

14          THE COURT:  So, you agree that it is an important

15  civic duty, when would you be available to do that, when you

16  retire?

17          JUROR 28: Good question, yeah.

18          THE COURT:  Counsel?

19          MS. SHIKUNOV:  I don't have any questions.

20          THE COURT:  All right, thank you.  We'll hopefully

21  only be a few more minutes.

22          JUROR 28:  Okay, thank you.

23          MS. DIBIANCA:  Thank you.

24          MR. CAVALIER:  Thank you so much.

25          MS. SHIKUNOV:  Thank you.

1            THE COURT:  Motions?

2            MR. CAVALIER:  None here.

3            MS. SHIKUNOV:  No.

4            THE COURT:  Too bad (unintelligible).

5            MS. SHIKUNOV:  I don't even know, I mean he's coming

6    here, and saying he's not going to pay attention, but then

7    you're like why?  And he's not really giving an answer, so it's

8    like I don't hearing that a juror isn't going to pay attention

9    at all.

10            THE COURT:  You were about to say every person, but

11   we're talking about the most busy person in the world.

12            MS. DIBIANCA:  I mean, I believe that we will be so

13   captivating, and compelling, that he will be immediately drawn

14   into our storytelling.

15            MS. SHIKUNOV:  Right, I'm just like, on the one hand,

16   you don't like somebody telling you this isn't that important

17   to me, and I'm not going to pay attention, but on the other

18   hand, he's not really.

19            MR. CAVALIER:  He didn't really put any beef on it.

20            (Simultaneous speaking.)

21            MS. DIBIANCA:  Right.

22            MR. CAVALIER:  I agree about it.

23            THE COURT:  Well, he probably don't like me, but

24   that's okay.

25            MS. DIBIANCA:  You were a little tough on him.  I was

1   like I think the judge is getting a little upset.

2           MS. SHIKUNOV:  I was like uh oh, it's somebody's

3   dinner time.

4           MS. DIBIANCA:  Well yeah, but I was also thinking

5   that, I was like you're not allowed to have your mood --

6           THE COURT:  Do you want to bring -- yeah, thank you.

7           MS. SHIKUNOV:  We're so close.

8           THE COURT:  Hi.  You thought we'd never, ever get to

9   you, didn't you?

10          JUROR 29:  I was starting to think I'd be here all

11  night.

12          THE COURT:  We're so close, and I am so grateful for

13  your patience, I can't tell you, and I know you've come a long

14  way too.  Thank you, we hope to get you out of here shortly, we

15  just need to, again we're at the last couple people as you can

16  tell from where you're sitting.  First question has been, no

17  wrong answer to this, would you be uncomfortable if I was not

18  wearing this mask?

19          JUROR 29:  Go right ahead.

20          THE COURT:  Okay, all right, counsel don't mind me

21  sharing, we're all vaccinated.

22          JUROR 29:  Yeah, so am I.

23          THE COURT:  But however you're most comfortable,

24  please, it's only fair.

25          JUROR 29:  I've had my shots.

1           THE COURT:  Thank you.  And we put you in a room for

2    eight hours on the hardest benches we could find, and then say

3    put this mask over your head.

4           JUROR 29:  I know.

5           THE COURT:  That's not the best way to show our

6    gratitude, but we are so grateful.  So, one of the things that

7    we need to determine is whether or not the prospective jurors,

8    everyone has an inconvenience, but depending on what's going on

9    in people's lives at any given time, does it raise to a level

10   that it's really a hardship, it's really going to cause some

11   pain, and I'd put that in quotes, for the person to serve.

12          The first thing I share in here that you didn't learn

13   out there is how long we're expecting to go, and where.  I see

14   you're in Berks County, how long is five days, including today.

15    That's our estimate from all of us.  It could be a little

16   shorter, it could be a little longer, but we feel pretty good

17   about that number.  The where is in Allentown at the federal

18   courthouse.  I don't know if that's better, or worse for you in

19   Berks, because Berks could be --

20          JUROR 29:  It's actually closer, easier.

21          THE COURT:  It's a little closer.  Would you be

22   taking 78 if you were there too?

23          JUROR 29:  Yeah, 78 or 222.

24          THE COURT:  Yeah, I try to avoid 222 because it's one

25   lane in each direction, and there's always a school bus in

1   front of you stopping at every stop.  So is that, we're going

2   to talk about anything that you want to talk about, and as

3   freely as you want to discuss with us, we welcome it.

4           THE COURT:  The instant question is, is there

5   anything about those days, which would be again, Friday,

6   Monday, Tuesday, Wednesday, and Allentown that creates a

7   hardship?

8           JUROR 29:  Nothing really, not right now.  I'm a

9   substitute teacher right now.  So, right now I'm at a school, I

10  mean I do work.

11          THE COURT:  For at least a couple weeks.

12          JUROR 29:  Yeah, I mean I work part time at an

13  engraving store, but they can cover, I believe that I cover on

14  one or two shifts.

15          THE COURT:  Well, that's a great attitude, and we're

16  grateful for it.  Anything you want to talk with us, feel free.

17   For right now, I'm just going to turn to counsel, there's

18  excellent lawyers in this case, and not only that, they're

19  really nice people, so feel comfortable, okay?

20          MS. SHIKUNOV:  We try.  I'm just going to follow up on

21  a few of the line items that you raised your card for.  So, you

22  had indicated that yourself, or somebody that you knew worked

23  in HR, you just told us you're a substitute teacher, so can you

24  tell us who know that works in HR?

25          JUROR 29:  I used to be a public librarian, so I was

1   the one in charge of hiring, and firing people.

2            MS. SHIKUNOV:  Okay, and how long ago was that?

3            JUROR 29:  The last time I worked in a library was

4   2015.

5            MS. SHIKUNOV:  Okay, and do you think that experience

6   would impact your ability to be fair, or impartial?

7            JUROR 29:  No.

8            MS. SHIKUNOV:  Did you ever have to handle, or

9   investigate any kinds of sexual harassment?

10           JUROR 29:  No.

11           MS. SHIKUNOV:  You mentioned, and I think you've

12  probably sort of answered this with your last answer, but you

13  had raised your card for having to terminate people, was that

14  while working at the library?

15           JUROR 29:  Yes.

16           MS. SHIKUNOV:  And did any of those terminations ever

17  result in any type of litigation?

18           JUROR 29:  No.

19           MS. SHIKUNOV:  You indicated that yourself, or

20  somebody you knew was forced to resign from a position for

21  reasons that they thought were unfair, was that yourself, or

22  somebody that you knew?

23           JUROR 29:  That was myself.  My first library job I

24  actually have PTSD from, they basically made my life miserable

25  to the point where I felt like I had to quit, or else my mental

1    health would just go kaput.

2             MS. SHIKUNOV:  Okay, and I'm going to ask you the

3    same question I asked about when you were hiring, and firing

4    folks.  Do you think that experience would impact your ability

5    to be fair, or impartial in these proceedings?

6             JUROR 29:  No.

7             MS. SHIKUNOV:  And how long ago was that?

8             JUROR 29:  When I, the --

9             MS. SHIKUNOV:  When you left that job.

10            JUROR 29:  My first library job was 2012.

11            MS. SHIKUNOV:  Okay, and you also had indicated that

12   you, or someone you knew had been subjected to sexual

13   harassment.  I don't want you to talk about anything that's

14   uncomfortable, but if you could just clarify if it was

15   yourself, or somebody else.

16            JUROR 29:  I don't know how well versed my, I mean

17   like over 20 years ago just walking to work one day, and a guy

18   drove by my car, and exposed himself to me, so.

19            MS. SHIKUNOV:  Do you think that experience would

20   impact your ability to be fair, or impartial in these

21   proceedings?

22            JUROR 29:  No.

23            MS. SHIKUNOV:  That's all I have.

24            THE COURT:  All right, thank you.

25            MS. DIBIANCA:  I'm fine with this.

1              THE COURT:  The defense side?

2              MR. CAVALIER:  A few.  You did raise your card when

3     you were asked whether you had concerns about whether you could

4     be fair, and impartial in this case, and I'm just curious about

5     certain things.

6              JUROR 29:  Well, with my first job, the gentleman on

7     my board of trustees, he was an older gentleman with white

8     hair, and just ever since then, every time I have to deal with

9     a gentleman who is older, white hair, it kind of makes my

10    anxiety go up, because he was the one who was the lead

11    instigator in my first library job, with the micromanaging, and

12    just he was basically a real jerk.

13             MR. CAVALIER: Okay, so did you see Dr. Pipes in the

14    courtroom?

15             JUROR 29:  I saw --

16             MS. DIBIANCA:  She might not know what his name is,

17    but.

18             MR. CAVALIER:  Did you see the older gentleman in the

19    courtroom?

20             JUROR 29:  Yes.

21             MR. CAVALIER:  Did that trigger some of that for you?

22             JUROR 29:  Yeah.

23             THE COURT:  You think that might be a trigger if we

24    were in the same room for three, or four days?

25             JUROR 29:  Yes.

```
 1              THE COURT:  That's why we're here, so we can have
 2    these conversations.  All right, do you have any questions for
 3    us?
 4              JUROR 29:  No.
 5              THE COURT:  We're super grateful for your patience,
 6    and your willingness to serve, and I'm hopeful we'll get you
 7    out of here very, very shortly, okay?
 8              JUROR 29:  Okay.  Hopefully before the tornado comes.
 9              MS. DIBIANCA:  I know.
10              THE COURT:  Yeah, I saw that alert.
11              MS. DIBIANCA:  Thank you.
12              THE COURT:  It's great to meet you.
13              JUROR 29:  Yeah, thank you so much.
14              MS. SHIKUNOV:  That's also a first for me.
15              THE COURT:  She's going for cause.
16              MS. DIBIANCA:  I missed that, I was trying to get
17    ahead, and write down every time I saw (unintelligible).
18              (Simultaneous speaking.)
19              THE COURT:  I felt it.
20              MS. SHIKUNOV:  Yeah, you could feel it from her.
21              MS. DIBIANCA:  That's why when she started talking, I
22    was like you don't have to talk about it.
23              THE COURT:  Yeah, that's awful.  She's courageous
24    though, come in here, and okay, last one.  Are we getting close
25    on numbers?
```

1                    MR. CAVALIER:  18.

2                    THE COURT:  Sir, small consolation.

3                    JUROR:  What's that?

4                    THE COURT:  Small consolation, we saved the best for

5     last.  Thank you so much.

6                    JUROR 30:  I'm sure everybody's excited to see me in

7     here.

8                    MS. DIBIANCA:  Yeah.

9                    THE COURT:  Yeah.

10                   JUROR 30:  Everybody, like five minutes ago,

11    everybody is looking around, who's the last guy?  I'm like I'm

12    here, I'm here.

13                   THE COURT:  How come I heard them cheering when you

14    came in?

15                   MS. DIBIANCA:  Right, exactly.

16                   THE COURT:  Thank you for your patience.

17                   JUROR 30:  No problem.

18                   THE COURT:  Incredibly long day.  I do have, the

19    first thing I've been asking people, and there's just no wrong

20    answer to it, is if I were not wearing this, would you be

21    uncomfortable?

22                   JUROR 30:  Absolutely not.

23                   THE COURT:  And vice versa, okay.  Thank you so much,

24    some people are, and I'm fine with that.

25                   JUROR 30:  No, I hate these things, I have more than

1   three masks.  Can we have a burn party after this?

2            THE COURT:  Yeah, let's do it.  Well, we can't do it

3   today, the tornado will blow it out.  I know you're in

4   Lancaster.

5            JUROR 30:  That's correct.

6            THE COURT:  And two things I want to tell you up

7   front about this case, the length of time, and where it's going

8   to be.  We're looking at, our best estimate through all our

9   years of experience, is this will be a five day trial, and that

10  first day will be today.  So it would be Friday, Monday,

11  Tuesday, Wednesday.  That's the when.  The where is not here in

12  Philadelphia, it's at the courthouse in Allentown.

13           JUROR 30:  Okay.

14           THE COURT:  I know Lancaster has a train to here, I

15  don't know if you took it today.

16           JUROR 30:  I'm actually in Ephrata.

17           THE COURT:  Okay, all right, that's, I think a little

18  better.

19           JUROR 30:  It's an hour closer.

20           THE COURT:  Good.  Well we want you to share anything

21  you want with us, counsel will ask you questions, this is so

22  much more free form than just holding up the signs.  But just

23  at the outset, as to those days, and that place, does that

24  create a --

25           JUROR 30:  You said today, tomorrow, Monday, Tuesday,

1   right?

2          THE COURT:  Yeah, so it would be Friday, Monday,

3   Tuesday, Wednesday.

4          JUROR 30:  Wednesday, okay.

5          THE COURT:  So, does anything about those dates, and

6   that place create more than an inconvenience, but a hardship?

7          JUROR 30:  No.

8          THE COURT:  And if there are other things, be free to

9   share that with us, and counsel will also ask you questions.

10          JUROR 30:  No, I don't have any, I mean it's going to

11   be an inconvenience no matter what.  But as far as hardships,

12   no.  I mean I'm, it's not going to affect my work, or anything

13   of that nature.

14          THE COURT:  And I'm grateful to hear you say that,

15   and I know the parties are too.  As I mentioned outside before,

16   if it was you, or me that it was our rights, and we wanted a

17   good jury, a responsible jury, a fair jury, we'd want either

18   us, or our family members to have that as well, that's what

19   we're looking for here.

20          JUROR 30:  Right.

21          THE COURT:  Okay, I'm going to turn it over to

22   counsel, we have excellent, experienced lawyers in this case,

23   and they're also good people.  So, all right, please.

24          JUROR 30:  Okay, no problem.

25          MS. SHIKUNOV:  I just have one follow up question,

1   it's only on the one question that you raised your card for.

2   You had indicated that yourself, or somebody that you knew

3   worked in HR, was it yourself, or somebody that you knew?

4         JUROR 30:  It's my brother in law.

5         MS. SHIKUNOV:  Okay, and does he talk to you a lot

6   about his work?

7         JUROR 30:  It's more not so much specifics, just it's

8   usually about the conditions that he experiences at work,

9   there's no real specifics.

10        MS. SHIKUNOV:  All right.  Do you feel like your

11  experience in chatting with your brother in law would impact

12  your ability to be fair or impartial with regard to this case?

13        JUROR 30:  No, I don't think it would affect my

14  ability to make a decision on this case.  What he usually

15  shares is usually complaints about a superior.

16        MS. DIBIANCA:  Okay, got you.

17        MS. SHIKUNOV:  I don't have any further questions.

18        THE COURT:  And who doesn't do that?

19        MS. DIBIANCA:  Yeah, that's what I was thinking

20  actually.

21        THE COURT:  Yeah.  But it's important for us to ask,

22  because I know that.

23        JUROR 30:  It's usually about a complaint about

24  superiors, it's usually what it is, it's not specific cases of

25  individuals or anything else.  I think he knows the law pretty

1  well enough to know what he can, and cannot share.

2           THE COURT:  And we're just, we're trying to drill

3  down.  If people, if information is shared with people, we

4  understand people live their lives before they come here, it's

5  just a matter of we don't want that to affect their evaluation

6  of the evidence in this case.  And, or their ability to follow

7  the law as its given to the jury.  And we know people who have

8  experiences, but the main question is with those experiences

9  can you ensure both sides you'll be fair.

10          MS. SHIKUNOV:  We don't have any questions.

11          THE COURT:  All right, everyone is going to be happy

12  to see you walk out.

13          MS. SHIKUNOV:  You're going to get a cheering

14  section.

15          THE COURT:  We're going to come back out, we're now

16  at the beginning of the end, and it's been a long day, and it

17  is a lousy day out there.  We have similar drives to make back,

18  so I can't tell you how much we all appreciate your service.

19          MS. SHIKUNOV:  Thank you so much.

20          THE COURT:  All right, so we'll see you in a bit,

21  thank you.  We'll talk a little bit about numbers, so you have

22  19?  So it looks like there's 19.  Obviously there's the six

23  preempts, and we'd still have plenty.  My question, I'll just

24  put out there is there was three question marks.  Should we be

25  talking about them?

1          MS. DIBIANCA:  Were there three, or four?

2          MS. SHIKUNOV:  I thought there were three.

3          MR. CAVALIER:  It depends on whether you're going to

4    give the I'm so busy guy a question.

5          MS. DIBIANCA:  No, I think it was the USGA guy who

6    was the fourth that I had a question mark for.  I had eight,

7    ten, 18, and 19.

8          THE COURT:  Let me check that.

9          MS. DIBIANCA:  Because I didn't think we were sure

10   about USGA.

11         MR. CAVALIER:  Eight was the guy who had trouble

12   hearing, and had the cane, right?

13         MS. DIBIANCA:  Right.

14         THE COURT:  Eight, ten, is that what you had?

15         MS. DIBIANCA:  Yes, he said he served on two juries

16   previously, and I was screaming at him trying to --

17         (Simultaneous speaking.)

18         MR. CAVALIER:  I have eight, 14, 18, and then I

19   didn't get (unintelligible).

20         THE COURT:  Me either.  14, and what was the other

21   one?  Not the golfer.

22         MR. CAVALIER:  18.

23         MS. SHIKUNOV:  Your Honor, I think that we're

24   probably in agreement that number eight is a question mark

25   because --

1          THE COURT:  Remind me who that was.

2          MS. SHIKUNOV:  The one with the cane who couldn't

3    hear.

4          MS. DIBIANCA:  The one that I was like screaming at

5    him.

6          THE COURT:  I think we have the leeway, and both

7    sides are good with that, I'm good with that.

8          MS. SHIKUNOV:  I don't want to have to

9    (unintelligible).  I do enough of it anyway.

10         MS. DIBIANCA:  Eight is gone, yeah.

11         THE COURT:  Which hearing guy was he?

12         MS. DIBIANCA:  He was the guy with the pink shirt, he

13   had the cane, quite older.

14         MR. CAVALIER:  Big mask.

15         THE COURT:  Big mask, and a beard.

16         MS. DIBIANCA:  And he didn't want to take his mask

17   off.

18         MR. CAVALIER:  Wanted to keep masks on.

19         MS. DIBIANCA:  Right, ding, ding Mike, exactly.  He

20   would be our only hold out on that.

21         THE COURT:  The other two that I, at least on our

22   list is 14, and, is it 14, and 18? 14, and 18.

23         MR. CAVALIER:  18 had the eight year old with the

24   wife.

25         MS. SHIKUNOV:  Right, and he said he had Friday off,

1  but.

2          MS. DIBIANCA:  Well, his hearing, he couldn't, he was

3  the blue jacket.

4          MS. SHIKUNOV:  No, that's 18.

5          MS. DIBIANCA:  That's what I'm talking about.

6          MS. SHIKUNOV:  We're talking about 14.

7          THE COURT:  Let's go to 18 though, first.

8          MS. DIBIANCA:  Okay.

9          MR. CAVALIER:  I have no problem letting him go, the

10  guy's almost 80 years old.  It's probably favorable to our

11  side, but I mean 78 years old driving yourself down here, I'm

12  not, I wouldn't object if you want to.  He's the one that

13  sometimes has trouble understanding that hearing, but.

14          THE COURT:  He was a close call, I'll be honest.

15          MS. DIBIANCA:  Well I mean, look, I don't care if we

16  let him go, we have enough people, but do we want to go back,

17  what was the 14 objection?  Oh, the eight year old.

18          MR. CAVALIER:  So, we had 19 before we started, so

19  we're down to 18.

20          THE COURT:  So it's minus one so far.

21          MR. CAVALIER:  So 14 is the gentleman with the 8 year

22  old who is concerned about getting coverage with childcare.  18

23  is the guy who gets the words scrambled in his head, and then

24  we had a questionable question mark on the golf guy.

25          THE COURT:  Is there any --

1              MS. DIBIANCA:  Exactly, a questionable question mark,

2    right?

3              THE COURT:  I'm not eager to let that guy go for that

4    reason.

5              MS. DIBIANCA:  I'm totally fine, I just had a

6    questionable question mark.

7              MR. CAVALIER:  You know how much golf this trial has

8    cost me over the last --

9              THE COURT:  He hasn't considered that.  So, is there

10   any agreement as to either 14, or 18?

11             MS. SHIKUNOV:  14 I don't have strong feelings one

12   way, or the other.

13             MR. CAVALIER:  I think we need to keep him.

14             MS. DIBIANCA:  That's between, more compelling from a

15   humanitarian perspective between 14, and 18 is 18 to me.

16             THE COURT:  18 is the second worst hearing person.

17             MR. CAVALIER:  Right.

18             MS. SHIKUNOV:  Yeah.

19             THE COURT:  I actually rather liked him, that's

20   Dougie, right?

21             MS. DIBIANCA:  No.  He was the one who said he had

22   negative feelings towards Israel.

23             THE COURT:  Yeah, that was Dougie, that's right,

24   Dougie said that.

25             MS. DIBIANCA:  Then he also said he recommended that

1   people get terminated, so he was kind of all over the place in
2   terms of, I don't think he's for cause on either side, because
3   he said stuff that cuts against everyone.  He's a wildcard that
4   way, but he did have the hearing aid in the same --
5          THE COURT:  That's what I'm going to rely on, we're
6   going to cause him.
7          MR. CAVALIER:  We're causing number 18?
8          THE COURT:  And Eric, it was a very close call for
9   me, keeping him in, and I just think that --
10          MS. DIBIANCA:  I don't like hearing that, I'm Jewish,
11   I don't like hearing somebody saying that.  I mean, so --
12          THE COURT:  That's not why I would give cause.  I
13   think he was rehabilitated himself on that, it's the hearing.
14          MS. SHIKUNOV:  I agree.
15          MS. DIBIANCA:  Yeah, I mean I have no desire to be
16   screaming at people.
17          THE COURT:  HE may get through the trial without the
18   aid of whatever, but he may not too, so that's where I came out
19   on that.
20          MS. DIBIANCA:  Right, and also he said he loses
21   context, and fills in the blanks.
22          THE COURT:  So that's 18.
23          MS. DIBIANCA:  Yeah, 18's out.  So that gives us 17
24   Mike?
25          MR. CAVALIER:  We're at 17 now, with 14's undecided.

1          MS. DIBIANCA:  So, if we each have three dings at 17,
2   we still have plenty.
3          MS. SHIKUNOV:  We still have plenty.
4          MS. DIBIANCA:  I didn't have a strong feeling about
5   him, I feel like it.
6          MS. SHIKUNOV:  We're talking about 14 now?
7          MS. DIBIANCA:  Yeah.
8          (Simultaneous speaking.)
9          THE COURT:  (Unintelligible.)
10          MS. DIBIANCA:  Yes, he said he couldn't find somebody
11   to watch the kid, and he said the confusing thing about the
12   office was closed on Friday, but then he had an audit, and we
13   couldn't figure out exactly what he was saying.
14          MS. SHIKUNOV:  I did not find that compelling, I did
15   not find that to be a compelling explanation, but.
16          THE COURT:  The only thing that stood out for me was
17   the childcare, any thoughts on that?
18          MR. CAVALIER:  He needs childcare whether he goes to
19   work, or he goes to serve on a jury, I don't mean to be callous
20   about it, but.
21          MS. SHIKUNOV:  Well, unless he's working from home of
22   course.
23          MR. CAVALIER:  I thought he said he was going in?
24          THE COURT:  It sounded as if he was going in, that it
25   was closed, but he was going in.

1          MS. SHIKUNOV:  I just know that the place that he
2    works is a fancy gym, like it's like a fancy gym environment,
3    so he could be bringing the kid in with him.  But I don't have
4    a strong feeling one way, or the other, I just feel a little
5    bad for him, because he's got a kid, and he's in Delco, so that
6    is a pain in the neck.  But, I mean I don't know if that's more
7    of a pain in the neck than anybody else who has kids.
8          MS. DIBIANCA:  Or the very busy guy, or.
9          MS. SHIKUNOV:  I don't have a strong compunction
10   there one way or the other.  Other than I do feel a little bad
11   for him, because just looking at the numbers, he's probably
12   going to get sacked.
13         THE COURT:  I was going to say, would we agree to
14   this, that that guy with the kid has the best excuse of those
15   that we haven't struck yet?
16         MS. SHIKUNOV:  Of those that we have not struck, do
17   you mean that we think he's better than healthcare not going to
18   try?  Number 28.  I shouldn't call people like that.
19         THE COURT:  With the health, has the most important
20   job?
21         MS. DIBIANCA:  Right, I agree.
22         MR. CAVALIER:  I do agree with that.
23         MS. DIBIANCA:  I mean you were tough on him
24   admittedly, but I do feel a little bad for him, and also he
25   said distracted, which doesn't --

```
1               THE COURT:  I wasn't even talking about that guy.
2               MS. SHIKUNOV:  That was healthcare guy.
3               MS. DIBIANCA:  He was saying, does number 14 have the
4      most valid excuse of anyone that's left?
5               THE COURT:  The childcare guy, does he have, of the
6      ones that haven't been caused, does he have?
7               MS. DIBIANCA:  Let's say yes.
8               MS. SHIKUNOV:  I don't know that he does.
9               MR. CAVALIER:  You guys -- I don't have a kid, so I
10     can't say.
11              MS. DIBIANCA:  I do have a kid, but I don't know.
12              MS. SHIKUNOV:  I think we're just unclear about what
13     he really was saying, so if we want to bring him back to
14     clarify, but if we just want to move this along.
15              THE COURT:  Yeah, I'm going to let him go.
16              MR. CAVALIER:  We're letting 14 go?
17              THE COURT:  Yeah, on the childcare.  I just, the
18     extra work waiting, does that put a numbers problem for us?
19              MS. SHIKUNOV:  No, I was just, the point I was
20     saying, the only reason I was pausing on him, and not saying
21     get over it buddy, is just looking at the numbers with the
22     people we've already stricken, he would likely get sacked
23     unless he got stricken.
24              THE COURT:  He's high up the list.
25              MS. SHIKUNOV:  Yeah, that was my thought process, so
```

1   it's like we know then we're sitting somebody who is --

2            THE COURT:  Obviously it's up to counsel, but he came

3   across fairly neutral to me.

4            MS. SHIKUNOV:  He did.

5            (Simultaneous speaking.)

6            MS. DIBIANCA:  He did, that's what I'm saying, that's

7   why (unintelligible).

8            THE COURT:  And he's got the child, and we have the

9   numbers, so I'm going to just cut him a break.

10           MS. DIBIANCA:  Okay, yeah.

11           MR. CAVALIER:  That's fine.  So, what do we have

12  left?

13           THE COURT:  That brings us to 16, right?

14           MR. CAVALIER:  Are we going to roll it back?

15           THE COURT:  I think so, I think so, and we're trying

16  to get to eight, and we'll do that.

17           MR. CAVALIER:  Yeah.

18           THE COURT:  All right.  This should actually go very

19  quickly.

20           MS. SHIKUNOV:  Yeah, I think so too

21           THE COURT:  I feel horrible, we kept these people so

22  late, and then we're sending them out into a monsoon.

23           MS. SHIKUNOV:  I have to figure out how to get to

24  Allentown, because I can't drive my car, because I don't have a

25  license.

1        MS. DIBIANCA:  For the record, I told her she can

2   ride with me, and we can talk about settlement the whole ride

3   up, it is such a great idea Erica, I'll buy you dinner.

4        THE COURT:  Or it'll be a very quiet car ride.

5        MS. DIBIANCA:  No, there's no such thing with me,

6   there's no such thing.

7        MS. SHIKUNOV:  The problem we seem to be having is

8   that it's Groundhog Day, because we seem to make process, and

9   then we go backwards.

10        THE COURT:  We're a trial court, did you hear me tell

11   the veneer of that?  We're a trial court, it's what we do.  Is

12   that right?  So, we'll go in folks, and again I'll thank them,

13   and apologize for how long this has taken, and I'll say

14   counsel, we're going to do strikes. My thought is because again

15   plaintiffs have the burden, one, one, one, one seat them.

16        MR. CAVALIER:  Fair enough.

17        THE COURT:  Okay?

18        MS. SHIKUNOV:  Deal.

19        MR. CAVALIER:  Let's do it.

20                              * * * * *

21

<u>C E R T I F I C A T E</u>

        I, court approved transcriber, certify that
the  foregoing  is  a  correct  transcript  from  the
official electronic sound recording of the proceedings
in the above-entitled matter.




_____        August 3, 2021
    Neal R. Gross


**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com