1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

```
MARNIE O'BRIEN,            .    Case No. 2:19-cv-06078-JMG
                          .
          Plaintiff,      .
                          .    U.S. Courthouse
      v.                  .    504 W. Hamilton Street
                          .    Allentown, PA 18101
THE MIDDLE EAST FORUM      .
et al.,                   .
                          .
          Defendants.     .
                          .    August 2, 2021
. . . . . . . . . . . . . . .   9:32 a.m.
```

TRANSCRIPT OF TRIAL DAY THREE
BEFORE HONORABLE JOHN M. GALLAGHER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          ERICA A. SHIKUNOV, ESQ.
                            POND LEHOCKY STERN GIORDANO
                            2005 Market Street, 18th Floor
                            Philadelphia, PA 19103

                            SUSAN C. KEESLER, ESQ.
                            DEREK SMITH LAW GROUP PLLC
                            1835 Market Street, Suite 2950
                            Philadelphia, PA 19103


For the Defendants:         MARGARET M. DIBIANCA, ESQ.
                            JAKOB F. WILLIAMS, ESQ.
                            CLARK HILL PLC
                            Two Commerce Square
                            2001 Market Street, Suite 2620
                            Philadelphia, PA 19103

                            JONATHAN R. CAVALIER, ESQ.
                            COZEN O'CONNOR
                            1900 Market Street
                            Philadelphia, PA 19103

Audio Operator:             CHRISTINE C. STEIN

TRANSCRIBED BY:             NEAL R. GROSS

```
            Proceedings recorded by electronic sound
       recording, transcript produced by transcription service.
```

# I N D E X

PAGE

**WITNESS FOR THE PLAINTIFF**

KENDRA KUBALA

  Direct Examination by Ms. Keesler       11

  Cross-examination by Mr. Cavalier      28

  Redirect Examination by Ms. Keesler    80,89

  Recross-examination by Mr. Cavalier    88

MARNIE O'BRIEN

  Cross-examination by Ms. Dibianca      97

  Redirect Examination by Ms. Shikunov   262

  Recross-examination by Ms. Dibianca    284

**EXHIBITS**                 **ID.**  **EVD.**

1

1          THE COURT:  It is nice to everybody.  Slightly
2    eventful weekend, right?  We have a witness who's -- at least
3    at the moment -- unavailable due to illness.
4          MS. SHIKUNOV:  Well, she's available as the Court
5    sees fit.  We did -- it was confirmed, a positive diagnosis.
6          THE COURT:  Okay, okay.
7          MS. SHIKUNOV:  I can provide the medical
8    documentation to the Court if the Court finds it necessary.
9          THE COURT:  I do not.
10          MS. SHIKUNOV:  Okay.
11          THE COURT:  And if Counsel wants to see it, it's up
12    to them.
13          MS. SHIKUNOV:  So it would be our proposal that she
14    be permitted to teleconference from her current location.  She
15    is willing to come here.  I will tell the Court -- selfishly,
16    being pregnant, I'm a little uncomfortable with that.
17          THE COURT:  Understood, understood.
18          MS. SHIKUNOV:  But we will defer to the Court.
19          THE COURT:  And -- and I did get to see your email as
20    well.
21          MS. DIBIANCA:  Yes, we do not want her to come in-
22    person.
23          MS. SHIKUNOV:  Yes.
24          THE COURT:  Yes.  No, that's fine.  And I appreciate
25    that.  And -- and there's -- there's some things that have to

```
 1   happen on the technical side that Ms. Stein -- we've dealt with
 2   before in other cases.  So we'll make that work.  I -- are you
 3   anticipating her?  When?  Tomorrow, or --
 4            MS. SHIKUNOV:  We were going to try to call her this
 5   afternoon, but we just didn't want -- we may -- we switched it
 6   around just because we didn't want to put pressure on the
 7   Court.  And in terms of setting up technology or however that
 8   would happen --
 9            THE COURT:  Okay.
10            MS. SHIKUNOV:  -- we just didn't want to waste -- so,
11   definitely tomorrow.
12            THE COURT:  All right.  And you probably have
13   already, but just stay in touch with Ms. Stein and she'll
14   figure out how we get that done.
15            MS. SHIKUNOV:  Okay.
16            THE COURT:  Okay?  Sound good, Christine?
17            MS. STEIN:  That's perfect, thank you.
18            THE COURT:  All right.  So I'll -- I'll sign that
19   order at our next break.  And -- and we're starting with the
20   Plaintiff's expert?  Is that what we're doing this morning?
21            (Simultaneous speaking.)
22            MS. SHIKUNOV:  Yes, Your Honor.
23            THE COURT:  Okay.  I'm going to give just the -- it's
24   -- it's a -- you know, the very general Third-Circuit
25   instruction.  It doesn't even use the word expert, but it --
```

1    you know, it touches on some of the consideration that the jury

2    has -- really with all witnesses, but the -- in the drafting of

3    the Third-Circuit's model instruction they've sort of taken

4    that word out of my mouth.  So -- that's what I'll read, all

5    right?

6            MS. DIBIANCA:  We had one other housekeeping before

7    the jury is called in, I believe.

8            THE COURT:  Talk to me.

9            MS. DIBIANCA:  Okay.  And Erica -- Ms. Shikunov is up

10   to speed.  This is not a surprise, but she's -- she will have

11   the opportunity to object.  So we -- one of our witnesses is

12   the recruiter, People Share.  We learned last week that the

13   person who is supposed to be testifying, Mr. Beady (phonetic)

14   is on vacation and unavailable.  And so in the course of trying

15   to figure out how to deal with that, we -- they provided us

16   with documents that we did not receive pursuant to our subpoena

17   request which was issued about -- more than a year ago.  So now

18   we have received, as of Friday, documents that we did not have

19   access to before.  It's her People Share file, which is --

20   probably -- I'm going to call it 10-ish pages.  I provided this

21   to Ms. Shikunov on Friday and said that -- explained the

22   circumstances and provided the communications by which I

23   received the -- the documents.  And we'd like to use it as an

24   exhibit.  Obviously she is going to -- or she has --

25   (inaudible) provide her -- you know, requires it, that she can

 1   object to it, but I just wanted to let you know the

 2   circumstances by which we received the document.

 3                THE COURT:  Okay.  So in short, there -- there -- it

 4   looks like there may be a substitute witness, but also an

 5   additional exhibit?

 6                MS. DIBIANCA:  I won't be calling a substitute

 7   witness.

 8                THE COURT:  Okay.

 9                MS. DIBIANCA:  There's not a person with personal

10   knowledge, so I won't be able to call a substitute, yes.

11                THE COURT:  Okay.  And have you had a chance to look

12   at that --

13                MS. SHIKUNOV:  I did, and we do object because we did

14   not receive these -- we're receiving new exhibits in the middle

15   of trial.  This isn't an affidavit.  This isn't a deposition.

16   And I don't think it's an appropriate substitute for the

17   witness.

18                THE COURT:  Well I'm -- maybe if -- is this something

19   you can give us a copy of to see it?  Just --

20                MS. DIBIANCA:  Yes.

21                THE COURT:  -- and I'm not going to rule now, but if

22   you could share that with Mr. Fischer (phonetic).  Is that --

23   you have a copy of your own?

24                MS. DIBIANCA:  Yes -- yes, yes.

25                THE COURT:  Okay, great.  Just hang on to that.

```
 1              MS. DIBIANCA:  And if it's necessary I could request
 2     that People Share provide a witness to authenticate the
 3     documents.  But I just -- I -- honestly, I didn't think that
 4     that was necessary in light of the -- uncontroversial nature of
 5     them.
 6              THE COURT:  Okay.  I'll just -- I'll need some time
 7     to look at it --
 8              MS. DIBIANCA:  Absolutely.
 9              THE COURT:  -- and then we can discuss at a break,
10     and -- and I'm assuming this would be during the Defendant's
11     own case in chief?
12              MS. DIBIANCA:  I would actually intend to use it on
13     cross since I'm not going to call the recruiter.
14              (Simultaneous speaking.)
15              THE COURT:  So the cross of the Plaintiff?
16              MS. DIBIANCA:  Yes.
17              THE COURT:  All right.  So we -- we'll have to make
18     the decision quickly.  I -- I'll need to take a look at it,
19     okay?
20              MS. DIBIANCA:  Absolutely.
21              THE COURT:  All right.  Anything else?
22              MS. DIBIANCA:  No, I believe so.
23              MS. SHIKUNOV:  I don't think so, Your Honor.
24              THE COURT:  Okay.  All right, if we can bring the
25     jury in, that would be terrific.
```

 1            (Pause.)

 2            THE CLERK:  All arise.

 3            (JURY ENTERS COURTROOM.)

 4            THE COURT:  Good morning, ladies and gentleman.

 5   Please be seated.  Welcome back.

 6            (Pause.)

 7            THE COURT:  Folks, you might recall that on Friday

 8   after the completion of the direct examination of Mr. O'Brien,

 9   I mentioned that we were going to go somewhat out of order this

10   morning.  And that's still our plan.  So you will be hearing

11   testimony from a Plaintiff's witness, Kendra Kubala.  That will

12   be the next thing we do.  As I mentioned Friday, there's

13   nothing unusual about this.  We -- we frequently do have to go

14   out of order when we're trying to accommodate witnesses'

15   schedules and do that whole balancing act.

16            So for -- for this witness, I do want to give you a

17   brief instruction.  I hope everyone had a good weekend.

18            (Laughter.)

19            THE COURT:  Shortly you will hear testimony you may

20   consider her qualifications, the reasons for her opinions, and

21   the reliability of the information supporting those opinions,

22   as well as the fact that as I previously mentioned for weighing

23   the testimony of any other witness.  The opinion of Kendra

24   Kubala should receive whatever weight and credit, if any, you

25   think appropriate given all of the evidence in this case.

1            In deciding whether to accept or rely upon the

2    opinion of Kendra Kubala you may consider any bias that she may

3    have, including any bias that may arise from evidence that she

4    has been or will be paid for reviewing the case or testifying.

5     But again, this -- this witness's testimony should also be

6    considered in -- in regard with the factors that you would use

7    when considering the testimony of any witness in the case.  And

8    the -- the determination of how much weight and credit to give

9    to each witness in this case belongs individually to each of

10   you.  Okay?  That's our brief instruction and we're ready to

11   resume testimony.

12            MS. KEESLER:  Thank you, Your Honor.  The Plaintiff

13   would call Dr. Kendra Kubala to the stand.

14            THE COURT:  Please approach.

15            (Pause.)

16            THE COURT:  Hello, good morning.

17            (Pause.)

18                KENDRA KUBALA, WITNESS, SWORN

19            PARTICIPANT:  Please state and spell your name for

20   the record.

 1            THE WITNESS:  Kendra Kubala, K-E-N-D-R-A K-U-B-A-L-A.

 2            PARTICIPANT:  Please be seated.

 3            (Pause.)

 4                      DIRECT EXAMINATION

 5    BY MS. KEESLER:

 6    Q    Good morning, Dr. Kubala.

 7    A    Good morning.

 8    Q    Dr. Kubala, can you begin by telling the jury about your

 9    education background?

10    A    Yes.  I have my bachelor's degree from Salisbury

11    University in 2004.  I got my master's degree in 2007 from

12    Adelphi (phonetic) University in New York.  And then I got my

13    doctorate in psychology from 2012 from Immaculata University in

14    Pennsylvania.

15    Q    Dr. Kubala, at Salisbury University, what was your major?

16    A    Psychology.

17    Q    And at Adelphi University where you received your master

18    of arts, what was your major?

19    A    General psychology.

20    Q    Okay.  And then you mentioned -- or testified that you got

21    your doctor of clinical psychology.  Can you explain to the

22    jury what clinical psychology is?

23    A    Clinical psychology is the study and research of how we

24    act and how we feel and how those two things interact with one

25    another.  The reasons we may engage in certain behaviors,

1   different symptoms we may experience.

2   Q     Okay.  And how many years were you at Immaculata

3   University?

4   A     Five.

5   Q     Okay.  And in those five years -- can you take us through

6   those years, as to what you completed?

7   A     Yes.  The first three years are mainly in-classroom

8   instruction.  There's a lot of lectures that you go to, maybe

9   some off-site events that you're going to for different

10  trainings.  The -- those are the first three years.  The fourth

11  year is -- and then within the third year, into the fourth

12  years, you do two practicum experiences.  So the goal of a

13  practicum is to go off site to a location that has a

14  relationship with the university and gain some hands-on

15  experience.  One is more diagnostic geared.  So you're looking

16  at different people with a variety of presenting issues.  And

17  your job is to diagnose those individuals.

18        The second practicum is much more of a therapeutic

19  practicum.  So you're learning hands-on, different therapeutic

20  techniques and different approaches and you're implementing

21  them with the patient roster you're given.  The fourth year you

22  do an internship.  So that is a pre-doctoral internship and you

23  are again off site -- once again, with a relationship between

24  the school and the location.  And you are either being

25  supervised by a licensed psychologist, or you're working

1   directly in the room with the psychologist and the team.  And
2   then eventually you're given the opportunity to do those same
3   things yourself.  So the goal is for you to have the training -
4   - the hands-on training, and then you graduate to doing the
5   same things you were observing.  You do them yourself.
6       And then the fifth year you're doing your dissertation and
7   then you're -- you graduate.
8   Q   Okay.  So I'd like to talk about the -- I believe you
9   discussed it was the third year where you do your practicum.
10  So for your third year, which practicum did you do?
11  A   I started my diagnostic program at the Joseph J. Peters
12  Institute in Philadelphia.  The Joseph J. Peters Institute is
13  100-percent trauma-based.  So we worked with a clientele from
14  the ages of three up to 70s.  And they were 100-percent people
15  who had experienced a sexual trauma.
16  Q   Okay.  And during your practicum -- and I am going to use
17  the acronym JJPI just because it's easier to say.  During your
18  practicum at JJPI, what were you involved in?
19  A   I did predominantly evaluations to begin with.  So we
20  would -- it was a forensic-involved experience, meaning that
21  all of -- most of the people that we had were involved in the
22  court system in some way.  Whether there was allegations of
23  abuse or somebody had been charged with an assault situation.
24  I also worked with the offenders.  We would communicate with
25  the court.  The person would come in.  I would do a full

1  evaluation on the individual and then I would work with the

2  treatment team to determine how to move forward with treatment

3  for the individual.

4  Q    And while you were at this practicum, were you supervised

5  under a supervisor?

6  A    Correct.

7  Q    Okay.  And would that supervisor be a licensed clinician

8  or a psychologist?

9  A    Both a licensed psychologist and a psychiatrist.

10  Q    Okay.  And what kinds of evaluations were these?

11  A    They were called biopsychosocial evaluations.  Basically

12  what that means is you're getting a full background of the

13  person.  So you're looking at biological factors, social

14  factors, and psychological factors.  So you're getting a full

15  structured interview. You're also gaining information from --

16  maybe collaborative reports -- and you're also doing measures

17  and psychological tests.

18  Q    I now want to have you discuss the second practicum that

19  you did.  Where is that you did your second practicum?

20  A    It was the Philadelphia School of Psychoanalysis.

21  Q    Okay.  And what were you involved in there?

22  A    That was my psychotherapeutic practicum experience.  So

23  the majority of that there was -- somebody else was doing the

24  testing and diagnosing.  And then they would move the person on

25  to their therapy needs that were recommended, and I would

1   provide the therapy under the supervision of a licensed

2   psychologist.

3   Q    One moment.  Okay, you then testified about your fourth

4   year regarding your pre-doctoral internship.  Where is it that

5   you did your pre-doctoral internship?

6   A    I was at MercyFirst in Syosset, New York.

7   Q    And how long was that pre-doctoral internship?

8   A    One year.

9   Q    Okay.  And does the pre-doctoral internship have to be

10  accredited by the American Psychological Association?

11  A    Ideally, yes.

12  Q    Okay.  Was your pre-doctoral internship APA accredited?

13  A    Yes.

14  Q    And can you please describe your pre-doctoral internship

15  for MercyFirst?

16  A    It was a residential treatment facility for teens and

17  younger children. These were young people who were either

18  dependent or delinquent -- meaning they were dependent in that

19  they had nowhere else to go.  So we sort of became their

20  guardians for the State.  Or they were delinquently involved,

21  which meant that these were young people who had gotten

22  involved in the court system and it was no longer safe for them

23  to reside in a residential setting.  So they were placed at a

24  residential treatment facility.

25  Q    Okay.  And during this pre-doctoral internship -- was this

1   a clinical psychology pre-doctoral internship?

2   A    Yes.

3   Q    Okay.  At this pre-doctoral internship, did you conduct

4   evaluations?

5   A    Yes.

6   Q    Did you also provide therapy?

7   A    Yes.

8   Q    What kind of evaluations did you administer?

9   A    The same biopsychosocial evaluations that I described

10  previously.

11  Q    Okay.  And was this all conducted under the supervision of

12  a licensed psychologist?

13  A    Yes.

14  Q    Okay.  And how many hours did you have to complete for

15  this pre-doctoral internship?

16  A    Fifteen hundred hours.

17  Q    And did you receive your certificate of completion for

18  your pre-doctoral internship?

19  A    Yes.

20  Q    Okay.  And what was the focus of these evaluations at

21  MercyFirst?

22  A    The focus was to compile the various documentation that we

23  were receiving from -- because these were younger people --

24  school, because they were involved in court happenings in some

25  way.  We would compile all of those documents, complete some

 1  psychological testing, complete a structured interview, and

 2  generate a report that included diagnoses and recommendations

 3  for treatment.

 4  Q    Okay.  At MercyFirst were you involved in conducting

 5  evaluations and therapy with respect to teens and children --

 6  teens and children who were subjected to sexual trauma as well?

 7  A    Yes.

 8  Q    Okay.  And then you mentioned -- give me one moment.  In

 9  your fifth year you present a dissertation, correct?

10  A    Correct.

11  Q    Can you describe to the jury what a dissertation is?

12  A    A dissertation is sort of the culmination of your entire

13  experience as a doctoral student.  So you complete -- you

14  create a research study, basically.  You create the question

15  you want answered.  You create your hypothesis, which is what

16  you hope to happen.  Then you complete the research methods.

17  You find your participants.  You engage in all of that

18  strenuous activity.  You administer, test -- I'm sorry.  You

19  administer, score, and interpret those results.  And you

20  compile them into a conclusion and present your research in a

21  bound copy.  And you have to present it in front of a team of

22  both licensed psychologists and different administrators at the

23  university.  And they have to decide if you've done an

24  acceptable job.

25  Q    Okay.  And just generally what was your dissertation

1   about?

2   A     Some vicarious (phonetic) trauma.

3   Q     And -- I don't know if I'm using the correct terminology -

4   - but did you pass in presenting your dissertation?

5   A     I did.

6   Q     Okay.  So after you completed your doctor of clinical

7   psychology at Immaculata University, did you -- I guess, what

8   further requirements did you have to undertake to become a

9   practicing psychologist?

10  A     So after you graduate you do one year of post-doctoral

11  training.  So I chose to go back to the Joseph J. Peters

12  Institute because, understandably, it's a fairly small world in

13  terms of working with such young people -- and exclusively

14  people who have dealt with trauma -- specifically sexual

15  trauma.  So there are only a few institutes that really focus

16  on that.

17        I decided to go back to JJPI for my year of post-doc,

18  which is also 1500 hours, and I completed that year.  And then

19  at the end of that you take what's called the EPPP, which is

20  the Exam for the Practice of Professional Psychology.  It's a

21  nationwide exam.  Many people consider it the boards of

22  psychology.  You sit for that exam.  You have to wait to pass

23  that.  And then you take the jurisprudence exam for the state

24  that you want to be licensed in.  So I have two -- New York and

25  Pennsylvania.

1    Q    And did you pass that EPPP?

2    A    I did.

3    Q    Okay.  The -- I just want to talk about your post-doc at

4    JJPI.  How long was that post-doc?

5    A    One year.

6    Q    Okay.  And I understand that you returned to JJPI.  What

7    type of work did you do during your post-doc?

8    A    A little bit of everything.  Evaluation, therapy --

9    because I had been there for previous stints for different

10   training and been -- I had been an employee there, I was very

11   fortunate to have the experience of working with a variety of

12   trauma-influenced populations.

13   Q    During your time at JJPI for your post-doc, did you also

14   work with adult sexual offenders?

15   A    I did.

16   Q    Okay.  And what were you involved in when you worked with

17   the adult sexual offenders?

18   A    They were more heavily court-involved.  Understandably,

19   they either had -- excuse me -- probation or parole officers

20   with whom I had to be in contact.  I completed evaluations on

21   them as well as completed individual therapy and group therapy

22   for those individuals.

23   Q    And what type of evaluations did you conduct with respect

24   to that group?

25   A    It would, again, be a biopsychosocial.

1    Q    Okay.  Did you also work with survivors of sexual trauma
2    during that post-doc?
3    A    Yes.
4    Q    Okay.  And what were you involved in while working with
5    the survivors?
6    A    I did pretty much the same -- evaluations, individual
7    treatment, group therapy.  There was also a court in
8    Philadelphia that was specifically geared toward working with
9    women who had been -- who had experienced prostitution.  So I
10   would often go to that -- those court hearings just to attest
11   to their attendance and their participation.
12   Q    You mentioned the requirements of a licensing exam, and
13   then the jurisprudence.  As part of, I guess, maintaining your
14   license as a psychologist, what else do you have to undergo to
15   maintain your license?
16   A    Every state is a little different in their requirements.
17   But for Pennsylvania and New York -- Pennsylvania, every two
18   years you have to complete 30 hours of what are called C-E-Us.
19    They're continuing education units.  And New York is 36 hours
20   for a three-year period.  So they have specific requirements
21   with what CEUs you can take.  You have to take CEUs in ethics,
22   child abuse reporting, and suicidality assessment.  But other
23   than that, you can enroll in different CEUs that are of
24   interest to you.
25   Q    Okay.  And -- do you take those CEUs to maintain your

1  license for both PA and New York?

2  A     Yes -- yes.

3  Q     Okay.  Now what is your current position, Dr. Kubala?

4  A     I'm a psychologist in private practice.

5  Q     How long have you been in private practice?

6  A     It's been about five years now.

7  Q     And what type of individuals do you work with in your

8  private practice?

9  A     Those who have experienced trauma.

10 Q     Is your practice, I guess, focused on sexual trauma only?

11  Or do you also see individuals for other issues?

12 A     Almost -- 100-percent trauma-based, but not 100-percent

13 sexual trauma.

14 Q     What other types of traumas?

15 A     I've had people who have experienced car accidents,

16 somebody who was bitten in the face by a dog -- those sort of

17 traumatic events.

18 Q     Okay.  And how is that these patients come to you?

19 A     Mostly through word of mouth. I've been fortunate enough

20 to have many referrals.  Otherwise there's a website called

21 Psychology Today, and that's a location where you can go and

22 parcel out the specifics of what you want.  If you want

23 somebody who accepts a particular insurance, or if you want

24 somebody who specializes in a particular field, you would go to

25 Psychology Today, and it has a roster of different

1   psychologists.

2   Q    Okay.  So for these individuals that you work with, do you

3   provide therapy?

4   A    Yes.

5   Q    Okay.  And what theoretical approach do you implement for

6   these individuals?

7   A    Cognitive behavioral therapy -- more specifically, trauma-

8   focused cognitive behavioral therapy.

9   Q    Okay.  I'm going to use the acronym CBT as we refer to

10  this.

11  A    Yes.

12  Q    The CBT -- can you just describe for the jury what that

13  means?  What the approach is?

14  A    Cognitive behavioral therapy is most predominantly used

15  when you are engaging in therapy with trauma survivors as a --

16  as a basis of treatment.  It basically is sort of what the

17  words stand for.  It's cognitive behavioral therapy.  So how

18  your cognitions, or thoughts, impact your behavior or actions -

19  - and vice versa.

20  Q    In addition to your private practice, Dr. Kubala, have you

21  ever been hired for legal cases?

22  A    Yes.

23  Q    Okay.  About how many legal cases per year do you handle?

24  A    Approximately eight.

25  Q    Okay.  And about -- what types of claims are presented to

1  you with respect to these legal cases?

2  A    Mainly personal injury.

3  Q    And in these personal injury cases, what are you hired to

4  assess?

5  A    The level of emotional distress and how the incident

6  continues to impact the individual.  As well as what can be

7  implemented to reduce that experience.

8  Q    What percentage of your work constitutes work for legal

9  cases?

10  A    Work?  Or --

11  Q    Yes.

12  A    About 20 percent, maybe.

13  Q    Okay.  And it -- what percentage of your income is derived

14  from legal cases?

15  A    About 20 percent.

16  Q    Okay.  Can you describe your work experience prior to your

17  private practice?

18  A    Sure.  I was the director of DelStar (phonetic), which is

19  a program -- a nonprofit in Philadelphia that works with

20  adjudicated youth.  Meaning they've been in the legal system,

21  they've been found guilty but on a juvenile level.  So a huge

22  component of that is getting these young people treatment.  So

23  they're sent to me from court.  I oversaw the therapist who

24  directly treated them and evaluated them.  And we would report

25  back to the court on a daily basis.

1   Q    And how long were you the director of the DelStar program?

2   A    Five years.

3   Q    You testified that you also evaluated them.  What kind of

4   evaluations did you administer?

5   A    We would administer different -- depending on the specific

6   referral questions, sometimes the court would have a specific

7   question that would center upon whether or not this young

8   person could safely live in the community.  So that might

9   involve a personality inventory.  Most of the time it involved

10  a trauma symptom checklist because these individuals -- aside

11  from being involved in the juvenile system, were also survivors

12  of trauma themselves.  So we needed to assess that as well to

13  determine how it impacted their current behavior.

14  Q    Okay.  So is it safe to say that your work involves

15  assessing emotional distress as well?

16  A    Yes.

17  Q    As well as psychological -- and hopefully I pronounce this

18  correctly -- sequelae?

19  A    Yes.

20  Q    Okay.  Can you describe to the jury what psychological

21  sequelae means?

22  A    Psychological sequelae is the more formal experience of

23  emotional distress.  So as humans we all have emotional

24  distress.  We go through stressful moments.  We go through

25  different life events.  When those become more pervasive --

 1   when they become more frequent, more intense in symptomology,

 2   that's when it moves on to the psychological sequelae realm.

 3   Q    Okay.  One moment.

 4            (Pause.)

 5   Q    Other than your director position at the DelStar -- was

 6   that in Philadelphia?  I apologize.

 7   A    Yes.

 8   Q    Okay.  In addition to your director position at the

 9   DelStar program, what other work experience did you have prior

10   to that?

11   A    I worked at JJPI.  Aside from when I was a student there,

12   I was invited to be a full-time employee.  So I completed the

13   same sort of things that I was doing as a student after I

14   completed my time there.  So I was doing evaluations,

15   individual therapy, group therapy.

16   Q    Okay.  And how long were you doing that for?

17   A    Gosh, at least three years.

18   Q    Okay.  Would it reflect your recollection if I were to

19   show you a copy of your CV?

20   A    Please.

21            MS. KEESLER:  May I -- may I approach the Witness?

22            THE COURT:  Certainly.

23            MS. KEESLER:  Thank you.

24            (Pause.)

25            THE WITNESS:  Thank you.

1  BY MS. KEESLER:

2  Q    Dr. Kubala, is that a copy of your CV, or curriculum

3  vitae?

4  A    Yes, it is.

5  Q    Okay.  And after reviewing your CV, how long did you work

6  at JJPI?

7  A    As an employee -- as an evaluator, I was there for a

8  little over a year -- aside from the training I did as a

9  practicum student and post-doc.

10 Q    Okay.  And then what other employment did you have prior

11 to private practice that you haven't already testified about?

12 A    The same location that I became the director of, I was

13 also a clinician years prior.  So I worked at that DelStar

14 program as a clinician who was implementing the evaluations and

15 doing therapy.

16       Q    And how long were you in that position for?

17 A    Just about two years.  Little over two years.

18 Q    Okay.  And then I noticed that you also have here that you

19 were an intake coordinator, slash group facilitator, for the

20 Halts (phonetic) Program?

21 A    Correct.

22 Q    What years were you employed there?

23 A    2006 to 2007.

24 Q    And what type of work were you involved in there?

25 A    The HALT Program stood for Help Abusers Learn Together.

1   This was a program that focused on domestic violence.  So these

2   were the offenders of domestic violence and they were court

3   ordered to attend group therapy -- also called a BIP, a B-I-P,

4   which is a batterers' intervention program.  So I began as the

5   intake coordinator there.  So I would do sort of a cursory

6   background under the supervision of other licensed therapists.

7    And then I would provide group therapy.

8   Q    How long were you in that position for?

9   A    Approximately one year -- a little over.

10  Q    Okay.  I also noticed on your CV that you were a medical

11  reviewer for Health Line Media, is that correct?

12  A    Correct.

13  Q    When did you start that position?

14  A    I started in March of this year.

15  Q    Okay.  Could you please describe for the jury what that

16  work entails?

17  A    As a medical reviewer, there are different authors who

18  present on a variety of topics.  So an author will write the

19  piece and it will be sent to me, and my job is to check that

20  the research that they're attaching to it is relevant, timely,

21  appropriate, and that there's no misleading information in the

22  actual article.

23  Q    Dr. Kubala, have you ever previously been qualified as an

24  expert in the area of assessing emotional distress?

25  A    Yes.

1  Q    And do you recall what -- for what court or jurisdiction?

2  A    It was the Court of Common Pleas in Philadelphia.

3  Q    And do you recall when you were qualified as an expert?

4  A    2018 -- spring, summer 2018.

5  Q    Okay.  Have you ever been disqualified as an expert?

6  A    I have not.

7        MS. KEESLER:  All right, thank you Dr. Kubala.  I now

8  offer Dr. Kubala for cross under qualifications.

9  CROSS EXAMINATION

10 BY MR. CAVALIER:

11 Q    Just briefly, Doctor, you are not licensed in forensic

12 psychology, correct?

13 A    Correct.

14 Q    And you are not trained in forensic psychology, correct?

15 A    Correct.

16        MR. CAVALIER:  That's all I have.

17        THE COURT:  Thank you, Mr. Cavalier.  And I will

18 grant your application and we recognize the Witness as an

19 expert in assessing emotional distress -- is -- is --

20        MS. KEESLER:  Yes.

21        THE COURT:  Is -- that's the discipline for which she

22 is offered?

23        MS. KEESLER:  Well I am offering her as an expert in

24 the field of psychology.

25        THE COURT:  More generally?

1          MS. KEESLER:  Yes.

2          THE COURT:  That is also granted.  Ladies and

3     gentlemen, just briefly, the law permits than an expert, once

4     qualified, may offer an opinion of the area of expertise.  And

5     as we discussed in prior instruction, it's for the jury to

6     determine how much weight and credit — credit, if any, to give

7     to the testimony of each witness, including a witness who was

8     qualified as an expert before the court.

9          Okay, thank you.

10         MS. KEESLER:  Dr. Kubala, Defense just asked you if

11    you're licensed as a forensic psychologist.  However, has any

12    of your previous training or work involved forensic components?

13         THE WITNESS:  Yes.

14    BY MS. KEESLER:

15    Q    Can you just give a summary of which work experience your

16    training involves forensic components?

17    A    All of them.

18    Q    Okay, so that would — everything you testified to?

19    A    JJPI (phonetic), my time at Delstar.  The very basis of a

20    forensic evaluation or anything like that is something that's

21    court-involved.  So I very frequently work with court-involved

22    individuals.

23    Q    Okay.  Now, Dr. Kubala — give me one moment.  Okay, Dr.

24    Kubala, you discussed in your course of your career that you've

25    conducted it sounds like many evaluations over the course of

1   your career.  As part of your practice, you indicated that
2   you've been hired for legal cases.  Now, when you're hired for
3   legal cases, do you conduct what we call psychological
4   evaluations?
5   A    Yes.
6   Q    Okay.  Do you have to be a licensed forensic psychologist
7   to conduct these psychological evaluations?
8   A    No.
9   Q    Okay.  And why is that?
10  A    Because the basis of it is clinical psychology.  So you're
11  looking at diagnostics.  And throughout my training I've been
12  trained on how to identify different symptomology, how to use
13  the clinical book that we use to diagnose patients, and to
14  determine what treatment would be appropriate.
15  Q    Okay.  And can you please describe the general procedures
16  in conducting a psychological evaluation of an individual?
17  A    So you start off with a referral question.  There's a
18  reason the person's coming to see you.  You go over different
19  things like confidentiality, identify how confidentiality
20  impacts the evaluation you're doing, and then you start with a
21  structured interview.
22       So you touch on a variety of topics within the person's
23  life that may be impacting their current mental health or their
24  behavior or anything like that.  And then you determine which
25  psychological measures would be the most appropriate to

1   identify a diagnostic summary of how this person is feeling.

2        Then you complete those measures, you score them, you

3   interpret them.  You develop a diagnosis.  And then you create

4   a report that summarizes everything, with your conclusions and

5   recommendations for treatment.

6   Q    Okay.  As part of that psychological evaluation, are you

7   also reviewing any documents?

8   A    Yes.

9   Q    Okay, what types of documents?

10  A    Anything that's provided is generally helpful: past

11  medical information documentation; past psychological

12  experiences, whether that's therapy notes or psychiatric

13  diagnostic notes; and any health information that's helpful.

14  Q    When you're hired for a legal case study are you also

15  provided with, I guess, legal documents?

16  A    Yes.

17  Q    Okay.  And how does that I guess shape or inform your

18  psychological evaluation, if at all?

19  A    It just lets me know what the person is experiencing from

20  a legal point of view.

21  Q    Okay.  You talked about the structured interview.  What is

22  the purpose of this structured interview?

23  A    The structured interview is just an organized way to make

24  sure that you are addressing the pertinent topics for that

25  person.  So as I discussed before, the bio-psycho-social.

1    There's a lot of things that fall under those three categories.

2         So you're asking about history of trauma, health issues,

3    relationships, a variety of different experiences.  Whether

4    they've attended therapy in the past, have they ever received a

5    psychiatric diagnosis.  There's a quite a few areas that are

6    touched upon.

7    Q    Okay.  During this structured interview, do you also

8    assess differences in personality?

9    A    Could you re-ask that question?

10   Q    Sure.  Maybe I'm just phrasing it incorrectly.  Do you

11   make any, I guess, personality determinations during the client

12   interview?

13   A    With most personality disorders there are hallmark

14   features that you're trained to look for as a licensed

15   psychologist.

16        So if somebody does present in a way that might suggest

17   they're struggling with a personality disorder diagnosis or

18   they're experiencing the world in a concerning way, then you

19   would address that and provide some personality measures and

20   inventories that would help you come to a decision regarding if

21   this is an appropriate diagnosis or not.

22   Q    Can you describe to the court and explain to the jury what

23   a personality disorder is.

24   A    A personality disorder is typically it's the way that the

25   person experiences the world.  So you've probably heard of

1  narcissistic personality disorder, there's borderline
2  personality disorder, there's antisocial personality disorder.
3      Antisocial personality disorder is often talked about in
4  forensic cases because there's a lack of empathy that's usually
5  evident.  There's a desire to go against social norms. Those
6  are the sorts of things that you would question and kind of
7  things that you would question and kind of follow up on with a
8  measure.
9  Q    Okay.  Now, you earlier mentioned that as part of the
10 psychological evaluation, you will determine if – I guess which
11 measures are appropriate.  Is measures kind of a fancy word for
12 tests?
13 A    Yes.
14 Q    Okay.  And tell the jury how it is that you determine
15 which measures to administer during the psychological
16 evaluation.
17 A    So as I alluded to just previously, if you're seeing
18 different suggestions that a personality disorder might be
19 evident or if somebody gives you a response to a question that
20 suggests depression, anxiety, those are the kind of things that
21 you're over in your head in preparing your test battery. And a
22 test battery is just a group of tests that you're going to
23 administer.
24 Q    Okay.  If an individual is presenting to you symptoms of
25 anxiety or depression, how would that impact your determination

1   as to which measures to administer?

2   A    The Beck Depression Inventory and the Beck Anxiety

3   Inventory are the tried-and-true sort of self-report measures

4   that assess those different areas, depression and anxiety.

5   Q    Okay.  Now, Dr. Kubala, are you trained to detect whether

6   someone might be malingering?

7   A    Yes.

8   Q    Okay, can you describe to the jury first what malingering

9   means within the clinical context.

10   A    Malingering means essentially that you're trying to

11   present worse than you actually are.  So if you feeling a

12   certain way, malingering would be you are trying to convince

13   the person who's evaluating you that your symptoms are actually

14   much worse than they are.

15   Q    Okay.  And as a trained professional, I guess what signs

16   or indicators would inform you that a particular individual

17   might be malingering?

18   A    A good example is if the person uses language that is

19   straight from the diagnostic manual that we use that most

20   people would not be familiar with.  If they use that exact

21   terminology, that can be a little bit of a red flag.

22       If they perseverate on a certain topic even though you're

23   trying to get to a different realm of questioning, that could

24   be another suggestion of malingering.

25   Q    Could you just define what perseverating means.

1  A    Yes, perseverating means just returning to the same

2  question or topic or word over and over and over again despite

3  redirection.

4  Q    Okay.  If during the interview you had concerns or you

5  just detected signs of malingering, I guess would you

6  administer any additional tests?

7  A    Yes.

8  Q    What types of tests?

9  A    There are tests that are specifically made to detect

10  malingering.  Within certain objective tests they are

11  internally within there.  Otherwise, you can just administer a

12  malingering measure.

13  Q    Okay.  You mentioned that as part of your psychological

14  evaluation that you will determine whether I guess there's a

15  diagnosis to be made.

16  A    Correct.

17  Q    It's not – is it fair to say it's not always your goal to

18  find a diagnosis?

19  A    Correct.

20  Q    Okay.  And how do you determine how to diagnose the

21  individual?

22  A    We have the DSM-5, which is the Diagnostic and Statistical

23  Manual of Mental Disorders.  The 5 is just because it's in the

24  fifth edition, that came out nearly ten years ago, about 2013.

25   And they do a great job.  That is the – the diagnostic tool

1   that psychologists and mental health professionals use.  And

2   they provide almost a checklist of different symptoms.

3        So they have – there are a couple hallmarks of each

4   diagnosis and then are maybe a list of different symptoms and

5   the person has to possess at least a certain number of those

6   symptoms to receive that diagnosis.

7   Q    And after you complete the psychological evaluation, do

8   you, I guess, memorialize your findings in a report?

9   A    Yes.

10  Q    Okay.  And do you, I guess, arrive at an opinion if it's

11  with respect to a legal case that you were hired for?

12  A    Yes.

13  Q    Okay.  Dr. KUBALA, back on January 4, 2021, did you

14  evaluate the Plaintiff in this case, Marnie O'Brien?

15  A    I did.

16  Q    Was this in person or via video?

17  A    It was via video.

18  Q    Can you explain to the jury why it was conducted via

19  video?

20  A    The pandemic had hit.

21  Q    And we're referring to the COVID-19 pandemic?

22  A    Correct.

23  Q    Okay.  The fact that you conducted this evaluation by

24  video, did that at all impair your ability to evaluate her?

25  A    No.

1  Q    Okay, and why is that?

2  A    The American Psychological Association has put out ample

3  guidance on how to administer appropriately, how conduct

4  therapy over video, and even phone at times.  How to complete

5  and administer psychological measures.  And it's an acceptable

6  way to do so right now.

7  Q    Dr. Kubala, can you explain to the jury what is the

8  purpose -- with respect to you evaluation of Ms. O'Brien, what

9  was the purpose of her evaluation?

10 A    To determine if the experience of sexual harassment she

11 went through was causing lingering psychological damage.

12 Q    Did you review any records prior to evaluation?

13 A    I did.

14 Q    Okay.  One moment.  Did you review her charge with the

15 Employment Opportunity – I'm sorry, the Equal Employment

16 Opportunity Commission, otherwise known EEOC?

17 A    Yes.

18 Q    And did you also review her complaint that she filed in

19 court?

20 A    Yes.

21 Q    Did you also review her – the Defendant's answer to her

22 complaint?

23 A    Yes.

24 Q    Did you review any medical records prior to her

25 evaluation?

 1   A      I wasn't provided with any, no.

 2   Q      Okay.  Were you made aware that she had previously been

 3   diagnosed with ADHD?

 4   A      Yes.

 5   Q      Can you just describe to the jury what ADHD is?

 6   A      Attention Deficit Hyperactivity Disorder.  It tends to

 7   impact inattention, concentration difficulties, and

 8   hyperactivity.

 9   Q      Okay.  And you mentioned that you had not received any

10   medical records.  I imagine you didn't receive any records with

11   respect to her ADHD diagnosis, is that correct?

12   A      Correct.

13   Q      Did that at all impact your ultimate opinion in this case?

14   A      No.

15   Q      Okay.  And did you speak with Ms. O'Brien prior to

16   evaluating her?

17   A      No.

18   Q      Okay.  Now, at the beginning of her evaluation, did you go

19   through the procedures that you just testified about in regards

20   to conducting a psychological evaluation?

21   A      Yes.

22   Q      Okay.  As before she began her evaluation, did you give

23   her the instructions as to how the evaluation would proceed?

24   A      Yes.

25   Q      And did she display that she understood the instructions?

1    A    Yes.

2    Q    Okay.  During her evaluation, did you tape (phonetic) the

3    structured that you previously testified about?

4    A    Yes.

5    Q    And did you document this interview – or actually, strike

6    that.  About how long was your evaluation of Ms. O'Brien back

7    on January 4, 2021?

8    A    Approximately 90 minutes.

9    Q    And the client interview that you took of Ms. O'Brien, do

10   you document that into a type of report?

11   A    Yes.

12   Q    Okay.  And did you prepare a report with respect to Ms.

13   O'Brien's evaluation?

14   A    Yes.

15   Q    Okay.  Would it help you refresh your recollections to see

16   that report?

17   A    Yes.

18            MS. KEESLER:  May I approach the witness?

19            THE COURT:  Certainly.

20            THE WITNESS:  Thank you.

21            MS. KEESLER:  Dr. Kubala, is that the report that you

22   prepared as it relates to this case?

23            THE WITNESS:  Yes.

24   BY MS. KEESLER:

25   Q    Okay.  During Ms. O'Brien's evaluation, or rather let me

1  just take it back for a second.  During the client interview,
2  did you have any concerns of a personality disorder with
3  respect to Ms. O'Brien?
4  A    No.
5  Q    Did you have any concerns of, I guess, malingering or
6  exaggeration, report of exaggerated symptoms?
7  A    No.
8  Q    How did you determine which measures to administer during
9  her evaluation?
10  A    After the structured interview, it became apparent that
11  she was struggling with anxiety and possibly depression.
12  Q    And what symptoms did she report to you?
13  A    She reported difficulty concentrating, excessive worry,
14  difficulty controlling the worry, restlessness, sleep
15  difficulty, irritability.  And she was – it was physically
16  evident because she was shifting in her seat, wringing her
17  hands quite a bit.
18  Q    Did she report any nightmares to you as well?
19  A    Yes.
20  Q    Okay.  And based on the information that she provided,
21  which measures did you end up ultimately administering?
22  A    The Beck Anxiety Inventory and the Beck Depression
23  Inventory.
24  Q    Okay.  Let's start with the Beck Depression Inventory.
25  Can you please describe to the jury what the Beck Depression

1  Inventory measures?

2  A    The Beck Depression Inventory measures depressive symptoms

3  and it focuses on a short term prior to when you're meeting

4  with the person.  So they're talking about what they're

5  experiencing presently.

6  Q    Okay.  And the Beck Depression Inventory, is it a written

7  test, is it a verbal test?  Could you just describe to the jury

8  what that measure is – what it entails?

9  A    That authors of the test say that it can really be done

10  either way.  There are certain situations that you have to

11  think about when you're administering psychological testing.

12  So that impacts literacy issues, mental fatigue on the part of

13  the client, all of those things need to be taken into

14  consideration.

15       So if I was in person with Ms. O'Brien, she could have

16  done it herself.  But because we were over the Zoom platform, I

17  completed those questions.  And those questions each have three

18  to four answers.  So if one question is how – you're talking

19  about sadness or sleep disturbance, it gives you three options

20  that really capture accurately what you're experiencing, rather

21  than a true-false kind of a situation.

22  Q    Okay, I'm just looking at your report of the Beck

23  Depression Inventory.  You mention that it lists four

24  statements arranged in increasing severity about a symptom of

25  depression, is that correct?

1   A    Correct.

2   Q    Okay, can you just give an – well, actually, are you

3   permitted to, I guess, give a description of the types of

4   answers involved with this measure?

5   A    I can give a vague description, I cannot – not with the

6   test item specifically.

7   Q    Why is that, by the way?

8   A    They're copyrighted and because of validity concerns, you

9   wouldn't want to make that public information.

10  Q    Okay, so could you vaguely describe what, I guess, the

11  four statements would be that, I guess, the individual could

12  choose, is that correct?

13  A    Correct.  So for example if the first question is I sleep

14  and the answers would be as well as ever or less than usual,

15  more than usual, or I can't sleep at all.  That's an example of

16  the four responses that you could choose.

17  Q    Okay, so they are phrased responses to describe the

18  severity, correct?

19  A    Correct.

20  Q    Okay.  And this Beck Depression Inventory, is – how do you

21  score this measure?  Is there a scale, could you describe that

22  to the jury?

23  A    Yeah, so if there are – there are some that have three

24  items and there are some that have four.  And it's graded on a

25  way of zero, one, two, or three.  And then you add those up

 1   from the front of the page, and then there's more questions on
 2   the back of the page.
 3        It's only about 21 questions.  And then you add that
 4   total.  And then there are ranges for which the score will
 5   fall.
 6   Q    Okay.  So can you just describe what the scale is and the
 7   ranges are for this particular measure.
 8   A    Yes, if you don't mind if I double check.
 9   Q    Of course.
10   A    I want to be accurate.
11   Q    And I can direct you specifically to page 5 of your
12   report.
13   A    Okay.  So for the depression inventory, total scale -
14   total score of zero to 13 is considered minimal.  So if they
15   score anywhere between zero to 13, it would be considered
16   minimal depressive symptoms.  Fourteen to 19 is mild, 20 to 28
17   is moderate, and 29 to 63 would be considered severe.
18   Q    Okay.  Now, in this instance with respect to Ms. O'Brien,
19   where did she score on the Beck Depression Inventory?
20   A    She fell in the mild level.
21   Q    Okay, so this would be a mild level for her depressive
22   symptoms, is that correct?
23   A    Correct.
24   Q    All right.  And now can we move on to the Beck - I don't
25   want to botch this, Beck Anxiety Inventory.

1   A    Yes.

2   Q    Can you describe to the jury what this measure entails and

3   what it tests.

4   A    It's a similar layout, but this focuses on anxiety

5   symptoms.  So it'll give an example, for example, feeling hot,

6   and then there's an option to say never, sometimes, frequently,

7   or always.

8   Q    Okay.  And is there a scale, I guess, associated with this

9   measure as well?

10  A    Yes.

11  Q    Okay, and can you describe that scale to the jury.

12  A    Yes.  So again, zero to 7 would be considered minimal in

13  terms of anxiety symptoms, 8 to 15 would be considered mild, 16

14  to 25 is considered moderate, and 29 to 63 is severe.

15  Q    Okay.  I see this as 26 to 63.  Is it 26 to 63 or 29 to

16  63?

17  A    Twenty-six to 63, I apologize.

18  Q    Okay, and where did Ms. O'Brien score on the Beck Anxiety

19  Inventory?

20  A    She received a 29, which is in the severe level.

21  Q    Okay.  The Beck inventories, the Beck Anxiety Inventory

22  and the Beck Depression – Beck Depression Inventory, are these

23  methods reliable measures?

24  A    Yes.

25  Q    And are these methods generally accepted in the

1  psychological fields?

2  A    Yes.

3  Q    Okay, and when you say that, what does that mean?

4  A    It means that they are – they're – they've been researched

5  continuously, dozens, probably hundreds of times in respect to

6  the validity and reliability that they convey and they've been

7  found to be robust or meaningful in each of those sections.

8  Q    Okay, and are these evidence-based measures?

9  A    Yes.

10 Q    What does that mean?  Can you describe that to the jury?

11 A    Evidence-based is the result of the – all this research.

12 So all of this research has concluded that they are evidence-

13 based tests and they test what they say they test.  And they

14 test them consistently.

15 Q    Okay.  Now, after administering the measures and taking

16 the interview of Ms. O'Brien, were you able to diagnose Ms.

17 O'Brien?

18 A    Yes.

19 Q    Okay, and what did you diagnose Ms. O'Brien with?

20 A    Generalized Anxiety Disorder.

21 Q    Okay, can you describe to the jury what Generalized

22 Anxiety Disorder is and what the essential features of – I'm

23 going to refer to it as GAD, G-A-D, the essential features of

24 GAD.

25 A    Generalized Anxiety Disorder falls under the anxiety

 1   disorders section of the DSM that I described before.  The

 2   hallmark symptom is excessive, uncontrollable worry that the

 3   person recognizes they're unable to control.  So that kind of

 4   adds to the cycle of ongoing anxiety.

 5        It creeps into different areas including sleep.  It might

 6   impact different things like appetite, relationships, self-

 7   esteem, concentration.  It can be fairly insidious in terms of

 8   how it presents.

 9   Q    Okay, and I guess you mentioned earlier that the DSM-5

10   presents almost like a checklist --

11   A    Yes.

12   Q    For certain diagnoses.  Do you have to check off each and

13   every single, I guess, symptom or presenting symptom to qualify

14   for that particular diagnosis?

15   A    No.

16   Q    So with respect to Generalized Anxiety Disorder, I guess

17   how many of the symptoms need to be present for you to be able

18   to diagnose an individual with GAD?

19   A    There are a couple hallmark symptoms that must be present,

20   namely the excessive worry that is uncontrollable, that's a

21   must.  And then there are symptoms – let's say that there are

22   six symptoms and she – you have to be able to identify three

23   that the person is experiencing.  Marnie, or Ms. O'Brien

24   experienced more than the minimum.

25   Q    My apologies.  Okay --

1  A    Then there are two other options that need to be

2  completed, meaning that it has to impact general functioning,

3  and it's not better accounted for by a medical diagnosis.

4  Q    Okay, and how can Generalized Anxiety Disorder impact an

5  individual's daily life?

6  A    It can be paralyzing in many ways.  There can be quite a

7  bit of excessive worry that there's no relief from.  And that

8  can translate into muscle tension, GI symptomology, sweating,

9  trembling, shaking that can make it physically impossible to

10  complete even the most basic of tasks.

11      And then psychologically it can really challenge your

12  self-esteem, your belief in your self-efficacy or your ability

13  to complete tasks.  It can be very daunting.

14  Q    Is it fair to say that you don't necessarily have to be

15  paralyzed within your daily life to be diagnosed with

16  Generalized Anxiety Disorder.  Is that fair to say?

17  A    Correct.

18  Q    Okay, so there's almost like a scale.

19  A    Sure.

20  Q    Mild to severe, is that fair to say?

21  A    Fair.

22  Q    Okay.  And give me one moment.  Are panic attacks, I

23  guess, a hallmark of Generalized Anxiety Disorder?

24  A    They can be.

25  Q    Okay.  Do you have to exhibit panic attacks to be

1  diagnosed with Generalized Anxiety Disorder?

2  A     No.

3  Q     Okay, your diagnosis of Ms. O'Brien with generalized

4  anxiety disorder, what was that diagnosis based on?

5  A     The DSM-5 as well as the measures in my interview of Ms.

6  O'Brien.

7  Q     Okay, and was this based on the symptoms that she

8  presented with?

9  A     Correct.

10  Q     Okay.  And is this based on the symptoms that you had

11  earlier testified about in terms of what she presented?

12  A     Correct.

13  Q     Okay.  Now, did you also reach an opinion as to Ms.

14  O'Brien's emotional distress?

15  A     Yes.

16  Q     Okay, and what was that opinion?

17  A     That her current symptoms are directly attributed to the

18  sexual harassment she suffered.

19  Q     Okay.  And you're referring to the sexual harassment that

20  she suffered.  So during her client interview, did she convey

21  to you a history of sexual harassment?

22  A     Yes.

23  Q     Okay.  And was this with respect to her employment at

24  Middle East Forum?

25  A     Yes.

1  Q    Okay.  Is it fair to say that she provided you quite a
2  lengthy summary as to what occurred during her appointment with
3  MEF, or Middle East Forum, correct?
4  A    Yes, yes.
5  Q    And this opinion with respect to her emotional distress,
6  what is that based on?
7  A    I'm sorry, can you re-ask the question?
8  Q    Sure, the opinion with – that you just gave with respect
9  to her emotional distress, what is that opinion based on?
10 A    The lingering symptomology that she shared about.  I mean
11 down to she received a call from a blocked number in order to
12 set up our session and she described having severe anxiety
13 related to just having an unknown number call her for fear that
14 it was linked to the harassment she suffered.  Down to her
15 inability to sleep, very terrifying nightmares.  And it was –
16 it all came back to the sexual harassment that she suffered.
17 Q    Okay.  And did you – was this opinion also based on her
18 responses to the measures, the Beck Anxiety Inventory and the
19 Beck Depression Inventory?
20 A    Yes.
21 Q    Okay.  And is this also, is your opinion also based on the
22 identification of symptoms?
23 A    Yes.
24 Q    That she presented with.  Did you consider any other
25 diagnostic possibilities when forming your opinion?

1    A     Yes.

2    Q     And what other diagnostic possibilities did you consider?

3    A     I considered a possible mood disorder, possibly a

4    depressive disorder.

5    Q     Okay, and why is that you did not diagnose her with a

6    depressive disorder?

7    A     She didn't meet the criteria --

8    Q     Okay.

9    A     For the presenting symptoms.

10   Q     But she did meet the criteria for the anxiety disorder

11   Generalized Anxiety Disorder, correct?

12   A     Correct.

13   Q     Dr. Kubala, since your evaluation of Ms. O'Brien and

14   drafting the report, have you had a chance to review Ms.

15   O'Brien's deposition transcript in this proceeding?

16   A     Yes.

17   Q     After reviewing that transcript, does that change or

18   impact your opinion that you just testified to?

19              MR. CAVALIER:  Objection.

20              THE COURT:  Grounds?

21              MR. CAVALIER:  We're outside the report.  This is

22   after she issued the report.

23              THE COURT:  I'm sorry, I couldn't hear you.

24              MR. CAVALIER:  I'm sorry.  We're outside her report.

25   She – she was deposed after this expert issued her report, it's

1   not in her report.  She can't base her opinions on subsequent

2   information that she may or may not have come in possession of.

3            THE COURT:  Can we approach just for a moment?

4            MR. CAVALIER:  It's beyond the scope of report.

5            THE COURT:  Don't we frequently (inaudible) witness

6   (inaudible) and then opine and that would necessarily have a

7   (inaudible) report, and that her (inaudible).

8            MR. CAVALIER:  That's her line of testimony, not her

9   deposition testimony.

10           THE COURT:  Gentleman, help me with the distinction.

11           MR. CAVALIER:  As long as I have some leeway with it,

12  Your Honor,

13           THE COURT:  Fair enough.  You understand that, Ms.

14  Keesler?

15           MS. KEESLER:  Yes.

16           THE COURT:  Okay, thank you.

17           MS. KEESLER: Thank you.

18           THE COURT:  Attorney Keesler, if you would restate

19  the question, please.

20           MS. KEESLER:  Sure.  Dr. Kubala, after - since your

21  evaluation of Ms. O'Brien and drafting the report, have you had

22  a chance to review Ms. O'Brien's deposition testimony in this

23  proceeding?

24           THE WITNESS:  Yes.

25  BY MS. KEESLER:

1  Q    And after reviewing that transcript, does that change or

2  impact the opinions that you just testified to?

3  A    No.

4  Q    Did you review portions of her transcript as it related to

5  her relationship with her paramour, Matthew Ebert?

6  A    Yes.

7  Q    All right.  And why is that after reviewing that, that

8  does not impact your decision?  Or your opinion, rather?

9  A    When I asked her about her current relationship with her

10 partner, she reported a generally healthy experience.

11 Q    Okay.  And her deposition transcript I believe referenced

12 that part of her relationship with Mr. Ebert was stressful.

13 After reading that, why did that not impact your decision, or

14 opinion, rather, in this — in your report?

15 A    Because the majority of relationships have moments that

16 are stressful and events.

17 Q    Okay.  So is your distinction between, I guess, daily

18 stress and other types of stress?

19 A    Yes.

20 Q    Okay.  Did you review portions of her transcript with

21 respect to Mr. Ebert in terms of how — I guess it was specific

22 incidents where she reports a sabotage upon — I'm sorry, by Mr.

23 Ebert.

24 A    Yes.

25 Q    Okay.  Why is it that that portion did not impact your

1  opinion in this case?

2  A     Because like I said, it was a situation that she

3  experienced and overcame.  She dealt with it in a healthy way.

4  Q     Okay.  And so did you also review portions of her

5  transcript about her son's existing mental health issues?

6  A     Yes.

7  Q     Okay, and did that impact or change your opinion?

8  A     No.

9  Q     And why is that?

10 A     When she spoke about her adult children, she spoke about

11 them with pride.

12 Q     Okay.  And I guess having a child with mental health

13 issues, I guess did that present as concerning to you as some

14 type of alternative source of stress?

15 A     No.

16 Q     Okay, and why is that?

17 A     Because as I said, she described her relationship and her

18 children overall as resilient and healthy and had good

19 relationships.

20 Q     Okay.  So during your interview of Ms. O'Brien, what

21 presented as like the source of stress in her life?

22 A     Her experience of sexual harassment and subsequent

23 symptomology related to that.

24 Q     Okay.  Dr. Kubala, did you have an opportunity – give me

25 one moment – to review the reports prepared by the Defendant's

1   expert, Dr. Lee Goldstein (phonetic)?

2   A    Yes.

3            MS. KEESLER: Okay.  Did you read his, quote unquote,

4   rebuttal report of your examination?

5            MR. CAVALIER:  I'm sorry, Your Honor, I object.

6            THE COURT:  Grounds?

7            MR. CAVALIER:  There's no rebuttal report issued by

8   this witness.

9            PARTICIPANT:  Can you speak a little more loudly,

10  please?

11           MS. KEELSER:  I'm sorry, can we approach?  I think

12  there's some confusion.

13           THE COURT:  Please.

14           MR. CAVALIER:  There's no rebuttal report.

15           MS. KEESLER:  Dr. Goldstein specifically provided us

16  -

17           (Simultaneous speaking.)

18           MR. CAVALIER:  Dr. Goldstein rebuttal Kubala, Kubala

19  never rebutted Goldstein.

20           MS. KEESLER:  Right, I asked her did you have an

21  opportunity to review his report, his rebuttal report to your

22  examination.

23           MR. CAVALIER:  I don't - without a report, without

24  any analysis, I don't think that's proper testimony.

25           MS. KEESLER:  I'm confused what he's saying.  Dr.

1   Goldstein prepared a rebuttal report to Dr. Kubala's –

2           (Simultaneous speaking.)

3           THE COURT:  Correct.

4           MS. KEESLER:  I'm asking her did she have chance to

5   review Dr. Goldstein's rebuttal report because I want to ask

6   questions about whether she agrees with his rebuttal.

7           THE COURT:  And Attorney Cavalier is saying she

8   didn't issue a rebuttal of her own to the Defendant's expert.

9           MS. KEESLER:  Well, that's not necessary.  She can

10  still review it and give her opinion as to whether she agreed

11  with his conclusions of her examination.

12          MR. CAVALIER:  So long as that's the limit, and

13  again, and as long as I have leeway with it –

14          MS. KEESLER: What do you mean by the limit?

15          MR. CAVALIER:  I'm not going to step on it.

16          MS. KEESLER:  Because I guess the question is she's

17  going to testify.  This is what (inaudible).  She's going to

18  testify she's doesn't agree with the report and why.  He's

19  obviously going to cross on issues raised in Dr. Goldstein's

20  report, so I'm just giving him an opportunity to explain it on

21  direct.

22          THE COURT:  Well, won't you be able to do that on

23  redirect?

24          MS. KEESLER:  I could.

25          THE COURT:  I think that might be the better order.

1  Okay?

2            MS. KEESLER:  Okay.

3            THE COURT:  Next question, please.

4            MS. KEESLER:  Sure.

5            THE COURT:  Attorney Kee.

6            MS. KEESLER:  Give me one moment.

7            Dr. Kubala, as a result of the psychological

8  evaluation of Ms. O'Brien, did you have any treatment

9  recommendations for Ms. O'Brien?

10           THE WITNESS:  Yes.

11  BY MS. KEESLER:

12  Q    And what were your treatment recommendations?

13  A    Specifically that she meet with and be followed by and

14  monitored by a psychiatric practitioner.  As well as beginning

15  therapy, individual therapy, and implementing group therapy if

16  the individual therapist deemed that appropriate.

17  Q    Okay, and why did you, I guess, provide these treatment

18  recommendations in light of her evaluation?

19  A    Based on the symptomology that she shared, she's

20  struggling.  And these are things that there are tools that can

21  be implemented to alleviate the symptoms that she's struggling

22  with.

23  Q    All right.  Dr. Kubala, the opinions you testify to today,

24  do you hold these opinions you testify to to a reasonable of

25  psychological certainty?

 1  A    I do.

 2          MS. KEESLER:  Thank you, Dr. Kubala, I'm going –

 3  Defense may have some questions for you.

 4          THE WITNESS:  Thank you.

 5          THE COURT:  Attorney Cavalier.

 6          MR. CAVALIER:  Thank you.

 7          THE COURT:  Thank you.

 8          MR. CAVALIER:  Good morning.

 9          THE WITNESS:  Good morning.

10                      CROSS-EXAMINATION

11  BY MR. CAVALIER:

12  Q    You were hired by the Plaintiff's lawyers in this case,

13  correct?

14  A    Correct.

15  Q    And I think I heard you testify on direct, but please

16  correct me if I'm wrong, that you've spent the majority of your

17  career counseling survivors of trauma, is that a fair

18  statement?

19  A    That's a fair statement.

20  Q    Are those patients of yours mostly women?

21  A    Mostly.

22  Q    You never treated a patient as a therapist, though,

23  correct?

24  A    Correct.

25  Q    You did recommend that she seek treatment, as you just

1  testified to, though, correct?

2  A     Correct.

3  Q     You thought it was important that she seek that treatment?

4  A     Correct.

5  Q     Do you know if she ever did?

6  A     I don't know.

7  Q     You advertise your services via a website and social media

8  mostly, correct?

9  A     Correct.

10 Q     Do you have an Instagram page?

11 A     I do.

12 Q     And that Instagram page, and again, correct me if I'm

13 wrong, is it fair to say that that page is tailored towards

14 supporting women who have suffered a trauma in their lives?

15 A     Suffering trauma survivors.

16 Q     Okay, okay.  And the same for your webpage, right?

17 A     Correct.

18 Q     You're generally speaking, an advocate for women who have

19 suffered a trauma in their lives, fair?

20 A     Generally speaking an advocate for survivors overall.

21 Q     Right.  You do understand, though, today you're here as an

22 expert witness, not an advocate, correct?

23 A     Correct.

24 Q     Okay.  How many times have you testified as an expert

25 witness?

 1  A    This is my first jury experience, but I've completed

 2  depositions I think four times maybe.

 3  Q    Okay.  And you said, I think I heard on direct, that about

 4  20 percent of your practice deals with legal cases, correct?

 5  A    Correct.

 6  Q    Okay.  Every time you've served as an expert, your

 7  client's been a plaintiff.

 8  A    Correct.

 9  Q    You're never testified on behalf of the defendant in any

10  case, correct?

11  A    Correct.

12  Q    You've never testified on behalf of a defendant in sexual

13  harassment case, correct?

14  A    Correct.

15  Q    And in any case where you've been hired as an expert, you

16  have never found that a plaintiff alleging sexual harassment

17  was not suffering trauma as a result of that sexual harassment,

18  correct?

19  A    That's correct.

20  Q    The documents you reviewed in this case, they're listed in

21  your report, correct?

22  A    Correct.

23  Q    And you still have your report in front of you?

24  A    I do.

25  Q    Okay.  You listed the Plaintiff's charge, that's the EEOC

1  charge, the notice of the right to sue the Plaintiff was

2  issued, the complaint, and the Defendant's answer, correct?

3  A     Correct.

4  Q     You did not review the Defendant's counterclaim against

5  the Plaintiff, right?

6  A     Correct.

7  Q     You did not review any transcripts of any phone calls made

8  by Matthew Ebert.

9  A     Correct.

10  Q     You didn't review any of Plaintiff's prior medical

11  records.

12  A     Correct.

13  Q     You didn't review anything other than the legal

14  documentation that was provided to you by the Plaintiff's

15  attorneys, correct?

16  A     Correct.

17  Q     You met with Ms. O'Brien one time?

18  A     Yes.

19  Q     Have you ever been in the same room with her before today?

20  A     No.

21  Q     You said your evaluation took about 90 minutes?

22  A     Correct.

23  Q     You did a structured interview?

24  A     Yes.

25  Q     And you administered two tests, correct?

 1   A    Correct.

 2   Q    Would you have preferred to do the examination in person?

 3   A    No.

 4   Q    You don't think it matters at all, to be able to --

 5   A    I didn't --

 6   Q    To be able to observe your subject in the same room?

 7   A    In the same room?  No.

 8   Q    The very first line of your report: Marnie O'Brien is a

 9   51-year-old female was the victim of chronic sexual harassment

10   by her previous manager, Greg Roman, while employed by the

11   Middle East Forum.  What's the basis for that statement?

12   A    What I was provided and reviewed as well as self-report.

13   Q    Okay.  So the legal documentation from the Plaintiff and

14   Plaintiff's own words.

15   A    Yes.

16   Q    Nothing beyond that.

17   A    Correct.

18   Q    Okay.  So other than that, you have no objective evidence

19   to base that conclusion on, correct?

20   A    Correct.

21   Q    And it's fair to say, is it not, that when the Plaintiff

22   came to you and told you her story, you took her at her word.

23   A    Correct.

24   Q    Okay.  You didn't conduct any independent evaluation to

25   determine whether that backstory was true.

1  A    Correct.

2  Q    And other than Plaintiff's own story and the legal

3  documentation that you got from Plaintiff's Counsel, again, we

4  know there's no other basis for your opinion that Plaintiff did

5  in fact suffer sexual harassment at the hands of Mr. Roman.

6  A    Correct.

7  Q    Don't you think as an expert witness in federal court

8  before you make a statement like that, you have an obligation

9  to go a little deeper than just taking Plaintiff at her word?

10          MS. KEESLER:  Objection.

11          THE COURT:  Overruled.

12          THE WITNESS:  No.

13          MR. CAVALIER:  No.  Just, you can accuse someone of

14  sexual harassment in a federal court document based on nothing

15  more than legal documentation from Plaintiff's counsel and her

16  own – her own story.

17          THE WITNESS:  After meeting with –

18          MS. KEESLER:  Objection.  She's here to testify with

19  respect to the (inaudible), she's not here to make a factual

20  determination.  That's a decision for the jury.

21          MR. CAVALIER:  I agree with you.  But the first line

22  of her report accuses Mr. Roman of being the cause of that – of

23  that emotional distress, and I'm entitled to explore that.

24          THE COURT:  And I would agree with that.

25          MR. CAVALIER:  You say the purpose of this evaluation

1   is to determine within a reasonable degree of psychological

2   certainty how the aftermath of being the victim of sexual

3   harassment and gender discrimination will continue to impact

4   Ms. O'Brien and what can be implemented to reduce negative

5   impact.

6            Did I read that accurately from your report?

7            THE WITNESS:  Yes.

8   BY MR. CAVALIER:

9   Q    So again, you based that statement purely on the

10  information from the Plaintiff's lawyers and Plaintiff's own

11  story.

12  A    Correct.

13  Q    No independent evaluation.

14  A    Correct.

15  Q    And sitting here today because of that, you can offer no

16  opinion that's helpful to this jury as to whether Ms. O'Brien

17  was actually sexually harassed, correct?

18  A    Can you rephrase that?

19  Q    Sure.  Because you're taking the Plaintiff and her counsel

20  at her word as to the information you've relied on in

21  diagnosing the Plaintiff, you can't offer an opinion helpful to

22  the jury about the cause of the emotional trauma, correct?

23  A    Incorrect.

24  Q    Why?

25  A    Based on my interview of Ms. O'Brien as well as the

1  testing completed, I can certainly have an opinion about what

2  she shared with me and the following symptomology.

3  Q    Even is she didn't tell you about Matthew Ebert in that

4  interview?

5  A    Yes.

6  Q    That doesn't concern you as to whether she's being fully

7  truthful and fully disclosing all of the relevant issues in her

8  backstory?

9  A    No.

10 Q    Okay.  Did you do any tests to evaluate whether she's

11 telling the truth?

12 A    Are you talking a malingering inventory?

13 Q    Yes.

14 A    I did not.

15 Q    Did you consider any other alternative causes beyond –

16 besides sexual harassment as the cause of Plaintiff's emotional

17 distress?

18 A    We discussed a variety of topics that every human

19 experiences relationship-wise, history of physical trauma,

20 anything like that, and nothing presented itself.

21 Q    But you didn't review her medical records.

22 A    I didn't have any medical records, correct.

23 Q    She didn't tell you about Matthew Ebert.

24 A    That – I know that that was her partner's name, that was

25 it.

1   Q    Right, okay.  You say specifically she has a heightened

2   startle response as in is generally hypervigilant, paranoid of

3   being monitored or her privacy being threatened by Mr. Roman.

4   Has a significant distrust of men, excessive worry that is

5   uncontrollable, muscle tension, and difficultly concentrating

6   and focusing.

7   A    Sorry, what page are you on, sir, three?  Four, got it.

8   Correct.

9   Q    And as – as you testified to on direct, a recent example

10  includes when this evaluator contacted Ms. O'Brien from a

11  private phone number, Ms. O'Brien experienced increased anxiety

12  at the thought a call might be coming from Mr. Roman.

13  A    Correct.

14  Q    As you testified to on direct.

15  A    Correct.

16  Q    Your basis for that is, again, entirely what the Plaintiff

17  herself told you, correct?

18  A    Correct.

19  Q    The tests administered, as we confirmed, were all done

20  over Zoom, right?

21  A    Correct.

22  Q    The Beck Anxiety Disorder Test is 21 questions.

23  A    Correct.

24  Q    And as you testified to on direct, it's a self-report

25  tool, correct?

1   A   Correct.

2   Q   Plaintiff supplies her own answers to the questions.

3   A   Correct.

4   Q   The test only covers the last week.

5   A   Correct.

6   Q   Right, so if the Plaintiff was emotionally distressed six

7   months earlier, this test would have ne relevance to

8   discovering that, correct?

9   A   Correct.

10  Q   Wouldn't the Plaintiff in a lawsuit seeking emotional

11  distress damages have an incentive to exaggerate her answers on

12  such a test?

13  A   No.

14  Q   Why not?

15  A   Because there are ways to determine if she's malingering.

16  That would be considering malingering, as we discussed earlier.

17  Q   Right, and including – those ways include tests, right,

18  objective tests?

19  A   Your – sorry?

20  Q   The ways to determine that a plaintiff might be

21  malingering include objective tests.

22  A   Correct.

23  Q   None of which you ran.

24  A   Correct.  She didn't evidence any symptoms of malingering.

25  Q   You don't make any evaluation other than your own judgment

1   as to whether Plaintiff is malingering as to the accuracy of

2   her reported answers on the Beck test, correct?

3   A    Correct.

4   Q    And that test is used to determine whether the subject is

5   currently suffering from anxiety, correct?

6   A    Correct.

7   Q    Not the cause of that anxiety.

8   A    Correct.

9   Q    Right, it has nothing to do with what's causing the

10  anxiety.

11  A    Correct.

12  Q    Okay.  And as far as the Beck Depression Inventory test,

13  that is another 21-qusetion test, right?

14  A    Correct.

15  Q    And again, that's a self-report tool.

16  A    Correct.

17  Q    What does that mean?

18  A    It means that the person answers the questions

19  independently.

20  Q    She supplies her own answers.

21  A    Right.

22  Q    Right.  And again, this test only covers a very short

23  period of time.

24  A    Correct.

25  Q    How long for this test?

 1   A     Two weeks.

 2   Q     Two weeks.  So again, it has no relevance whatsoever to

 3   determine whether a plaintiff might have been depressed six

 4   months ago or a year ago or three months ago.  It's only for

 5   two weeks.

 6   A     Correct.

 7   Q     Okay.  And I'll ask you the same question.  Don't you

 8   think a plaintiff in an emotion distress lawsuit has an

 9   incentive to exaggerate her answers when she's choosing which

10   multiple-choice answer to the test she's going to give?

11   A     No.

12   Q     You take these reported answers at face value, right?

13   A     What do you mean by face value?

14   Q     It's a self-report tool.

15   A     Right.

16   Q     So the Plaintiff answers the questions, you take those

17   answers and you fold them into your analysis, correct?

18   A     Correct.

19   Q     And again, this test is used to determine whether the

20   subject might be depressed.

21   A     Right.

22   Q     It has nothing to do with the cause of that depression,

23   correct?

24   A     Correct.

25   Q     They're subjective tests, right?

1    A    Correct.

2    Q    Not objective tests.

3    A    Correct.

4    Q    But as we talked about before, objective tests for this

5    kind of thing do exist, do they not?

6    A    Not specifically, no.

7    Q    But they do exist to determine whether a plaintiff is

8    being completely open and honest with you in her answers.

9    A    Yes.

10   Q    And one of those is the Millon Clinical Multiaxial

11   Inventory 4 test?

12   A    The Millon, yes.

13   Q    Right.  The MCMI test.

14   A    Correct.

15   Q    That contains a validity assessment.

16   A    Correct.

17   Q    Right.  And that validity – that validity assessment

18   generally measures whether a person was open and honest during

19   their assessment, correct?

20   A    Correct.

21   Q    You didn't perform that test on Ms. O'Brien.

22   A    Right.

23   Q    Are you familiar with the Minnesota Multiphasic

24   Personality Inventory-2 Test?

25   A    I am.

1  Q    We'll call that the MMPI test, fair?

2  A    Yes.

3  Q    And is it fair to say that that test, among other things,

4  contains an assessment that can aid someone in your position in

5  determining whether a patient is faking or telling the truth?

6  A    Yes.

7  Q    And again, you didn't administer that test.

8  A    No.

9  Q    If a patient only discloses one source of trauma to you,

10 then it's reasonable to assume that whatever symptoms you find

11 are attributable to that trauma, correct?

12 A    Correct.

13 Q    So you, for example, you testified about some dog bite

14 cases, some personal injury cases.  If somebody comes to see

15 you with a dog bite, whatever emotional distress they're

16 suffering can be reasonably attributed to the dog bite, right?

17 A    Correct.

18 Q    And same with an automobile accident victim.  They come to

19 see you for those purposes, they say they had a really

20 traumatic car accident.  You say okay, you measure their

21 emotional distress, and it's easy to attribute it to the sole

22 source of trauma, correct?

23 A    Oftentimes, yes.

24 Q    If a patient doesn't share a complete and honest history

25 with you, that would impact your conclusions, right?

1  A    Correct.

2  Q    So if a patient hid from you potential sources of other

3  trauma, that would also impact your conclusions, correct?

4  A    Correct.

5  Q    And then any conclusions that you drew based on that

6  patient's self-report that hid other sources of trauma wouldn't

7  be reliable, right?

8  A    It would depend on the severity of the trauma.

9  Q    That's fair.  So I'll rephrase the question.  If a

10 plaintiff hid from you sources of other potentially severe

11 trauma, any conclusions that you reached based on the

12 plaintiff's self-report wouldn't be reliable, right?

13 A    They would have to be further explored.

14 Q    Okay.  Let me ask it a different way.  The reliability of

15 your conclusions concerning the cause of a plaintiff's trauma

16 depends on the plaintiff providing you with full disclosure on

17 all potentially relevant sources of trauma, correct?

18 A    Correct.

19 Q    In your report, I notice that you did mention that the

20 Plaintiff used marijuana, right.  Did you consider whether her

21 daily marijuana use might be a cause of exacerbation for some

22 of these psychological symptoms you say she exhibits?

23 A    No, quite the opposite.

24 Q    Okay.  You relied on the DSM-5 in reaching your

25 conclusions?

1  A    Correct.

2  Q    Did you evaluate Ms. O'Brien for whether she meets the

3  DSM-5's definition of cannabis use disorder?

4  A    I did not.

5  Q    Are you familiar with cannabis use disorder?

6  A    Somewhat.

7  Q    Some of the criteria provided by the DSM-5 for cannabis

8  use disorder include using cannabis for a minimum of year, used

9  in larger amounts over a longer time than what was intended.

10  Using it even in light of the fact that it has negative

11  consequences, and building a tolerance to cannabis.

12       Do you think if you could do it over again today, you

13  might analyze Ms. O'Brien for whether she meets that criteria?

14  A    I might analyze her, yes.

15  Q    Over-use of marijuana can cause in some people negative

16  psychological consequences, right?

17  A    I would assume so.  I'm not familiar with marijuana usage.

18  Q    Okay.  If you're not familiar with marijuana usage,

19  doesn't it make it difficult for you to eliminate it as a

20  possible cause of her emotional distress?

21  A    No.

22  Q    So square that for me, Doctor.

23  A    If I'm not familiar with the diagnosis in the DSM-5

24  regarding cannabis abuse?

25  Q    No, general marijuana use and its impact on psychological

1   symptoms.  You certainly have experience with people who have

2   reported to you that they use marijuana, correct?

3   A    Sure, yes.

4   Q    And it's generally accepted, is it not --

5   A    For the most part.

6   Q    In the medical field --

7   A    Yes.

8   Q    That in some patients or some people, marijuana can have

9   negative psychological consequences, correct?

10  A    I'm not familiar with that.  I've only seen it as a

11  resource and a calming effect.

12  Q    Okay.  Even every day?

13  A    I couldn't speak to the duration and intensity of usage.

14  Q    Even though you ruled it out as a potential cause in your

15  report.

16  A    I did not rule it out, I didn't explore it.

17  Q    Okay.  So you talked earlier about this, I had to write it

18  down, bio-psycho-social.

19  A    Yes.

20  Q    Remind us what that is.

21  A    That's a type of evaluation.  So it's a way to organize a

22  structured interview that focuses on the biological, social,

23  and psychological symptoms that present a constellation of

24  symptoms for any human being.

25  Q    You didn't do that here, right.

1  A    Yes, I did.

2  Q    Okay.  I thought you testified that you did a structured

3  interview.

4  A    Correct, inherent --

5  Q    And as part of that structured interview, you testified on

6  direct that you explore a history of trauma.

7  A    Correct.

8  Q    And relationships.

9  A    Correct.

10  Q    And again, during that structured interview, the patient

11  didn't mention anything about her relationship with Matthew

12  Ebert, correct.

13  A    Incorrect.

14  Q    Other than that she was in a relationship with a person

15  named Matthew Ebert.

16  A    And it was a healthy relationship, correct.

17  Q    She told you it was a healthy relationship.

18  A    Correct.

19  Q    Okay.  Assuming that relationship was not healthy,

20  hypothetically speaking, would that change the conclusions you

21  render in your report?

22  A    There would have to be much more information gathered

23  regarding what made it unhealthy.

24  Q    Assume it was abusive.

25  A    That would certainly take precedence in how I questioned

1  her.

2  Q    Right.  And it would change the reliability of your report

3  if that were in fact the case, correct?

4  A    Not the reliability, it would impact how I defined her

5  experience of trauma and how she overcame it.

6  Q    And the potential causes of that trauma.

7  A    Potential factors involved in trauma, yes.

8  Q    Did she tell you at the time of the interview that she'd

9  been in a relationship with Mr. Ebert for several years?

10 A    Yes.

11 Q    Did she tell you that Mr. Ebert had some money problems,

12 including bankruptcy?

13 A    I don't recall that, no.

14 Q    Did she tell you that when she went for a job interview at

15 the Kimball (phonetic) Center, Mr. Ebert made an anonymous

16 phone call to the Kimball Center and told them that she was a

17 drug addict that sued her former employers and sabotaged her

18 job prospects?

19 A    She did not tell me that.

20 Q    Is that a sign of a healthy relationship?

21 A    It would seem not.

22       MS. KEESLER:  Objection, I would say calls for

23 speculation.

24       THE COURT:  I'll allow it.

25       MR. CAVALIER:  Did she tell you during the structured

1  interview that Mr. Ebert made multiple anonymous phone calls to

2  Mr. Roman, the very man she alleges harassed her, and claimed

3  that she and other women were drug users who were teeing up a

4  lawsuit against the Forum?

5      THE WITNESS:  She did not tell me that.

6  BY MR. CAVALIER:

7  Q    Would that have a relevant impact on your - the

8  reliability of your report had you known it at the time?

9  A    No.

10  Q    Is that the sign of a healthy relationship?

11  A    I don't think so.

12  Q    Did she tell you that she falsely accused Mr. Roman of

13  making the phone call to the Kimball Center and had a lawsuit

14  filed against her as a result of it?

15  A    No.

16  Q    Does having pending litigation against you potentially

17  weigh in someone's emotional distress?

18  A    Yes.

19  Q    Did she tell you how she felt when she ultimately found

20  out that her boyfriend, Mr. Ebert, made the phone call to the

21  Kimball Center and the phone calls to Mr. Roman?

22  A    She did not tell me directly.

23  Q    We heard testimony on Friday than when she found out about

24  those actions, she considered breaking up with him, sat in her

25  car outside her house in tears over it, but couldn't break up

1  with her because we were just entering into the COVID pandemic,

2  so they were stuck in the same house after Mr. Ebert's

3  betrayal.

4      Sitting here on the stand today as an expert witness under

5  oath, do you believe that that is relevant information that she

6  should have provided to you?

7  A    That is relevant.

8  Q    You counsel women who are in abusive relationships, do you

9  not?

10  A    I do.

11  Q    The actions that I just described to you that are in

12  evidence in this case from Plaintiff herself we know Mr. Ebert

13  took, do those indicate to you that that might be an abusive

14  relationship?

15  A    Might be, yes.

16  Q    And again, hypothetically speaking, if Ms. – if Ms.

17  O'Brien was in an abusive relationship, that could provide an

18  alternative explanation for her trauma, correct?

19  A    An additional one, yes.

20  Q    An additional one, assuming, as you did, that she had been

21  sexually harassed.

22  A    Correct.

23  Q    You conclude your report with this statement: It is within

24  a reasonable degree of psychological certainty that these

25  symptoms and diagnoses are directly attributed to harassment

1    and discrimination that Ms. O'Brien suffered as a subordinate
2    of Mr. Roman while employed at the Middle East Forum.  That's
3    not a true statement, is it?
4    A    Are you asking me a question?
5    Q    Yes.  That's not a true statement, is it?
6    A    Yes, it is a true statement.
7    Q    How can it be true after everything we just talked about?
8    A    Because based on her explanation of her personality prior
9    to this event, as well as her current symptomology, there is a
10   marked difference, and those symptoms are directly attributed
11   to her experience of sexual harassment.
12   Q    Despite her not telling you anything about Matthew Ebert,
13   despite you agreeing with me that the signs that I described to
14   you indicated an abusive relationship, and despite you agreeing
15   with me that they – those – that that abusive relationship
16   could provide an alternative, in your words, or additional
17   explanation for her trauma, how can you then say that, sitting
18   here today under oath, that her symptoms are directly
19   attributable to something that happened to her at the Middle
20   East Forum?
21   A    This is an example of what we talked about regarding
22   emotional distress.  Unfortunately, as you mentioned, the women
23   that I counsel who are in abusive relationships often go
24   through stressors that are unavoidable.
25        An example would be, as you mentioned, she had no other

1  option but to stay in this house with this potential breakup

2  happening.  That's an example of another human experience that

3  she was experiencing as related to the sexual harassment

4  symptomology that she was presenting.  She was stuck in a

5  position, but those symptoms that she's presenting are directly

6  attributed to the sexual harassment.

7  Q    Because you say so, right?

8  A    Because my expertise points to that way, yes.

9  Q    I just want to be very clear on this before I let you,

10 because frankly, I respect what you do.

11 A    Thank you.

12        MR. CAVALIER:  In your treatment of women.  But I'm

13 going to ask you again, sitting here under oath as an expert,

14 sitting here today, knowing what you know now, having read the

15 deposition transcript that you didn't read before, having heard

16 what I told about Matthew Ebert, having looked at subsequent

17 documents concerning dramatic events in the Plaintiff's life,

18 you cannot say, sitting here today under oath, can you, that it

19 is within a reasonable degree of psychological certainty that

20 these symptoms and diagnoses are directly attributed to

21 harassment and discrimination Ms. O'Brien suffered as a

22 subordinate of Mr. Roman while employed at the Middle East

23 Forum.

24        MS. KEESLER:  Objection, asked and answered.

25        THE COURT:  Sustained.

1          MR. CAVALIER:  You couldn't consider the alternative

2     sources of Plaintiff's trauma if she never told you about them,

3     right?

4          MS. KEESLER:  Objection, asked and answered.

5          THE COURT:  Sustained.

6          MR. CAVALIER:  Is it fair to say Plaintiff wasn't

7     fully honest with you in describing her history?

8          THE WITNESS:  Yes.

9          MR. CAVALIER:  Nothing further.

10          THE COURT:  Ms. Keesler, redirect?

11                    REDIRECT EXAMINATION

12          MS. KEESLER:  Yes, thank you.

13          Dr. Kubala, Defense just asked you whether – whether

14     the facts – the fact remains is you don't know for sure whether

15     Ms. O'Brien was involved in an abusive relationship, correct?

16          THE WITNESS:  Correct.

17     BY MS. KEESLER:

18     Q    Okay, and during the structured interview, she did not

19     describe her relationship as abusive, correct?

20     A    Correct.

21     Q    Okay.  So really, it – you – I know that you're an expert

22     working with sexual trauma victims.  You would need more

23     information essentially to make a determination such as that,

24     correct?

25     A    Correct.

1   Q     Now, being in an abusive relationship could be another
2   source of stress, is that correct?
3   A     Correct.
4   Q     Okay.  But that doesn't necessarily mean that the
5   emotional distress is wholly attributed to the abusive
6   relationship if there's another concerning or presenting
7   source, correct?
8   A     Correct.
9   Q     And in fact, if she were in an abusive relationship and
10  she also reported to emotional distress related to harassment
11  and discrimination at work, that would actually be emotional
12  distress that was exacerbated by her work environment, correct?
13  A     Correct.
14  Q     In other words, it would have worsened whatever emotional
15  distress she may have been suffering from an abusive
16  relationship, correct?
17  A     Correct.
18  Q     If it were determined that these actions by Mr. Ebert that
19  Defense informed you about, if those were determined to have
20  occurred after she left her employment with MEF, that would be
21  subsequent emotional distress, correct?
22  A     Correct.
23  Q     And so the emotional distress that she suffered as a
24  result of harassment and discrimination would have predated
25  that, correct?

1   A     Correct.

2   Q     I'd also like to ask about the measures.  Counsel asked

3   you about two other measures.  I'm going to use the acronyms,

4   the MCMI, sorry, and the MMPI.  Those two measures are also

5   self-reporting measures, correct?

6   A     Correct.

7   Q     In other words, the individual has to answer questions to

8   those tests, correct?

9   A     Correct.

10  Q     So it's based on what she provides, correct?

11  A     Correct.

12  Q     And in fact those tests only include two responses, true

13  or false, correct?

14  A     Correct.

15  Q     And why is it that you felt it was unnecessary to

16  administer the MMPI or the MCMI with respect to Ms. O'Brien's

17  evaluation?

18  A     They've very long.  One of them is a 567-item measure, the

19  other one I believe is around 195 questions.  It just seems a

20  little bit extraneous.  A good example is if you go into the

21  hospital with an injured ankle, it's sort of like doing

22  exploratory surgery before stepping back and doing an exam and

23  then possibly an x-ray and possibly an MRI.

24          This going to those very long, daunting measures

25  seems unnecessary.

1  Q    And earlier you had mentioned on direct that during her

2  interview she did present with indicators of a personality

3  disorder, correct?

4  A    Correct.

5  Q    Okay, so would you administer a personality inventory if

6  you did not find there were concerns for a personality

7  disorder?

8  A    No, I would not.

9  Q    So in other words if you find that to be extraneous –

10 A    Correct.

11 Q    And would you find that – that would – that – that

12 applying an unnecessary measure would unnecessarily fatigue the

13 individual whom you are evaluating?

14 A    Again, as we discussed earlier, there are several reasons

15 that you would not, mainly fatigue, literacy concerns.  And

16 again just, that's over 700 questions to ask somebody in a

17 sitting.

18 Q    Okay.  And something I wanted to clarify because Counsel

19 brought it up with respect to the MCMI and MP – MMPI in that

20 they contain validity measures.  You didn't – did you have any

21 concerns of validity when you interview Ms. O'Brien?

22 A    I did not.

23 Q    Okay.  And I just want to really make this distinction,

24 when you described what malingering was, that is with respect

25 to whether the individual is exaggerating their symptoms,

1  correct?

2  A    Correct.

3  Q    Okay.  You're not here as an expert to make any factual

4  determinations as to Ms. O'Brien's claims of harassment and

5  discrimination, correct?

6  A    Correct.

7  Q    Okay, so malingering doesn't refer to, oh, Ms. O'Brien

8  lied about harassment and discrimination, correct?

9  A    Correct.

10 Q    It's rather a focus on whether there's a presentation of

11 exaggeration of symptoms.

12 A    Correct.

13 Q    And it's - it's true to say that you had no concerns of

14 malingering in this instance, correct?

15 A    No, correct.

16 Q    Now, Counsel brought up an issue regarding Ms. O'Brien's

17 marijuana use and whether that could exacerbate symptoms, and

18 you mentioned quite the opposite.  Could you elaborate on what

19 I guess you were trying to say?

20 A    My understanding of Ms. O'Brien's marijuana usage was to

21 help her with her sleep disturbance that she began suffering

22 following the sexual harassment.  So she would use marijuana at

23 night to help her fall asleep and stay asleep.

24 Q    Okay, how is that clinically relevant in light of what she

25 reported to you and your diagnosis of Generalized Anxiety

1  Disorder?

2  A     It doesn't – it's not relevant.

3  Q     I mean, in terms of – let me step back for a second.  Are

4  you aware that some individuals may use marijuana to self-

5  medicate?

6  A     Yes.

7  Q     Okay, and was there an indicator that she was using it

8  self-medicate symptoms related to her Generalized Anxiety

9  Disorder?

10 A     Those symptoms were what was preventing her from falling

11 asleep and staying asleep, so they were connected.

12 Q     Okay, because she reported sleep disturbance to you,

13 correct?

14 A     Correct, and severe nightmares.

15 Q     And why is it that you did not – hold on a minute.  Did

16 she present with any concerns of overuse of marijuana during

17 her interview?

18 A     No.

19 Q     Counsel brought up whether you considered cannabis use

20 disorder, is that correct?

21 A     Correct.

22 Q     Okay, are you familiar with the diagnostic criteria of

23 cannabis use disorder?

24 A     Mildly.

25 Q     Okay.  That disorder is contained in the DSM-5, correct?

1  A    Correct.

2  Q    If I were to show you, I guess, the diagnostic criteria of

3  that disorder, would you be able to make a determination today

4  based on what was presented to you during the evaluation as to

5  whether that would have been the appropriate diagnosis in this

6  case?

7  A    Yes.

8           MS. KEESLER:  May I approach the witness?

9           THE COURT:  You may approach.

10          THE WITNESS:  Thank you.

11          MS. KEESLER:  Dr. Kubala, just take your time to

12  review that and let me know when you're done.

13          Oh, and just for the record, Dr. Kubala, you are

14  looking at the DSM-5 manual, correct?

15          THE WITNESS:  Correct.

16  BY MS. KEESLER:

17  Q    Thank you.

18  A    Okay, finished.

19  Q    After reviewing the diagnostic criteria for cannabis use

20  disorder, would you have diagnosed Ms. O'Brien with that

21  disorder over Generalized Anxiety Disorder based on the

22  symptoms that she presented to you and after reviewing the -

23  her responses to the measures?

24  A    No.

25  Q    And why is that?

1   A    Even in the first couple examples, it talks about a desire
2   to want to cut down the usage of cannabis and not being able
3   to, therefore indicating some sort of an addiction or something
4   like that.  Ms. O'Brien did not communicate any concern with
5   her usage or desire to reduce the amount that she was using.
6   Q    Okay.  If hypothetically an individual were to report to
7   you that they take marijuana mainly for sleep and take three or
8   four hits each night, mainly for sleep, would that indicate an
9   abuse of marijuana?
10  A    No.
11  Q    Okay.  And marijuana is – or sorry.  Use of recreational
12  marijuana is legal in New Jersey, correct?
13  A    Correct.
14  Q    Okay.  Now, I understand that Counsel asked you whether it
15  would have been relevant to have this additional information
16  that apparently may not have been disclosed during the history.
17   However, despite that information not having been disclosed,
18  you still hold your opinion today that the emotional distress
19  that Ms. O'Brien suffered was a result of the harassment and
20  discrimination during her employment at Middle East Forum.
21  A    Yes, I do.
22  Q    And why is that?
23  A    Actually, in light of this information it just highlights
24  her strength and how she was able to overcome other stressors
25  that she experienced as a human being with relationship issues,

1   what sounds like housing issues.  That to me is more of a
2   strength than it is a deterrent in terms of her diagnostic
3   symptoms.
4   Q    Is it fair to say that her symptoms or the lingering
5   symptoms she still experiences is a result of the harassment
6   and discrimination, whereas she has overcome the other stresses
7   in her life?
8   A    Correct.
9            MS. KEESLER:  Okay.  Thank you, I don't have anything
10  further, Dr. Kubala.
11           THE COURT:  Attorney Cavalier?
12           MR. CAVALIER:  Just very briefly.
13           THE COURT:  Yes.
14                       RECROSS EXAMINATION
15  BY MR. CAVALIER:
16  Q    You talk about how you were holding on to your conclusion
17  that the sexual harassment that you found is the cause of the
18  trauma is because that predated the information you now know
19  about her relationship with Matthew Ebert and these other
20  factors she didn't disclose to you, correct?
21  A    Correct.
22  Q    So you talked about that as a particular exacerbation
23  source of the trauma, correct?
24  A    Correct.
25  Q    The tests you ran only looked back one and two weeks,

 1   respectively, right?

 2   A    Correct.

 3   Q    So there's really no way for you to sit here and opine

 4   with any kind of expertise about what caused what and when,

 5   right?

 6   A    Well, you use the measures as a way to complete the

 7   questionnaires that you ask the client.  So you go back through

 8   the measures with the client and look at how they answered, and

 9   then you pay attention to the frequency, intensity, and

10   duration of those symptoms.

11   Q    You testified that you didn't run any of the tests I asked

12   you about because they were really long and they, quote, Seemed

13   unnecessary.

14   A    That's one reason, correct.

15   Q    Don't you think you have an obligation to run whatever

16   relevant tests might be out there before you accuse someone of

17   sexual harassment?

18   A    Yes, I do.

19   Q    Okay.

20   A    That's what was done.

21            (Simultaneous speaking.)

22            MS. KEESLER: Just one follow-up.

23            THE COURT:  I'll allow it.

24                         REDIRECT EXAMINATION

25            MS. KEESLER:  Thank you.  Dr. Kubala, there is no

1   requirement that every expert administer the exact same tests,

2   correct?

3          THE WITNESS:  Correct.

4   BY MS. KEESLER:

5   Q    In fact, it's based on the discretion of the expert or the

6   licensed psychologist to determine which measures are

7   appropriate based on the presenting symptoms and the

8   information that is provided, correct?

9   A    Correct.

10         MS. KEESLER:  I have nothing further.

11         THE COURT:  All right, thank you, Doctor, we

12  appreciate it, you may step down.

13         THE WITNESS:  Thank you very much.

14         THE COURT:  Ladies and gentlemen, it's a little late

15  for our morning break, but we'll take it now, okay.

16         (Whereupon, the above-entitled matter went off the

17  record at 11:16 a.m. and resumed at 11:38 a.m.)

18         THE COURT:  A couple of things if we can before we

19  bring the jury back in.  I wanted to talk a bit about what Ms.

20  Dibianca handed up to us this morning.  I have a couple of

21  thoughts on this, but if I may ask, how are you intending to

22  use this?  There's a resume in here.  There's, it seems like,

23  some fill in the caption type of form, but there's also

24  impressions of HR people from --

25         MS. DIBIANCA:  Oh, right, I wouldn't be using that.

1          THE COURT:  Okay.

2          MS. DIBIANCA:  Basically the resume and the cover

3  letter.

4          THE COURT:  And what would be the objection to that?

5          MS. SHIKUNOV:  Well, it was disclosed to me as a

6  packet and that the entirety of the packet was being entered

7  into evidence and then published to the jury, and I don't

8  really think that it's fair to have the impressions of a

9  recruiter, or a log such that, again, when I -- I haven't seen

10 this before the middle of trial and the jury is already

11 empaneled, so --

12         THE COURT:  Well, certainly that part --

13         MS. SHIKUNOV:  Yes.

14         THE COURT:  -- bothered me too.  There's no doubt

15 about it, but Attorney Dibianca's representation that that is

16 not something we would put before the jury --

17         MS. SHIKUNOV:  I mean, obviously there's a cover

18 letter and resume.  She can authenticate that.  I don't have

19 bones with that.

20         THE COURT:  Okay, I guess one question would be if

21 it's going to be an exhibit, we'll have to find a way that it,

22 you know, that -- I think that to the extent you didn't already

23 have the resume, it was probably something you, you know, that

24 was --

25         I'm guessing, correct me if I'm wrong, but was

1   incorporated in the document production demands made back when,

2   and just getting it today doesn't seem to be the -- you know,

3   that's not the fault of anybody here in this courtroom today,

4   but if we do have to present it as an exhibit, we do need to

5   make sure it doesn't bring in things that are hearsay of HR

6   reps or things that we can't authenticate.

7           MS. DIBIANCA:  So, we can fix the problem.  I

8   produced this as I received it because I didn't want Ms.

9   Shikunov to feel that I was holding back, so I just turned over

10  everything I got, but what we can do is just admit -- take the

11  pieces out that are objectionable and just move the resume and

12  the cover letter.

13          THE COURT:  And that just look like the first page,

14  Attorney Dibianca, front and back?

15          MS. DIBIANCA:  Yes, so there's a page one.  Actually,

16  Rich, if you want to pull it up, we can just look at it on the

17  screen, but the first page and the second page, which is the

18  back of the first.

19          THE COURT:  So, the front and back?

20          MS. DIBIANCA:  Right, and then skip ahead to, through

21  the sort of forms, and then there's, I thought her resume was

22  in here as well.

23          PARTICIPANT:  I think it's actually at the bottom of

24  this.

25          MS. DIBIANCA:  No, there was a separate one with a

1   header on it, this one.  Yes, thanks, Rich.  Resume for -- it

2   says candidate profile and resume for Marnie O'Brien just like

3   a sort of shaded bar at the top.  It's at the very end.

4           THE COURT:  Oh, I do see that, okay.

5           MS. DIBIANCA:  Yeah, towards the very end.

6           THE COURT:  And that would just be one-sided,

7   correct, one page?

8           MS. DIBIANCA:  That's just one page --

9           THE COURT:  Okay.

10          MS. DIBIANCA:  -- correct, Your Honor, and then the

11  next page looks like another cover letter, but without the date

12  on it.

13          THE COURT:  It almost seems like the resume --

14          MS. DIBIANCA:  And let me just compare it.  It may be

15  exactly --

16          THE COURT:  Someone cut and paste --

17          MS. DIBIANCA:  It's actually -- I can just use the

18  first page.  So, all I need, Your Honor, is the first page,

19  front and back, and then the resume that we just looked at with

20  the shaded bar at the top.

21          THE COURT:  Okay.

22          MS. DIBIANCA:  So, I can have Mr. Hobbs take out the

23  other pages from the one that we'll publish to the jury.

24          THE COURT:  If you would, that would be --

25          MS. DIBIANCA:  Yeah.

1              THE COURT:  -- terrific, and then we'll sort out

2    before exhibits go to the jury how we get a clean copy of this.

3              MS. DIBIANCA:  Okay, okay.

4              THE COURT:  Okay?

5              MR. HOBBS:  And just to be clear, Molly, this is the

6    page of the resume?

7              MS. DIBIANCA:  That's the page of the resume.

8              MR. HOBBS:  And the cover page?

9              MS. DIBIANCA:  Yeah.

10             MR. HOBBS:  And then one other page after that?

11             MS. DIBIANCA:  Yes.

12             MR. HOBBS:  So, three pages?

13             MS. DIBIANCA:  Correct.

14             MR. HOBBS:  Got it.

15             MS. DIBIANCA:  Correct.

16             THE COURT:  Okay.

17             MS. SHIKUNOV:  I have no problem with it.

18             THE COURT:  Thank you.  I appreciate that.

19             MS. DIBIANCA:  Thank you.

20             THE COURT:  We always have wrinkles to iron out

21   during a trial, right, but there's no exception here.  Oh, by

22   the way, we did hear from the juror who took ill last week, and

23   he's well and said thank you for everybody's concerns for him.

24             MS. DIBIANCA:  That was nice of him.

25             THE COURT:  Yeah, it was very --

 1            MS. DIBIANCA:  Yeah.

 2            THE COURT:  It seemed it was a bad episode of short

 3    duration, thankfully.

 4            MS. SHIKUNOV:  Well, you know, I can honestly say

 5    that's never happened to me before, so.

 6            THE COURT:  Yeah, never made a juror sick you said,

 7    right?

 8            MS. SHIKUNOV:  Yes, that's a new experience for me.

 9            THE COURT:  All right, so we'll bring in the jury.

10    We'll have to break for lunch.

11            MS. DIBIANCA:  Yes, yes.

12            THE COURT:  Okay, so if that clock is right, it's

13    about 20 to 12:00.  Is that right?

14            MS. DIBIANCA:  Yes.

15            MS. SHIKUNOV:  Yes.

16            THE COURT:  So, how long do you figure until we take

17    a break, maybe an hour?

18            MS. DIBIANCA:  The easiest thing for me to do would

19    be you tell me what time you want to break and I will stop at

20    that time.

21            THE COURT:  Let's say about an hour --

22            MS. DIBIANCA:  Deal.

23            THE COURT:  -- but it's not a hard deadline.  If

24    there's a natural breaking point --

25            MS. DIBIANCA:  Okay.

```
 1              THE COURT:  -- around an hour in --

 2              MS. DIBIANCA:  Okay.

 3              THE COURT:  Okay, sound fair?

 4              MS. DIBIANCA:  No problem, and the same thing, Your

 5  Honor, for this afternoon for the afternoon break, if you could

 6  just tell me what time you want that to be when we come back,

 7  I'll just stop at that time.  I can do it no problem.

 8              THE COURT:  Again --

 9              MS. DIBIANCA:  Yeah.

10              THE COURT:  -- when it's a good break time --

11              MS. DIBIANCA:  Okay, okay.

12              THE COURT:  -- I'll leave it to counsel.

13              MS. DIBIANCA:  Okay.

14              THE COURT:  Okay?

15              MS. DIBIANCA:  Got it.

16              THE COURT:  All right.

17              THE CLERK:  All rise.

18              (JURY ENTERS COURTROOM.)

19              PARTICIPANT:  Should Marnie take the stand, Your

20  Honor?

21              THE COURT:  That would be fine, sure.
```

O'BRIEN-97

1           THE COURT:  Ms. O'Brien, let me know if there's water
2    in there when you get up there.  There is?  Okay.  Welcome
3    back, folks.  We figure we'll do about an hour of testimony
4    before lunch give or take and then we'll take our lunch break,
5    okay?  Attorney Dibianca?
6           MS. DIBIANCA:  Thank you.
7    CROSS-EXAMINATION
8    BY MS. DIBIANCA:
9    Q    Good morning, Ms. O'Brien.
10   A    Good morning.
11   Q    You remember that we met previously in January of this
12   year when I took your deposition, correct?
13   A    Correct.
14   Q    Okay, if you can speak up just a little bit for me?  And
15   at that deposition, you testified under sworn testimony under
16   penalty of perjury, correct?
17   A    Correct.
18   Q    And you testified truthfully during that deposition, is
19   that correct?
20   A    Correct.
21   Q    Okay, we may need to refer to your deposition today for
22   some period of time.  I see you have your glasses on, so when
23   that happens, we'll put it up on the screen and you can refer
24   to it.  During your deposition, Ms. O'Brien, you told me your
25   version of events, correct?

1   A    Correct.

2           MS. DIBIANCA:  Okay, I'd like to put to the witness

3   before publication to the jury DX39, please.

4   BY MS. DIBIANCA:

5   Q    Ms. O'Brien, can you review that and tell me if that is

6   something, a document you're familiar with?

7   A    Yeah, it looks like it.  I guess I had the number wrong

8   though.

9           MS. DIBIANCA:  Okay, so we can publish it to the jury

10  at this time.  Thank you.

11  BY MS. DIBIANCA:

12  Q    This DX39, Ms. O'Brien, is your offer letter, correct?

13  A    Correct.

14  Q    And I should specify your offer letter from the Middle

15  East Forum, correct?

16  A    Correct.

17  Q    And you were hired by the Forum in June 2016, is that

18  correct?

19  A    Correct.

20  Q    You resigned from the Forum in March 2020, correct?

21  A    It was February 29, I believe.

22  Q    February 28?

23  A    Yes.

24          DEPUTY STEIN:  Can you speak a little bit more

25  loudly, please?  Thank you.

1  BY MS. DIBIANCA:

2  Q     You were hired pursuant, according to this offer letter,

3  you were hired as the controller, correct?

4  A     Correct.

5  Q     And at some point, you started to use the title of

6  director of administration and finance, correct?

7  A     Correct.

8  Q     Okay, what time did you start using the title of director

9  of administration and finance at the Middle East Forum?

10  A     When you say I started using, I was given the title.

11  Q     Okay, and when was that?

12  A     I don't recall.

13  Q     Okay, you were not a bean counter, were you, Ms. O'Brien?

14  A     That's my main function, but --

15  Q     Director of administration and finance is a bean counter?

16  A     I picked up additional responsibilities.

17  Q     You were a little above a bean counter, correct?

18  A     Correct.

19  Q     Correct.  At the time you were hired --

20  A     When you say above, what do you mean above?  I just had --

21  I wasn't above a bean counter.  I had added responsibilities.

22  Q     Such as?

23  A     I picked up the grants and then I picked HR --

24        (Simultaneous speaking.)

25  Q     Well, you were hired for HR, correct?

O'BRIEN-100

1    A    -- HR generalist.  Well, I didn't start with that because
2    there was issues to handle with the controllers.
3    Q    Well, let's look at your offer letter, DX39.  Take a look
4    at that and tell me if that offer letter says that you were
5    hired to do human resources --
6    A    It was -- that was one of the reasons.
7              MS. DIBIANCA:  Let me finish the question, please.
8              THE COURT:  Folks, we can't talk over each other,
9    okay?
10             THE WITNESS:  I'm sorry.
11   BY MS. DIBIANCA:
12   Q    The offer letter says that you were responsible for human
13   resources functions, correct?
14   A    Some human resources work, yeah.
15   Q    And at your deposition, do you recall that we talked about
16   your human resource experience, Ms. O'Brien?
17   A    Yes.
18   Q    Okay, and do you recall at your deposition that you
19   testified that you were hired to perform human resources
20   functions for the Forum, correct?
21   A    Correct.
22   Q    Okay, at the time you were hired, you were told that you
23   would not receive healthcare benefits, is that correct?
24   A    That's correct.
25   Q    Okay, who was your direct supervisor, Ms. O'Brien?

1   A    Mr. Roman.

2   Q    Let's talk about your HR responsibilities.  During your

3   tenure with the Forum, you were responsible for the

4   organization's human resources functions, correct?

5   A    Yes.

6   Q    And you were the only person who was responsible for the

7   human resources functions in the organization, correct?

8   A    No.

9   Q    Did you have someone who reported to you?

10  A    No, Marc Fink, who is the in-house counsel, he was the one

11  that was -- he would handle the offer letters and the higher-

12  level stuff.  I was a generalist, some human resources

13  responsibilities.  I was onboarding and creating, creating an

14  onboarding process, termination process, employee reviews, that

15  sort of thing.  I don't have any certifications for human

16  resources.

17  Q    When you applied for the position, you told Mr. Roman and

18  Dr. Pipes that you did have prior human resource experience,

19  didn't you?

20  A    I did, in exactly those things that I had just said.

21  Q    Okay, and you said that you attended employees' annual

22  reviews, correct?

23  A    I did.

24  Q    Okay, as the HR person, correct?

25  A    Correct.

1   Q     You considered yourself a management level employee at the

2   Forum, correct?

3   A     I was told I was by Mr. Roman.

4   Q     And Dr. Pipes, I believe you testified last week, correct?

5   A     That they considered me management.

6   Q     So, you were considered by the organization to be a

7   management level employee, correct?

8   A     That's what I was told.

9   Q     You testified last week that you wanted to grow the

10  organization tenfold I believe was the quote, right?

11  A     No, Mr. Roman said that he -- I don't think I ever said

12  tenfold.  Mr. Roman said that he wanted to grow the

13  organization to a $20 million a year organization and I was

14  excited to help and be a part of that.

15  Q     And when Mr. Roman left on business trips, he put you in

16  charge of the office sometimes, didn't he?

17  A     In charge in what way?  What do you mean in charge?

18  Q     There's an email, isn't there, that when Mr. Roman is

19  traveling, he says, Marnie, you're in charge of the office

20  while I'm out?

21  A     Okay, but I'll say that no one was really in charge of

22  anything.  That meant that if there was an issue, they brought

23  it to me and I was the point to go to him on those issues.

24  Q     Him who?

25  A     Gregg, Mr. Roman.

```
 1   Q    And when he was out?

 2   A    When he was out.  If he wasn't there, then I would report

 3   to him anything that was happening --

 4   Q    Okay.

 5   A    -- that was brought to me.

 6   Q    Mr. Roman traveled quite a bit, didn't he?

 7   A    Yes.

 8   Q    Would you agree with me that he traveled sometimes upwards

 9   of 200 days a year?

10   A    I would have no idea.

11   Q    Okay, you would agree with me, Ms. O'Brien, that HR is a

12   tough job, isn't it?

13   A    Yes.

14   Q    Sometimes in HR, you have to make tough decisions, don't

15   they?

16   A    That's correct.

17   Q    Sometimes those decisions that you have to make in HR are

18   unpopular decisions, aren't they?

19   A    That's correct.

20   Q    And as HR, you sometimes have to be the unlucky one to

21   break bad news, don't you?

22   A    I'm not sure what you mean, but --

23   Q    Have you ever had to fire anyone as human resources?

24   A    Sure.

25   Q    That's bad news, isn't it?
```

1   A    Sure.

2   Q    Right, and so when you deliver that news, you would agree

3   with me that that's bad news that the HR person is delivering?

4   A    Yes.

5   Q    Okay, sometimes HR has to be the one to impose discipline,

6   correct?

7   A    Impose?  I mean, document.  I didn't determine discipline

8   for people.  If there was discipline to be made or, you know,

9   to be laid out, I documented it and suggested, you know, for

10  the four guidelines that are in there.  First, it's a verbal

11  warning, a write-up, that type of thing.

12  Q    And when you say in there, you're referring to the Forum's

13  personnel manual?

14  A    Correct.

15  Q    You said documenting, Ms. O'Brien.  Do you agree with me

16  that as a human resource professional, documenting things is of

17  paramount importance?

18  A    Yes.

19  Q    Okay, as human resources at the Forum, you were

20  responsible for managing and developing employee relationships,

21  correct?

22  A    Correct.

23  Q    And for maintaining a friendly work environment, correct?

24  A    That's in my job description that I was to maintain a

25  friendly work environment?

1  Q    No, ma'am, I'm asking you if as HR, you were responsible
2  for maintaining a friendly work environment?
3  A    I don't see how that would be my job.  I was required to
4  make sure everyone was behaving appropriately or respecting
5  each other.
6           MS. DIBIANCA:  Let's look at DX136, please, second
7  page at the top.  It says oversee human resources.  Actually,
8  let me just introduce this document.  This is, if you can go
9  back to the first page, Mr. Hobbs, DX136 and we're publishing
10  this to the jury as --
11           THE WITNESS:  I'm sorry, what is this?
12           MS. DIBIANCA:  This is your cover letter that you
13  submitted to People Share.
14           THE WITNESS:  Okay.
15  BY MS. DIBIANCA:
16  Q    Does this look familiar to you?
17  A    Sure.
18  Q    Okay, so we'll look at the top of the second page, Ms.
19  O'Brien.  The second bullet there says oversee human resources.
20   Do you see where he's highlighted there?
21  A    Yes.
22  Q    Okay, the fourth bullet says work directly with the
23  director to maintain and efficient and financially healthy
24  office and friendly work environment.  Do you agree with that?
25  A    Yes.

1   Q    Okay, so --

2   A    That it's on my resume, yes.

3   Q    It's on your resume, correct?

4   A    Yes.

5   Q    And, in fact, that was part of your job description and

6   that's why you wrote it on your resume, correct?

7   A    It was what I was tasked with.

8   Q    Okay, at the American Institute for History Education

9   where you worked prior at some point prior to coming to the

10  Middle East Forum, you also oversaw human resources, correct?

11  A    Correct.

12  Q    And in that role, you were responsible for recruiting,

13  managing, and maintaining healthy employee relationships,

14  correct?

15  A    Correct.

16  Q    Okay, so maintaining healthy employee relationships, and

17  healthy office, and friendly work environments have been part

18  of your job duties as a human resources professional since at

19  least 2013, correct?

20  A    Correct.

21  Q    Okay, now as human resources, you would agree, Ms.

22  O'Brien, wouldn't you, that you should conduct yourself in a

23  professional manner at all times in the workplace, correct?

24  A    Correct.

25  Q    Okay, and that HR sets the tone for the expected conduct

1  in the office, correct?

2  A    I would disagree.

3  Q    Okay, does HR have a role in setting the tone for the

4  workplace environment?

5  A    HR is a place where employees come if they need assistance

6  or help.  They're supposed to get their -- I'm supposed to make

7  sure everyone has, knows their job, has a good job description.

8   They know what's expected of them.  I did the payroll.  I

9  didn't -- the management, the actual management sets the tone

10 and I make sure that the organization is protected.

11 Q    Okay, you made sure that the organization was protected,

12 is that what I just heard you say?

13 A    Yes.

14 Q    Okay, so you would agree with me then that a bad decision

15 by an HR person could expose the organization to significant

16 liability, don't you?  You testified --

17 A    Yes, yes.

18 Q    -- to that at your deposition, didn't you?

19 A    Yeah, I just said yes.

20 Q    Okay, and you would agree with me that HR is a position of

21 trust within an organization, correct?

22 A    Yes.

23 Q    And you would agree with me that HR has a higher duty to

24 the company than the average employee, wouldn't you agree?

25 A    Yes.

O'BRIEN-108

1  Q    Let's talk about the Forum's handbook, please.  The Forum

2  had an employee manual as you said, didn't it, Ms. O'Brien?

3  A    Yes.

4  Q    Okay, and you were, in fact, asked to provide your input

5  as the human resources person on the handbook, correct?

6  A    I was asked to review it and make edits and suggestions.

7  Q    Okay, did you make edits and suggestions to the handbook?

8  A    Yes, I never received them back, it was never published,

9  it was never changed.  The original was kept.

10  Q    Okay, you presented changes in the handbook at an all-

11  staff meeting, didn't you?

12  A    They may have been not -- so maybe I'm misunderstanding

13  the time that you're talking about because towards the end, I

14  was asked to review the entire thing.  I don't know what

15  changes you're talking about, so if you want to show them to

16  me, I'll look at them and I can maybe try to remember, but I

17  can't have a conversation about something that I don't know and

18  it happened three years ago.

19           (Simultaneous speaking.)

20  Q    Pardon me, I'm sorry.  I didn't mean to interrupt you.

21  A    It happened quite a few years ago.  I don't know exactly

22  what you're speaking about.

23  Q    Did the handbook have a harassment policy?

24  A    It did.  Are you going to share it with me?

25  Q    The Forum had an anti-harassment policy throughout your

1  employment, didn't it?

2  A    Yes.

3  Q    Let's look at the harassment policy, DX123, and let's go

4  to D1034 of the harassment policy, please, and then 1035

5  actually.

6  A    That was not the one that we used.  The one that we used

7  had parentheses and said that it was edited in, I forget

8  exactly, but that wasn't the one that we used, I don't believe.

9   Is this the one that was presented at the meeting?

10 Q    Yes, ma'am.

11 A    Okay.

12 Q    So, let's go to the harassment policy.  Just to be clear

13 on your testimony, are you debating that this is the -- are you

14 disputing that this is the correct manual?

15 A    I'm unsure, but I'll look at it.

16 Q    Okay, I have a 2015 version as well if you prefer to see

17 that.  The policies are identical, but I'm happy to share that

18 with you.

19 A    I assume that might be it.

20 Q    Okay, so let's look at the --

21 A    Can I just say that I may have been involved in this, but

22 this is -- the one that I said that was never published then

23 was after this.  This is confusing to me.  I'm sorry, go ahead.

24 Q    Ma'am, on April 17, 2018, did you present anti-harassment

25 training at the Forum?

O'BRIEN-110

 1  A    Yes.

 2  Q    Okay, do you know which policy, which version of the

 3  manual you presented at that time?

 4  A    It wouldn't have been this one because this says 2019.

 5  Q    So, would you like to look at the 2015 manual?

 6  A    No, that's fine.  I was just --

 7        PARTICIPANT:  If you're interested, it's DX14.

 8        MS. DIBIANCA:  DX14, please.

 9  BY MS. DIBIANCA:

10  Q    This says May 2015, Ms. O'Brien.  Does this look better

11  for you?

12  A    I think that was the one I remember, yeah.

13  Q    Let's go ahead and look at the harassment policy in this

14  version then.  Does that look familiar?

15  A    Yes.

16        MS. DIBIANCA:  All right, Mr. Hobbs, if we can turn

17  to the next page of the document?  The next one, sorry.

18  BY MS. DIBIANCA:

19  Q    All right, let's look at the section titled reporting and

20  investigation.  Do you see here that it says that if you

21  believe you are the victim of impermissible harassment or you

22  become aware of another employee who is being subjected to

23  impermissible harassment, you must promptly report the facts of

24  the incident to your supervisor or to the president or the

25  director?  Did I read that correctly?

O'BRIEN-111

1    A    Yes.

2    Q    You do allege, Ms. O'Brien, that you were subject to

3    impermissible harassment, correct?

4    A    I do.

5    Q    Okay, and you do allege that you witnessed another

6    employee being subjected to impermissible harassment, correct?

7    A    I do.

8    Q    Okay, Ms. O'Brien, you would agree with me that you did

9    not report either the incident that you believe constituted

10   sexual harassment as to yourself or the incident that you

11   believe constituted harassment as to another employee promptly?

12    Would you agree with that statement?

13   A    I do.

14   Q    Okay, in fact, the incident that you're talking about with

15   respect to the other employee is the incident at AIPAC that you

16   described with Ms. McNulty, correct?

17   A    Mm-hmm.

18   Q    I need --

19   A    Yes, sorry.

20   Q    You never reported the incident at AIPAC to Dr. Pipes,

21   correct?

22   A    I did not.

23   Q    You agree with me you did not report it?

24   A    I did not.

25   Q    In fact, the only conduct that you complained of on behalf

1   of yourself were the, quote, vibes, that you got from Mr. Roman

2   at a dinner at a sports bar, correct?

3   A    Correct.

4   Q    Okay, let's go to the harassment training.  In February

5   2018, Mr. Roman told you that he wanted you to present anti-

6   harassment training at the Forum's annual all-staff meeting,

7   correct?

8   A    Correct.

9   Q    Okay, so you started planning that as soon as he requested

10  it in February, correct?

11  A    Correct.

12  Q    Okay, you did plan and present that training in April

13  2018, correct?

14  A    Yes.

15  Q    And you gave that presentation to employees during an in-

16  person training session on April 17, 2018, correct?

17  A    Yes.

18  Q    Lisa Barbounis was present for the anti-harassment

19  training?

20  A    Yes.

21  Q    Ms. McNulty was also present for the harassment training?

22  A    Yes.

23  Q    And Katrina Brady, she also was present for that training,

24  correct?

25  A    Yes.

```
 1   Q    At the time you presented as the HR person, at the time
 2   you presented the anti-harassment training, you understood what
 3   the definition of harassment was, correct?
 4   A    Correct.
 5   Q    And you would agree with me that as an HR professional, it
 6   was, in fact, your job to understand what harassment was,
 7   correct?
 8   A    Correct.
 9   Q    You would agree with me, wouldn't you, that as an HR
10   professional, it was, in fact, your job to stop harassment
11   should you see it, correct?
12   A    Correct.
13   Q    You would agree that as the HR person, it could cause
14   serious harm to the Forum if you failed to timely report a
15   complaint of harassment, correct?
16   A    Correct.
17   Q    No one raised any issues or concerns about harassment
18   during that training, did they?
19   A    No.
20   Q    You didn't take Ms. McNulty aside after the training and
21   speak to her about what you claim to have witnessed at AIPAC,
22   correct?
23   A    No.
24   Q    Correct?
25   A    Correct.
```

1  Q    Okay, you didn't pull Ms. Barbounis aside and say, Ms.

2  Barbounis, do you have any concerns about harassment, correct?

3  A    I did not.

4  Q    Okay, the same thing with Ms. Brady, correct?  You didn't

5  pull her aside and speak to her about whether she had any

6  concerns about harassment training?

7  A    I did not.

8  Q    Mr. Roman wasn't present for that training, was he?

9  A    I think he was there for part of it.  I can't really

10  remember.

11  Q    And there was part of it at least that you recall where he

12  was not present and the women would have been able to speak

13  freely in front of you, and you alone, without Mr. Roman

14  present, correct?

15  A    Correct.

16  Q    Okay, did the women trust you, Ms. O'Brien?

17  A    No, they did not.

18  Q    No, they did not, okay.  Let's talk about your

19  relationship with your coworkers.  From time to time, you did

20  go out socially with some of your coworkers from the Forum,

21  correct?

22  A    Correct.

23  Q    For example, you went out for drinks from time to time

24  with your coworkers, right?

25  A    Correct.

1   Q    You thought it was a good idea to get together with those

2   with whom you work so you could blow off some steam, correct?

3   A    We were a small group, so we worked together, so it was --

4   Q    You testified at your deposition that you thought it was a

5   good idea to get together to blow off some steam, correct?

6        MS. SHIKUNOV:  Your Honor, I would just ask that the

7   witness be permitted to finish her answer before we move to the

8   next question.

9   BY MS. DIBIANCA:

10  Q    Ms. O'Brien, will you finish your answer?

11  A    Can you repeat the question, please?

12  Q    Sure, I'm not sure which question Ms. Shikunov is

13  objecting to that I didn't let you finish, so I'll repeat both.

14   You went out from time to time with your coworkers for drinks

15  because you thought it was a good idea to get together with

16  those with whom you work so you could blow off some steam,

17  correct?

18  A    Correct.

19  Q    Okay, for example, in May 2018, you tried to arrange a

20  work outing to a Phillies game as a sort of extracurricular

21  activity, correct?

22  A    I don't recall that, but if you say that --

23  Q    Let's look at DX109, please.  Does this document help you

24  refresh your recollection?

25  A    Not really, but --

1  Q    Okay, do you recall that Ms. McNulty and Ms. Barbounis,

2  they didn't want to hang out with you so much at about May

3  2018?

4  A    No, I don't.

5  Q    Okay, in July of 2019, you went on an overnight weekend

6  trip with some MEF employees to Atlantic City, correct?

7  A    I'm sorry, when was that?

8  Q    In July of 2019 --

9  A    Okay.

10 Q    -- you went on a trip, on an overnight trip on the weekend

11 with some of your coworkers to Atlantic City, correct?

12 A    Yes.

13 Q    And I believe you testified last week that your boyfriend,

14 Matthew Ebert, had a comped room at a casino?

15 A    Yes.

16 Q    Okay, and Ms. McNulty was on that trip, correct?

17 A    Correct.

18 Q    Ms. Barbounis went too, correct?

19 A    Correct.

20 Q    And your boyfriend, Matthew Ebert, he also was there,

21 correct?

22 A    He was not there.  He was there briefly.  He had to check

23 in because the room was in his name.  I'm sorry.  He had check

24 in because the room was in his name, so he went down and

25 checked in, and then he left.

O'BRIEN-117

 1   Q     Well, I believe you testified last week that you sent him

 2   to the liquor store with Katrina Brady, right?

 3   A     No, that is not what I testified to.

 4   Q     Who went to the liquor store?

 5   A     When we checked in, he checked us in, and we had said we

 6   wanted to go to the liquor store and grab some drinks, so he

 7   drove Katrina and I to the liquor store and then he dropped us

 8   off.

 9   Q     Okay.

10   A     The liquor store was like maybe two minutes away.

11   Q     That trip, the purpose of that trip was to celebrate Ms.

12   McNulty getting a new job, correct?

13   A     Correct.

14   Q     She had gotten a new job in New York City, correct?

15   A     Actually, she had gotten a job offer.  It wasn't finalized

16   at that point.

17   Q     Okay, she wanted to move to New York to be with her

18   boyfriend, right?

19   A     Yes.

20   Q     So, is it fair to say that you were a lucky enough

21   individual to have good friends at work who you could hang out

22   with after work too?

23   A     I wouldn't say that they were friends.  We were friendly.

24    At that point, we had been through everything.  We had been

25   through a lot and Tricia was getting out, so we were

1  celebrating that.

2  Q    Yes, this is July 2019, the same month when you filed your

3  first charge of discrimination against my clients, correct?

4  A    That is when it became official, yes.  The wheels were in

5  motion prior to that.

6  Q    When were the wheels in motion, Ms. O'Brien?

7           MS. SHIKUNOV:  I'm going to object to that insofar as

8  asking about communications with counsel's office.

9           THE COURT:  Rephrase the question.

10 BY MS. DIBIANCA:

11 Q    When did you initiate the charge process, Ms. O'Brien?

12 A    The day Dr. Pipes forced me to turn my work product over

13 to Gregg Roman.

14 Q    The day when Mr. Pipes forced you to turn your work

15 product over to Mr. Roman, and that was with relationship to

16 the audit, correct?

17 A    Correct.

18 Q    And that was in June 2019, correct?

19 A    Correct.

20 Q    And that's when you began to initiate the process that has

21 led us to this courtroom today, correct?

22 A    Correct.

23 Q    You testified on Friday that you and Mr. Roman were

24 friends, didn't you?

25 A    Did I say friends, that we were friends, friendly, that he

1  pushed a friendship, that he promoted a friendship and that I -
2  - I wanted a friendship, especially when I first started.
3  Q    So, my question -- I'm going to ask the witness to answer
4  the question.  You testified on Friday twice, didn't you, that
5  you and Mr. Roman were friends?
6  A    I guess I thought we were.
7  Q    Okay, you and Mr. Roman talked about your families, didn't
8  you?
9  A    When he pushed the conversation that way.
10 Q    Okay, you shared with him information about your family,
11 Ms. O'Brien?
12 A    I think with coworkers, you work with people all day, you
13 definitely do share some stuff.  You find some stuff out.
14 Q    I'm not talking about your coworkers, Ms. O'Brien.  I'm
15 talking about Mr. Roman, who you testified was your direct
16 supervisor.
17 A    Correct.
18 Q    Did you share information with Mr. Roman about your
19 family?
20 A    I've shared information with my previous boss about my
21 family as well.
22        MS. DIBIANCA:  Your Honor, I'm going to ask you to
23 direct the witness to answer the question.
24        THE COURT:  Ask her one more time, please.
25 BY MS. DIBIANCA:

1   Q    Ms. O'Brien, did you share information with --

2   A    Yes.

3   Q    Ms. O'Brien, did you share information with Mr. Roman

4   about your family?

5   A    Yes.

6   Q    Personal information about your children, correct?

7   A    I don't know how personal or how much detail, but probably

8   some.

9   Q    Well, you talked to him about your son's health issues,

10  correct?

11  A    Probably at an overview level, probably not too detailed,

12  but, yes, I had to be out of work one day, so.

13  Q    That was the only context in which you spoke to Mister --

14  A    Oh, I don't know.  I mean, no, probably not, but --

15  Q    You went out for drinks with Mr. Roman from time to time,

16  correct?

17  A    I remember one time.

18  Q    And when was that?

19  A    I'm not sure.  I think it was in 2017.

20  Q    And do you know where you went for drinks in 2017 with Mr.

21  Roman?

22  A    To Misconduct.

23  Q    Okay, no other times?

24  A    I don't recall.  I mean, out after work?

25  Q    Yes, ma'am.

```
 1   A    I don't recall.  I recall that one because I was
 2   traumatized.  You'd have to show me and maybe I would remember.
 3   Q    Just to be clear about your testimony, you just said that
 4   you were traumatized --
 5   A    Yes.
 6   Q    -- by going out for drinks with Mr. Roman in September of
 7   2017 to Misconduct, is that --
 8   A    It --
 9   Q    -- your testimony?
10   A    It was --
11   Q    I need to finish the question, please.
12   A    Okay.
13   Q    Is that your testimony?
14   A    Yes.
15   Q    Okay.
16   A    I was uncomfortable.
17   Q    You remember it distinctly, is that correct?
18   A    What I will tell you is that I don't know the dates
19   specifically.  I might have my dates wrong.  I'm not sure, but
20   when I went out to dinner, for drinks with Mr. Roman for our
21   quarterly management meeting, I was made incredible
22   uncomfortable.  I'm not sure of the date.
23   Q    And it traumatized you, so you have a clear recollection
24   in your head, correct?
25   A    I have a clear recollection in my head of that evening.
```

1  Q    Okay, for example, you also went out with Mr. Roman in
2  mid-July 2018 for drinks, didn't you?
3  A    Well, that might be the time that I was traumatized,
4  actually.  I'm not sure.  Ms. Dibianca, I don't have a timeline
5  in front of me and you're saying I went here and I went there.
6   This is like three years ago.  I was -- I had a boss that I
7  was trying to have a friendly relationship with.
8  Q    I'm going to ask the witness to stay on the answer.  So,
9  did you go out with Mr. Roman for drinks in July of 2018?
10 A    I believe I did, yeah.
11 Q    Okay, and you believe you went out for drinks with him in
12 September 2017, correct?
13 A    I'm not sure.
14 Q    Okay, which one was the alleged trauma?
15 A    And now I'm not sure.  I don't know.  I don't ever
16 remember going out two times with him.  If you gave me
17 something to look at or some frame of reference --
18 Q    The harassment training, Ms. O'Brien, that you did on
19 April 17, 2018, that was almost exactly one month after the
20 alleged incident at AIPAC, right?
21 A    It seems convenient.
22 Q    I'm not sure what that means, Ms. O'Brien.  This is a
23 court of law, so if you'd like to answer my questions, I would
24 appreciate it.
25 A    Yes.

1  Q    Was it one month?

2  A    Yes.

3  Q    Okay, so at that time, that incident was fresh in your

4  mind, correct?

5  A    It wasn't in the office.  It was after hours and I thought

6  he had made an incredibly poor choice, and I was trying to have

7  a good relationship with my boss and all of my coworkers, so I

8  tried to have a good relationship with him, maintain --

9  Q    You were trying to have a relationship --

10  A    -- a friendly workplace.

11  Q    Please, finish.

12  A    I wanted to maintain a friendly workplace, good

13  relationships with my coworkers and my boss.

14  Q    So, you -- I'm not sure how that pertains to whether or

15  not you would have addressed an incident at harassment training

16  after having allegedly witnessed what you contend to be an

17  incident of harassment.  How does that relate to you --

18  A    It happened --

19  Q    -- being friends with your coworkers, Ms. O'Brien?

20  A    It happened so quickly and no one ever complained to me

21  about it, and I was afraid to ruffle feathers.

22  Q    How does that relate to you being friends with your

23  coworkers?

24  A    I was afraid to ruffle feathers, so I was keeping a good

25  relationship, trying to keep a good relationship with my

 1  coworkers and my boss.

 2  Q    So, at the harassment training in April 2018, you wanted

 3  to maintain your friendships with your coworkers, so you did

 4  not bring up what you, the human resources professional, now

 5  contend was an incident of harassment?

 6  A    As I said, I wanted to keep a friendly atmosphere and I

 7  was trying to do my part to have a friendly relationship with

 8  everyone, but I was also afraid, Ms. Dibianca, to report

 9  anything.  I certainly wasn't going to go out on a limb and

10  report something against somebody who wasn't complaining to me.

11  Q    Well, does the policy at the Middle East Forum say

12  anything about only if you received a complaint?  It doesn't,

13  does it?

14  A    The policy says that I would have to report it to Gregg

15  Roman or Daniel Pipes and I was afraid to do that, and rightly

16  so.

17  Q    Okay, you did report it to Daniel Pipes, not the AIPAC,

18  but you did make a report of harassment on behalf of Lisa

19  Barbounis to Dr. Daniel Pipes at some point, correct?

20  A    I did.

21  Q    Okay, on August 10 -- so we talked about you said in

22  September 2017, you were allegedly traumatized at the sports

23  bar during your drinks and conversation with Mr. Roman, then

24  you can't recall whether you went out with him in mid-July 2018

25  for drinks.  How about on August 10, 2018, do you recall that

1  you told Mr. Roman that you were headed home or you would tell

2  him to come out for a drink?

3  A    I don't recall that.

4         MS. DIBIANCA:  Okay, let's pull up DX99, please, and

5  maybe that will refresh your recollection.  It's at -- yeah,

6  that first page there.  No, I'm sorry, Rich, that's not it, so

7  we can go to the next one.  Oh, the bottom, I'm sorry, bottom

8  of the page, last one.  I'm heading home, yeah, there we go.

9         THE COURT:  Attorney Dibianca, can you let us know

10  who are the parties in this exchange?

11         MS. DIBIANCA:  Yes, certainly.

12  BY MS. DIBIANCA:

13  Q    So, this is a text message string between you and Mr.

14  Roman, Ms. O'Brien.  Does it look familiar?

15  A    No, but --

16  Q    Okay, take your time and familiarize yourself with it if

17  you would like.

18  A    I'm fine.  If you say that it's between us, I believe you.

19  Q    Okay, so you see the date there is October 10, 2018, and

20  you say I'm heading home or I would tell you to come out for a

21  drink?

22  A    Do you have one of those where I ask him out for a drink?

23  Q    My question is this one.

24  A    I see that.

25  Q    Okay, do you remember saying that to Mr. Roman?

1   A    Do I remember handing him an empty invitation?  No.

2   Q    I don't know anything about an empty invitation.

3   A    I don't recall saying it, but it doesn't sound like it was

4   likely that we were getting a drink.

5   Q    Does it sound like something you would not have said?

6   A    It sounds like me trying to be friendly with my boss.

7   Q    Okay, that will do.  On September 19, 2018, you told Mr.

8   Roman that you wanted to have, and I'm going to quote, a

9   follow-up with Lisa, but you didn't want to discuss it at the

10  office so she couldn't listen in.  Does that sound familiar?

11  A    I said what?

12        MS. DIBIANCA:  Let's pull up DX100.  Technical

13  difficulties?  No problem.

14        PARTICIPANT:  It's going to be a second.

15        MS. DIBIANCA:  It's okay.  We'll come back.

16  BY MS. DIBIANCA:

17  Q    In September 2018, do you remember discussing Ms.

18  Barbounis with Mr. Roman?

19  A    I mean, Ms. Barbounis was a topic of discussion quite

20  often.  I don't --

21  Q    Okay, do you remember saying to Mr. Roman that you and he

22  could just get some beer and order sandwiches so you could talk

23  without distraction?

24  A    No, I don't remember.

25  Q    You don't remember that.  We'll pull that exhibit up in

 1   just a minute.  You testified last week that Mr. Roman looked

 2   to you for guidance because of your experience, didn't you?

 3   A     He told me when he hired me at first that he wanted to use

 4   me as, I guess, a consult.

 5   Q     Okay, because of your experience?

 6   A     Correct.

 7   Q     How old were you compared to how old was he at that time,

 8   do you know?

 9   A     I don't know how old he is now, so I don't know.

10   Q     Okay, how old are you now?

11   A     51.

12   Q     Okay, so would you disagree if I said you're approximately

13   15 years older than Mr. Roman?

14   A     If you say so.

15   Q     Okay, I'd like to talk about the conduct that you allege

16   occurred during your employment at the Middle East Forum and

17   that you now claim was harassment.  Ms. O'Brien, you allege

18   that early on in your employment with the Forum, Mr. Roman made

19   the statement that he, quote, liked older women.  You allege

20   that, correct?

21   A     That's correct.

22   Q     Okay, when did he say that, Ms. O'Brien?

23   A     I don't remember.  It was early on.

24   Q     Early on before Misconduct or after Misconduct --

25   A     Before.

1   Q      -- Sports Bar?

2   A      Before.

3   Q      Before that.

4   A      I thought he had a crush on me.

5   Q      You don't know whether there were others present when he

6   made that statement, do you?

7   A      I don't recall.

8   Q      You don't know whether -- you don't know the context of

9   that statement, do you?

10  A      The context of the statement was he said to me I like

11  older women.

12  Q      And what did you say to him, Ms. O'Brien?

13  A      I don't recall.

14  Q      Anything?

15  A      No.

16  Q      Okay, did you talk to him the next day and say you know,

17  Mr. Roman, I don't know that that's such an appropriate thing

18  to say from an HR perspective?

19  A      That sounds like something I would do.  I do -- I

20  certainly was offering him guidance at that point --

21  Q      But --

22  A      -- because he had told me that he wanted it.

23  Q      And did you actually say that to him?

24  A      I may have.  I don't know.

25  Q      But you don't recall?

O'BRIEN-129

1   A     I don't recall.

2   Q     You didn't object at the time of the alleged comment, did

3   you, Ms. O'Brien?

4   A     Did I object?  I probably -- did I object or didn't I?

5   You just told me I did.

6   Q     I didn't tell you anything.  I'm just --

7   A     Oh.

8   Q     -- asking questions.

9   A     You're confusing me because you -- okay, so could you

10  repeat the question, please?

11  Q     At the time that Mr. Roman allegedly said to you that he

12  liked older women, you don't remember the date of that,

13  correct?

14  A     I do not.

15  Q     Okay, and you don't remember whether others were present,

16  correct?

17  A     I don't.  It sticks in my head.  I remember it.

18  Q     You did not object to the comment at the time that he made

19  it, correct?

20  A     Most likely I blew it off and tried to change the subject.

21  Q     Okay, and you did not object to the comment after that,

22  correct?

23  A     I don't recall.

24  Q     You didn't offer Mr. Roman any guidance or counseling

25  about things that he should or should not maybe say?

O'BRIEN-130

1  A    I thought you said I did do that.

2  Q    Ma'am, I'm not saying you did anything.  I'm asking you

3  questions.

4           (Laughter.)

5  A    I said I don't recall.

6  Q    You weren't offended by the comment at the time, were you,

7  Ms. O'Brien?

8  A    I was made uncomfortable by the comment, sure, I was.

9           MS. DIBIANCA:  Yeah, we're ready for -- Mr. Hobbs has

10 successfully located the exhibit that I wanted to point you to.

11  This is the page, DX, for counsel's purposes, DX100, and I'm

12 looking for the September 19, 2018, yeah.

13          THE COURT:  And who were the participants here,

14 please?

15          MS. DIBIANCA:  This is -- yes, thank you, Your Honor.

16 BY MS. DIBIANCA:

17 Q    This is the same -- this is text messages between you and

18 Mr. Roman, Ms. O'Brien?

19 A    Who is who?

20 Q    You are on the left.  He is on the right.  So, you are in

21 the texts on the left.  His responses to you are in the shaded

22 right-hand column.  Does this help refresh your recollection

23 about whether or not you were talking with Mr. Roman in

24 September of 2018 about Ms. Barbounis?

25          MS. SHIKUNOV:  Your Honor, before she answers that

1   question, I would just ask that she be permitted to read the

2   entire string because we just zoomed it out right away, which I

3   appreciate because it's tiny and that's why we're doing that,

4   but --

5           THE COURT:  Okay, we'll allow it.  Mr. Hobbs,

6   (inaudible) maybe the bottom of that page just so it's easier

7   to read?

8           MR. HOBBS:  Good, Your Honor?

9           THE COURT:  I think that will work.  Let's see.  Can

10  you read that, Ms. O'Brien?

11          THE WITNESS:  Yes.

12          MS. DIBIANCA:  Can you go to the second page of

13  DX100, please, at the top?

14  BY MS. DIBIANCA:

15  Q    You see there, don't you, Ms. O'Brien, where you suggest

16  to Mr. Roman maybe we could just get some beer and order

17  sandwiches so we can talk without distraction, correct?

18  A    Can we go back to the first part?

19          MS. DIBIANCA:  We sure can.

20          THE COURT:  Let's let Attorney Dibianca ask her

21  questions.

22  BY MS. DIBIANCA:

23  Q    Do you remember saying to Mister -- does help you refresh

24  your recollection whether you suggested to Mr. Roman that you

25  should, the two of you should go get beer and sandwiches so you

1  could talk without distraction?

2  A    It wasn't the two of us.  I said -- can you -- I had said,

3  from what I just read there, I said I wanted to talk about

4  Lisa.  He said drinks, and then I said maybe Matt should go

5  too.

6  Q    Okay.

7  A    So, that's a little bit different than me inviting Mr.

8  Roman out for drinks.

9  Q    Okay, so it was -- did you go out for drinks with Mr.

10  Roman --

11  A    I don't recall.

12  Q    Did you go out for drinks with Mr. Roman and Mr. Bennett?

13  A    I don't recall.

14  Q    You don't recall ever going out for drinks with them?

15  A    Yeah, we did maybe once.  It was like you said, coworkers.

16   We all went out, so it was different people at different

17  times.  I may have gone out with Matt and Gregg at one time.

18  Q    So, you did go out for drinks with Mr. Roman.  Your

19  testimony is just that there may have been other people there?

20  A    Yes.

21        MS. DIBIANCA:  Okay, I think that's a good place to

22  take a break, it's 12:30, for lunch if that works for the

23  court.

24        THE COURT:  Okay, yeah, we can do that.

25        MS. DIBIANCA:  Okay.

1          THE COURT:  Thank you very much.  Ladies and

2    gentlemen, let me just remind you as we do, we're about to take

3    a lunch recess, and consistent with the instruction that we've

4    been discussing these last days, during this recess and as with

5    any other recess, you must not discuss the case with anyone,

6    including your fellow jurors, members of your family, people

7    involved in the trial, or anyone else.

8          If anyone tries to talk to you about the case, do not

9    tell your fellow jurors, but let me know about it right away.

10   Do not read, watch, or listen to any news reports if there are

11   any about the trial, and do not conduct any research on your

12   own.

13          Remember, it is important and it is critical that you

14   keep an open mind until all of the evidence has been received

15   and you've heard the views of your fellow jurors.  And with

16   that, folks, we'll see you in an hour and enjoy your lunch.

17          THE CLERK:  All rise.

18          (JURY EXITS COURTROOM.)

19          THE COURT:  Okay, folks, we're going to take an hour.

20    I would ask the witness to listen carefully to the questions

21   from Attorney Dibianca on cross exam.  Do your best to answer

22   directly what her questions are.  If there's other information

23   that you think that the question isn't allowing you to share in

24   your testimony, your counsel are very experienced and they'll

25   get an opportunity in redirect to, I would presume, make sure

1  you're fully heard, okay?

2          All right, folks, that's what we have.  Thank you

3  very much.

4          THE CLERK:  All rise.  Court is in recess for one

5  hour.

6          (Whereupon, the above-entitled matter went off the

7  record at 12:33 p.m. and resumed at 1:32 p.m.)

8          THE COURT:  Welcome back, please be seated, witness

9  is still on the stand.  Ready, Ms. Dibianca?

10         MS. DIBIANCA:  Yes, Your Honor.

11  BY MS. DIBIANCA:

12  Q    Ms. O'Brien, we got off to a rocky start so I'm going to

13  try to see if I can do a better job in getting us through the

14  questions.

15        The AIPAC conference in Washington D.C., do you recall

16  that was on March 4, 2018, correct?

17  A    Yes.

18  Q    Mr. Roman told you that you did not need to go to AIPAC,

19  correct?

20  A    I don't remember that.

21         MS. DIBIANCA:  If you could pull up DX 130 for me,

22  please?

23         At the bottom of the page, and again, this is one of

24  the text message strings between you and Mr. Roman, on February

25  21, 2018 you say, did you need me for AIPAC?  I need to know so

O'BRIEN-135

1    I can get coverage for my daughter and dog.

2           And then we'll go to the next page of the exhibit at

3    the top and his response there is no.

4    BY MS. DIBIANCA:

5    Q    Does that help refresh your recollection?

6    A    Is there more to it?  I said, okay, good, so I don't know.

7     There's a lot of stuff that isn't there.  There's a lot of

8    text missing up at the top.

9    Q    Okay, I'm asking you about the text where you ask Mr.

10   Roman whether he needs you for AIPAC, do you see that?

11   A    Yes, and he said, no, and I said, okay, good.

12   Q    Let's see what you said right below no.  You said, okay,

13   good, lol.  So, you weren't needed for AIPAC, correct?

14   A    I guess no.

15   Q    But you did go to AIPAC, correct?

16   A    Something must have changed.

17   Q    me ask you this, you had a hotel room, correct?

18   A    At AIPAC?

19   Q    Yes.

20   A    Yes.

21   Q    You were not intending to stay at the Airbnb that was

22   rented by the Forum, correct?

23   A    Correct.

24   Q    And that Airbnb was also used as the meeting place for the

25   Forum business during the conference, correct?

1   A    Correct.

2   Q    After the conference on March 4th, you, Mr. Roman, and

3   other MEF employees, grantees, and fellows went to various

4   social functions, correct?

5   A    Correct.

6   Q    So did Ms. Barbonous and Ms. McNulty?

7   A    Did they what?

8   Q    They attended those social events with you?

9   A    Yes.

10  Q    And you were drinking at those functions, correct?

11  A    Everyone was, yes.

12  Q    After the social functions were over, Mr. Roman had the

13  MEF folks return to the Airbnb for a debrief, do you recall

14  that?

15  A    I don't recall it being a debrief, I recall him inviting a

16  couple fellows and some grantees back.

17  Q    Would you agree that there were about 15 to 20 people at

18  the Airbnb that night?

19  A    I don't know if it was that many but --

20  Q    Do you remember there was pizza there?

21  A    Yes.

22  Q    By the time you got to the MEF after-party you were drunk,

23  weren't you?

24  A    I don't know how drunk I was but I had been drinking, yes.

25  Q    I believe you testified at your deposition that you were

1  intoxicated at the least, do you recall testifying to that?

2  A    I said buzzed.

3  Q    Were you intoxicated at the Airbnb?

4  A    I had been drinking, yes.  Can you define intoxicated?

5  Q    If we could pull up the witness's deposition transcript,

6  Page 87 please, and we'll see what her words were?  Does this

7  help refresh your recollection?

8  A    Yes, it sounds exactly like what we just said here.

9  Q    So, you decided to stay the night at the Airbnb even

10  though you had a hotel room waiting for you, correct?

11  A    I don't feel like I decided that.

12  Q    Did you stay at the Airbnb that night?

13  A    Yes.

14  Q    Did anybody force you to stay at the Airbnb that night?

15  A    Greg is a very alpha personality and he said you guys

16  don't need to go back there, just stay here, and we all did

17  that.

18  Q    So, did anyone force you to stay at the Airbnb?

19  A    No.

20  Q    The other women, Ms. Barbonous and Ms. McNulty, also were

21  intoxicated, correct?

22  A    I can't speak for them.  They had been drinking as well.

23  Q    But you don't recall whether they were intoxicated?

24  A    I didn't give them a breathalyzer. We were all drinking

25  and buzzed I would say.

```
 1   Q     Didn't Mr. Roman offer to get you and the other women an
 2   Uber back to your hotel?
 3   A     I don't recall that.
 4   Q     And there were no incidents overnight there, were there?
 5   A     There were not.
 6   Q     Wasn't Mr. Roman the first in the group to go to bed that
 7   evening?
 8   A     I don't know what he did.  He did leave the room.
 9   Q     For the rest of the evening, correct?
10   A     I never saw him again.
11   Q     You left early the next morning, correct?
12   A     Correct.
13   Q     With the other women?
14   A     Correct.
15   Q     And that same morning, the next morning, March 5th, you
16   texted Mr. Roman and said that you were, quote, hungover as
17   shit, didn't you?
18   A     I don't know, if you say I did.  I'm assuming you saw it.
19   Q     We'll do DX 130, the next page.  Mr. Roman says to you in
20   the morning of the 5th, everybody okay, and your response, Ms.
21   O'Brien, was what?
22   A     Hungover as shit but okay.  But everybody, not just me.
23   Q     Was everybody okay?
24   A     We were hungover, I guess.
25   Q     But everyone was okay, correct?
```

O'BRIEN-139

1   A     Yes, we were.

2   Q     You testified last week on Friday that you saw Mr. Roman

3   sitting on the couch with Ms. Barbonous and Ms. McNulty,

4   correct?

5   A     I did, yes.

6   Q     And how long did that last, him sitting between the two

7   women?

8   A     It wasn't that long.  I'm sorry, I don't know exactly, it

9   was a crowded room, as you said, but it wasn't that long.  They

10  both got out pretty quickly.

11  Q     And I believe your testimony last week was that you

12  observed Mr. Roman, and I'm going to use your word and your

13  Counsel's words, scoop Ms. McNulty onto his lap?

14  A     Correct.

15  Q     I don't believe that's in your charge of discrimination,

16  is it?

17  A     That was filed with the Court?

18  Q     With the EEOC.

19  A     No.

20  Q     You didn't mention anything in your charge about the AIPAC

21  conference, did you?

22  A     I was concentrating more on myself and the things that

23  happened directly to me.

24  Q     You testified last week that Ms. McNulty -- I believe your

25  word was looked mortified at the time?

```
 1   A     She did, she's very prim and proper.
 2   Q     You didn't step in to do anything about that, did you?
 3
 4   A     I did not.
 5   Q     You didn't report it when you got back from the conference
 6   to Dr. Pipes, did you?
 7   A     I did not.
 8   Q     You didn't speak to Mr. Roman about it at that time when
 9   you got back from the conference, did you?
10   A     I did not.
11   Q     And no time thereafter, correct?
12   A     No.
13   Q     I believe you testified last week that Ms. McNulty simply
14   moved over and the night went on, correct?
15   A     Moved on from that, yes.
16   Q     You didn't talk to Ms. McNulty about the incident either,
17   correct?
18   A     I did not.
19   Q     You as the HR person, Ms. O'Brien, did nothing about any
20   alleged concerns you had that evening about what you claim that
21   you saw, is that correct?
22   A     Correct.
23   Q     I'm going to talk about the incident that you claim you
24   heard about in Israel but first I wanted to play a recording
25   for you.
```

1           The recording that I'm going to play is an agreed
2   upon excerpt that the parties have stipulated to.
3           It's not the complete recording, it's just excerpts
4   and I believe you've heard it before, it's a recording of a
5   phone call between you and Ms. Barbonous.
6           Are you familiar with that recording?
7   A    Yes.
8   Q    And can you tell us when the recording was made?
9   A    Date-wise, I can't give you a specific date.  It was after
10  Greg had been removed from the office.
11  Q    And who recorded the call?
12  A    Ms. Barbonous did.
13  Q    And she recorded it without your knowledge, correct?
14  A    That's correct.
15  Q    You can go ahead and play it, DX 118, just so you got it
16  for your records.  And there's two segments to it, we're going
17  to listen to the first one and I'm going to ask you to confirm
18  who's speaking and then we'll go ahead and listen to the second
19  one.
20          (Audio played.)
21          And who's speaking in that first portion?
22  A    That's me.
23  Q    Go ahead, please.
24          (Audio played.)
25          Do you remember the context of your comments there, Ms.

1   O'Brien?

2   A     I do.

3   Q     Why were you yelling?  Would you agree with me that you

4   were yelling at Ms. Barbonous?

5   A     She called me up and was screaming at me so, yes, I was

6   yelling back.

7   Q     And what was the context of the comments?

8   A     When Greg was removed from the office, some of his

9   responsibilities were moved over to everybody else.

10          So, Daniel had called Tricia McNulty in and she had

11  gotten some additional responsibilities and I think this is

12  actually after Matt Bennett left.

13          Because he was in charge of development as well, so

14  she received those responsibilities and he gave her money for

15  it.  And I do payroll so he told me that, that's how I knew it,

16  and then he had asked me to pick up and be the point person for

17  the office.

18          I had already had my benefits taken away from me so

19  now I had to pay for them myself, so that was a huge chunk.

20  And so I wanted the extra responsibilities because I thought he

21  would pay me like he was Tricia, and he said that he didn't

22  think that was worth it.

23          And I said, then I think you should get somebody else

24  to do it because I'm not going to take on the extra

25  responsibility and not get paid for it.  And he said, all

1  right, let me think about it.

2          The next time I heard anything about it he had called

3  a meeting and he had said, we're going to have a vote to see

4  who you all want to be your point person in charge of the

5  office.         And everybody was more content-based, the only

6  ones that were really involved in the office management were

7  Thelma Prosser and I, and Thelma was part time and Thelma

8  definitely didn't want more.

9          So, I just assumed that I would win because why would

10  you make something who didn't have anything to do with the

11  office a point person?  I was hoping to win because then I knew

12  that he already knew that I would want money for it.

13          So, then I thought, okay, well, this is good, they'll

14  vote for me and I'll get paid.  And when the vote came back, he

15  called to tell me that Lisa won the vote.

16          And I was confused as to why she would be the office

17  point person, especially because she wanted nothing to do with

18  the office.  And he told me she was campaigning behind the

19  scenes, he said, so I was mad.

20  Q    You were mad at Ms. Barbonous, correct?

21  A    Yes.  Well, I was mad at everyone, really, but I really

22  felt dejected because I felt after we had had so much turmoil

23  in the office, I was always trying to really promote everybody,

24  like, wow, she did this, that was amazing, she's so good at

25  this.

1          People are picking up and really trying to show you
2     what they can do and I thought this would be an opportunity for
3     me to do that and it was taken away from me and I was angry
4     about it.
5     Q    So, it's fair to say you were cussing at Ms. Barbonous in
6     an elevated voice, is that fair to say?
7     A    Yes.
8     Q    And you were the human resources person at that time,
9     right?
10    A    Yes.
11    Q    And sitting here now, do you think that was appropriate
12    behavior for a human resources person?
13    A    In a huge cooperation, certainly not.  Should I have done
14    it?  No.  We were a small team of about eight people, ten tops
15    -- still no but it was a more relaxed office.
16    Q    That was a more relaxed office?
17    A    Well, I don't know what you mean.  It should have been, I
18    meant the relationships between the people were more lax.
19          (Audio played.)
20    Q    Did you hear Ms. Barbonous say in that conversation that
21    DP, David Paul, wrote me an email.
22    A    It's actually Daniel Pipes.
23    Q    That's what I was going to ask you, to explain to the jury
24    that DP means Daniel Pipes, Dr. Pipes?
25    A    Yes.

1   Q     And you heard her say since Greg left, and is that

2   consistent with your testimony that the recording occurred

3   after Mr. Roman had been sent out of the office, some of his

4   responsibilities removed?

5   A     Yes.

6   Q     Let's go to the Israel trip.  The week after AIPAC --

7   A     I'm sorry, it was after both Greg and Matt left that that

8   recording was made.

9   Q     The week after the AIPAC conference, so AIPAC was March

10  4th, you returned to work, Mr. Roman offered you the

11  opportunity to travel to Israel, correct?

12  A     Correct.

13  Q     You declined to take that trip, correct?

14  A     I did.

15  Q     You are aware that Mr. Roman, before he had asked you, he

16  asked Mr. Bennett to attend the trip, correct?

17  A     I never heard that until this moment.

18  Q     And you told Mr. Roman that you wanted a hotel room

19  instead of the Airbnb, correct?

20  A     Yes.

21  Q     And he said no due to the additional costs, correct?

22  A     He said that he had already gotten and Airbnb and that's

23  where he was staying.

24  Q     So, the Airbnb had already been booked by the time he

25  asked you if you wanted attend?

```
 1   A    Yes.

 2   Q    When you declined, Mr. Roman offered the seat to Lisa

 3   Barbonous, correct?

 4   A    When I declined, he said, okay, I'll ask Lisa to go and I

 5   said, okay.

 6   Q    She accepted, correct?

 7   A    She did.

 8   Q    She was very excited about the trip, wasn't she?

 9   A    Yes.

10   Q    She sent pictures of the Airbnb to her mom, right?  Were

11   you aware of that?

12   A    I don't know.

13   Q    This was just one week after the alleged couch incident,

14   right?

15   A    I believe the trip to Israel was in April I thought?

16   Q    The trip to Israel, do you think, was perhaps March 14,

17   2018?

18   A    If you say so.

19   Q    So, if you were at AIPAC on the 4th of March and the trip

20   was March 14th, would you agree that you were home for less

21   than a week before Lisa was invited to attend the trip?

22   A    I thought there was a bigger time in between.

23   Q    So, would you agree with me that Ms. Barbonous did not

24   seem concerned about staying in the Airbnb in Israel with Mr.

25   Roman?
```

1   A     I would agree.

2   Q     Dr. Pipes did not know about the trip to Israel, correct?

3   A     He did not.

4   Q     Mr. Roman instructed the staff to not tell Dr. Pipes,

5   correct?

6   A     He did.

7   Q     And you knew that you had been asked by Mr. Roman to hide

8   it from Dr. Pipes, right?

9   A     Yes.

10  Q     And you did in fact hide it?

11  A     I didn't hide it, I didn't tell him. I think he hid it.

12  Q     You did not tell Dr. Pipes?

13  A     I did not.

14  Q     And you were the HR professional at the time?

15  A     Yes.

16  Q     And you testified earlier an HR person is a position of

17  trust within the organization, right?

18  A     Yes.

19  Q     So, do you think now Dr. Pipes would have expected you as

20  the HR person to come tell him if there was something that was

21  being hidden from him that could have been of interest and

22  importance to him?

23  A     I was afraid to tell him.  Mr. Roman had made it very

24  clear that --

25  Q     I'm just going to interrupt because I'm asking you a

 1  different question.

 2  A    I'm sorry, okay.

 3  Q    My question was do you think Dr. Pipes, as the President

 4  and Founder of the Middle East Forum would have been interested

 5  to know the information and would have been expecting you as

 6  the HR person to disclose it to him?

 7           MS. SHIKUNOV:    I'm going to object because this

 8  calls for speculation.  She can't testify as to what Dr. Pipes

 9  would like to know.

10           THE COURT:  Rephrase it, Counsel, please?

11  BY MS. DIBIANCA:

12  Q    I can move on.  I'd like to talk about the dinner at the

13  sports bar, Misconduct.  Do you remember at your deposition you

14  had trouble nailing down the actual year of that dinner?

15  A    Yes.

16  Q    Have you settled on a date at this point?

17  A    I really believe that it was in 2017.

18  Q    You believe it was in 2017?

19  A    Yes.

20  Q    And your charge, you're aware that you allege it was

21  September 2018, correct?

22  A    I'm not good with dates, we could see that I'm not good

23  with dates.

24  Q    Do you know when you filed your first charge of

25  discrimination, Ms. O'Brien?

O'BRIEN-149

1   A     That was in June.

2   Q     July 24, 2019.  So, in July of 2019 you swore under

3   penalty of perjury to the United States Equal Opportunity

4   Commission that you had had a dinner at Misconduct with Mr.

5   Roman in September of 2018?

6         Does that sound familiar?

7   A     Yes, I have my dates wrong.

8   Q     So, was it September of 2018 the dinner occurred?

9   A     I'll have to look because now I'm so far removed from it

10  that I don't remember the days and I don't remember the dates.

11   But what I put in my charge is what it may have been must have

12  been because I'm sure I checked at that time.

13  Q     So, you're not able to recall today sitting here but you

14  certainly are comfortable relying on your memory at the time

15  you filed the charge, that would have been accurate, correct?

16  A     I would assume.  I don't know the date.

17  Q     But you knew it at the time you filed the charge, right?

18  A     I guess, I don't know what you want me to say.

19  Q     You testified you were traumatized by the event so I'm

20  trying to nail down the time that you are testifying that you

21  believe you had a traumatic experience.

22  A     It was a traumatic experience, this whole employment was a

23  traumatic experience when I now look back.

24  Q     The entire four years was a traumatic experience?

25  A     It is to me now.

1   Q     You claim when you were at the sports bar that Mr. Roman

2   expressed that he was having some marital problems, right?

3   A     He did.

4   Q     And at that time he asked you about your divorce, right?

5   A     He did, yes.

6   Q     At no time during that evening did Mr. Roman ever

7   proposition you, did he?

8   A     Outwardly proposition?  I'm asking you to clarify

9   proposition.  Outwardly go back to the office with me, he did

10  not ever say that.

11  Q     I don't know what the opposite of that would be but if I

12  said inwardly propositioned you, would that -- I'm not sure

13  what the opposite of that is.

14  A     I felt propositioned, he kept asking me to go back to the

15  office.

16  Q     Let's look at her deposition testimony transcript at 80 to

17  81.

18         So, at the top of 81, and you can use 80 to get you

19  to 81 if you wish, my question here that I asked you during

20  your deposition was, the end of that question is, did he

21  proposition you?       And you answered, he talked about, no,

22  I don't remember saying there was a proposition. And you go on,

23  and you can certainly read the rest of that, but does that help

24  you refresh your recollection about whether or not Mr. Roman

25  propositioned you?

1   A   That's what I was trying to clarify by what you meant by

2   proposition.  He did keep trying to get me to go back to the

3   office but he didn't say that it was to have sex.

4   Q   And I believe you testified last week that he asked you to

5   return to the office, there were three instances when he said

6   that?

7   A   Yes, to sign paperwork.

8   Q   About a bank transfer?

9   A   Yes.

10  Q   At no point in the evening did Mr. Roman ever talk about

11  sex, did he?

12  A   He talked about needing a release.

13  Q   I'd like to talk about that, Ms. O'Brien.  That is not in

14  your charge, is it?

15  A   No.

16  Q   It's not in your complaint either, is it?

17  A   No.

18  Q   It's not in your second charge of discrimination, is it?

19  A   No.

20  Q   And it's not in your second complaint, is it?

21  A   No.

22  Q   So, the first time I heard about this was at your

23  deposition.  When did you decide that Mr. Roman had said the

24  comment about a release?

25  A   There were a lot of comments that he made and I might not

O'BRIEN-152

1  remember or have included them at that point.

2  Q    Did you ever tell Daniel Pipes that Mr. Roman had made a

3  comment about a release?

4  A    I was uncomfortable even telling Dr. Pipes anything

5  sexually-related.

6  Q    But there was no conversation about sex that night,

7  correct?

8  A    Just releases.

9  Q    How many times do you contend that Mr. Roman said

10  releases, the evening of Misconduct?

11  A    He probably said it two maybe three but it was in trying

12  to drive home a point, like, release, release, like that.  And

13  that was it.

14  Q    And at no point in the evening at the sports bar did Mr.

15  Roman ever touch you, correct?

16  A    No, he didn't.

17  Q    And at one point in the evening you introduced sex into

18  the conversation, correct?

19  A    I did?

20  Q    That's what I'm asking.

21  A    I don't recall that.

22  Q    You said that you were not going to F him.

23  A    Yes, I did because I felt so uncomfortable at that point.

24  Q    So, you did introduce sex into the conversation?

25  A    I introduced it as not going to happen.

1  Q    Twice you said it to him that evening, correct?

2  A    Maybe if I said it the same way he said release, twice,

3  driving home a point.

4  Q    Your testimony at deposition was that at one point in the

5  evening you stopped, you looked at Mr. Roman and you said, you

6  know I'm not going to -- and I'm not going to say the curse

7  word in federal court -- F you, right?

8         And then you said that Mr. Roman responded by asking

9  you, quote, why would you say that, do you remember that?

10  A    Correct.

11  Q    That is what he said, right?

12  A    It is.

13  Q    And you repeated to him in response, quote, you know I'm

14  not going to F you, right?

15  A    Correct.

16  Q    And then he changed the topic, didn't he?

17  A    One of us did.

18  Q    Did you review your deposition prior to your testimony?

19  A    I did.  This is a lot.

20  Q    So, you recall then that he said that you said at your

21  deposition that after you said, you know I'm not going to F

22  you, right, for the second time, he then changed the topic and

23  the dinner went on without incident.  Do you recall that?

24  A    Correct.

25  Q    Ms. O'Brien, isn't it normal for coworkers who are friends

1    to talk about their personal lives and perhaps even their
2    marital problems when out at a sports bar in the evening?
3    A    I guess if they're both at the same level of comfort.  I
4    felt uncomfortable talking about his marriage.
5            We were supposed to go there to talk about work and I
6    started the conversation about work, and he said we're not
7    going to talk about that, let's not talk about work tonight.
8            So, I went out for the pretense of a work meeting and
9    then was suddenly at a personal meeting.
10   Q    You often talked about your personal life with your
11   coworkers, right?
12   A    I don't know how often but I'm sure everybody -- like I
13   said, it was a small group so everybody knew some of what was
14   going on in others' lives.
15   Q    You did not go back to the office that evening with Mr.
16   Roman, correct?
17   A    I did not.
18   Q    I'd like to talk about Ms. Barbonous.  Ms. Barbonous, as
19   you know, will be here to testify on your behalf tomorrow or
20   the next day, and we heard a snippet of your relationship with
21   Ms. Barbonous.
22           Would you agree with me that you had a rocky
23   relationship with Ms. Barbonous?
24   A    Yes.
25   Q    You testified I believe last week that Mr. Roman pitted

1  you and Ms. Barbonous against each other, is that correct?

2  A    Yes.

3  Q    So, is it correct to say that you blame Mr. Roman for your

4  poor relationship with Ms. Barbonous?

5  A    Yes.

6  Q    And it wasn't Ms. Barbonous's alpha female personality,

7  which were your words last week?

8  A    I have many alpha female friends, you just respect each

9  other.  And by him pitting us against each other, there was no

10  respect.

11  Q    So, the tape we heard from March 2019, I believe it was

12  March 2019, we'll say after Mr. Roman was out of the office, he

13  was not pitting you against Ms. Barbonous, correct?

14  A    Daniel Pipes was pitting us against each other when he

15  told me that but we had already had a lot of mistrust at that

16  point, there was a lot of damage done already.

17  Q    So, when Mr. Roman was in the workplace, he pitted you and

18  Ms. Barbonous against each other, right?

19  A    Yes.

20  Q    And then when he was not there anymore, he had been

21  exiled, Dr. Pipes began to pit the two of you against each

22  other, right?

23  A    I don't think he did it repeatedly, he did it in that

24  instance.

25  Q    By telling you that he thought Ms. Barbonous had

1  campaigned for herself?

2  A    Yes.

3  Q    But that was the truth, wasn't it, she had campaigned for

4  herself?

5  A    She had said she didn't.

6  Q    So, it was Dr. Pipes at that point who was causing the

7  animosity?  It had nothing to do, then, with the fact that you

8  and Ms. Barbonous did not get along?

9  A    We got along often, we would get along sometimes and not,

10 we would argue but then we would always be able to work

11 together.

12 Q    Were you getting along on the tape we just heard?  Was

13 that you getting along?

14 A    That was one of our fights.

15 Q    That was you not getting along?

16 A    Correct.

17 Q    How much of the time percentage-wise always that you did

18 actually get along during her tenure with Middle East Forum?

19 A    I would say most.  Towards the end when he was having me

20 document her, that's when it started to really get bad.  But we

21 would go, we'd go, we'd get along, we wouldn't, we'd have our

22 issues, we'd let it go and we'd get back to work.

23 Q    During your deposition, do you recall we reviewed some

24 text messages in which Ms. Barbonous used some particularly

25 foul language about you with your coworkers?

 1   A     I'm sorry, when did we do that?

 2   Q     Ms. Barbonous sent text messages to Ms. McNulty and Ms.

 3   Brady calling you words that I really don't want to put on the

 4   screen, do you remember that?

 5   A     When was that?

 6   Q     Early March.

 7   A     Was that in the deposition that we looked at those, is

 8   that what you said?

 9   Q     Yes, do you recall them?

10   A     Vaguely but yes.

11   Q     You testified last week that you do not believe Ms.

12   Barbonous had the qualifications for the job for which she was

13   hired, correct?

14   A     That was openly discussed during her interview.

15   Q     My question was just last week you testified that you

16   thought at the time she was hired, she did not have the

17   qualifications, right?

18   A     Yes.

19   Q     And you were very open about that at the time she was

20   being hired?

21   A     During the interview, yes.

22   Q     And I believe you testified last week that during Ms.

23   Barbonous's actual interview, you told her that she would hate

24   the job and she would either quit or get fired, right?  Do you

25   remember testifying to that?

O'BRIEN-158

1    A    Yes.

2    Q    You were the HR person and you told a job candidate during

3    her interview that she'd hate the job or end up getting fired

4    or quit?

5    A    She wanted to be content-based and that's what she talked

6    about during her interview.

7    Q    I'm just asking the question of when did you say during

8    your interview?  I promise your Counsel will have the

9    opportunity to follow up with this.

10   A    I'm sorry.

11   Q    So, did you tell a candidate that? As the HR person, you

12   told a candidate that during a job interview?

13   A    Yes.

14   Q    And do you think that was appropriate for the HR person to

15   tell a candidate that they were going to hate the job and would

16   quit or get fired?

17   A    In that instance there was a whole conversation about how

18   she had no skill set for that job, she had never done it before

19   so I feel it was practical thinking.

20        Normally, when you're hiring an executive assistant

21   you hire someone with an executive assistant skill set and she

22   didn't have it.

23   Q    But she wasn't going to be just an executive assistant,

24   was she, she was hired to go into a different position, wasn't

25   she?

1   A    And I suggested that when he was ready to hire for that

2   position he'd call her back.  Because he needed an executive

3   assistant, he should hire an executive assistant.  Q   Ms.

4   Barbonous was loud in the office, wasn't she?

5   A    Yes.

6   Q    And she was disruptive in the office, wasn't she?

7   A    Yes.

8   Q    You didn't like she was loud, correct?

9   A    Correct.

10  Q    And you complained that she was frequently disruptive,

11  correct?

12  A    Yes.

13  Q    She was often late to work, correct?

14  A    Yes.

15  Q    And sometimes she left during the work day to get her hair

16  and nails done, didn't she?

17  A    Yes, but I think that was on her lunch break.

18  Q    You testified in her deposition that Ms. Barbonous was,

19  quote, the angry, aggressive, alpha-type personality, right?

20  A    During my deposition I said that?

21  Q    Yes.  And that's still your testimony today, that Ms.

22  Barbonous was the angry, aggressive, alpha-type personality?

23  A    Yes.

24  Q    You also testified during your deposition that she was

25  high-strung, correct?

1    A    Yes.

2    Q    And you agree today that Ms. Barbonous is a high-strung

3    individual?

4    A    Yes.

5    Q    You also testified during your deposition that Ms.

6    Barbonous often flies off the handle, do you remember that?

7    A    I agree with it.

8    Q    Do you agree today that Ms. Barbonous often flies off the

9    handle, correct?

10   A    Yes.

11   Q    Prior to her trip to Israel in March 2018, you had

12   addressed her lateness with her, didn't you?

13   A    I had what?

14   Q    You had spoken to Ms. Barbonous to address the fact that

15   she was often late to work, right?

16   A    I don't recall.

17   Q    We'll go back to it.  And prior to the Israel trip you had

18   called her out for being loud and disruptive in the office,

19   right?

20   A    I may have.

21   Q    But you don't have any actual firsthand knowledge of

22   whether or not Ms. Barbonous successfully performed her job

23   duties, do you?

24   A    I would ask Mr. Roman because he would discuss people's

25   work ethic or just the status of their work, and I would ask

1   him if she was doing a good job.  And he always said yes.

2   Q    And you don't have any firsthand personal knowledge that

3   was not correct, do you?

4   A    I don't.

5   Q    You alleged that following his return from Israel in March

6   2018, Mr. Roman told you to document Ms. Barbonous' performance

7   and attendance issues, correct?

8   A    He did.

9   Q    He said Ms. Barbonous was not doing her job and that's why

10  he wanted you to document those issues, correct?

11  A    Correct.

12  Q    You were human resources at the time, right?

13  A    Yes.

14  Q    And you were already documenting her lateness and

15  behavioral problems, correct?

16  A    I wasn't, I think he wrote her up one time or something

17  like that but I wasn't really documenting it.  I wasn't keeping

18  a log, which is what he had told me to do at that point.

19  Q    So, as HR, it makes sense that you would be asked to

20  document performance and attendance issues?

21  A    Yes.

22  Q    And you agree that there's nothing wrong with documenting

23  those things when someone is not doing a good job, correct?

24  A    Correct.

25  Q    And in fact, as a human resources professional you know

1    that employers are supposed to document performance problems,

2    correct?

3    A    Yes, you have to give the person an opportunity to correct

4    their behaviors.

5    Q    Ms. Barbonous had her own issues, didn't she?  Did she

6    talk about her sex life in the workplace, Ms. O'Brien?

7    A    Yes.

8    Q    You never reported to that to anyone, that that was a

9    problem, did you?

10   A    No one ever complained about it.

11          I would jokingly, not jokingly but seriously

12   jokingly, because everybody did have a friendly relationship, I

13   would say, is anyone offended by Lisa?  Let me know.

14   Q    You said that?

15   A    I did say that.

16   Q    To whom did you say that?

17   A    When she would make an inappropriate comment or whatever,

18   I would say if anyone's offended you've got to let me know.

19   Q    And that happened more than once, right?

20   A    Yes.

21   Q    While you were employed as HR with the Forum you were

22   aware that Ms. Barbonous had sexual encounters with multiple

23   different men connected to the Forum, correct?

24   A    I did.

25   Q    You did not report that to anyone at the Forum, correct?

1  A    Correct.

2  Q    I'd like to take a look at DX 96.  It would be helpful if

3  I pointed out which part, I'm looking at June 4, 2018.  Down at

4  the bottom there.

5       In this message, Ms. O'Brien, you ask Mr. Roman to

6  please call you when he had a moment but to please not mention

7  to anyone that you asked to speak with him.

8       Do you see that highlighted portion there?

9  A    I do.

10 Q    And I should have said this is again a text message

11 between you and Mr. Roman.  So, in June 2018 did you feel

12 comfortable speaking to Mr. Roman in private?

13 A    I have no idea.  I would speak to him on the office or on

14 the telephone.

15 Q    But you were comfortable having communications you didn't

16 want others to know about, correct?

17 A    I don't have any idea what that's about.

18 Q    You don't remember this?

19 A    No, I don't remember it.  I'm not saying I didn't say it

20 but I don't know why I said it.  He was my boss and he was the

21 one that made the decisions about the office.

22 Q    Let's go to the incident on October 30, 2018.  There were

23 times that you and Ms. Barbonous got into heated arguments in

24 the workplace, correct?

25 A    I don't know, I don't recall getting heated like that day.

1   Q     What day?

2   A     October 30th.

3   Q     I'm just talking generally speaking. So, at any time

4   during your time at the Forum did you and Ms. Barbonous

5   exchange loud words?

6   A     I don't recall a specific instance. Like I said, we didn't

7   get along all the time but not like this.

8   Q     And we're talking about this, we'll go ahead and get to

9   it.  So, the this that you're mentioning is the fight that you

10  and Ms. Barbonous got into on October 30, 2018, right?

11  A     Yes.

12  Q     You have a recollection of the events on that date?

13  A     I do.

14  Q     A pretty clear recollection?

15  A     Yes.

16  Q     You went to the office that morning, correct?

17  A     Correct.

18  Q     At some time during the morning Ms. McNulty was there?

19  A     Correct.

20  Q     And Ms. Barbonous was there?

21  A     Correct.

22  Q     The two of them, Ms. Barbonous and Ms. McNulty, were

23  meeting in an office with the door closed, is that your

24  recollection?

25  A     Correct.

1   Q    You then texted Matthew Bennett.  Let me ask you this,

2   what was Matthew Bennett's role as compared to you?  Was he

3   management?

4   A    No, he was a director of development.

5   Q    He wasn't your direct report, he was more of a peer, is

6   that fair?

7   A    Yes.

8   Q    And he wasn't your boss?

9   A    No.

10  Q    So, at some point in the morning you texted Mr. Bennett to

11  see if he was coming in, right?

12  A    I suppose.

13  Q    And when he did get to the office, you told Mr. Bennett

14  that Ms. Barbonous and Ms. McNulty had been meeting behind

15  closed doors for the past 20 minutes, do you recall that?

16  A    I don't recall that but I may have. They were behind

17  closed doors and the thing about it was that usually, everybody

18  had their doors open so it was weird when somebody shut the

19  door.

20  Q    It was weird so is that why you mentioned it to Mr.

21  Bennett?

22  A    I don't remember mentioning it to Mr. Bennett.  I thought

23  that I had told Greg when he called in or something, or maybe I

24  mentioned it to Mr. Bennett, I don't know.

25  Q    Do you recall that Mr. Bennett questioned Ms. McNulty

 1   about the topic of her closed-door meeting?

 2   A    I remember Greg or Mr. Roman told me to go in there and

 3   find out what they were doing, and I said I wasn't comfortable

 4   doing that because I was not their boss.

 5   Q    Mr. Roman was not there that day, was he?

 6   A    Right, I guess we were texting or had a phone call, he

 7   would call in when he was not at the office.

 8   Q    But just so we're all clear, he wasn't in the office?

 9   A    It may be that he talked to Matt and Matt said Greg wants

10   you to -- the instruction was for me to go in there and find

11   out what they were talking about and I said, no, I'm not doing

12   it.

13           And then Matt did, Mr. Bennett did.

14   Q    Who did you tell you weren't going to do that?  You said

15   you weren't going to do it but I'm not sure if --

16   A    I'm not sure if I spoke with Greg or if Mr. Bennett spoke

17   with Greg, or if I did.  But I know that they wanted me to go

18   in and say, what are you guys talking about, and I said, no,

19   I'm not doing it.

20           I thought I had spoken with Greg on the phone but I

21   could be wrong.

22   Q    So, if I told you that Mr. Bennett intends to testify that

23   you texted him and told him there was a closed-door meeting and

24   you were concerned about it, would that be inconsistent with

25   what your testimony is right now?

1   A    I don't think it's inconsistent because I wasn't sure how

2   I told somebody, but that makes sense, yes.  And then he must

3   have said to me, Greg was to go in and found out what they're

4   talking about, and I said no.

5   Q    Why did you say no?

6   A    Because them worked on projects together, I didn't have

7   anything.

8          Even if they were working on something, I didn't know

9   what it was, I didn't know what they were doing, I wasn't their

10  boss, them made it very clear to me that I was not to tell them

11  what to do because I wasn't their boss.

12         And he was telling me that I was management but they

13  were not responding and I said you've never told them they have

14  to listen to me so I'm not going to, I'm not doing it.

15  Q    All that happened on October 30th?

16  A    Yes.

17  Q    You told them you weren't going to do it, for all those

18  reasons you just said, on October 30th?

19  A    Yes.

20  Q    Mr. Bennett questioned Ms. McNulty about the topic of her

21  meeting with Ms. Barbonous, right?

22  A    He did and he said that Marnie told Greg that you guys

23  were in their meeting?

24  Q    And did that upset them?

25  A    They were very angry.

1  Q    Because they felt like you had been tattle-taling on them?

2  A    Correct.

3  Q    As a result of Mr. Bennett approaching them about their

4  closed-door meeting, which he pointed in your direction for,

5  you and Ms. Barbonous got into a screaming match, right?

6  A    Correct.

7  Q    She screamed at you and you screamed at her, correct?

8  A    Correct.

9  Q    You backed her into her office?

10 A    Correct.

11 Q    You then yelled at Mr. Bennett?

12 A    Correct.

13 Q    And then you proceeded to storm out of the office?

14 A    Correct.

15 Q    Before you stormed out of the office you did yell at Ms.

16 Bennett as well, right?

17 A    Correct.

18 Q    You texted Mr. Roman immediately after you walked out, do

19 you remember that?

20 A    No.

21 Q    Would you agree with me that's the case?

22 A    I may have, he was my boss and I just had a big fight in

23 the office and we looked like we were crazy, so I probably

24 wanted to let him know.

25 Q    You wanted to let him know that you had just --

```
 1   A     I was angry.

 2   Q     And that you had just screamed at Ms. Barbonous and then

 3   Mr. Bennett in the workplace, right?

 4   A     Yes.

 5   Q     And you would agree with me that was not appropriate

 6   behavior for a human resources professional to engage in,

 7   correct?

 8   A     Correct.

 9   Q     So, you wanted make sure that Mr. Roman knew so that you

10   didn't get in trouble, right?  Let me ask it this way.  You

11   were worried that you were going to get in trouble, correct?

12   A     I was more angry at that point because I was angry at him

13   as well because I felt like he enabled discord in the office.

14   Q     So, you were angry at Ms. Barbonous, you were angry at Mr.

15   Bennett, and you were angry at Mr. Roman, right?

16   A     Yes.

17   Q     Were you angry at Ms. McNulty too?

18   A     No.

19   Q     So, let's look at DX 101 again, please, the top of the

20   first page.  This is a text message between you and Mr. Roman,

21   October 31, 2018.

22         At 3:19 p.m. you said, you need to call me.  Do you

23   see that?

24   A     Yes.

25   Q     And then one minute later at 3:20 p.m. you texted him, I'm
```

1   leaving for the day, I'll call you when out the door, is that

2   right?

3   A    Yes.

4   Q    So, you left for the day?  You left the office and did not

5   return, correct, after the screaming match?

6   A    Correct.  No, this is the wrong day because this is

7   October 31st so this is the next day.

8   Q    The 31st is the next day, the 30th, I apologize.  So,

9   let's go back up to the 30th, you say at 10/30/2018, can you

10  give me a call when you get a chance, a couple of questions?

11          Would that be before or after?  And I apologize for

12  that, that I gave the wrong date.

13  A    Can you see the time?  I can't tell what the time is.

14  Q    22:51.

15  A    Which is what time?

16          MS. SHIKUNOV:  10:51 p.m. It's minus 12 if it's

17  military time.

18          THE WITNESS:  That was in the morning.

19  BY MS. DIBIANCA:

20  Q    So, that was before the screaming match?

21  A    Yes.

22  Q    Now, you know now that Ms. Barbonous made a complaint

23  about you that day?

24          THE COURT:  I'm sorry, I don't know if it matters but

25  did you say that 22:00 was the morning?

O'BRIEN-171

1              MS. DIBIANCA:  That's what the witness said, I

2    didn't.

3              THE COURT:  Do the parties agree that would have been

4    the time?

5              MS. SHIKUNOV:  There was talk at the deposition that

6    this was Mountain Standard Time, which I don't know the

7    conversion of.

8              So, I can agree that it was at 10:51, whether it's

9    a.m. or p.m. I have no idea.  And if it was that time in

10   Philadelphia, I also do not know.

11             MR. CAVALIER:  It's Israel time, plus 7.

12             THE COURT:  Too much math.

13             MS. DIBIANCA:  I'm counting on my fingers right now.

14    So we'll just agree it was on the 30th, that's fair enough for

15   now.

16             THE COURT:  I'm sorry, I didn't mean to --

17             MS. DIBIANCA:  Thank you, Your Honor, for the

18   clarification.

19             THE COURT:  Such that it wasn't.

20             MS. DIBIANCA:  When the dust settles, no one will

21   remember.

22   BY MS. DIBIANCA:

23   Q    Now, you know now sitting here today that after the

24   screaming match that day on the 30th, Ms. Barbonous later filed

25   a complaint about that incident in particular, right?

1  A    She had told me she did it when we met for coffee.

2  Q    So, you are aware that she filed a complaint in the

3  workplace about your behavior towards her on October 30th?

4  A    Yes, I have been instructed to do the same.

5  Q    You've seen the complaint, right?

6  A    Yes.

7  Q    Let's look at it, DX 26.  Now, you did not write this but

8  I'm just asking if you've seen this before?

9         This is an email from Lisa Barbonous on the afternoon

10 of October 30, 2018 to Mr. Roman copying the Forum's in-house

11 counsel, Mr. Fink, would you agree with that?

12 A    Yes.

13 Q    Let's go to, if you can, the bottom so we can see the

14 original and we're not doing it backwards.  That would be it

15 right here.  This is Ms. Barbonous's complaint to Mr. Roman.

16 A    On the 30th.

17 Q    That's right, exactly, at 1:47 p.m. and I'm going to read

18 just excerpts of it.

19         Please read the whole thing so that you have context

20 but what I'm going to point out is that she says I am

21 constantly monitored and micro-managed.

22         Do you see that?

23 A    Yes.

24 Q    She says that today around noon I was having a

25 conversation about the Tommy Robinson event with Tricia prior

1   to our call.  I shut the door because I am constantly being

2   reprimanded for being loud and I was trying to be respectful.

3          She says I would like to know that the only person

4   who has an issue with my loudness is Marnie.  Marnie proceeded

5   to ask Matt, I'll infer there that's Mr. Bennett, why you were

6   in my office with the door closed, making a big deal about

7   nothing.

8          She says this is not the first occurrence, I am

9   constantly monitored and singled out about my time in the

10  office.  When did you first see this complaint that Ms.

11  Barbonous wrote about you?

12  A   After we had spoken at coffee on the 31st, she had shown

13  me what she sent.

14  Q   She goes on to say, you can guarantee once every two

15  weeks, Marnie calls me into her office to speak to me about my

16  time.  She claims that you view her as a manager, Marnie claims

17  that Mr. Roman views Marnie as a manager, and she, Marnie,

18  needs to deal with people being late.

19         Did you need to deal with people being late as the HR

20  person?

21  A   An HR person doesn't monitor somebody's lateness, the

22  supervisor does, and then I guess it's handled in HR.

23  Q   So, you would be the person to deal with it, correct?

24  A   Correct.

25  Q   Do you remember having conversations with Ms. Barbonous

1  about how you believe that Mr. Roman saw you as a manager and

2  that Mr. Roman --

3  A    Mr. Roman told me that, that's why I believed it.

4  Q    I'm not arguing, I'm just going through the steps, and

5  that you needed to deal with people being late.  Remember

6  telling Ms. Barbonous that?

7  A    I don't.

8  Q    Is there more we can look at?  Thank you.  She says in her

9  complaint, I feel that Marnie targets me and has made it her

10  mission to reel me in because she has said as much.

11        When did you tell Ms. Barbonous that it was your

12  mission to reel her in?

13  A    I don't remember saying that, I don't know what she's

14  talking about that there.

15  Q    Maybe I shouldn't use the word mission.  Do you remember

16  telling Lisa that it was your job to reel her in?

17  A    Greg had told me to document her.

18  Q    She says, additionally, when others are being loud, no one

19  including Marnie ever says a word to them.  Was Lisa the only

20  one you dealt with for being loud in the office?

21  A    Yes, she was loud.

22  Q    The next paragraph says, I know I am being targeted.  The

23  next paragraph starts, we all know this is not the first

24  occurrence of her singling me out.

25        I am fearful that with Marnie as the HR person my job

1   is in jeopardy.  I believe this because when after we were in

2   your office talking about your position a few weeks ago, Marnie

3   said to me, quote, you are lucky it's not me because I would

4   not have given it to you, end quote.

5            She also said that she told you that you should,

6   quote, deal with my attitude before offering me any additional

7   work, period.  Did you tell Mr. Roman that he ought to deal

8   with Lisa's attitude before he gave her additional work?

9   A    So, he was saying he was going to give her additional

10  content stuff and I don't know what was going on between them,

11  but he wanted me in the office and he called her in to talk to

12  her about giving her the additional responsibilities.

13           And I was excited for her because I knew she wanted

14  that, and something had happened and she stomped through the

15  door and she pulled the couch off the wall and sat in the chair

16  and was like this -- and then he continued to give her the

17  position.

18           The way that she behaved in that office, I would have

19  never given her what she wanted at that point.  She needed to

20  be addressed for that but he didn't and he's the boss, and I

21  told her that, I'm blunt.

22  Q    You know that the Forum responded to Ms. Barbonous's

23  complaint about you, correct?

24  A    I think it was at the top, right?

25  Q    I didn't mean there was an email chain, let me be more

O'BRIEN-176

1   specific.  You know that them brought the Forum's in-house

2   attorney, Mark Fink, into the loop, right?

3   A    I did.  Well, I was told that, actually I was told that by

4   Greg.

5        He called me the next morning and said that Lisa

6   filed a complaint against you and Mark's coming in the office

7   and he's going to discuss it with everybody, but don't worry, I

8   can make this go away.

9   Q    He told you that the next morning and that means October

10  31st?

11  A    Let me think.  Yes, it would have been the next day.

12  Q    And you know that Mark Fink rarely came into the office?

13  A    Correct.

14  Q    So, when Mark Fink came in the office something generally

15  serious was going on?

16  A    He didn't come into the office, it was going to be on

17  Friday.

18  Q    But the only time he would come into the office was for a

19  serious matter?

20  A    Correct.

21  Q    And he was higher than you in the chain of command as far

22  as HR?

23  A    Yes.

24  Q    Were you worried it had escalated to a new level once

25  Attorney Fink was involved?

 1   A    Yes, I was worried that Greg was getting rid of both of us

 2   at that point because I already knew he was targeting her, and

 3   then when he brought in Mark Fink to address my behavior, now

 4   he's targeting me as well.

 5   Q    So, you were worried that would you rather going to be

 6   fired over Ms. Barbonous --

 7   A    I absolutely 100 percent was.

 8   Q    I appreciate you being willing to answer the question but

 9   I just have to finish it for the record.  So, you were worried

10   that you were going to be fired over Ms. Barbonous' complaint

11   against you, correct?

12   A    No, I was worried that I gave him a reason to fire me, I

13   gave him an excuse.

14   Q    And Mr. Fink, the Forum's attorney, was going to come into

15   the office that week to interview others about what had

16   happened on October 30th, right?

17   A    Correct.

18   Q    And so I believe your deposition testimony is that you

19   were, quote, immediately concerned that you were going to be

20   fired?

21   A    Absolutely.

22   Q    So, the next morning --

23   A    Excuse me?

24   Q    Yes.

25   A    I was concerned because Lisa and I had had that

1    conversation.  When Greg called me after our conversation in

2    the morning, I told him that I wasn't going to write her up and

3    he wouldn't like what I was going to say because I knew about

4    Israel at that time.

5            That's when I found out, that's why I was concerned

6    that Mark Fink was going to get rid of me as well because he

7    knew that I now knew, or suspected.

8    Q    I suspect we may have gotten our dates a little wrong

9    again so let's work through it.  On October 30th you had the

10   fight?

11   A    Correct, and I left at the end of the day.

12   Q    You stormed out after the fight?

13   A    Correct.

14   Q    And your testimony today is that Mr. Roman called you in

15   the morning of October 31st and said you ought to submit a

16   complaint too and I'm going to do my best to work it out?

17   A    I was told on the 30th to submit a complaint.

18           When he was out of the office he would call in and we

19   would talk, he'd talk to whoever he needed to talk to and when

20   he talked to me, that's when he told me that he could make it

21   go away.

22   Q    I'm sorry, because you said that you knew about Israel but

23   what would you have known about Israel on October 30th?

24   A    I'm sorry, you're right, that was in the morning I found

25   out about that so it wasn't until the next day after we had the

1   fight when we had coffee that she told me about it.

2           And he called me after that and that's when I was

3   like, I'm not -- I was so mad.

4   Q    So, he called you at what time on October 31st?

5   A    He called the office, I spoke to him on the office phone,

6   I believe I spoke to him on his cell phone too at some point in

7   there.

8   Q    Before you and Ms. Barbonous went out for coffee?

9   A    After.

10  Q    But you wouldn't speak with him because you were so mad?

11  A    No, I did speak with him, yes.

12  Q    And that's when he said he could make it go away?

13  A    Correct, he told me that she wrote me up, Mark was going

14  to come in but he could make it go away.

15  Q    So, the morning of October 31, 2018, you sent a text

16  message to Mr. Roman and said you were going to text Lisa this

17  morning to see if she wants to meet for a cup of coffee before

18  coming into the office so that we can smooth things over?

19  A    Correct.

20  Q    And were you hoping that you would avoid getting into

21  trouble at that point?

22  A    I didn't know anything about Mark Fink or that she had

23  written me up at that point.  I don't know if he called me or

24  texted me that night and told me to call Matt Bennett and

25  smooth it over with him.

1          So, I did that, Matt and I spoke, smoothed it over,

2    and then the next day I was looking about going into the office

3    the next day, thinking about going into the office the next

4    day.

5          Greg and Matt were both not going to be there, it was

6    just going to be the office staff and I thought that it would

7    be really uncomfortable.

8          So, in the same vein where he instructed me to smooth

9    things over with Matt, I told him I was going to reach out to

10   her and smooth things over as well so that it wasn't awkward in

11   the office the next day.

12   Q    And you and Ms. Barbonous did meet outside the office on

13   October 31, 2018, correct?

14   A    Correct.

15   Q    You met at the Starbucks and then went and sat some place,

16   is that right?

17   A    Yes.

18   Q    At that time, I'll call it a meeting, I don't know if

19   that's perhaps too formal of a term, but during that meeting

20   between the two of you, you and Ms. Barbonous, she expressed

21   that she was worried about her job, right?

22   A    Yes.

23   Q    And then she tried to make some excuses about how she

24   hadn't done the various things that she'd been accused of as

25   far as her performance went?

 1  A    I don't recall discussing her performance.

 2  Q    During your deposition didn't you testify that Ms.

 3  Barbonous tried to make excuses about how she hadn't done the

 4  various things she'd been accused of as far as her performance?

 5  A    I don't remember my exact words but I remember that she

 6  was scared that she was going to lose her job, she felt like

 7  she was being persecuted, she couldn't do anything right, and

 8  she was working hard and was afraid of losing her job.

 9  Q    She told you that she felt that you were persecuting her,

10  correct?

11  A    Yes.

12  Q    And she told you that she felt that you were harassing

13  her?

14  A    Yes.

15  Q    By this point she also was fearful about being fired,

16  wasn't she?

17  A    Correct, I think she was fearful before that.

18  Q    And you were afraid for your job too as of October 31,

19  2018, weren't you?

20  A    Yes.

21  Q    And that was at least in part because Mr. Roman no longer

22  relied on you as his right-hand person, right?

23  A    Yes, I noticed that I had been kind of benched.

24  Q    And that was in favor of Mr. Matthew Bennett, correct?

25  A    Correct.

1  Q    Matthew Bennett had started to do some of the point person

2  things that you were doing for Mr. Roman at some point?

3  A    Correct.

4  Q    And Mr. Bennett speaks Hebrew?

5  A    He does.

6  Q    And Mr. Bennett has a number of skill sets that you don't

7  have that are relevant to that position, correct?

8  A    I don't know his skill set.

9  Q    So, you were afraid that you were going to be fired at

10  least in part because Mr. Bennett had taken on some of your

11  role, right?

12  A    I was afraid I was going to be fired because I told Mr.

13  Roman that I didn't want to have sex with him.  I felt I was

14  going to be fired because I turned down Israel, because that's

15  when it started to shift after that.

16         And after Ms. Barbonous told me what had happened to

17  her in Israel and we had had that huge argument the day before,

18  I felt that my days were numbered there.

19  Q    At your deposition you testified you were afraid that you

20  were going to be fired because Matthew Bennett had taken over

21  the position of right-hand person to Mr. Roman.  So, was that

22  testimony true?

23  A    It is true and he had taken it over because I had fallen

24  out of favor because I wouldn't sleep with him, that's what I

25  believe.

O'BRIEN-183

1  Q    Because you wouldn't sleep with Mr. Roman?

2  A    Yes.

3  Q    That's your testimony?

4  A    That's what I believe, yes.

5  Q    Did Mr. Roman at any time ask you to sleep with him?

6  A    He's much more calculating than that.

7  Q    He did not, correct?

8  A    He did not, no.

9  Q    He never laid a hand on you, did he?

10 A    He did not.

11 Q    He never cornered you in the office, right?  You were

12 never physically afraid, were you?

13 A    No.

14 Q    He didn't hit on you, did he?

15 A    He did, though it was very subtle.

16 Q    So subtle, do you think, that he knew he was hitting on

17 you?

18 A    Yes.

19 Q    And that was at that bar in September 2018?

20 A    Yes, it was there.

21 Q    So, I believe you testified last week that during your

22 meeting with Ms. Barbonous on October 31, 2018, Ms. Barbonous,

23 in addition to telling you that you were persecuting her, that

24 you were harassing her, and that she was fearful because of you

25 about being fired, she also told you that something

1   inappropriate had happened in Israel.  Is that your testimony?

2   A    Correct.

3   Q    At that point, Ms. O'Brien, you were the human resources

4   person --

5   A    Correct.

6   Q    -- receiving a complaint from an employee about what that

7   employee claimed to be, or what you interpreted to be,

8   inappropriate conduct by that employee's supervisor?

9   A    Correct.

10  Q    Would you agree that with me that the most basic duty of a

11  human resources professional would be to report such a claim

12  immediately to the person in power?

13  A    Correct.

14  Q    You did not immediately report it, did you?

15  A    I was afraid to.

16  Q    You did not immediately report it, did you?

17  A    I did not.

18  Q    You and Ms. Barbonous agreed that you would not report it

19  right away, didn't you?

20  A    She didn't want to report it so yes, we did, I'm sorry,

21  you're right.

22  Q    Let's look at DX 48, please.  Your Counsel has moved this

23  and the jury will be able to use it, it's the entire packet of

24  text messages.

25          But, so we can move it along, I'm going to point you

1  to individual ones.  This is a text message, your name at the

2  time or in this contact was Myer, that was your married name

3  but you're now O'Brien?

4  A    Correct.

5  Q    This is from you to Ms. Barbonous, and it's difficult to

6  see because it's not her name there but that's her phone

7  number, correct?

8  A    Correct.

9  Q    And this is October 31st?

10 A    Correct.

11 Q    You say to Ms. Barbonous -- this is immediately following

12 the meeting after coffee, right?

13 A    Correct.

14 Q    You're walking away and you say they are going to ask what

15 we talked about, like our similar personalities, how we need to

16 respect each other's space, drawing lines between

17 responsibilities and how we don't want to get emotional in the

18 office anymore so we can work together better.

19          That was the cover story that you and Ms. Barbonous

20 agreed to share, right?

21 A    I certainly did not want Mr. Roman to know that she

22 reported to me what had happened in Israel.

23 Q    This was the story you agreed to tell, correct?

24 A    So that we didn't get fired, yes.  We were afraid he was

25 going to fire us.

1  Q    You're laughing?

2  A    I'm not laughing, I really don't think this is funny at

3  all, I'm sorry.

4  Q    So, this was the cover story that you and Lisa agreed to

5  tell?

6  A    If that's what you want to call it.

7  Q    You tell me what you want to call it.

8  A    I would say while we were totally figure out how to handle

9  this, because it was so scary, we just wanted everyone to think

10  that there was no discourse between us.

11        And I didn't want anybody to know what she had told

12  me, or that I knew that.  I certainly didn't want Greg to know

13  I knew it.

14  Q    You can go to the next one.  Ms. Barbonous immediately

15  agreed to your proposal, saying that she was on board for all

16  of that, right?

17  A    Yes.

18  Q    You can go to the next one as well, Mr. Hobbs, DX 49 and

19  then DX 50.  She said to all of that, right, she was on board

20  to all of that?

21        MS. SHIKUNOV:  I'm going to object to there being any

22  further extrapolation as to what the claim language of the text

23  message, they're being mischaracterized.

24        THE COURT:  She's asking the witness, the witness can

25  answer.

1  BY MS. DIBIANCA:

2  Q    If we can go to DX 51, I'll let you read it, Ms. O'Brien.

3   What did you respond back?

4  A    Good.

5  Q    Good, smiley face, right?

6  A    Yes.

7  Q    DX 57, please.  Less than an hour later, you texted Ms.

8  Barbonous and said what?

9  A    We both need to be model employees right now.

10  Q    So, you were further agreeing on your cover story, right?

11         MS. SHIKUNOV:  I'm going to object to it being

12  characterized as a cover story, Your Honor.

13         THE COURT:  The witness can answer, Counsel.

14         THE WITNESS:  I don't agree to it being a cover

15  story, that's not a cover story.  We did both need to be model

16  employees right now.  He had tweaked the situation between us

17  so horribly that we were looking like the crazy ones.

18         We had just had an argument in the middle -- two

19  grown women almost fist-fighting in the middle of an office and

20  there's no evidence, and it's he said, she said.

21         And he's the boss and he's already gotten rid of

22  Tiffany Lee and he's already gotten rid of --

23         MS. DIBIANCA:  I'm going to stop you because you're

24  running down a path.

25         THE WITNESS:  I thought I was allowed to answer.

1   BY MS. DIBIANCA:

2   Q    So, you said you both needed to be model employees right

3   now, right?

4   A    I did.

5        MS. SHIKUNOV:  Your Honor, I would ask that she be

6   permitted to finish her answer, she was being responsive to the

7   question that was asked.

8        THE COURT:  Respectfully, I don't think it was

9   responsive.  What is the question for the witness?

10        MS. DIBIANCA:  The question before the witness is

11   whether she said that we both need to be model employees right

12   now.

13        THE COURT:  Do you have more on that?

14        MS. DIBIANCA:  I don't, I'm going to the next

15   exhibit.  Thank you, Your Honor.  DX 59, please.

16   BY MS. DIBIANCA:

17   Q    So, your Counsel doesn't object to my question, why don't

18   you go ahead and tell us what you said to Ms. Barbonous in this

19   text message?  This is the same day or this is just minutes

20   later, right?

21   A    Yes.

22   Q    What did you say here, Ms. O'Brien?

23   A    We need to steer clear of each other around everyone else.

24    I believe you about what happened in Israel.  I said, they

25   need to think we are at odds, though, they are trying to pit us

1    against each other, probably to get rid of both of us.

2    Q    They need to think we are at odds, who's they?

3    A    Greg, Matt, Stacy.  I was afraid that --

4    Q    Who are they?

5    A    Greg, the office, everyone in the office, Dr. Pipes wasn't

6    in the office.

7    Q    Mr. Roman wasn't in the office either, though, right?

8    A    But he would call in and ask who's doing what, what's

9    going on, who's doing what so I didn't want anybody reporting

10   back to him that, oh, Marnie and Lisa are in the office behind

11   closed doors.

12   Q    But this says they need to think we are at odds.  You were

13   not at odds with Ms. Barbonous when you sent this text message,

14   right?

15   A    No.

16   Q    So, you wanted mislead Mr. Roman?

17   A    I didn't want anybody to know what I knew because I was

18   terrified that he would fire both of us before we could even

19   figure out what to do.

20   Q    Did you want to mislead the organization?

21   A    No, I did not want to mislead the organization.

22   Q    But you were not at odds but you wanted them to think you

23   were at odds?  So, you were hiding the situation at this time,

24   correct?

25   A    I was afraid for my job.

O'BRIEN-190

1  Q    You were hiding the situation at this time, correct?

2  A    Because I was afraid I was going to get fired.

3  Q    You were?

4  A    Because I knew.

5  Q    You were hiding information at this time, yes or no?

6  A    Yes.

7  Q    So, as the HR person, you were instructing Ms. Barbonous

8  at that time or at least suggesting to her at that time that

9  she lie, correct?

10  A    She did not want to file a complaint so I was trying to --

11  well, she didn't know what she wanted to do so she was trying

12  to figure it out and I said nobody can know.

13        It's a very small office, you tell one person and

14  everybody knows.  You can't let anybody know what's going on

15  until you decide what you want to do, that was the mindset.

16  Q    DX 65, please.  How about this one, Ms. O'Brien, if you

17  could read that to the jury so your Counsel doesn't object?

18  A    We just need to be smart and no one else can know that we

19  have each other's backs.

20  Q    So, would you agree with me based on this text message

21  that you were encouraging Ms. Barbonous to be secretive?

22  A    I was trying to protect her and myself.

23  Q    Were you encouraging her to be duplicitous?

24  A    She wanted time to think about what she wanted to do and

25  during that time, I was trying to protect her and myself.

1   Q    We'll let the jury decide whether this is duplicitous or

2   secretive.  DX 78, please.  This is another text message right

3   in the string of it where you say, I'd like to look out for EMF

4   but I'm in your corner.

5            In the meantime, I will be looking to cover my A-S-S.

6    Were you looking to cover your butt at that time?

7   A    I was afraid I was going to get fired.

8   Q    So, you were looking out for yourself at that time, right?

9   A    And Lisa and ended up MEF was Greg Roman.

10  Q    You were not looking out for the Forum at this time, were

11  you?

12  A    I wanted to look out for the Forum.

13  Q    But you didn't, correct?

14  A    I didn't think I was going to be able to because Greg

15  Roman, I was afraid, was going to get rid of me.

16  Q    You'd say I'd like to look out for MEF but -- would you

17  agree with me?

18  A    Yes.

19  Q    So, you agree with me that you were not looking out for

20  MEF at this time?

21  A    It says I really think DP and Mark would hear us if we

22  went together and spoke from the heart.  I wanted to look out

23  for MEF.

24  Q    But?

25  A    She didn't want to report it.

1  Q    That's not what it says, though, right?  It says that you

2  were looking to cover your --

3  A    While she was trying to decide what she wanted to do, I

4  was afraid that Mr. Roman was going to get us fired before she

5  could decide.

6          And I was trying to encourage her, I really think DP

7  and Mark would hear us if we went together and spoke from the

8  heart.

9  Q    DX 79, you then said, but I'm in your corner.

10  A    I am, she was horrified, she had just fallen apart in the

11  street and was crying, she was a mess and I was trying to

12  support her.

13  Q    You were in her corner?

14  A    I was in her corner.

15  Q    You felt that at this point if you played your cards

16  right, you and Ms. Barbonous would not get fired and Mr. Roman

17  would, correct?

18          That's from your deposition, you said that you

19  believed if you played your cards right you and Ms. Roman would

20  not get fired and Mr. Roman would.

21          Is that consistent with your recollection of your

22  feeling at that time?

23  A    If we played our cards right and he didn't know that we

24  were filing a complaint him before we could do it, yes.

25  Q    You wanted Mr. Roman to be fired, correct?

 1  A     At that point I did.

 2  Q     And at any point thereafter did you not want him to?

 3  A     Did I not want him to be fired?

 4  Q     Yes.

 5  A     I didn't want to work with him anymore.

 6  Q     You wanted to him to be fired, correct?

 7  A     I think he's a horrible boss, I think he's a horrible

 8  person.

 9  Q     You wanted him to be fired, right?

10  A     Yes, I did.

11  Q     Mr. Roman texted you after your meeting with Lisa, do you

12  recall that?  He asked you how it had gone with Lisa, didn't

13  he?

14  A     If you say so.  I do remember, yes.

15  Q     Let's look at DX 101 and see what you responded to Mr.

16  Roman when he asked you how your meeting had gone with Lisa.

17  It starts with, find, Mr. Hobbs and actually, the one before

18  that just to give some context.

19          So, this is another text between you and Mr. Roman,

20  10/31/2018, he texts you, how did it go.  And what did you

21  respond to Mr. Roman?

22  A     Exactly what I had thought would help me buy some time.

23  Q     What I referred to as the cover story, correct?

24  A     Yes.

25  Q     Then you went on to say to Mr. Roman, I do need to talk to

1  you about something though, do you see that?  It's the same

2  text?

3  A    I don't see that.

4  Q    Keep reading past, fine.

5  A    It's enlarged, I can't see anything.

6  Q    It's the same one, where it starts with, fine, we are very

7  alike.  Keep reading that.

8  A    We are very alike, we just need to figure out how to

9  respect each other, I do need to talk to you about something,

10 though.

11 Q    So, the person that you allege now had been the subject of

12 a complaint that had Ms. Barbonous in tears, you told him what

13 I referred to as the cover story.  And then you said I do need

14 to talk to you about something, though.

15 A    I don't know what that was.

16 Q    But you said it?

17 A    I did, yes.

18 Q    And then you said what?

19 A    Not now, I'm in the office, I want to do my work and not

20 incite drama.

21 Q    So, you wanted to talk to Mr. Roman at some point later

22 but not now, you didn't want to incite drama.  Do you have any

23 idea what you may have meant by that?

24 A    Yes.

25 Q    Pray tell.

1   A    There's just so much story to it but Matt Bennett had been
2   telling me that he was going to take the job as the executive
3   assistant for Daniel and Greg and he was going to move Tricia
4   into the director of development seat.
5            And I knew he was looking to get rid of Lisa already
6   and I was blaming him, and when we did talk I yelled at him and
7   screamed at him over all of this and I never talked to him
8   about what Lisa told me because I was afraid.
9            But I did blame him for all of the discourse in that
10  office and it was exactly what Ms. Barbonous said it was.
11  Q    So, when you spoke to Mr. Roman you did yell at him,
12  right?
13  A    I did.
14  Q    And this is someone you were saying you were scared of?
15  A    I was scared, he was going to take my job.
16  Q    But you yelled at him?
17  A    I have a bad temper.
18  Q    Then you go on to say, this has me nervous.  Do you see
19  the next text?
20  A    Yes.
21  Q    Especially when I'm supposed to be out of the office for
22  two weeks.  You were supposed to be out of the office for two
23  weeks for a real estate course that you wanted to take,
24  correct?
25  A    Yes, it said, I want to do my work, is why I was nervous,

1   I wanted to to get my work done because I was going to be out

2   of the office for two weeks.

3   Q    I'm not asking why you're nervous, I'm just asking why you

4   had been previously approved by Mr. Roman to take two weeks off

5   to go to work from home for two weeks so that you could take a

6   real estate course?

7   A    Correct.

8   Q    And you had previously requested that and he had

9   previously granted that, no problem, correct?

10  A    Correct.

11  Q    And so now, on the day you allege, on the morning you

12  allege -- I'll say morning but I don't know if that's true

13  because of the timestamp so I can't say if it's morning or

14  afternoon.

15        But shortly after you return from your meeting where

16  Ms. Barbonous accused you of persecuting her and harassing her,

17  and you allege that you were scared of Mr. Roman, if I'm

18  understanding this text, you checked with him to make sure you

19  were going to get that two weeks' time, right?

20        That was important to you at this moment?

21  A    I was afraid if I was out of the office for two weeks that

22  he would say I wasn't in the office for two weeks and I didn't

23  have it in writing.  But he had said I could do it.

24  Q    But you didn't have it in writing before that either, did

25  you?  You were nervous now, you needed him to confirm now

1   because you thought he was going to get in trouble and not

2   going to be there to confirm that you were allowed?

3   A    No, that's not it at all.  I was supposed to start it on

4   that next Monday so all of this happened and then I was not

5   going to be in the office for two weeks, and I had nothing in

6   writing that said that was okay.

7   Q    So, the day that you received this alleged complaint from

8   Ms. Barbonous that had you so upset and scared, your first

9   thought was to make sure that you got to take those two weeks

10  off?

11  A    My first thought was that I had paid for the course and it

12  was starting and I had to go to it, and I was afraid already

13  that I was going to get fired because of all of the shenanigans

14  that have gone on.

15          And then I was going to be out of the office for two

16  weeks with nothing in writing saying that it was okay or that

17  anyone even knew it was happening.

18  Q    Let's look at his response, down a little further, please,

19  perfect.  So, he responded back and told you you were good to

20  go on the two weeks, right?

21  A    Yes.

22  Q    Now, later that day you told -- I say told but perhaps I

23  should say you ask Mr. Roman if you could leave early, correct?

24  A    It looks like it.

25  Q    You said, and I'm looking at the last one, which is the

1  large one, this is to Mr. Roman, I'll be available later to
2  talk, I'm honestly not much good right now anyway.
3          I walked away from coffee with her today feeling like
4  we were going to work towards a better relationship and she
5  frigging filed a complaint about me.
6          You're talking about Lisa Barbonous there, correct?
7  A   It's hard to read because I have so many typos in it.  He
8  had said call me and I guess I didn't answer.  I'll be
9  available to talk later.  I told you I was going to cover my
10  rear end, I was afraid of him and every time I --
11          THE COURT:  Ms. O'Brien, please listen carefully to
12  the questions.  Can you repeat the question?
13  BY MS. DIBIANCA:
14  Q   When you say you walked away from coffee with her today,
15  you were referring to Ms. Barbonous, correct?
16  A   Yes.
17  Q   And you walked away from coffee feeling like the two of
18  you were going to work towards a better working relationship?
19  Was that true?
20          Was it true or were you being manipulative with Mr.
21  Roman?
22  A   Is that manipulative?  I think I was trying to cover my
23  rear end, is what I was trying to do.
24  Q   And you expressed, she frigging filed a complaint about
25  me, so you were pretty upset that you found out that Lisa had

O'BRIEN-199

1   filed a complaint about you, right?

2   A    She told me that, she told me at the meeting she filed it,

3   that he made her.

4   Q    Immediately after the meeting, you told Mr. Roman, fine,

5   it went fine, we're very alike, no mention of a complaint.

6   Now, hours later, same day, you find out that she has filed a

7   complaint against you.

8   A    Like I said, I knew it at the time but now he had called

9   me and said that she filed it and there was going to be a whole

10  thing.  It sounds to me you're calling me manipulative, I would

11  say I was playing his game.

12  Q    You say I try really hard to be good at my job, very

13  upsetting to me.  You were very upset, weren't you?

14  A    I was.

15  Q    That Ms. Barbonous had filed a complaint against you,

16  right?

17  A    The complaint was the least of my worries at that point.

18  Q    But that's what you said here.

19  A    That's what I said because he was holding it over my head.

20  Q    There is no text from Mr. Roman that prompted this, was

21  there?  This is a request for you to leave early, isn't it?

22         You reach out to him and say you want to leave early

23  for the day because your daughter has a new job, you want to

24  see her off, and you have a headache and you're very upset,

25  isn't that what you told him?

1  A    That place was the last place I wanted to be, I wanted to

2  get out of there.  Again, I was afraid for him --

3  Q    Your Honor?

4  A    I don't know what to tell you, you keep telling me what I

5  said.  It's right there, you can see it, I was terrified, I was

6  scared I was going to lose my job.

7          THE COURT:  Ms. O'Brien, please, there's now a

8  question before you.  Counsel, please try to focus the question

9  for the witness.

10 Q    I will.  You say the whole thing with Matt, what was the

11 whole thing with Matt?  And I presume you mean Bennett here,

12 Mr. Bennett?

13 A    Yes.

14 Q    Do you have a recollection?

15 A    We had had that argument.

16 Q    Well, you had smoothed things over, you said, the night

17 before?

18 A    Right.

19 Q    So, there was not a thing with Matt as of the day before

20 this, so you don't know what the thing with Matt was?

21 A    It was the same day I had the fight with Lisa, the thing

22 with Matt, it was all the stuff that was going on.

23 Q    But you testified that you went home that night and called

24 Mr. Bennett and smoothed things over with him.  This is the

25 following day.

1   A    Correct, but it was still there, there was all this stuff
2   going on in the office.
3   Q    So, it wasn't smoothed over?
4   A    It was fine but there were issues in the office, there
5   were fights that happened.  The whole team had seen it.
6   Q    What do you go onto say here?
7   A    I say we should do a bowling night or something because we
8   had done that before.
9   Q    I'm thinking we should do a bowling night or something to
10  get people to decompress.
11  A    I was still working.
12  Q    That was your suggestion to Mr. Roman, who you were
13  terrified of and who was the puppet master of the office?
14  A    Absolutely.
15  Q    You suggested we should have a bowling night because
16  people needed to decompress?
17  A    Yes.
18  Q    So, were you just manipulating him at that point?
19  A    Again, I was just trying to keep my head above water.
20  Q    Cover your rear end?
21  A    Yes, my rear end.
22  Q    If you can look at the bottom of that, DX 101, Mr. Roman's
23  response, the three blocks here.  He responds to you with
24  kindness, wouldn't you agree?
25          He says give me a call, let's schedule bowling or

1  another activity, and you are excellent at your job.  Was that

2  an appropriate response?

3  A    Yes, it was fine, I was out of the conversation.

4           MS. DIBIANCA:  This would probably be a good

5  opportunity to take a break if that suits the Court.

6           THE COURT:  We'll have our afternoon break then.

7  Folks, remember my earlier instructions, I want you to keep an

8  open mind and you're not to discuss the case with anyone, even

9  one another, okay?

10          (Whereupon, the above-entitled matter went off the

11  record at 3:10 p.m. and resumed at 3:32 p.m.)

12          THE CLERK:  All rise for the jury.

13          (JURY ENTERS COURTROOM.)

14          THE COURT:  Thank you.  Welcome back.  Please be

15  seated.

16          Attorney Dibianca?

17          MS. DIBIANCA:  Thank you, Your Honor.

18  BY MS. DIBIANCA:

19  Q    Ms. O'Brien, on November 1st at 2000 -- 2018, which was

20  the day after your meeting with Ms. Barbounis, you sent Dr.

21  Pipes a handwritten letter, correct?

22  A    Yes.

23  Q    Okay.  And you described that handwritten letter last week

24  during your testimony as Lisa's complaint, correct?

25  A    Mm-hmm.

1  Q    Okay.  Just -- can you say yes for --

2  A    Oh.  Yes.  Sorry.

3         MS. DIBIANCA:  And if you can pull up PX10.

4  BY MS. DIBIANCA:

5  Q    Your Counsel showed you this last week, so we're going to

6  talk about it not in -- in every line, but I do want to talk

7  about a few things.  On the second page of the -- of the

8  handwritten complaint about -- or I should say about Lisa's

9  complaint --

10        MS. DIBIANCA:  One more for me, Mr. Hobbs.  There we

11  go.

12  BY MS. DIBIANCA:

13  Q    The bottom paragraph, it says, after our meeting, he

14  called me and told me that Lisa had filed a complaint about me

15  and that Mark was coming in to interview everyone about the

16  situation and her accusations against me.

17        Now, does that help you remember whether Mr. Roman told

18  you about the complaint on the 31st and not the 30th?  You say

19  after your meeting -- I presume that means after your meeting

20  with Lisa -- he called me and told me.

21  A    Okay.

22  Q    So it was November 1st, right?

23  A    Okay.  Mm-hmm.

24  Q    Okay.  All right.  You say that you had -- you wrote

25  everything up on a notepad.  You told Dr. Pipes that you'd

1   written everything up on a notepad, correct?

2   A    I wrote the note.  I hand-wrote the note.  What do you

3   mean, everything?

4   Q    You -- in your complaint -- in the complaint, you wanted

5   to write down everything so that you could give Dr. Pipes a

6   really clear picture of what you called all of the shenanigans.

7   A    The timeline -- that's not all of the shenanigans,

8   clearly.  But it was what had happened in the last couple days.

9   Q    Do you remember that in your deposition, you testified

10  that you'd written everything up on a notepad so that you could

11  give Dr. Pipes a really clear picture of all of the

12  shenanigans?

13  A    Okay.  Everything in the last couple days.  I'll clarify

14  it a little bit more because clearly that's not everything that

15  ever happened.

16  Q    Okay.  And I believe you testified earlier, Ms. O'Brien,

17  that as a Human Resources professional, you certainly

18  understand the importance of documentation.  Correct?

19  A    Yes.

20  Q    Okay, and that your documentation should be complete.

21  Correct?

22  A    Yes.

23  Q    Okay.  Can you point out for the jury where in your

24  complaint you reported the conduct that you alleged occurred at

25  the sports bar in September of 2018?  I can handle this paper

1  copy if that -- if that's easier for you.

2  A    I just -- is it on this page?  I don't know that it's on

3  this page.

4            THE COURT:  If you have a paper copy, I think that

5  would be helpful.  Thank you, Counsel.

6            THE WITNESS:  Thank you.

7  BY MS. DIBIANCA:

8  Q    You didn't put anything in the -- in the handwritten

9  letter to Dr. Pipes about what you contend occurred at the

10  sports bar in September '18 -- 2018, did you?

11  A    Okay.  I guess not.

12  Q    Okay.  You didn't put anything in the -- the -- Lisa's

13  complaint about what you claim you witnessed at AIPAC?

14  A    No.

15  Q    After Dr. Pipes read your -- the -- Lisa's complaint, he

16  told you that he would be in the office shortly and was glad to

17  meet with anyone or everyone.  Correct?

18  A    Correct.

19  Q    Okay.  Now, about that same time, Mr. Roman was calling

20  you on the phone, right?

21  A    About what time?  When all this was --

22            (Simultaneous speaking.)

23            THE WITNESS:  When I was writing the note?

24            MS. DIBIANCA:  After you had -- just shortly after

25  you had submitted it.

O'BRIEN-206

1            THE WITNESS:  Okay.

2            MS. DIBIANCA:  Next page.  Next page.  And next page.

3            MR. HOBBS:  That's the last page.

4            MS. DIBIANCA:  Sorry.  Sorry.  It is 1153 right there

5    where your cursor is, Mr. Hobbs.

6    BY MS. DIBIANCA:

7    Q    And then you say, Greg is calling me.  I'm hesitant to

8    speak with him.  I'm not sure how to handle it.  Should I let

9    him know there has been an accusation filed?

10           Okay.  So there was an accusation filed, and that was Ms.

11   Barbounis's accusation.  Correct?

12   A    Yes.

13   Q    Okay.

14           THE COURT:  Counsel, if I may -- I'm sorry.  Just --

15           MS. DIBIANCA:  Sure.

16           THE COURT:  -- who are the participants --

17           (Simultaneous speaking.)

18           MS. DIBIANCA:  I -- thank you, Your Honor.  So this

19   is a Telegram message, which is -- would you agree with me

20   Telegram is sort of a text messaging --

21           THE WITNESS:  Yeah.

22           MS. DIBIANCA:  -- between you and Dr. Pipes at the

23   time?

24           THE WITNESS:  Okay.

25           MS. DIBIANCA:  Thank you, Your Honor.  Thanks.

1   BY MS. DIBIANCA:

2   Q    Did you tell Mr. Roman when he was calling you at 11:53

3   that there had been an accusation filed by Ms. Barbounis?

4   A    I don't believe so.

5   Q    Okay.  Two days after you filed the complaint for Lisa

6   with Dr. Pipes, you brought two other coworkers into the

7   conversation about it, right?  Ms. Brady and Ms. Yonachek

8   (phonetic)?  Do you remember that?

9   A    I brought two people into the conversation?

10  Q    You had a conference call with them to discuss it.  Do you

11  recall that?

12  A    I don't.

13  Q    Okay.  Dr. Pipes did come in that day, correct?

14  A    He did.

15  Q    November 1st?

16  A    He -- he did.

17  Q    Okay.  And he met with you?

18  A    Yes.

19  Q    And he met with Ms. Barbounis?

20  A    He met with everyone in the office.

21  Q    Everyone in the office individually?

22  A    Yes.

23  Q    Okay.  And did you tell him what you knew at that point?

24  A    What I knew -- yeah.  Well, some -- some of it.

25  Q    Did you --

1   A    I told him about the -- I can't remember what I

2   specifically told him.

3   Q    Okay.  Did you not disclose part of it to him?

4   A    I -- you know, I think I thought of, like, one thing and

5   told him that.  I didn't tell him every single offense at that

6   point.

7   Q    Okay.  And you testified earlier today that you told him

8   when you met -- when he met with you that there had been a

9   dinner with you and Mr. Roman where you had gotten bad -- or

10  you had gotten vibes from Mr. Roman.  Correct?

11  A    Right.

12  Q    Okay.  And you did not -- you were not able to tell Dr.

13  Pipes at that time when that dinner occurred, correct?

14  A    Okay.  Probably.  I still don't know.

15  Q    Okay.  Fair enough.  But -- and you told him that you said

16  you were not -- and I'm not going to use the word, but you

17  would not sleep with him?  You told Dr. Pipes that that was

18  your response --

19  A    Correct.

20  Q    -- to Mr. Roman?

21  A    Correct.

22  Q    Okay.  That was the only instance of inappropriate conduct

23  directed towards you by Mr. Roman that you reported to Dr.

24  Pipes, correct?

25  A    At that time, yes.

O'BRIEN-209

1 Q    Was there a time later when you reported more?

2 A    No.  You're -- you're right.

3 Q    Right.  Okay.  So, just so we're all getting it clear on

4 the record, the only thing that you ever reported to Dr. Pipes

5 as far as what you believed was inappropriate conduct directed

6 from Mr. Roman to yourself was the incident at the sports bar

7 that you couldn't recall the date but that you know you had

8 responded to Mr. Roman that you would not F him?

9 A    Yes.

10 Q    Okay.  All right.  By this point, November 1st, you had

11 decided that Mr. Roman had to be fired in your mind.  Correct?

12 A    I -- I -- yeah.

13 Q    That Saturday, November 3rd, you told Lisa, Ms. Barbounis,

14 that you, quote, would not deal with him for another minute,

15 meaning Mr. Roman.

16 A    I didn't -- I didn't want to work with him anymore, no.

17 Q    All right.  So, on November 5th -- your complaint to Dr.

18 Pipes was the 1st.  He came in and met with each of the

19 employees in the office.  On November 5th, which I believe was

20 a Monday, Dr. Pipes held an in-person staff meeting with all

21 employees except Mr. Roman.  Correct?

22 A    Correct.

23 Q    Okay.  And you testified that -- last week that the

24 meeting lasted about an hour.  Right?

25 A    I believe.

1   Q    Okay.  During that meeting, Mr. Pipes opened the

2   conversation to allow anyone in the room to air any concerns

3   they had about Mr. Roman.  Correct?

4   A    Correct.

5   Q    You testified last week that the employees -- no one

6   shared any claims of sexual harassment during that meeting.  Is

7   that correct?

8   A    I can't remember what exactly was shared.  I -- I know

9   that everyone was hesitant to say very much in front of Stacy

10  (phonetic).

11  Q    Okay.  Did you not share any information at that time?  At

12  the meeting, the all-staff meeting, did you reserve any

13  information that you thought was important for Mr. -- Dr. Pipes

14  to make his decision?

15  A    I had told him -- I probably didn't say everything that I

16  had told him when we met individually.

17  Q    Okay.  So that's fair.  So, after the -- by the time you

18  met with him individually, then the staff meeting -- by the end

19  of the staff meeting on November 5th, there was nothing that

20  you were holding back from Dr. Pipes; you had shared with him

21  all of the relevant information that you thought you knew?

22  A    I didn't sit down and think about every single instance at

23  that point.  I -- I -- I think the dinner was the biggest thing

24  that stuck out in my head, so I shared that with him.

25  Q    But you weren't holding back other -- other instances that

1   you thought were inappropriate behavior?

2   A    Not intentionally.  I just didn't -- there was a lot going

3   on, and, like -- again, I said I was so scared, and there was

4   just a lot going on.  And my nerves were ridiculous.  So I -- I

5   didn't tell -- I didn't think of every single instance.  I

6   thought of that one specific instance.

7   Q    And there were no instances that you later thought of that

8   you went back and shared with Dr. Pipes, right?

9   A    No.

10  Q    Okay.  Following the meeting on November 5th, 2018, Dr.

11  Pipes announced that Mr. Roman would no longer be returning to

12  the office.  Correct?

13  A    Yes.

14  Q    Okay.  Dr. Pipes informed Mr. Roman that he could no

15  longer run the forum, correct?

16  A    He removed his -- some of his administrative duties.  He

17  retained his -- his title.  He retained his salary.  And he

18  continued to work with the project directors.

19  Q    You were aware that prior -- the week before your meeting

20  with Ms. Barbounis that Dr. Pipes had informed Mr. Roman and

21  Mr. Bennett that Mr. Roman would be Dr. Pipes' successor at the

22  forum, correct?

23  A    I don't know if I knew that then or now, but Greg had been

24  saying that for like a year and a half, that he was going to be

25  the successor.

O'BRIEN-212

1   Q     Okay.

2   A     That was the whole -- yeah.

3   Q     Do you agree with me that Dr. Pipes, as a result of the  -

4   - the complaint that you submitted on behalf of Ms. Barbounis -

5   - that Dr. Pipes decided that Mr. Roman would no longer be his

6   successor at the forum?

7   A     I did not know that.  But I felt that Dr. Pipes needed to

8   know everything that was going on if he was going to leave the

9   organization that he founded to Mr. Roman.

10  Q     And he did not leave the -- the foundation?

11  A     I -- I don't know.

12  Q     Okay.  Dr. Pipes removed Mr. Roman from the approval of

13  expenses and initiatives, correct?

14  A     Initiatives?  What do you mean by initiatives?

15  Q     That was your testimony at deposition.

16  A     Initiatives?

17  Q     Yes.  So we'll break it down.

18  A     Expenses --

19  Q     So he removed -- he removed Mr. -- the -- Mr. Roman could

20  no longer approve expenses for the forum.

21  A     Correct.

22  Q     Okay.  Dr. Pipes removed Mr. Roman from any involvement in

23  the hiring and firing of employees, correct?

24  A     Correct.

25  Q     Right.  Dr. Pipes removed Mr. Roman from having a

O'BRIEN-213

1  supervisory role over employees, correct?

2  A    Over women.

3  Q    Okay.  Who -- who did he not remove supervisory authority

4  from?

5  A    He was -- the project directors that were males still

6  reported to them.  There was one female project director that

7  did not report to him anymore.

8  Q    Who was the male project director?

9  A    Well, there was a lot of them.  I believe they all

10  reported to him.

11  Q    Okay.  So, within the Philadelphia office, Dr. Pipes

12  removed Mr. Roman from having any supervisory role over the

13  employees in the Philadelphia office.  Correct?

14  A    Yes.

15  Q    And that's where you worked, right?

16  A    Yes.

17  Q    Okay.  Dr. Pipes took away Mr. Roman's authority to

18  approve contracts on behalf of the forum, right?

19  A    Yes.

20  Q    Right.  And Dr. Pipes told Mr. Roman that Mr. Roman was

21  not to have contact with female employees outside of business

22  hours other than via forum email, correct?

23  A    Correct.

24  Q    Okay.  Dr. Pipes also instructed Mr. Roman to have no

25  involvement in the forum's accounting, finances, or property

1   management, right?

2   A    Correct.

3   Q    Okay.  And Mr. Roman was not allowed to come into the

4   office without requesting access in advance so that there would

5   be no female staff members there, or if they were, they would

6   have to be comfortable with him being there in advance.

7   A    Correct.

8   Q    Okay.  You were satisfied with the way Dr. Pipes handled

9   the issue, weren't you?

10  A    I never said I was satisfied with how he handled it.  I

11  was satisfied that he was attempting to handle it.

12  Q    Okay.

13        MS. DIBIANCA:  Let's look at DX92, please.

14  BY MS. DIBIANCA:

15  Q    This is a text message from you to Ms. Barbounis on

16  Thursday, November 8th.  So that would have been one week after

17  the Lisa complaint.  And you say, I like the way Daniel

18  operates.

19        Do you think you're referring to Dr. Pipes there?

20  A    Yes.

21  Q    Okay.  So, as of Thursday, November 8th, would you agree

22  with me that you were satisfied that the way Dr. Pipes was

23  handling it was appropriate?

24  A    I felt that he was trying to handle it appropriately.

25  There's -- there's a -- they actually sent a -- after the

1    meeting, they sent an email and asked three questions, were we

2    happy with how it was handled?  And somewhere there's a

3    statement in there that I wrote, and it says that I was happy

4    that I felt like he was attempting to handle it properly.

5              MS. DIBIANCA:  PX -- or DX50, please.  Or maybe it's

6    PX50.

7              (Off-microphone comment.)

8              MS. DIBIANCA:  No, that's not it.

9              PARTICIPANT:  Is it a D or a P?  (Inaudible.)  That

10   was a D or a P?

11             MS. DIBIANCA:  I'm going to check.

12             PARTICIPANT:  Okay.  Thank you.

13             (Off-microphone comments.)

14   BY MS. DIBIANCA:

15   Q    From November 1st, the time of your complaint on behalf of

16   Ms. Barbounis, through the end of your employment at the forum,

17   you saw Mr. Roman just once.  Correct?

18   A    That -- that sounds about right.

19   Q    Okay.  When you did see him in the office on that one

20   occasion, you knew in advance that he was going to be there,

21   correct?

22   A    Correct.

23   Q    Okay.  And you did not interact at all with Mr. Roman on

24   that occasion, correct?

25   A    I don't -- no.  Mm-mm.  No.  I'm sorry.  No.

1   Q    Okay.  That's okay.  At no time after November 1st, 2018,

2   did Mr. Roman conduct himself inappropriately with you,

3   correct?

4   A    Correct.

5   Q    Okay.  At no time after November 1st did you ever observe

6   Mr. Roman make a sexual comment, correct?

7   A    Observe it?  The rumor came about where I was told that he

8   had said that I slept with Dr. Brady.  That came out  after --

9   Q    Did you ever observe him make a comment --

10  A    No.

11  Q    -- a sexual comment?  Okay.  At no time after November 1st

12  did Mr. Roman make a sexual advance towards you, correct?

13  A    Correct.

14  Q    After November 1st, 2018, Mr. Roman never spoke to you in

15  a manner that you thought was inappropriate, did he?

16  A    No.

17  Q    Okay.  Other than the audit, which we'll talk about, after

18  November 1st, 2018, you had no issues with Mr. Roman.  Correct?

19  A    Correct.  I mean, I had animosity, but I didn't have --

20  yeah.

21  Q    There was no event that occurred?

22  A    Right.

23  Q    Okay.  Your feelings towards him remained, but --

24  A    Correct.

25  Q    Okay.  After November 1st, 2018, Mr. Roman did not

O'BRIEN-217

1   sexually harass you, correct?

2   A    With the exception of the rumor.

3   Q    Okay.  At no time after November 1st, 2018, did Mr. Roman

4   ever become your supervisor again?

5   A    Correct.

6   Q    Okay.  After November 1st, 2018, you were never again

7   during your employment with MEF, the forum, subject to any

8   sexual comments or remarks by Mr. Roman --

9   A    Correct.

10  Q    -- correct?

11  A    I'm sorry.  Say -- can you say that again?

12  Q    After November 1st, 2018, you were never subjected to any

13  sexual comments or remarks by Mr. Roman?

14  A    Except for the rumor that was going around after.

15  Q    So we're dancing around it.  We'll just get -- we'll just

16  talk about the rumor.  The rumor, to the best of your

17  knowledge, was started before November 1st, 2018, wasn't it?

18  A    Yes.

19  Q    Okay.  So at no time after November 1st, 2018, did Mr.

20  Roman, to your knowledge, ever make any sexual comments at all?

21  A    Correct.

22  Q    Okay.  And just so the jury, you, and I are on the same

23  page on this, the rumor that we're talking about Ms. Barbounis

24  told you after November -- sometime after November 1st, 2018,

25  that she had heard that Mr. Roman had started a rumor about you

O'BRIEN-218

1  sleeping with your former boss.  Right?

2  A    She said he told her that.

3  Q    Okay.  And that she told him -- that he told her that

4  before November 1st, 2018?

5  A    Yes.

6  Q    Okay.  So you found out about the rumor from Ms. Barbounis

7  -- we'll assume that the rumor, for this purpose, occurred

8  after November, but the rumor had not been circulating.  It was

9  not circulating at that time, correct?

10 A    I mean, that's what rumors do.  Once you start them, they

11 -- they're out there.

12 Q    Who was talking -- who was spreading the rumor after

13 November 1st?

14 A    Well, Lisa had told me, and then I --

15 Q    We'll just take that -- just take that one at a time.  So

16 Lisa told you, so she wasn't circulating the rumor; she was

17 telling you.

18 A    And, you know, I was upset about it.  And Trisha McNulty

19 (phonetic) had said that Matt Bennett had told her the same

20 thing.

21 Q    And when did that happen?

22 A    That was, like, right around the same time.

23 Q    Right.  After -- before November 1st, 2018?

24 A    After.  It was after.

25 Q    Did you ever report that to Dr. Pipes?

1  A     Well, wait.  The conversation when I found out about it

2  was after.  It was started before.

3  Q     Right.

4  A     Okay.  I -- I misunderstood you.

5  Q     Okay.  That's all right.  So it was circulating before

6  November 1st, 2018.

7  A     But it was still circulating because --

8  Q     Who was circulating it after?

9  A     -- people were still talking about it.

10  Q     I apologize for interrupting.  Who was circulating it?

11  A     I don't know.  How can I know who was circulating it or

12  who knew or who was talking about it at that point?

13  Q     So, to your knowledge, no one was.

14  A     Well, when somebody tells you that somebody started a

15  rumor about you, you think everybody's talking about it.

16  Q     Okay.  Fair enough.  You were not -- after November 1st,

17  2018, you were not subject to any unwanted sexual advances by

18  Mr. Roman?

19  A     Correct.

20  Q     Okay.  And you did not interact with Mr. Roman at all in

21  early 2019, right?

22  A     No.

23  Q     Okay.  In March 2019, some of your coworkers approached

24  Dr. Pipes about having Mr. Roman resume some of his

25  administrative duties.  Do you recall that?

O'BRIEN-220

1    A    I learned that, yes.

2    Q    Okay.  That was the predicate -- that was the event that

3    preceded the phone call between you and Ms. Barbounis that we

4    heard earlier in the testimony, correct?

5    A    I'm sorry.

6    Q    That's okay.  We'll go through it.  So everyone in the

7    office -- is it correct to say that everyone in the office

8    except for you was in favor of Mr. Roman returning on a limited

9    basis to some of his administrative duties?

10   A    No.

11   Q    Who objected other than you?

12   A    Delaney Yonachek and Katrina Brady did not want him in

13   there either.

14   Q    Okay.  You voiced your opposition to Mr. Roman resuming

15   some of his administrative responsibilities, right?

16   A    I did.

17   Q    Okay.  And Dr. Pipes, in response to that opposition,

18   explained to you that you would under all circumstances

19   continue to report to Dr. Pipes and Dr. Pipes alone, and that

20   Greg Roman would not become your supervisor again.  Correct?

21   A    And -- and Mark Fink (phonetic).

22   Q    Okay.  At the meeting in March 2019, the women in the

23   office except for you and perhaps -- at least some of the women

24   in the office decided that Mr. Roman would be reassigned to

25   some of his former administrative duties, right?

1   A    Yes.

2   Q    Okay.  He did not get a key to the office, though,

3   correct?

4   A    No.

5   Q    He did not return to the office, correct?

6   A    No.

7   Q    Okay.  But finance, which was your area, would still

8   report to Dr. Pipes.

9   A    Correct.

10  Q    Okay.  And that was because you did not want Mr. Roman to

11  oversee anything you did, right?

12  A    Correct.

13  Q    Okay.  In July -- I'm sorry.  In early June -- that was

14  March 2019.  In early June 2019, you objected to Mr. Roman

15  being involved in the forum's financial audit.  Correct?

16  A    Yes.

17  Q    Okay.  You voiced your objections to Dr. Pipes, right?

18  A    He was supposed to be out of the financial.  That was one

19  of the -- one of the reasons that I would stay there was that

20  he would not be involved in the finances is one of the things

21  that would make me happy, I would say.

22  Q    Okay.  The only involvement Mr. Roman had in the -- what

23  you're describing as the finances was his role in the audit.

24  Correct?

25  A    After?

O'BRIEN-222

1   Q    After November 1st, 2018.

2   A    He wasn't supposed to have any role in the finances.

3   Q    But the only -- you contend that he did, right?

4   A    Yes.

5   Q    And that -- but the only contention that you have is that

6   he was involved in the audit?

7   A    They had -- yes.

8   Q    Okay.  He wasn't writing checks?

9   A    No.

10  Q    Okay.  He wasn't approving expenditures?

11  A    I don't think so.

12  Q    Okay.  Dr. Pipes, when you voiced your objection,

13  responded that Mr. Roman was the only person with sufficient

14  knowledge of the forum's finances and that, for that reason,

15  Mr. Roman would have to be involved in the audit.  Correct?

16  A    Yes.

17  Q    Okay.  And, at that time, you turned over the audit to Mr.

18  Roman and the auditors, and you had no further role in it.

19  Correct?

20  A    I -- yes.

21  Q    Okay.  You claim, I believe last week perhaps, that you

22  did not want Mr. Roman to have, quote, access to your work

23  product.  Is that correct?

24  A    That's correct.

25  Q    Okay.  And that work product was the forum's financial

1  reports, right?

2  A    Correct.

3  Q    Okay.  So you took issue with Mr. Roman having access to

4  the forum's financial reports.

5  A    I did.

6  Q    Okay.  You know, don't you, that as a nonprofit

7  organization, the forum is obligated by the IRS guidelines to

8  make their financial reports a matter of public record, don't

9  you?

10  A    Correct.

11  Q    Okay.  So Mr. Roman has access to the financial reports

12  via the internet like every other person with internet access,

13  right?

14  A    After.  Yes.

15  Q    Once they're published.

16  A    After they're published.

17  Q    Right.

18  A    Correct.

19  Q    So everyone with internet access technically has access to

20  your work product, don't they?

21  A    Once they're published.

22  Q    Correct.  Okay.  You were not fired, were you?

23  A    I was not.

24  Q    Okay.  You resigned -- you resigned -- I believe your

25  testimony was February 28th, 2020?

O'BRIEN-224

1   A    I actually do think it was the 29th because --

2   Q    Okay.

3   A    -- I think it was a leap year.

4   Q    Okay.

5   A    But it -- it was the 28th or the 29th.

6   Q    Okay.  You -- you testified last week that you -- the end

7   of your employment, you started working from home.  Correct?

8   A    I was instructed to work from home.

9   Q    And you thought that that was a punishment, right?  Well,

10  let me ask you this.  You didn't think it was a vacation, did

11  you?

12  A    I felt like they were restructuring, and they didn't want

13  me to be a part of that structure.

14  Q    But you working from home was not a vacation, was it?

15  A    It was nice.

16  Q    Okay.

17  A    I didn't have to drive in to the office, that type of

18  thing.

19  Q    Okay.  Not so bad.  Fair enough?

20  A    Yes.

21  Q    Okay.  You resigned voluntarily, correct?

22  A    Yes.

23  Q    No one forced you to quit, right?

24  A    I felt pushed out.

25  Q    But no one forced you to quit?

1    A     No.

2    Q     Okay.  You had been interviewing for jobs?

3    A     Yes.

4    Q     Okay.  When did you start interviewing for jobs?

5    A     Oh, early.  I mean, I was -- I had been applying for

6    months.

7    Q     Did you start looking for work in 2017?

8    A     I'd have to look, but I was definitely throwing out, you

9    know, my résumé and -- and replying to jobs that I would see.

10   Q     So, if we can look at DX136, this is the PeopleShare file

11   from the recruiter.  There's -- the first page of the document

12   is a -- what I would represent to you looks like a cover letter

13   from you dated December 5th, 2017.  So does this help refresh

14   your recollection as to whether you were looking for a new job

15   as of December 5th, 2017?

16   A     That was from PeopleShare?

17   Q     Correct.

18   A     I'm trying to think.  I -- I mean, I guess.  I think that

19   seems early at that point, but --

20   Q     This was before the -- the incident at -- or the -- the

21   dinner at the sports bar, right?  That was September 2018.

22   This is December 5th, 2017.

23   A     Yeah.  I'm wondering if I had a wrong date.  I didn't

24   change the date on it.  But yeah.

25   Q     Okay.  When you resigned from the forum, you already had

1  another job lined up, correct?

2  A    I did.

3  Q    Okay.  And that job was with a company in Cherry Hill, New

4  Jersey, called 1 Creation Construction.  Right?

5  A    Yes.

6  Q    You were supposed to start that new job with 1 Creation

7  Construction on March 16th, 2020?

8  A    Yes.

9  Q    And you never started that job, correct?

10  A    I did not.

11  Q    And that was because of the pandemic?

12  A    Correct.

13  Q    Okay.  So the pandemic was the reason that you're not

14  currently working for 1 Creation.

15  A    Correct.

16  Q    Okay.  My client had nothing to do with you not starting

17  at 1 Creation, right?

18  A    No.  No.

19  Q    Okay.  You also are still a licensed real estate broker,

20  correct?

21  A    Correct.

22  Q    Dr. Pipes also approved you to take that time off for that

23  real estate course, didn't he?

24  A    He did.

25  Q    Okay.  And your current --

 1  A    But I -- can I just clarify --

 2  Q    Sure.

 3  A    -- that I didn't really take the time off?  I just woke up

 4  at like 4:30, 5:00 in the morning.  I worked as much as I could

 5  before I had to leave.  I would go to the -- the class, and

 6  then I would come home and work when I got home.

 7  Q    How much of your time currently do you spend on real

 8  estate?

 9  A    I -- I network for it, but not a ton, because I don't know

10  that much about it and it was just running so rampant that I

11  couldn't get -- I got three houses.

12  Q    Sold?

13  A    Yes.

14  Q    And when did you sell those three houses?

15  A    I would have to look at the deeds.  But they were -- it

16  was in 2020.

17  Q    It was in 2020.  Have you produced your tax returns for

18  2020 in this case, Ms. -- Ms. O'Brien?

19  A    I don't -- I think I did.

20  Q    You also have a consulting business called GC4, right?

21  A    Correct.

22  Q    You've had that business since 2012?

23  A    Yes.

24  Q    Okay.  Your bookkeeping business did not take a hit

25  because of the pandemic, correct?

1  A    Yeah.

2  Q    Okay.

3  A    Yes.  Sorry.

4  Q    And you don't want to work for anyone else, do you?

5  A    I -- I am afraid to work for anyone else, to be quite

6  honest.  So I'm trying to build that up as much as I can, but

7  I'm still looking for work because --

8  Q    You testified in your deposition that you do not -- you

9  don't want to work for anyone else, and you have no plans to

10  look for another job.  Was that testimony correct at that time?

11  A    When did I say that?

12  Q    At your deposition in January 2021.

13  A    Well, it might have been correct at that time, but I --

14  you know, it's hard -- I'm building my business.  If it doesn't

15  build as fast and I -- you know, if I don't get it built up to

16  where I need it to be, then I need to get a job.

17  Q    Okay.  You testified last week that when you took the job

18  with the forum, you took it for reduced pay.  You took a pay

19  cut to take that job.  Do you remember that testimony?

20  A    I did, from what I was making before.

21  Q    And you testified that the job you left -- left to join

22  the forum paid something like $85,000 a year.

23  A    Correct.

24  Q    Okay.  So that would have been a pay cut of about $14,000

25  a year when you joined the forum?

1   A     Okay.

2   Q     Is that right?

3   A     Sounds right.

4   Q     So the cover letter earlier, that said you made $71,000

5   when you were hired, right?

6   A     Correct.  I -- I don't know that that was right, though.

7   I thought I started at 79.

8   Q     But you saw the offer letter that said 71?

9   A     That was an offer letter.

10  Q     Okay.  Ms. O'Brien, you did not leave a job to join the

11  forum, did you?

12  A     I had -- I had -- no, I was still working for my -- myself

13  at that point.  The job that I had previously, before I was

14  doing GC4, I made 85,000.  And then when I was working at --

15  for myself, I had built myself up there.

16  Q     You made $85,000 at the job before the forum?  And what

17  job was that?

18  A     At the American Institute for History Education.

19  Q     You hadn't been employed there --

20  A     Right.  That's what I'm --

21  Q     -- for three years, correct, before you took the job at

22  the forum?  Right?

23  A     I was working for myself, GC4.

24  Q     Okay.  You didn't make $85,000 at the time you joined the

25  forum, did you, Ms. O'Brien?

1  A    I was close.

2  Q    Your -- your tax return said $43,000 that year.

3  A    Well --

4  Q    Was that close to $85,000?

5  A    I -- I -- because I am an LLC, it could be a little bit

6  higher and the expenses bring it down.

7  Q    Okay.  So let's -- let's write it down.  Your testimony is

8  that you made $85,000 at the American Institute.

9  A    Yes.

10  Q    Okay.  And then you did not work for another employer for

11  three years --

12  A    Correct.

13  Q    -- after leaving that job before joining the forum.

14  A    Correct.

15  Q    Correct?  So is it accurate to say that you did not take a

16  pay cut to join the forum from the American Institute?  You

17  hadn't been there --

18  A    No.

19  Q    -- for over three years.

20  A    Okay.  That's fair.  Yes.

21  Q    Okay.  So, at the time you joined the forum, you were

22  making roughly $43,000 a year with your consulting business.

23  A    Okay.

24  Q    Okay.  And so, when you joined the forum at a rate $71,000

25  a year, it was a significant increase.  Right?  43 to 71.

1  A    Okay.

2  Q    Okay.  You're a bookkeeper, right?  Your --

3  A    Yes.

4  Q    -- your department is finance.

5  A    Yes.

6  Q    Okay.  Let's talk about your emotional distress.  Ms.

7  O'Brien, is it fair to say that you've had a number of

8  stressors in your life since you left the forum?

9  A    Everyone has stressors in their lives.

10  Q    Right, and we're talking about you because you're here

11  seeking emotional distress damages.

12  A    Okay.  Yes.

13  Q    Okay.  For example, you went through COVID like the rest

14  of us.  Right?  That was very stressful.

15  A    Of course.

16  Q    Right.  You testified in your deposition, I believe, that

17  you feared that we were all going to die, understandably.

18  A    In -- in the beginning, yeah.

19  Q    In the beginning.  Right.  So would you agree with me that

20  COVID was a significant stressor on you for a significant

21  period of time?

22  A    Sure.

23  Q    Okay.  Has this litigation been stressful to you?

24  A    Yes.

25  Q    Yes.  Okay.  How -- about how long has this been going on?

1    A    I mean -- well, since June of -- was it 2018, I guess?

2    Q    2019.

3    A    '19.

4    Q    Okay.

5    A    But it's not every day.

6    Q    Okay.  Okay.  Fair enough.  Of course, we also had

7    testimony about your -- your -- I believe your Counsel called

8    him a paramour.  I'll say live-in boyfriend, Matthew Ebert.  He

9    has been a source of stress for you, correct?

10   A    Yes.

11   Q    When you testified last week, I noticed that you cried

12   several times on the stand when you discussed Mr. Ebert.

13   Correct?

14   A    Yes.

15   Q    Okay.  You agree with me that Mr. Ebert, your boyfriend,

16   intentionally tried to sabotage your job opportunity with the

17   Kimmel Center, correct?

18   A    Agreed.

19   Q    Okay.  And that you were living with Mr. Ebert when you

20   found out that he had intentionally tried to sabotage your

21   employment opportunity?

22   A    Yes.

23   Q    Okay.  In fact, you were living with him in quarantine

24   during COVID, and you testified, I believe, that you had

25   nowhere else to go at that time.  Right?

1    A    Correct.

2    Q    Okay.  Do you have someplace else to go at this point?

3    A    I do.

4    Q    But you and Mr. Ebert are still together, correct?

5    A    We are.

6    Q    Okay.  I believe you testified during your deposition that

7    learning that your boyfriend, Mr. Ebert, had intentionally

8    tried to sabotage your employment opportunity was

9    heartbreaking.

10   A    It was.

11   Q    Okay.  And that you had to hide that stress from your

12   children, right?

13   A    Yes.

14   Q    Okay.  And that, too, was stressful?

15   A    I don't know how stressful that was, but everybody hides

16   stuff from their kids.

17   Q    Losing your employment with 1 Creation Construction was

18   also stressful?

19   A    Yes.

20   Q    Despite the existence of the many stressors and the

21   heartbreaking revelation that your domestic partner, Mr. Ebert,

22   intentionally tried to sabotage your job prospects, you have

23   not sought therapy, have you?

24   A    I -- I have not.

25   Q    Right.  You have not sought counseling of any kind?

O'BRIEN-234

1    A       No.

2    Q       No mental health treatment, correct?

3    A       No.

4    Q       Okay.  You rely on marijuana to deal with your emotions,

5    correct?

6    A       That is incorrect.

7    Q       That is what you testified at your deposition.  So why

8    don't you explain that to us?

9    A       I -- I said I rely on it to -- for my emotions?

10   Q       What's the role of marijuana in your life?

11   A       I said it helps me sleep.

12   Q       Okay.  You don't smoke it just at night, though, correct?

13   A       Yes, I do.

14   Q       You testified that you smoked it with Ms. McNulty.

15   A       At -- at a party or whatever, one time.  But that's not

16   every day.  I don't do that every day.

17   Q       At your deposition, you actually talked about several

18   times that you'd smoked marijuana, and none of those times were

19   at night to sleep.  So are -- are there other times that you

20   smoke marijuana?

21   A       They were socially, I guess you could say.

22   Q       Okay.  You're a social user?

23   A       Every so often.  I don't like to do it outside of my

24   house.  I prefer to be home.

25   Q       Okay.  But you do.

1   A    Occasionally.

2   Q    Okay.  And you use it every day.

3   A    To get to sleep at night.

4   Q    Every day?

5   A    A couple hits, yes.

6   Q    A couple hits.  Okay.  You don't have --

7   A    I'm not Cheech and Chong.  You're not going to see me roll

8   out of a smoke-filled car.

9   Q    Okay.  You don't have a license for it, do you?

10  A    I do not.

11  Q    You get it from Mr. Ebert?

12  A    I get it.

13  Q    That's what you testified at your deposition.  So --

14       (Simultaneous speaking.)

15  A    Okay.  I get it from Mr. Ebert.

16  Q    -- Mr. Ebert or somebody else?

17  A    I get it from Mr. Ebert.

18  Q    Okay.  Before that, before you met him, you -- before you

19  started dating him in May 2019, you smoked weed, or smoked

20  marijuana, correct?

21  A    I did occasionally, yeah.

22  Q    Every day to sleep or occasionally?

23  A    Not every day.

24  Q    So that was a new habit when you met Mr. Ebert?

25  A    No.  It was after I left the forum is when it was.

1   Q    Okay.  But you smoked marijuana when you were employed at

2   the forum, right?  You talked about that at deposition.

3   A    Yes.

4   Q    Okay.  You take medicine for your ADHD?

5   A    I do.

6   Q    Okay.  Do you take anxiety medicine?

7   A    I do not.

8   Q    Okay.  Does your ADHD medicine make you anxious?

9   A    No.

10  Q    Okay.  Are you aware that it could make you anxious?

11  A    They had me on 30 milligrams in a day, and it made me

12  anxious.  So I backed it down.

13  Q    Okay.  I'm going to switch now, as my last section -- and

14  I know everyone's relieved to be done with me -- the

15  counterclaim.  Okay?  And then we're finished.  When I say the

16  counterclaim, I'm -- I'm talking about the claim that my

17  client, Mr. Roman, filed against you in that second lawsuit

18  that we discussed -- that was discussed last week.  You

19  remember the second lawsuit that you filed against my client,

20  correct?

21  A    Yes.  Yes.

22  Q    That second lawsuit was based on an anonymous call that

23  was placed to the Kimmel Center, correct?

24  A    Correct.

25  Q    And the anonymous caller told the Kimmel Center that you

1  were a drug addict --

2  A    Correct.

3  Q    -- and that you were suing your former employer.  Correct?

4  A    Yes.

5  Q    Okay.  Did the anonymous caller say anything else to the

6  Kimmel Center that you're aware of?

7  A    Not that I'm aware of.

8  Q    Okay.  And the anonymous caller was your boyfriend, right?

9  A    Correct.

10 Q    Okay.  You filed two charges of discrimination with the

11 United States Equal Employment Opportunity Commission, right?

12 A    Yes.

13 Q    Yes.  Let's look at our first charge, which is DX125.

14 It's dated July 24th, 2019.  Does that appear to be the charge

15 that you filed?

16 A    Yes.

17 Q    Okay.  The very last sentence in this -- on this page --

18 and the document is several pages long, but on the last -- the

19 last sentence on the page, you say she -- meaning you -- never

20 went to the office with him -- Mr. Roman -- that night and

21 never -- she never attended another dinner meeting.  Is that

22 correct?

23 A    I don't believe we went one-on-one anywhere again.

24 Q    Okay.  Let's look at the second charge, please, DX126.

25 You signed this charge, just like you did the first one, under

O'BRIEN-238

1    the penalty of perjury.  Correct, Ms. O'Brien?

2    A    Yes.

3    Q    Okay.  The second paragraph toward the end says the caller

4    -- we're talking about here the anonymous call that was made to

5    the Kimmel Center.  The caller would leave a message with

6    prospective employers and state that Ms. O'Brien was a drug

7    addict who only got her previous job by sleeping with the boss,

8    and discouraged offering Ms. O'Brien employment.

9    A    I don't recall them saying that that's what he said.  That

10   -- that might have been an accident because we were doing the

11   different claims.  That might be a typo.  I don't remember them

12   saying that to me.

13   Q    You signed this under the penalty of perjury, correct?

14   A    Yes.

15   Q    Okay.  But it's your testimony now that the Kimmel Center

16   -- the call to the Kimmel Center didn't include anything about

17   you sleeping with your boss?

18   A    I don't recall that now, but now I just remember drug

19   addict and suing your employer.

20   Q    Okay.  You say the caller would leave a message with

21   prospective employers.  Other than the Kimmel Center, Ms.

22   O'Brien, were there any other prospective employers that got

23   this anonymous call?

24   A    No.

25   Q    No.  Okay.  The sentence before that talks about the

1  companies she applied to in the plural, the companies.  Were

2  there companies other than the Kimmel Center that you applied

3  to that got this call?

4  A    No.  The Kimmel Center is the only one that I know.

5  Q    Okay.  So this is a bit exaggerated.  Is that correct?

6  A    It should have been -- I should have payed closer

7  attention to the verbiage.

8  Q    Okay.

9  A    It was a little overwhelming for me.  I'm not used to that

10  sort of thing.

11  Q    It was a little over what?

12  A    Overwhelming, the -- the process of all the charges and

13  everything.

14  Q    Well, this was your second charge, right?

15  A    Correct.

16  Q    Right.  Now, you testified on Friday that you didn't know

17  how PeopleShare got your information in order to set up that

18  interview at the Kimmel Center.  Do you remember testifying to

19  that?

20  A    Yes.

21  Q    And your -- you theorized at that time that you suspected

22  that perhaps Mr. Roman may have given the -- your information

23  to PeopleShare so that they would get you an interview that he

24  could then sabotage, right?

25  A    At that point, I had been so beaten down by Mr. Roman.  He

1  threatened us for years about --

2  Q    Just --

3  A    -- being able to get into --

4         (Simultaneous speaking.)

5  Q    -- the question.

6  A    Yes.

7  Q    Yeah.  That's what your testimony was on Friday, that you

8  thought that he had set the whole thing up in an elaborate

9  scheme to get you sabotaged.

10 A    I -- I don't know that I thought that he sent them my --

11 my résumé, but I thought he knew about the interview.

12 Q    Okay.  But you know now that you provided your résumé to

13 the PeopleShare in 2017, right?

14 A    Correct.

15 Q    Okay.  So Mr. Roman didn't get PeopleShare that résumé and

16 then set up an interview so that he could then sabotage it,

17 right?

18 A    I don't remember saying that that's what I thought he did.

19 Q    Okay.

20 A    I thought he saw in my calendar or that he knew.

21 Q    Did -- would you have put an interview for new -- a new

22 job on your calendar, Ms. O'Brien --

23 A    In my Gmail.  It was in my Gmail calendar.

24 Q    Okay.

25 A    I thought Mr. Roman could access my phone because he told

O'BRIEN-241

1   me that he could.

2   Q      Okay.  You thought he could access your personal phone?

3   A      Yes.

4   Q      Okay.

5   A      And I also would check my Gmail on my laptop, or not my

6   laptop, but my -- my -- my desktop, which he had access to.

7   Q      The allegation in your second charge where you said that

8   the caller would leave a message with prospective employers,

9   that was a false allegation, wasn't it?

10  A      I'm sorry.  Can you say that again?

11  Q      In your charge -- we just reviewed it, and you testified

12  that there were no other prospective employers that got a

13  message from an anonymous caller.  But you said in your charge

14  that there were.  You said that the caller would leave a

15  message --

16  A      That was --

17  Q      -- with prospective employers.  So that was a false

18  allegation you made against my client, right?

19  A      Well, no.  It was true.  I mean, it was -- I alleged that

20  he did it.  The verbiage was wrong.  It shouldn't have been

21  several.  It should have been one.

22  Q      Okay.  So it was a false allegation that -- that it

23  happened to multiple prospective employers, correct?

24  A      Correct.

25  Q      Let's look at DX128, please.  This is your second lawsuit

O'BRIEN-242

1   that you filed against my client on January 27th, 2019.  Let's
2   go to paragraph 10.  You were -- you testified earlier that you
3   were the Director of Finance and Administration at the forum,
4   right?
5   A    Yes.
6   Q    Okay.  Let's look at paragraph 24, please.  Okay.  In
7   paragraph 24, you say the Plaintiff received -- that's you -- a
8   call from your headhunter, and the headhunter told you that
9   after your interview, the prospective employer received a call
10  from a blocked number informing the prospective employer that
11  Plaintiff was a drug addict and currently suing her employer.
12       So you didn't make any mention in your complaint about the
13  anonymous caller saying anything about you sleeping with your
14  boss.
15  A    Correct.
16  Q    Okay.  So the -- the allegation in the charge number 2
17  about the anonymous caller, who you contended was Mr. Roman,
18  saying that you slept with your former boss -- that also was a
19  false allegation in that charge, correct?
20  A    I'm sorry.  What?
21  Q    In your charge, you said that Mr. Roman --
22  A    In the EEOC?
23  Q    Correct.  Yes.  Thank you for clarifying.  That Mr. Roman
24  told your prospective employers that you were sleeping with
25  your boss, that was a false allegation?

1  A     Correct, I believe.  I don't -- I don't remember that

2  happening.

3  Q     Okay.  Paragraph 25 of the complaint says that you were

4  horrified and embarrassed by those statements, especially

5  because of the defamatory nature of the claim that you are a

6  drug addict.

7  A     Yes.

8  Q     You do smoke marijuana every day, right?

9  A     I don't see that as a drug.  It's a -- it's a medication,

10  actually.

11  Q     It's not a medication.  You don't have a prescription for

12  it, do you?

13  A     Okay.

14  Q     Do you?

15  A     I do not.

16  Q     Right.  Okay.  You know that you could go get one?

17         MS. SHIKUNOV:  Your Honor, at this point, I need to

18  object.

19         THE WITNESS:  I paid for one for my son.  They're

20  pretty expensive.

21         MS. SHIKUNOV:  We discussed this at the pretrial

22  conference.

23         (Simultaneous speaking.)

24         MS. SHIKUNOV:  We discussed this at the pretrial

25  conference.  And recreational marijuana is legal in the state

1   of New Jersey, and I think it is completely inflammatory to be

2   asking Ms. O'Brien if she's a drug addict on the stand because

3   she engages in the use of a legal substance.

4          THE COURT:  Counselor, if -- if you want to have a

5   sidebar, we can, but we're not going to discuss this in front

6   of the jury.  Now, I don't think that was the take I got from

7   the question that -- that the witness is a drug addict.  That

8   wasn't my takeaway.  If you rephrase your question, we'll --

9   we'll make a decision on it.

10         MS. DIBIANCA:  I can just move on.

11  BY MS. DIBIANCA:

12  Q    You -- you've not sought to get a medical marijuana card,

13  have you, Ms. O'Brien?

14  A    I paid for one for my son.

15  Q    But you didn't pay for one for yourself?

16  A    No.

17  Q    Okay.  Your interview at the Kimmel Center was on October

18  29th, 2019, correct?

19  A    Okay.

20  Q    At that time, Ms. O'Brien, you had not yet filed suit

21  against the forum, had you?

22  A    No.

23  Q    But you had filed your charge, correct?  The first charge

24  of discrimination with the EEOC, you had filed it at that time?

25  A    I believe so, yes.

1  Q    Okay.  Did Mr. Ebert know -- when he called the Kimmel

2  Center on October 29th, 2019, did Mr. Ebert know that you were

3  -- you had filed a charge against the forum and were planning

4  to sue the forum?

5           MS. SHIKUNOV:  Your Honor, I'm going to object.  That

6  calls for speculation.  This witness can't discuss what Mr.

7  Ebert knew or did not know.

8           THE COURT:  If the witness knows –

9           THE WITNESS:  I didn't tell him specifically anything

10  that was going on.

11  BY MS. DIBIANCA:

12  Q    The night of the interview on October 29, 2019, Mr. David

13  Beatty, the recruiter, or person with PeopleShare, called you

14  and told you that you did not get the Kimmel Center job because

15  of your poor interview performance, correct?

16  A    Correct.

17  Q    Okay.  He specifically told you during that call that the

18  anonymous phone call was not the reason you did not get the job

19  with the Kimmel Center, right?

20  A    Correct.

21  Q    Okay.  Ms. O'Brien, last week there was some talk about

22  counterclaims that my clients filed in their answer, along with

23  the counterclaim that we're describing as the second lawsuit,

24  and that they subsequently withdraw.  Do you remember that

25  testimony?

1    A     Yes.

2    Q     Okay.  And you said that Mr. Roman, my client, had filed

3    four counterclaims but withdrew three of them, correct?

4    A     Correct.

5    Q     Okay.  The one counterclaim that remains is for the abuse

6    of process, which we just finished discussing, correct?

7    A     Correct.

8    Q     Okay.  You recall, don't you, that the other three

9    counterclaims were claims against Mr. Ebert, correct?

10   A     I don't recall.  There was so many.

11   Q     Do you recall that Mr. Ebert was a named defendant in the

12   counterclaims?

13   A     Yes.

14   Q     Yeah.  And that those counterclaims had to be dropped

15   because Mr. Ebert filed for bankruptcy, correct?

16   A     Okay.

17   Q     And that my clients cannot pursue a claim against an

18   individual whose debts have been discharged in bankruptcy.

19   A     Okay.

20   Q     Okay.  We've talked about Mr. Ebert's anonymous call to

21   the Kimmel Center, but that was not the only anonymous call he

22   made; was it?

23   A     No.

24   Q     Okay.  He also -- well, you tell me.  Who did -- who else

25   did Mr. Ebert call anonymously, Ms. O'Brien?

```
1   A    Mr. Roman.

2   Q    Mr. Roman.  Do you know how many calls he made to

3   Mr. Roman?

4   A    I do not.

5   Q    You knew it was several, though, right?

6   A    I knew it was several.

7   Q    Okay.  Do you know that he called you before and after

8   each time he called Mr. Roman?

9   A    No.

10  Q    You weren't aware of that?

11  A    No.  No.

12  Q    Okay.  All of the calls that Mr. Ebert made to Mr. Roman

13  anonymously he did from a -- called from a blocked number,

14  correct?

15  A    Okay.  Yes.

16  Q    Okay.  And when you -- your witness -- your expert was on

17  the stand today, she testified that you had real distress about

18  receiving a call from a blocked number.  Does your boyfriend

19  call you from a blocked number sometimes?

20  A    No.

21  Q    No?

22  A    No.

23  Q    But you know that he called Mr. Roman numerous times from

24  a blocked number, right?

25  A    I forgot about that.
```

1  Q    Okay.

2  A    I mean, I didn't -- it wasn't on the top of my mind.  That

3  wasn't why the number made me nervous.

4  Q    Okay.  Has Mr. Roman ever called you since this litigation

5  began?

6  A    No.

7  Q    No?  Okay.  And this has been going on two, three years,

8  right?

9  A    Correct.

10  Q    Okay.  September 25, 2019, Mr. Roman actually answered

11  your boyfriend's phone call from the blocked number.  You're

12  aware of that, right?

13  A    Was that the only time he ever answered?

14  Q    I don't know, but I'm asking you if you're aware of the

15  September 25th time.

16  A    How would --

17  Q    You've heard the phone call.

18  A    Right.

19  Q    The phone call was reported; wasn't it?

20  A    Right.  My understanding was that they spoke more than

21  once, I thought.

22  Q    Okay.  Are you aware of a phone call that was recorded

23  from Mr. Ebert to Mr. Roman?

24  A    Yes.  Yes.

25  Q    Okay.

 1  A    Yes.  I thought they had spoken more than one time,

 2  though.

 3  Q    But the one that's recorded is September --

 4  A    There's only one recording.

 5  Q    Okay.

 6  A    Right?

 7  Q    That I --

 8  A    That we all know?

 9  Q    Okay.  Mr. Ebert is not currently employed; is he?

10  A    He is retired.

11  Q    Okay.  He is a former police officer?

12  A    Correct.

13  Q    Undercover, right?

14  A    Yep.

15  Q    So Mr. Ebert has some experience in undercover work,

16  correct?

17  A    Yes.

18  Q    He has some experience in keeping secrets, correct?

19  A    Okay.

20        MS. SHIKUNOV:  I'm going to object to that question,

21  Your Honor.

22        THE COURT:  Grounds?

23        MS. SHIKUNOV:  I don't understand how it's relevant,

24  that he used to be an undercover cop, and she is asking if he

25  has experience keeping secrets.

1           THE COURT:  Do you want to make an offer on that,

2  counsel?

3           MS. DIBIANCA:  Certainly, Your Honor.  We're going to

4  talk about the recording of the call.  Maybe that will explain

5  it.  I can just move right to the recording, if you'd like.

6           THE COURT:  Let's do that.

7           MS. DIBIANCA:  Okay.

8  BY MS. DIBIANCA:

9  Q    Ms. O'Brien, you counsel may have already told you this,

10  but what I'm going to play is not the complete call.  Some

11  excerpts have been removed.  The parties have agreed to that in

12  advance, so I just want to be clear you're not going to hear

13  the whole call.  It's going to be portions of the call.

14           MS. DIBIANCA:  Exhibit 119.

15           (Audio played.)

16  BY MS. DIBIANCA:

17  Q    Just to confirm the voices, who are you hearing on that

18  tape?

19  A    Greg and -- Mr. Ebert and Mr. Roman.

20           MS. DIBIANCA:  Okay.  Go ahead and resume, please.

21           (Audio played.)

22  BY MS. DIBIANCA:

23  Q    That was your boyfriend's voice, right?

24  A    Correct.

25           MS. DIBIANCA:  Just because there are two male

1    speakers, so I want to make sure everyone understands who is

2    speaking.  Go right ahead.

3            (Audio played.)

4    BY MS. DIBIANCA:

5    Q    Ms. O'Brien, your boyfriend told Mr. Roman on that call --

6    he noted that Mr. Roman had been on work leave for some months,

7    correct?

8    A    Yes.

9    Q    And Mr. Roman had, in fact, been out of the office

10   following that November 1st --

11   A    Yes.

12   Q    So by September 2019 when this call occurred, Mr. Roman

13   had, in fact, been -- my words -- exiled from the office for 10

14   months, right?

15   A    Yes.

16   Q    Okay.  Mr. Ebert also said that the main boss of the Forum

17   came in once a week, and the main boss was Dr. Pipes, correct?

18   A    Yes.

19   Q    And Dr. Pipes did come into the office once a week,

20   correct?

21   A    Yes.

22   Q    Okay.  And Mr. Ebert said during that call that there were

23   four or five women who were going to sue the Forum, correct?

24   A    Yes.

25   Q    And you and three or four other women did in fact sue the

1  Forum.

2  A    Correct.

3  Q    Correct.  And we're going to hear from those other

4  witnesses -- Ms. Barbounis, Ms. McNulty, and Ms. Brady,

5  correct?

6  A    Correct.

7  Q    And they're all represented by the same lawyer, right?

8  A    Yes.

9  Q    Okay.  And that lawyer is with the same firm that Ms.

10  Shikunov is with, correct?

11  A    Now.

12  Q    Correct.

13  A    Ms. Shikunov was not with that firm when I went and spoke

14  with her.

15  Q    Okay.  Mr. Ebert, during the call, talked about a woman

16  down in D.C., correct?

17  A    Correct.

18  Q    And at the time of this call, Ms. Barbounis was living in

19  D.C., correct?

20  A    She was, yes.

21  Q    Yeah.  Okay.  Mr. Ebert said that the woman in D.C. was,

22  quote, "the one who got the ball rolling with the suit,"

23  correct?

24  A    That's what he said.

25  Q    Yeah.  And you know that Lisa Barbounis was in fact the

1  first of the women to file a suit, correct?

2  A    Okay.  Yes.

3  Q    Okay.  So far, has anything that I've mentioned that

4  Mr. Ebert said during that call been untruthful?

5  A    No.

6  Q    Okay.  It has all been accurate, correct?

7  A    Yes.

8  Q    Okay.  Mr. Ebert said that, quote, "Everyone jumped in the

9  suit because of her," and by "her" he was referring to the

10  woman in D.C., right?

11  A    That's what he said.

12  Q    That's what he said.  And you know that Lisa Barbounis was

13  the first to retain a lawyer, and then the other women,

14  yourself excluded, also retained that same lawyer, right?

15  A    I believe that I actually retained my lawyer first.

16  Q    The other women, though.

17  A    Excuse me?

18  Q    Ms. Barbounis, Ms. Brady, and Ms. McNulty.  Ms. Barbounis

19  was the first to engage her lawyer.

20  A    Okay.

21  Q    Okay?  And the other two followed --

22  A    Followed her.

23  Q    Right.  Okay.  Mr. Ebert also said during the call that,

24  quote, "The one woman that left, or she is just leaving in the

25  next month, actually, joined in the suit and made up just to

1  cash in."  Do you remember him saying that?

2  A    I heard him say that, yes.

3  Q    Okay.  And the woman who was leaving the Forum in the next

4  months, October 2019, that was Ms. Brady, correct?

5  A    I'm not sure.  I'm not sure who left when, but it could

6  be.

7  Q    Okay.  And did Ms. Brady join the suit just to cash in,

8  Ms. O'Brien?

9  A    I don't believe so, no.

10  Q    Ms. O'Brien, did you tell Mr. Ebert about the women and

11  their lawsuits?

12  A    I did not.  I -- when -- I think when those -- can you

13  tell me when those calls were made?

14  Q    That one was September 25 --

15  A    That was --

16  Q    -- 2019.

17  A    September?  So we had just been dating since May.  I

18  didn't -- I didn't give him all of the information.  But as --

19  the longer that we dated, I did have calls from friends that I

20  confided in, and, you know, he may have heard some stuff there.

21  Q    So he just pieced together pieces of information he heard

22  from you on the phone?

23  A    With stuff that he knew, like he knew that I didn't go

24  into the office every day.  We had work flexibility because

25  Daniel allowed that.

1   Q    He didn't say that on that call; did he?

2   A    He did.  He said we were never in the office, and it was

3   like we were, you know, coming and going as we pleased.

4   Q    Okay.

5   A    So those things that he said like that, that he probably

6   knew, that I didn't go into the office every day.

7   Q    How did he know about Mr. Roman being on work leave, that

8   Daniel Pipes came into the office once a week, that

9   Ms. Barbounis was down in D.C., and that Ms. Barbounis was the

10  one who got the ball rolling?

11  A    I don't know how he knew.  That's what I'm telling you.  I

12  was talking to my friends on the phone, and they would ask me

13  stuff about it.  And most of the times I would try to go get

14  some privacy, but he may have heard some stuff.

15  Q    You testified last week that you worried that Mr. --

16  actually, you testified to it today, I believe, that Mr. Roman

17  -- you were worried he was hacking your personal phone, right?

18  A    I was -- yes.  I still worry about it, actually.

19  Q    Okay.  And Mr. -- you testified Mr. Ebert does have a

20  background in undercover and surveillance work, right?

21  A    Correct.

22  Q    Okay.  Did it ever occur to you, Ms. O'Brien, that your

23  boyfriend who has experience in covert surveillance as an

24  undercover cop may have been the one surveilling your phone?

25  A    No.

1  Q    No?  Okay.  Did it ever occur to you that Mr. Ebert was

2  listening to your private conversations with your co-workers

3  and that he knew the information that he conducted -- that he

4  conveyed to Mr. Roman as a result of his covert surveillance on

5  you?

6  A    No.

7  Q    Okay.  Did you bring your boyfriend, Mr. Ebert, into the

8  MEF office on the evening of June 29, 2019, to conduct

9  surveillance?

10  A    Not surveillance.  I asked him to look to see if there was

11  a video camera in my office because I was paranoid that Greg

12  was -- had put cameras in our office.

13  Q    Okay.  You didn't have him look just in your office,

14  though; did you?

15  A    I had him look above Greg's desk because that's where he

16  had the camera pointed that would go off when you walked into

17  the room.

18  Q    You had him look --

19  A    So I thought that --

20  Q    -- throughout the office?

21  A    I'm sorry.  What?

22  Q    Did you have Mr. Ebert look throughout the office?

23  A    Not throughout the office.  Above the desks of the women

24  and above Greg's.

25  Q    Okay.  Dr. Pipes had no idea --

 1  A    No.

 2  Q    -- that you brought your boyfriend into their highly

 3  secure work environment --

 4  A    No.

 5  Q    -- to look around.

 6  A    No.

 7  Q    Right.

 8  A    I did have him sign an NDA, though.

 9  Q    An NDA that you never gave to anybody.

10  A    I filed it.

11  Q    But --

12  A    With the rest of them.  That's what I usually did.  That's

13  exactly what I did.  I never gave them anybody's.

14  Q    Ms. O'Brien, did your --

15  A    I would have a signed --

16  Q    -- boyfriend have a legitimate business reason to be in

17  the offices?

18  A    No.

19  Q    No.  Okay.

20          MS. DIBIANCA:  I have no further questions, Your

21  Honor.

22          THE COURT:  All right.  Can we have a brief sidebar,

23  please?

24          (Whereupon, sidebar conversation begins.)

25          THE COURT:  Can you hear us, Christine?  Christine,

1   can you hear us?

2           DEPUTY STEIN:  Yes.

3           THE COURT:  We're going to continue to the redirect,

4   okay, and we're going to see how long this takes.  I'm not

5   sure.  I do -- I'm giving this some more thought about the

6   discussion about we -- and if there is an instruction -- I know

7   that the cross-examination was focused

1  on the complaint, the second complaint, and that's part of

2  your crossclaim.

3          And that the testimony, as I understand it, or at

4  least as it -- as that complaint alleges -- you know, that

5  complaint was filed by the Plaintiff.

6          An anonymous caller reached out to a prospective

7  employee, said bad things, including that she was a drug user.

8  I don't want the jury left with the impression -- I mean, that

9  -- first of all, I don't -- I don't think it's supported by --

10 at least by the evidence that I have that this -- that this

11 Plaintiff is a drug addict.

12         And I'm wondering if the -- through the objection and

13 me moving -- moving us on from there, if we created some

14 impression that you are concerned with that we should cure on

15 the record, or perhaps it's better not even to get into it

16 anymore, or is it something you want to deal with on redirect?

17         MS. SHIKUNOV:  I mean, if I just ask her if she's a

18 drug addict, she's going to say no.  I just -- you basically

19 implied that she was.  A drug addict is also going to say that

20 they're not a drug addict on the stand.

21         THE COURT:  But it -- this is the line that has

22 gotten fuzzy here.  The complaint that she filed that is the

23 subject of the -- of the crossclaim is where the suggestion of

24 the drug addict came out.  But I'm just wondering, in

25 discussing it, do we -- I don't want to leave the jury with the

O'BRIEN-260

1    impression other than what she said.  She uses marijuana

2    recreationally or what she -- what she had discussed about

3    marijuana use in terms of the expert's opinion that we received

4    today.

5         I just -- I'm asking counsel, so do we -- you know,

6    is there a -- is there an instruction you'd like to give?  Is

7    there a way that we --

8         MS. DIBIANCA:  I would prefer an instruction I think

9    probably just that -- I don't even know how to put it together

10   on the fly.  I'm sorry.  I'm like trying to --

11        MS. SHIKUNOV:  Your Honor, I think it, honestly, just

12   attracts more attention to it.

13        THE COURT:  Which crossed my mind as well.  And maybe

14   I'm the only one who -- who picked it up.

15        Again, it's -- the complaint itself is going to be in

16   evidence, and this may be -- maybe this gets fixed through

17   redirect, and when they finally meet Ebert, et cetera, that

18   when he -- is that we anticipate Ebert is going to say, "I'm

19   the one who said that, and I made it all up anyway."

20        But I'm just asking -- and assuming we get through

21   this witness today, if you want to, you know, sleep on an

22   instruction and suggest something --

23        MS. SHIKUNOV:  Can I do that?

24        THE COURT:  -- in the morning, I think that's fair.

25   And I may -- I may be overthinking it.

O'BRIEN-261

1          MS. DIBIANCA:  Right.

2          THE COURT:  I just -- and it may be a strategy call

3    that you -- that you --

4          MS. SHIKUNOV:  I know.  I just -- I'd like to chew on

5    that.

6          THE COURT:  How long do you think --

7          MS. SHIKUNOV:  I can tell you how long I would like

8    it to take, and then I can tell you how long I think that my

9    witness will take to answer the questions that I'm going to

10   ask.  So, I mean, I have about three and a half pages of

11   questions.

12         THE COURT:  That's not bad.  That's not bad.  I'd

13   like to give it a shot, even if we have --

14         MS. DIBIANCA:  That's my --

15         MS. SHIKUNOV:  I would like to (inaudible) here, and

16   I'll just know -- and I'll do my best either way.  But

17   questions that are inconsequential, if I could lead her a

18   little bit, I could get through it a lost foster.

19         MS. DIBIANCA:  Yeah, yeah.  I gave you a lot of

20   leeway last week.

21         MS. SHIKUNOV:  And so if Your Honor is going to allow

22   me some latitude --

23         THE COURT:  We did that this morning as well with the

24   expert, too.  I'm fine with that.

25         MS. SHIKUNOV:  Okay.

O'BRIEN-262

1          THE COURT:  And, again, maybe that's a way you -- if
2    you -- whatever you think is best, Erica, but maybe that's the
3    way to --
4          MS. SHIKUNOV:  Yeah.  No problem.
5          THE COURT:  -- maybe make your own instruction on the
6    lead, if you want.  You know, you can -- you can have leeway,
7    if you want to clarify that, sort of like what you were doing
8    with your objection, if you want to make that part of your
9    examination, too.
10          MS. SHIKUNOV:  Okay.
11          THE COURT:  All right?  All right, guys.  We're going
12    to give it a shot.
13          MS. DIBIANCA:  Thanks.
14          MS. SHIKUNOV:  Thank you.
15          THE COURT:  Thank you.
16          (Whereupon, the sidebar conversation ends.)
17          THE COURT:  Folks, we're going to move on to the
18    redirect at this point.  I do have an eye on the clock.  I know
19    it's getting to be a bit of a long day.  But if we have a shot
20    at getting the testimony of this witness completed today, I'd
21    like to take it.  Okay?
22          So we'll get started right now on the redirect.
23    Thank you so much.
24    REDIRECT EXAMINATION
25    BY MS. SHIKUNOV:

```
 1   Q    Ms. O'Brien, you were asked some questions on cross-exam
 2   about alleged drug use.  Other than your prescribed ADHD
 3   medication and marijuana, which is legal in the State of New
 4   Jersey, do you use any other drugs?
 5   A    No.
 6   Q    Have you ever used any other drugs?
 7   A    No.
 8   Q    Do you have any addiction issues with marijuana?
 9   A    No.
10   Q    Have you smoked marijuana at all this week since you've
11   been in the hotel?
12   A    No.
13        MS. SHIKUNOV:  Could you please bring up the
14   counterclaim, Patricia?  And if you could scroll down to the
15   counterclaim?
16   BY MS. SHIKUNOV:
17   Q    Ms. O'Brien, you were asked some questions on cross-exam
18   about whether or not the three counterclaims against you that
19   have since been dropped were only against Mr. Ebert.  That's
20   not true, correct?
21   A    No.
22        MS. SHIKUNOV:  Scroll back up to the first
23   counterclaim, please, Patricia.
24   BY MS. SHIKUNOV:
25   Q    Count 1 says it's against O'Brien and Ebert, correct?
```

O'BRIEN-264

1  A    Yes.

2         MS. SHIKUNOV:  All right.  Could you scroll to the

3  second count, please?

4  BY MS. SHIKUNOV:

5  Q    The second count says it's against you, correct?

6  A    Correct.

7  Q    There is a second count, too, that says it's against

8  Ebert, correct?

9  A    Correct.

10        MS. SHIKUNOV:  And then can you scroll down to the

11 last one, please, Patricia?

12 BY MS. SHIKUNOV:

13 Q    That one also says it's against you, correct?

14 A    Correct.

15 Q    Okay.

16        MS. SHIKUNOV:  Patricia, could you please bring up

17 the text messages, starting with DX 48.

18 BY MS. SHIKUNOV:

19 Q    Ms. O'Brien, you were asked some questions about text

20 messages that you exchanged on October 31st of 2018 with Lisa

21 Barbounis.  Do you remember exchanging those text messages?

22 A    Yes.

23 Q    So we're going to start at 48, because they were taken out

24 of context when you were asked questions about them, and I'd

25 like to go through them in the order they were exchanged, okay?

1   A    Okay.

2          MS. SHIKUNOV:  So I'm just going to read through

3   them, and I'd ask, Patricia, that you follow along with me.

4   And if I'm reading them incorrectly, let me know, okay?

5          THE WITNESS:  Okay.

6   BY MS. SHIKUNOV:

7   Q    The first one is from you to Lisa.  It says, "They are

8   going to ask what we talked about, like our similar

9   personalities, how we need to respect each other's space,

10  drawing lines between responsibilities, and how we don't want

11  to get emotional in the office anymore, and so we can work

12  better together."  Did I read that correctly?

13  A    Yes.

14  Q    Your response -- or her response, excuse me, was "yes."

15  A    Yes.

16  Q    Correct?  And she wrote to you again and wrote to all of

17  that.

18  A    Correct.

19  Q    You replied, "Good," smiley face.

20  A    Correct.

21  Q    You text her, "Just got off the phone.  You and I have no

22  choice but to trust each other."

23  A    Correct.

24  Q    She texts you, "I do not like being paranoid."

25  A    Yes.

O'BRIEN-266

1    Q    She texts you again, "Feel free to come look at what I

2    wrote."

3    A    Yes.

4    Q    Was that referring to the complaint she filed against you?

5    A    Yes.

6    Q    She writes to you, "If you're so shitty" -- or, excuse me,

7    "It's so shitty not to trust everyone," correct?

8    A    Yes.

9    Q    You write, "He called me.  He is going to angle.  He told

10   me he is going to squash a meeting with Mark.  Do it, and we

11   will talk later."

12        You write to her, "We both need to be model employees

13   right now."

14        She writes to you, "I can't even be more paranoid."

15        You write, "We need to steer clear of each other around

16   everyone else.  I believe you.  They need to think we are at

17   odds, though.  They are trying to pit us against each other,

18   probably to get rid of us both."

19        She writes back, "If this place doesn't honor transparency

20   and truth, then it's not worth it to me.  I'd rather be broke

21   than a scumbag rat."

22        She writes to you again, "It's so sad that I trust no one,

23   and I love the mission.  Come out stronger."

24        You write, "LOL.  We need to play our cards together, so

25   we can get out and not be broke or scumbags."

1    You write, "You can trust me.  I'm going to trust you with

2  mine.  I will not fuck you over."

3    She writes back, "Deal."

4    You write, "We just need to be smart, and no one else can

5  know that we have each other's backs."

6    She writes back, "Yes."

7    You write, "Hey, call me when you're out of there, but

8  don't let it interfere with your Halloween and your kids,

9  because it's supposed to be the best night ever.  But

10  definitely call me.  And if you text me, make sure you're

11  texting me, because I almost texted him with something I was

12  saying to you.  LOL."

13    She writes, "The minute I walk out the door."

14    You write, "I am a couple glasses in, but I would like to

15  talk to you before tomorrow."

16    She writes, "I'm so sick to my stomach, but I appreciate

17  you talking to me."

18    She writes again, "I almost" -- or "I deleted most.  This

19  is from Vasselly's phones.  The one Tricia has are worse.  I

20  don't even know if he can ask her for them."

21    She is referring to text messages, correct?

22  A   Correct.

23  Q   You write, "Figure out what you want to do.  I think if

24  you ask her to screenshot them and give them to you, she would.

25   I figured he went through my stuff.  Matt is in the wrong.  I

O'BRIEN-268

1  brought Katrina to him.  I don't know all if this -- when I

2  did."

3       What did you mean by that?

4  A    I didn't know all of this when --

5  Q    You didn't know all of --

6  A    When I brought Katrina --

7  Q    -- this.  Okay.

8  A    When I brought Katrina in.

9  Q    You write, "This is DP's life work.  I don't think he

10 would blindly fire someone/two someones."

11      She writes, "I'm trying to gather my stuff.  I told my old

12 work friend about it."

13      She writes again, "That's what I thought.  I thought no

14 fucking way am I telling her she is with him and spies for

15 him."

16      Is she referring to you?

17 A    No.

18 Q    Who is she referring to?  Or if you don't know, you can

19 say you don't know.

20 A    I don't think I know.

21 Q    She writes, "100 percent, that's what I thought."

22      You write, "I take my job seriously.  He hired me, but I

23 work for MEF.  He gave me HR responsibilities, and I look out

24 for MEF, and I look out for our people."

25      You write again, "Honestly, I figured you would.  I think

1   you should consult your people and see how they guide you.  I

2   think together we could have an impact with DP.  I'd like to

3   look out for MEF, but I'm in your corner.  In the meantime, I

4   will be looking to cover my ass.  Apparently, I am going to

5   need a new job.  Ugh.  So disappointing.  I really think DP and

6   Mark would hear us if we went together and spoke from the

7   heart, but I am in your corner."

8          She writes, "Thank you, but that's the whole thing.  I

9   don't want a new job.  I just want this one to be normal.  If

10  we do that, do you think they would fire us?"

11         She is referring to filing a complaint, correct?

12  A    Correct.

13  Q    You write the next morning, "I'm on my way in.  Call when

14  you can."

15         Then you write, "I'm handwriting it, and I feel like I'm

16  going to take a picture of it and send it to D and MS Gmail

17  accounts.  It's long and I'm two pages in.  I wish I could

18  type.  LOL.  I will send it to you."  Or, whoops, "I will send

19  to you, too."

20         She writes, "That's what we do.  I come to you.  You

21  document.  If they don't respond appropriately, then attorney."

22         You write, "I'm writing up a timeline right now, pen and

23  paper, because I'm afraid to do it on my computer."

24         Then you write, "The die is cast.  I'm pretty sure we can

25  talk to each other now.  Who cares what they think" -- or

O'BRIEN-270

1   "they'll think."  I'm assuming you meant "they," ma'am?

2   A    Mm-hmm.

3   Q    "While the shit is hitting the fan, let's talk a walk and

4   I'll show you the email and the telegram."

5        Then you write, "Lay low 'til Stacey leaves."

6        You're referring to Stacey Roman?

7   A    Yes.

8   Q    She was in the office?

9   A    Yes.

10  Q    And that's Greg's sister.

11  A    Yes.

12  Q    "Or let's take a walk."

13       She writes, "He's telling Greg what we all said and doing

14  nothing but letting him know there is a problem."

15       Then she writes, "We all still have to work for him."

16       Then you write, "I think they have to keep him for face

17  value."  Do you mean "for face value"?

18  A    For face value, yeah.

19  Q    "But if he retains even a miniscule amount of authority or

20  power, I am walking.  I do not want to have to deal" -- or "I

21  will not deal with him for another minute."

22       And then a week later you write, "I like the way Daniel

23  operates."

24       There is no other text messages with this one.  Do you

25  even know what you were talking about when you sent this,

O'BRIEN-271

1  ma'am?

2  A    Unh-unh.

3  Q    You were asked questions about why you delayed reporting,

4  and you answered that you had a few of reporting.

5  Specifically, I'm going to start with the Misconduct incident.

6   Tiffany Lee, Laura Frank, and Lara Zott, were they terminated

7  before or after the Misconduct incident?

8  A    Before.

9  Q    With regard to AIPAC, why did you delay reporting that or

10 bringing that up?

11 A    I was afraid, and no one said anything to me.  Everyone

12 was trying to be friendly and keep a good work atmosphere.

13 And, again, I thought it was those -- one of those creepy

14 moments that he had, and it was a poor choice, and if nobody

15 was complaining, I wasn't going to rock the boat because I was

16 afraid to.

17 Q    Why didn't you include the APIAC event in the write-up

18 when -- the five-page handwritten write-up that you wrote?

19 A    It was five pages.  I was exhausted, and I was trying to

20 just give them a time -- I felt like I had to explain the fight

21 at that point, too.  So it was really more just around that

22 stuff.

23 Q    With regard to the investigation that was conducted

24 afterwards, was the AIPAC event reported to Dr. Pipes?

25 A    Yes.

O'BRIEN-272

1  Q    Ma'am, you're HR, and there was a major report of sexual
2  harassment that was made to Dr. Pipes.  Were you included at
3  any point in the investigation after the report was made?
4  A    No.
5  Q    Were there any females included in the investigation when
6  the report was made?
7  A    No.
8  Q    You indicated that the morning of the report being made
9  that Mr. Fink was going to come in to investigate Lisa's
10  complaint against you.
11  A    Right.  Yes.
12  Q    Okay.  Was Mr. Fink brought in to investigate the claims
13  of sexual harassment when Daniel Pipes was conducting
14  interviews around the office?
15  A    No.  He came in by himself.
16  Q    Okay.  And when did he come in?
17  A    That day.  We had sent --
18  Q    When you're thinking -- I'm sorry.  Dr. Pipes.
19  A    Dr. Pipes came in the day --
20  Q    So, I'm sorry, maybe I asked the question in a confusing
21  way.  Did Mr. Fink ever come in?
22  A    He came in to the meeting that they had called.
23  Q    Okay.  And was he there in person or on the phone?
24  A    The first one I think he was in person.  The second one he
25  was on the phone.

1  Q    Did Mr. Fink ever ask you any questions?

2  A    No.

3  Q    Did he ever take it -- did he ever participate in the

4  interview?

5  A    No.

6  Q    When Dr. Pipes interviewed you, did he take any notes?

7  A    No.

8  Q    Did he notify you of any conclusions regarding his

9  investigation?

10  A    No.

11  Q    Namely, I'm asking you if he made a determination whether

12  Greg did these things or not.

13  A    No.

14         MS. SHIKUNOV:  Okay.  And could you pull up that 2015

15  sexual harassment policy, please, Patricia, and go to the

16  sexual harassment section?  Next page.

17  BY MS. SHIKUNOV:

18  Q    One second.  I'm trying to find the correct page I wanted

19  to ask you a question about.

20         Okay.  So with regard to the reporting and investigation

21  section, you were asked some questions about that.  Looking at

22  the first word of the third line from the bottom it reads, "The

23  MEF will promptly, appropriately, and with as much

24  confidentiality as possible, investigate any reports of

25  offensive conduct," correct?

 1  A     Correct.

 2  Q     You were invited to a staff meeting where Mr. Roman's

 3  sister was present?

 4  A     Yes.

 5  Q     Where his college buddy was present?

 6  A     Yes.

 7  Q     And where Mr. Fink was present?

 8  A     Yes.

 9  Q     And you were asked to discuss these complaints out in the

10  open at this meeting, correct?

11  A     Correct.

12  Q     You were asked some questions on direct exam about the

13  women in the Forum not trusting you.  Do you have an

14  understanding about why other women who worked for The Middle

15  East Forum didn't trust you?

16  A     Yes.

17  Q     And what is that?

18  A     Because I was HR, and Greg would promote us as like we're

19  like best friends, we're like a team, and then everyone didn't

20  trust me to -- to talk to me.

21  Q     You were asked some questions about going to Atlantic City

22  or the shore -- I might be imposing Atlantic City, I don't

23  recall, so forgive me -- with your colleagues the summer of

24  2019.  Do you remember being asked those questions?

25  A     Yes.

O'BRIEN-275

1  Q    Was Mr. Ebert there with you for the weekend?

2  A    No.  He went home.

3  Q    Okay.

4  A    After he checked us in and dropped us at the liquor -- or

5  took us to the liquor store.

6  Q    Other than -- and I believe you testified to this last

7  week.  Other than meeting Ms. Brady during that check-in and

8  subsequent trip to the liquor store, and Ms. Barbounis for

9  about five minutes in a bar, did he ever meet any of these

10  other women?

11  A    No.

12  Q    Did he ever meet Tricia McNulty?

13  A    No.

14  Q    Did he ever meet Delaney Onchek?

15  A    No.

16  Q    You were asked a lot of questions about you and Mr. Roman

17  being friends.  When were you friendly with Mr. Roman while you

18  worked at the MEF?

19  A    At the beginning more.  I was, you know, trying to be a

20  good friend, have a good relationship with my boss.

21  Q    Were you comfortable when he asked you personal questions

22  about your divorce?

23  A    No.

24  Q    What about with regard to your dating life or

25  relationships?

1  A    Not comfortable.

2  Q    You were asked questions about if you ever got drinks with

3  Greg Roman again after Misconduct.  Did you ever go with him

4  alone after Misconduct?

5  A    No.

6  Q    You were asked questions at the AIPAC conference about

7  staying at the Airbnb.  Why did you stay at the Airbnb?

8  A    We had been drinking.  It was later, and we were going to

9  get an Uber and Greg pushed, and he's loud and he's the boss

10  and he said, "No, you guys stay here."

11  Q    Okay.  And I apologize for jumping around, and I hope that

12  you're keeping -- I'm going quick.  I'm trying to get these

13  folks out of here, so stay with me.

14      With regard to the evening at Misconduct, why did you feel

15  like you need to explain to Mr. Roman that you weren't going to

16  fuck him that night?

17  A    Because he kept suggesting we go back to the office,

18  because he kept talking about personal things, because he had

19  talked about needing a release.

20  Q    And, actually, I'm glad you said that.  So with regard to

21  the language of needing a release, you were asked some

22  questions about that on cross-exam.  That first charge you

23  filed was -- stated what happened that evening generally,

24  correct?

25  A    Correct.

O'BRIEN-277

1  Q    And it read specifically, "Discuss various and appropriate
2  topics unrelated to work, specifically, sex, relationships, and
3  current problems he was having with his wife.  He continuously
4  mentioned he forgot papers at the office and continued to make
5  advances at dinner," correct?
6  A    Correct.
7  Q    You didn't directly quote any of the specific remarks he
8  made in that charge; did you?
9  A    No.
10 Q    Prior to the trip to Israel, Ms. Barbounis worked on
11 flextime, correct?
12 A    Correct.
13 Q    And can you explain what you mean by -- what "flextime"
14 means?
15 A    Well, we were able to work from home if we could.  We
16 could -- well, I could log in.  Actually, I'm not sure if she
17 could.  But, you know, if you needed to go to something for
18 your kids for school or a doctor's appointment, you would just
19 either come in late, work a little later, go in early, leave
20 early, that type of thing.
21 Q    After the trip to Israel, you were directed to document
22 Lisa for any minor infraction, correct?
23 A    Correct.
24 Q    So when she filed that complaint against you on
25 October 30, 2018, would you agree that most of the things she

1  stated in that complaint about you having it out for her,

2  disciplining her in particular, were true?

3  A    Yes.  I was told to document her.

4  Q    With regard to that write-up she made against you, it was

5  discussed that Greg told you he could make this go away.  What

6  did you take that to mean?

7  A    I was so nervous at that point.  I just was trying to get

8  through it without him finding out, and I was just -- I just

9  really was trying to deal with him as little as possible at

10  that point.

11  Q    Okay.  And then you were asked some questions about what

12  happened after the report in November of 2018.  So you were

13  asked some questions specifically about the rumor about your

14  sex life that was being spread.  Was that, to your

15  understanding, being spread in the office in the spring of

16  2019?

17  A    Yes.

18  Q    And did you report that to Dr. Pipes?

19  A    Yes.

20  Q    And was anything done to stop the people that were

21  currently talking about the rumor from discussing it?

22  A    No.  Dr. Pipes said it happened before November 1st, so he

23  wouldn't be dealing with that.

24  Q    And after you complained about that rumor, you were

25  ordered to directly work with Mr. Roman on the audit.

O'BRIEN-279

1  A    Correct.

2  Q    And you had to turn your work-product over to Mr. Roman,

3  correct?

4  A    Correct.

5  Q    Was your work-product published at that point?

6  A    No.

7  Q    Why didn't you want to give Mr. Roman unpublished work-

8  product?

9  A    Because I was afraid he would manipulate it.  I normally

10  gave it an Excel sheet, and I did -- and that's how I was

11  instructed to give it, because it's easier to look at that way.

12   But you can change anything.  I just was afraid for him to

13  have any access to my work because I was afraid he would

14  retaliate because he told us over and over and over again that

15  he would.

16  Q    After the -- following the audit and you complaining about

17  working with him on the audit, you were ordered to work from

18  home, correct?

19  A    That might have been before.  It was -- that -- I was

20  ordered to work from home -- I think I was working from home at

21  that point.

22  Q    During the audit.

23  A    Yes.

24  Q    Were there employees still working from the office during

25  the audit?

O'BRIEN-280

1   A     Yes.

2   Q     Who?

3   A     The directive was that all full-time administrative

4   employees would work from home because -- because they were

5   subletting the office, and so they wanted it to be clean and

6   neat, and they didn't want anybody in there.  So I was the only

7   full-time employee at that point.

8   Q     Were there other employees working from the office?

9   A     Yes.

10  Q     Who?

11  A     Thelma Prosser would go in.  She's part-time, and she had

12  to go in to get the mail, and she would do all of that. And I

13  was instructed that I could go in and get what I needed.

14  Q     Marnie, who was working in the office full-time?

15  A     Thelma Prosser, Gary Gamble would work in the office, and

16  they had hired a new Director of Development, which I don't

17  think I was aware of at the very beginning when -- when I found

18  out that he was working from the office.

19        I went in one day to get checks, and he was there, and he

20  had said that he was -- he was, like, there every day.

21  Q     Okay.  And is the Director of Development a full-time

22  position?

23  A     Yes.

24  Q     And that was a male that was hired into that position?

25  A     Yes.

1   Q    And that was a new employee that was hired into that

2   position.

3   A    Yes.

4   Q    Did you participate in his onboarding?

5   A    No.

6   Q    Were you asked to participate in his interview?

7   A    No.

8   Q    Were you asked to put him in Zenefits or any of the other

9   more --

10  A    I don't recall.

11  Q    -- administrative HR?

12  A    I don't recall if I had to do that.

13  Q    Okay.  You were asked some questions about interviewing

14  for jobs.  Did you have a job interview in February of 2021?

15  A    The --

16  Q    Of this year.  Did you have a job interview in February of

17  this year?

18  A    I'm like -- of this year?

19  Q    Yes.  When you were supposed to go to an IME.

20  A    When I was supposed to what?

21  Q    Go to an IME.  Did you have a job interview?

22  A    I don't understand what you said.  IMA?

23  Q    Did you have a job interview in February of this year,

24  Marnie?

25  A    Yes.

1  Q    Okay.  You indicated that you resigned because you felt
2  pushed out.  What did you mean by that?
3  A    I was no longer -- like when they were hiring for the new
4  positions, normally I would take part in the interviews,
5  reading the resumes.  I wasn't included in that anymore.  I was
6  forced to work at home.
7  Q    Marnie, after the phone call was made to PeopleShare, did
8  you ever hear from PeopleShare again?
9  A    No.
10 Q    With regard to your relationship with Mr. Ebert, is that
11 still a source of stress for you?
12 A    No.  I mean, every relationship is stressful occasionally.
13 Q    Are you still -- have you been able to largely work
14 through the phone calls that were made?
15 A    Yes.
16 Q    You were asked some questions about your damages in this
17 case.  How long would you have been planning to stay at MEF but
18 for the sexual harassment?
19 A    I --
20         MS. DIBIANCA:  Your Honor, I'm going to object.  It's
21 beyond the scope.
22         THE COURT:  It is.
23         MS. SHIKUNOV:  Okay.
24 BY MS. SHIKUNOV:
25 Q    You were asked some questions about a PeopleShare document

O'BRIEN-283

1   that you sent allegedly in 2017.  Other than it being -- saying

2   2017 at the top, do you have any reason to believe that you

3   sent a job application to PeopleShare in 2017?

4   A    No.

5   Q    Is that possibly a clerical error with the date on the

6   document?

7   A    It could be.

8   Q    At the time that you filed the counterclaim, did you

9   believe Mr. Roman had made that call to the recruiter?

10  A    Yes.

11  Q    And as soon as you found out that he didn't make that call

12  to the recruiter, you withdrew that complaint, correct?

13  A    Yes.

14        MS. DIBIANCA:  I'm going to object again.  That's

15  beyond the scope.  I didn't ask about this.

16        MS. SHIKUNOV:  She went way into the counterclaim,

17  Your Honor.  I think this is a fair point of inquiry.

18        THE COURT:  I'll allow it.  I'll allow it.

19  BY MS. SHIKUNOV:

20  Q    Did you believe Lisa when she disclosed to you what Greg

21  did to her in Israel?

22  A    Yes.

23  Q    Do you still believe her?

24  A    Yes.

25  Q    Are you and the other women making up these complains

1   about Mr. Roman?

2   A     No.

3   Q     Are you here today because Greg sexually harassed you and

4   the other female employees at MEF?

5   A     Yes.

6              MS. SHIKUNOV:  I don't have any further questions.

7              THE COURT:  Attorney Dibianca?

8              MS. DIBIANCA:  I have one.

9              THE COURT:  Yes.  Go ahead.

10             MS. DIBIANCA:  If I can see DX30, please.

11  RECROSS-EXAMINATION

12  BY MS. DIBIANCA:

13  Q     Ms. O'Brien, you did not -- you did or did not hear a

14  rumor in the workplace about you after November 1, 2018?  You

15  never heard a rumor -- you never heard a rumor being circulated

16  after November 1, 2018, correct?

17  A     It was being talked about.  That rumor was being talked

18  about.

19  Q     I would say that's the same thing as being circulated.

20  Who was talking about it?

21  A     Ms. Barbounis, and Ms. McNulty had said that Mr. Bennett

22  was talking about it.

23  Q     Okay.  But not Mr. Roman, the Defendant in this case,

24  correct?

25  A     I don't know what he was talking about.

O'BRIEN-285

 1  Q    You have no knowledge that -- or even reason to believe
 2  that he was talking about --
 3  A    I don't know that he was.
 4  Q    Okay.  I'm going to show you DX30.  This is an email
 5  exchange between you and Dr. Pipes.  He is inquiring about the
 6  rumor.  You say here on Wednesday, April 24, 2019, "I have had
 7  minimal interactions with him, Mr. Roman, post-November.  If I
 8  think of anything, I'll let you know."  Did you ever let him
 9  know any -- any other issues that you had you later thought of?
10  A    No.
11  Q    No.  Okay.
12        MS. DIBIANCA:  I have no further questions, Your
13  Honor.

 1                THE COURT:  Ms. Shikunov?

 2                MS. SHIKUNOV:  Nothing on that, Your Honor.

 3                THE COURT:  Okay.  All right.

 4                All right.  Thank you very much.  You may return to

 5     counsel table.

 6                (Whereupon, the witness was excused.)

 7                THE COURT:  That fills out our very busy day, ladies

 8     and gentlemen.  And, again, as always, I'm very grateful and

 9     impressed at how attentive you have been from the -- from the

10     morning until now, 10 minutes after 5:00.

11                MS. SHIKUNOV:  Actually, Your Honor, is Ms. O'Brien

12     permitted to step down?

13                THE COURT:  Yeah.  I did invite her --

14                MS. SHIKUNOV:  Oh, I'm sorry.  I missed that.

15                THE COURT:  Yeah.  I'm sorry, I'm sorry.

16                THE WITNESS:  I'm sorry.

17                MS. SHIKUNOV:  She was making eyes at me, and I

18     didn't -- I didn't want to be disrespectful.  I'm sorry.

19                THE COURT:  So I wish you a good night.  We're going

20     to be back here at 9:30 in the morning unless someone tells me

21     that that's a problem.  Seeing no hands, thank you again.  Have

22     a good evening.  Safe home, and we'll be back here before you

23     know it.  Thank you.

24                DEPUTY STEIN:  All rise.  Court is adjourned.

25                (JURY EXITS COURTROOM.)

 1            (Whereupon, the above-entitled matter went off the
 2   record at 5:11 p.m. and resumed at 5:13 p.m.)
 3            THE COURT:  All right.  We're back on the record.
 4            Counsel, just a few things, if we can, anything
 5   counsel wants to discuss as well.  We finished with Plaintiff
 6   O'Brien's testimony, so I guess I'd ask the Plaintiff, what are
 7   our plans for tomorrow?
 8            MS. SHIKUNOV:  Your Honor, I have -- I have Ms. Brady
 9   here ready to testify in person.  I am going to have Mr. Ebert
10   here ready to participate in person.  Ms. Barbounis, you know,
11   if we got the tech ready to go, I can be ready to have her on
12   tomorrow.
13            I have -- I don't know if we can get much -- through
14   much more than that, but I'll defer to counsel on how long they
15   think that process will be.  That's three witnesses.
16            I can -- I can have Ms. McNulty here tomorrow to be
17   ready to go.  I'm just trying to be courteous to her because
18   she does have a barely 12-week-old baby that she is taking care
19   of, so I'm trying to not have her have to stay the night at the
20   hotel, if I can help it.
21            THE COURT:  How far is she roughly from Allentown?
22            PARTICIPANT:  She lives in New York
23            MS. SHIKUNOV:  She lives in New York.
24            THE COURT:  Oh, in New York.  Yeah.  Just I -- I
25   don't -- that's a tough one.  I don't want to -- those three

1    witnesses may fill the day.  But at the same time, I don't want
2    to send the jury home early, because we did tell them that we
3    were going to try to move every mountain we could to get this
4    done by the end of the day on Wednesday.
5            MS. DIBIANCA:  Right.  And my concern would be that
6    if we're still in Plaintiff's case in chief by Wednesday
7    morning, we're --
8            THE COURT:  Yeah.  That --
9            MS. DIBIANCA:  -- we just don't get enough time.
10           THE COURT:  Yeah.  I think --
11           MS. DIBIANCA:  I mean, certainly, if you want to call
12   her, you know, have her come down first, or whenever she gets
13   here and put her on --
14           THE COURT:  Yeah.  Please --
15           MS. DIBIANCA:  -- but my strong preference --
16           THE COURT:  Please consider that.  I think we need to
17   try to get as many of these witnesses on as possible tomorrow.
18    And, again, it would be -- we didn't -- there was no wasted
19   time today, so don't take from what I'm saying a suggestion
20   that there was, we just want to make sure that we're using
21   every bit of the jurors' time in the most productive way we
22   can.  Okay?
23           And, again, as Ms. Dibianca said, perhaps because she
24   has this home situation, Ms. McNulty can be taken in a
25   different order than had been anticipated.

1          All right?  A couple other things that -- if you --
2     well, first, we still need from counsel -- there were several
3     proposed jury instructions we're looking for.  But that --
4          MS. DIBIANCA:  We're working on those, Your Honor.
5          THE COURT:  All right.  And then, so please see if
6     you can get that to me.  And then, from Plaintiff's side,
7     consider if there is any instruction you want that -- to follow
8     the completion of the Plaintiff's testimony, because she was
9     the last witness for today, so we still have time to do that in
10    the morning if -- if there is anything you want me to consider.
11         MS. SHIKUNOV:  Okay.
12         THE COURT:  All right.
13         MS. SHIKUNOV:  And then, I suppose this is more of a
14    question for Ms. Stein, but would we be able to get
15    Ms. Barbounis on by computer tomorrow?
16         DEPUTY STEIN:  We can.
17         MS. SHIKUNOV:  Okay.  And just procedurally, how is
18    that going to work?  Is she going to show up on each of the
19    individual jurors' screens?
20         THE COURT:  Yes.
21         DEPUTY STEIN:  If that's where you want her.
22         MS. SHIKUNOV:  I guess what is the alternative, a
23    huge screen up here?
24         THE COURT:  It's a screen like that back there.
25         MS. SHIKUNOV:  Yeah.  The individuals I think

1   probably would be better.  And then, do I remain seated, just

2   looking in front of --

3             THE COURT:  I think you can sit or perhaps right from

4   the podium, Ms. Stein?

5             DEPUTY STEIN:  Wherever you want to be, I can make a

6   camera appear directly on you.

7             MS. SHIKUNOV:  Got it.  All right.  Thank you.

8             THE COURT:  The only thing that will be tricky is the

9   exhibits.

10            PARTICIPANT:  That will be a little tricky.

11            THE COURT:  And so we -- it would probably be safest

12   to make sure that the witness has hard copies of those

13   exhibits, if that's something you can do.

14            MS. DIBIANCA:  We cannot do that on our side.  I have

15   -- we don't know what --

16            THE COURT:  Right.  Right.

17            MS. SHIKUNOV:  Can we email her the exhibits in

18   advance?

19            MS. DIBIANCA:  We can't.

20            THE COURT:  No.  That's a good point.  Do you have a

21   suggestion?

22            PARTICIPANT:  A screen share?

23            MS. DIBIANCA:  Is there a share screen?

24            PARTICIPANT:  Yeah.  A screen share function of this?

25    I mean, are you using Zoom?  Webex?  What's the platform?

 1          PARTICPANT:  The screen share function is the part

 2     that we were having a little bit of a problem with.  If we are

 3     -- and I don't know how it would work with a remote camera,

 4     what would we -- a remote camera might not be a great option

 5     either.  That's something I will have to tweak in the morning

 6     once they're back.

 7          THE COURT:  All right.  We're not sure if it will

 8     work, the screen share.  We did do this a number of times

 9     during the heavier pandemic months, and usually -- almost every

10     time it worked.

11          MS. SHIKUNOV:  Could I make a suggestion?  Maybe as a

12     backup, if we could provide to her electronically like a

13     Dropbox lens with all of the exhibits, and then counsel -- then

14     she at least has them electronically.  And if counsel needs to

15     refer to an exhibit, maybe that would be -- because then you

16     don't have to say ahead of time what you're pointing her to or

17     whatever.  She will just have all of the exhibits in the case.

18

19          I'm just trying to brainstorm.  If that's a bad idea,

20     I will --

21          PARTICIPANT:  Judge, if I may?

22          MS. SHIKUNOV:  -- zip it.

23          PARTICIPANT:  My recollection is that if we're

24     showing an exhibit, we would no longer be able to see her, and

25     she would no longer be able to see us.  But we would still be

1   connected by audio.

2            THE COURT:  Okay.

3            PARTICIPANT:  So I don't know if that would be -- if

4   that's the way it goes, is that --

5            MS. DIBIANCA:  Well, it is a little bit of a concern.

6    She was -- during her deposition, which was conducted by --

7   via Zoom, there was some real concern about who she was

8   communicating with during that deposition.

9            THE COURT:  Well, we can -- we can, in a general way,

10  non-accusatory way --

11           MS. DIBIANCA:  Yep.

12           THE COURT:  -- reminder her that she can't -- cannot

13  be -- she cannot be communicating with anybody.  The sequester

14  order applies to all witnesses, whether they're live or video.

15           Well, I -- our IT folks are located in Philadelphia,

16  but they -- they really do a terrific job, and this time we'll

17  be talking to them in the morning early before we get together,

18  and maybe then we can see whether any of these challenges still

19  remain.

20           PARTICIPANT:  Do we -- are we thinking this will be

21  the first witness?  Because another time I heard we were

22  (inaudible).

23           MS. DIBIANCA:  She is not going to be your first

24  witness; is she?

25           MS. SHIKUNOV:  I just don't think it's practical to

 1  have her --

 2          MS. DIBIANCA:  Right.  Agreed.

 3          MS. SHIKUNOV:  -- be my first witness with this stuff

 4  happening.

 5          MS. DIBIANCA:  Right.

 6          MS. SHIKUNOV:  So, no, Ms. --

 7          MS. DIBIANCA:  Just to take some pressure off of her.

 8          MS. SHIKUNOV:  -- Brady is here and was prepared to

 9  go today, so my instinct is to -- Ms. Brady and Mr. Ebert will

10  be here.

11          MS. DIBIANCA:  Yeah.  That way you have some more

12  time.

13          MS. SHIKUNOV:  I would rather get the two of them out

14  of the way before --

15          MS. DIBIANCA:  Yeah.

16          MS. SHIKUNOV:  -- her.

17          MS. DIBIANCA:  I agree.

18          THE COURT:  Okay.

19          PARTICIPANT:  Just wanted a timeframe.   Okay.

20          THE COURT:  I'm sorry.  It's still a bit contingent,

21  but we only -- all of us only learned over the weekend that --

22  that this would be necessary.  And I'm confident we'll get

23  there, just it may take a little bit of patience.

24          MS. DIBIANCA:  Counsel and I did have a conversation

25  earlier today.  I did express my concern that we are going to

1   be running so far over.  Counsel is going to -- Plaintiff's

2   counsel is going to call Dr. Pipes, have some cross, so I

3   suspect that won't be 'til Wednesday.  And then we still have

4   our witnesses to put up, so I -- I don't say that for any

5   reason other than so that the Court isn't feeling like we're --

6   that it's being caught off guard with the jury.

7               I do not want to keep the jury longer than Wednesday.

8    That's not a way to make a jury happy, so I don't want that to

9   occur.  But I want to raise, you know, our Delaware public

10  trial clock is calculating in my mind.  So just to put that out

11  there, that we're --

12              THE COURT:  I appreciate that.

13              MS. DIBIANCA:  -- where we are.

14              THE COURT:  And it has crossed my mind, and I

15  wouldn't be surprised if the jury is doing some math in their

16  head, too.  They heard the opening statements, and Chief Stein

17  said, "Give an overview of what witnesses to expect."  And

18  they're probably counting how many we have done and how many we

19  have to go as well.  We're going to do it -- we're going to

20  give it our best effort.

21              They've been -- as I said to them today, they've -- I

22  mean, they've been an excellent --

23              MS. DIBIANCA:  Yeah.

24              THE COURT:  -- panel and prompt and super attentive

25  and --

```
 1            MS. DIBIANCA:  Maybe we could start on -- at 9:00 the
 2   following day?  I don't remember -- I don't have my list of
 3   where people are driving from, but maybe that's one option.
 4   That's half an hour.  You know, it's not much, but just a
 5   thought.
 6            MS. SHIKUNOV:  But it can make all the difference,
 7   because a half an hour each day adds up.
 8            MS. DIBIANCA:  Right.
 9            THE COURT:  Right.
10            MS. DIBIANCA:  Just a thought.
11            THE COURT:  Okay.
12            MS. DIBIANCA:  Just trying to put something out there
13   for --
14            THE COURT:  We can discuss it.
15            MS. DIBIANCA:  -- ideas.
16            THE COURT:  Good.  Counsel, you'll probably remember
17   from jury selection there's one amongst the panel that --
18            MS. DIBIANCA:  Friday.
19            THE COURT:  -- suggested that Thursday night would be
20   cutting it very close for some travel he has.
21            If and when we get to that point, we may -- we may
22   need to speak to him.
23            MS. DIBIANCA:  Yep.
24            THE COURT:  Okay.
25            MS. DIBIANCA:  We recall that.
```

1            THE COURT:  All right.  Thank you.  Thank you,

2    counsel.  I know it has been a busy day, so -- and you probably

3    have some more work ahead of you this evening.  So thank you

4    very much.  Take care.  Safe travels.

5            (Whereupon, the above-entitled matter went off the

6    record at 5:23 p.m.)

7

8                              *  *  *  *  *

9

<u>C E R T I F I C A T E</u>

I, court approved transcriber, certify that
the foregoing is a correct transcript from the
official electronic sound recording of the proceedings
in the above-entitled matter.


_____          August 3, 2021
     Neal R. Gross

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com